# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
### AT CHARLESTON

WEST VIRGINIA RIVERS COALITION, INC.,

               Plaintiff,

   v.

THE CHEMOURS COMPANY FC, LLC,

               Defendant.

Civil Action No. 2:24-cv-00701

**DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................ 4

ARGUMENT .................................................................................................................... 8

   I.    **Plaintiff Does Not Have Article III Standing Because an Injunction Would Not Redress Plaintiff's Alleged Injury.** .............................................................................. 8

   II.   **A Preliminary Injunction Is Not Appropriate.** ............................................. 11

      A.   **Legal Standard – Preliminary Injunctions** ............................................. 11

      B.   **Irreparable Harm Will Not Befall Plaintiff in the Absence of a Preliminary Injunction Because Water Samples Already Show No Harm.** ....................................... 12

      C.   **A Preliminary Injunction Is Not in the Public Interest Because an Injunction Will Negatively Affect Washington Works's Employees, Customers, and the Public.** ........ 15

      D.   **The Balance of the Equities Weighs in Chemours' Favor Because Plaintiff Faces No Harm in the Absence of an Injunction, and an Injunction Would Burden Chemours, Its Employees, and Its Customers.** ................................................... 18

      E.   **Plaintiff Has Failed to Show Likelihood of Success on the Merits Because Permanent Injunctive Relief Is Unlikely Where Chemours, EPA, and WVDEP Are Already Addressing Exceedances.** ..................................................................... 19

   CONCLUSION ........................................................................................................ 20

Defendant The Chemours Company FC, LLC ("Chemours") submits this Memorandum of Law in opposition to West Virginia Rivers Coalition's Motion for a Preliminary Injunction. Also submitted herewith are the Declarations of Catherine Boston, Andrew Hartten, James Hollingsworth, and Katelyn R. Walck. Chemours respectfully requests that the Court deny Plaintiff's motion.

## <u>INTRODUCTION</u>

With speculative assertions of harms that do not exist, Plaintiff seeks extraordinary relief that would dramatically undermine Chemours' integral role in the national and global supply chain. Yes, Chemours has had exceedances of its permit discharge limits for HFPO-DA, a PFAS, primarily during wet weather conditions. *But* three overarching points bear special emphasis:

- Chemours has been working—and will continue to work—with its regulators, the Environmental Protection Agency ("EPA") and the West Virginia Department of Environmental Protection ("WVDEP"), neither of which has sought emergency relief, to address these permit exceedances. Most importantly, Chemours consented to a 2023 EPA Administrative Order on Consent ("AOC"), which is designed to address, and is addressing, the precise exceedances that Plaintiff complains about. An application for a new water discharge permit, which will achieve further HFPO-DA reductions, is pending before and being actively processed by WVDEP.

- *Second*, recent sampling data show that the concentration of HFPO-DA is at indisputably safe levels in the Ohio River and in downstream providers' treated water. Plaintiff's member who is relied upon for associational standing gets her drinking water not from the Ohio River but from a groundwater-sourced public water system that already has treatment in place, provided by Chemours, which delivers safe, clean water.

- *Third*, Plaintiff's motion makes clear that the fundamental reason Plaintiff believes an emergency now exists—that is, the reason Plaintiff is asking this Court to short-circuit the ongoing administrative process despite the fact that the same environmental conditions existed a year ago—is the new Federal Administration.  ECF No. 8 at 8 ("the Trump EPA froze all environmental enforcement actions").  A change in Administration does not create an emergency for Plaintiff's purpose in this matter or change Chemours' commitment to completing the AOC.

Turning to the specifics of the relief being sought, a preliminary injunction is inappropriate for a number of reasons.

*First*, Plaintiff does not have standing because the relief it seeks will not remedy its alleged injury.  The sought-after injunction applies to Outlets 002 and 005, channels that discharge wastewater from Washington Works to the Ohio River.  But, as referenced above, Plaintiff's member Charlise Robinson (relied on by Plaintiff to establish standing) gets her household water *not from the Ohio River* but from the Lubeck Public Services District—which (i) uses groundwater wells and (ii) is already utilizing filtration provided by Chemours which treats for PFAS all the water it delivers to Ms. Robinson.

*Second*, Plaintiff will not suffer irreparable harm without an injunction.  The three-year delay between Chemours' first permit violation and Plaintiff's preliminary-injunction motion is telling.  Moreover, EPA promulgated in 2024 a Maximum Contaminant Level ("MCL") for HFPO-DA under the Safe Drinking Water Act.  That limit is intended to protect public health.  Crucially, HFPO-DA levels in Plaintiff's member's water supply are ***under EPA's Maximum Contaminant Level***.  Additionally, Chemours has actively been working for six years to reduce HFPO-DA in its effluent and to resolve these issues.  The company has installed abatement projects, one of which

was just completed in February 2025.  And as part of the 2023 AOC with EPA that Chemours voluntarily agreed to, the company has proposed a compliance plan with further concrete abatement projects that would, once approved, bring the company into compliance, potentially in less than two years.

*Third*, an injunction works against the public interest.  Washington Works is the workplace of hundreds of employees and contractors.  One form of Plaintiff's requested relief, reducing production (which Plaintiff has not demonstrated would achieve permit limits in wet weather), would scale down Washington Works's operations, disrupting workers' livelihoods.  Scaled-down operations would also damage the medical-device, pharmaceutical, semiconductor, communications, and electric-vehicle sectors, which rely on Chemours to supply essential materials used to produce crucial products for those industries.  Those products make modern society—from open heart surgery to electric vehicles—possible.  The other form of Plaintiff's desired relief, massive off-site disposal of wastewater via a continuous supply of tanker trucks or rail cars moving around the country, is simply impossible.  The fact that Plaintiff suggests such a fanciful option is a reminder of why evaluation of compliance options should be left to regulators.

*Fourth*, for the same reasons that underlie the irreparable-harm and public-interest prongs, the balance of equities strongly weighs in Chemours' favor.  One of Plaintiff's proposed solutions would have massive economic impact on Chemours, the community surrounding Washington Works, and the national and global economies more generally.  The other is simply not possible.  Neither of Plaintiff's proposals would address the reality that Chemours' HFPO-DA permit exceedances from Outlets 002 and 005 are heavily correlated with precipitation events.  In contrast, Chemours' plan to come into compliance pursuant to its AOC with EPA will address Plaintiff's concern in an orderly, achievable manner.

*Finally*, Plaintiff has failed to show likelihood of success on the merits. Plaintiff must show that it is likely to succeed in pursuing its sought-after relief in its Complaint, including showing standing and entitlement to a permanent injunction. *See* Compl. at 11 ("Relief Requested"). As noted, Chemours and EPA are already administering an AOC process to resolve permit exceedances. Plaintiff has failed to explain why it is likely to receive a permanent injunction given this AOC process and Chemours' ongoing efforts to reduce HFPO-DA concentrations in discharges, including through its submitted water discharge permit revision.

## **BACKGROUND**

Plaintiff has long known of this case's facts and only felt that a complaint was necessary and that injunctive relief was urgent following the 2024 Presidential election. Plaintiff provided its citizen suit notice letter in April 2024. It filed its Complaint on December 5, 2024, served the Complaint on January 9, 2025, and moved for a preliminary injunction on February 25, 2025. ECF Nos. 1, 7. Plaintiff seeks declaratory and injunctive relief and civil penalties, alleging that Chemours violated the Federal Clean Water Act at its Washington Works facility. Compl. ¶ 1 (hereinafter ECF No. 1). Plaintiff principally asserts that Chemours discharged per- and polyfluoroalkyl substances ("PFAS") from four Washington Works outlets to the Ohio River in excess of limits in Chemours' National Pollutant Discharge Elimination System ("NPDES") Permit effective September 2018. ECF No. 1 ¶¶ 26, 31–35; ECF No. 7-6. The Permit sets effluent limits on two PFAS compounds, PFOA and HFPO-DA, which progressively become more stringent under a prescribed schedule. *See* ECF No. 7-6 at 7, 12, 16–17, 21–22, 25. Plaintiff alleges that Chemours first exceeded the most stringent HFPO-DA and PFOA limits—which became effective in January 2022—in February 2022 and July 2022, respectively. ECF No. 1 ¶ 35; ECF No. 1-1 at 2–3.

4

Plaintiff now claims that it will suffer irreparable harm unless the Court issues a preliminary injunction "prohibit[ing] Chemours from violating its permit limits for HFPO-DA at Outlets 002 and 005." ECF No. 8 at 20. According to Plaintiff, Chemours must either (1) scale down operations that generate process wastewater containing HFPO-DA or (2) transport the wastewater away from the site for disposal. *Id.*

<u>Chemours Identified the Possible Compliance Issues and Has Consistently Worked to Meet the 2018 NPDES Permit's PFAS Limits</u>

Chemours' predecessor, DuPont, voluntarily transitioned in 2013 from the use of PFOA to HFPO-DA as a polymer processing aid at Washington Works under a Voluntary Stewardship Program organized by EPA to reduce PFOA usage. Ex. 1, Hollingsworth Decl. ¶ 11. HFPO-DA was chosen because it has a more favorable toxicological profile than PFOA. *Id.* at ¶ 10. EPA approved the manufacture of HFPO-DA in 2009 under the Toxic Substances Control Act. *Id.* When it switched from using PFOA to HFPO-DA, DuPont entered into a Consent Order with WVDEP. The Consent Order imposed a limit on the amount of HFPO-DA that Washington Works could discharge to the Ohio River. DuPont and Chemours complied with that limit.

Complying with the 2018 Permit's much lower HFPO-DA limits has proven to be technologically challenging, particularly for stormwater. The most stringent limits took effect January 1, 2022. *See, e.g.*, Ex. 2, Nov. 2021 Email to K. Emery. The limits prohibit Chemours from discharging effluent with HFPO-DA concentrations greater than 2.3 micrograms per liter from each of Outlets 002 and 005 on any given day. *See* ECF No. 7-6 at 12, 22. The new limits are a significant decrease from the original allowable concentrations. Prior to January 2022, Chemours' daily HFPO-DA limit for Outlet 002 was 32 micrograms per liter, 14 times greater

than the new benchmark. *Id.* at 12. Chemours' daily HFPO-DA limit for Outlet 005 was 43 micrograms per liter, 18 times greater than the new limit. *Id.* at 22.

Chemours has been proactive in working to meet the new limits. The company promptly identified PFAS abatement projects after issuance of the Permit, proposing treatment systems for Outlets 001, 002, 003, 005, and 006. Ex. 1, ¶ 15. Within weeks of WVDEP issuing the 2018 Permit, Chemours hired consultant AECOM to identify abatement projects to meet the effluent limits. *Id.* at ¶ 16. By 2019, Chemours started designing abatement projects based on AECOM's advice. *Id.* at ¶ 17. By 2020, Chemours undertook a formal progress review and determined based on sampling results to stop one project and move forward with five projects. *Id.* at ¶ 18. Chemours regularly provided status updates to WVDEP summarizing the abatement efforts. *Id.* at ¶ 19. By the end of 2020, the company estimated that it would achieve compliance with the upcoming PFOA limits. *Id.* at ¶ 20. Less certain was compliance, specifically during wet weather, with the HFPO-DA limits. *Id.* at ¶ 21.

Chemours notified WVDEP in April 2021 that complying with the HFPO-DA limits during stormwater events by September 2021 (the original effective date for the most stringent limits) would not be attainable. *Id.* at ¶ 22. Chemours sought a compliance-deadline extension. *Id.* at ¶ 21. The company further explained that the COVID-19 pandemic had caused unexpected delays from equipment suppliers beyond Chemours' control. *Id.* at ¶¶ 21, 23–24. In light of such challenges, Chemours received a deadline extension to December 31, 2021. *Id.* at ¶ 26.

Meanwhile, Chemours continued its abatement efforts, *id.* at ¶ 27, meeting with WVDEP and EPA in September, October, and December 2021. The company reiterated that it needed additional time beyond December 31st to implement HFPO-DA abatement systems and to meet the stringent HFPO-DA restrictions. Ex. 3, Sept. 2021 "Chemours Washington Works NPDES

6

Permit" Presentation at 5.  Air deposition, the settling of HFPO-DA emissions to the ground, posed challenges in wet weather.  Ex. 1, ¶ 25.  Chemours assured the agencies that it recognized—and was addressing—challenges from air deposition and wet weather by installing tertiary air emissions abatement systems to further reduce air deposition.  Ex. 3 at 5.  Without a compliance-deadline extension, Chemours forecasted that it would violate the HFPO-DA limits taking effect January 1, 2022, despite the company's best efforts to come into compliance.  Ex. 1, ¶ 30.

As Chemours anticipated, discharges from Washington Works first exceeded the new HFPO-DA Permit limits in early February 2022 after days of rain and snowmelt.  Ex. 4, Feb. 2022 Letter to WVDEP Regarding Exceedances.  The company promptly informed the appropriate government officials about the exceedances.  *Id.*

After continued discussion in 2022 and early 2023, EPA and Chemours reached agreement in April 2023 on the AOC "to address the violations."  ECF No. 7-18 at 11.  The AOC prescribes a process for Chemours to come into compliance with the Clean Water Act and the Permit.  *Id.* at 8–10.  It requires Chemours to (1) implement a sampling plan characterizing PFAS in Washington Works's stormwater and wastewater (which is completed), (2) submit to EPA an Alternatives Analysis and Implementation Plan ("Plan") within 120 days to ensure discharges stay within Permit limits, and (3) implement the plan under a set schedule once EPA approves it.  *Id.*

Chemours submitted its Plan to EPA in August 2023 with its proposal for coming into compliance with the Permit.  ECF No. 7-16.  There was no formal response from EPA until December 24, 2024, when it, in consultation with WVDEP, conditionally approved parts of the Plan and rejected other parts.  Ex. 1, ¶ 34.  The parts rejected were based on proposed management of sudden volumes of contaminated stormwater through infiltration into a hydrologically contained groundwater aquifer followed by subsequent treatment.  ECF No. 7-19.  EPA requested a revised

plan within 30 days. *Id.* at 3. Accordingly, Chemours submitted a revised Plan in January 2025, which did not rely on groundwater infiltration. Ex. 5, Revised Plan Letter. Chemours also sent a follow-up letter to EPA on March 4, 2025, asking for EPA's expedited approval of Chemours' revised Plan. Ex. 1, ¶ 34. Chemours committed to begin work promptly upon EPA approval of the Plan, expecting to finish within two years. *Id.* at ¶ 34, Attachment A ("We ask that you promptly approve our submission . . . so that Chemours, WVDEP and EPA can move forward expeditiously with . . . implementing the projects identified in the Plan"). The company now awaits EPA's response. EPA has expressed an intent to finalize the Plan quickly, stating in its December 2024 letter that it wishes "[t]o avoid continual revisions of the Plan." ECF No. 7-19 at 3. The Plan's proposed projects are expected to bring the company into compliance with the 2018 Permit and to reduce HFPO-DA levels even further than currently required. *See* Ex. 5.

While Chemours has been actively working to resolve the exceedances with EPA, it also has submitted to WVDEP a NPDES Permit renewal application. Ex. 1, ¶ 36. The company submitted the initial application on February 24, 2023 and revised the application in December 2024 to align it with the proposed Plan. *See* ECF Nos. 7-3, 7-4.

Chemours' efforts over the last six years have resulted in new abatement technology installed at Washington Works. Recently, Chemours received WVDEP's authorization to implement the B-22 Sump Treatment Project, a project that further reduces HFPO-DA concentrations in Outfall 005 discharges. Ex. 6, May 2024 Consent Order. The B-22 Sump Treatment Project became operational in February 2025. Ex. 1, ¶ 35.

## ARGUMENT

### I.    Plaintiff Does Not Have Article III Standing Because an Injunction Would Not Redress Plaintiff's Alleged Injury.

Plaintiff is not properly before the Court. Sampling analyses of water downstream of

Washington Works show that no harm is occurring, despite Plaintiff's insistence that imminent injury will befall it without an injunction. *Compare* Ex. 7, Boston Decl. ¶¶ 12, 20–22, 27 *with* ECF No. 8. Moreover, the desired relief—which pertains specifically to Outlets 002 and 005— will not cure Plaintiff's speculative injury. ECF No. 8 at 20. The water provider noted in Plaintiff's motion gets its water from the groundwater, not directly from the Ohio River where Outlets 002 and 005 discharge effluent. Ex. 8, Hartten Decl. ¶ 18; ECF No. 1 at ¶¶ 32–33.

Under Article III of the Constitution, a plaintiff must establish standing to sue for each form of relief sought. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992); *Jonathan R. v. Morrisey*, No. 3:19-cv-00710, 2025 WL 655811, at *2 (S.D.W. Va. Feb. 28, 2025). Plaintiff is an organization, which may have standing to sue based on injury to itself or as the representative of its members who have been harmed. *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 155 (4th Cir. 2000). Here, Plaintiff purports to represent its members. ECF No. 8 at 8–9. An organization has representational standing when, *inter alia*, at least one of its members has individual Article III standing. *Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 181 (2000). To have such standing, a member must show that she "suffered or [is] imminently threatened with a concrete and particularized 'injury in fact' that is fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable judicial decision." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125 (2014).

The redressability element requires that it be likely, not merely speculative, that a favorable decision will remedy the alleged injury. *Lujan*, 504 U.S. at 561. "To determine whether an injury is redressable, a court will consider the relationship between 'the judicial relief requested' and the 'injury' suffered." *California v. Texas*, 593 U.S. 659, 671 (2021). Notably, "[i]n environmental cases, the 'relevant showing for purposes of Article III standing . . . is not injury to the environment

but injury to the plaintiff.'" *Ohio Valley Env't Coal., Inc. v. Marfork Coal Co.*, 966 F. Supp. 2d 667, 672–73 (S.D.W. Va. 2013).

Lastly, Plaintiff cannot rely on statutory standing alone to bypass the Article III standing requirement. The Supreme Court abrogated the view that the violation of a statutory right "automatically satisfies the injury-in-fact requirement whenever a statute . . . authorize[s] [a] person to sue to vindicate that right. Article III standing requires a concrete injury even in the context of a statutory violation." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016).

Here, Plaintiff has moved for a preliminary injunction as a representative of its member, Charlise Robinson, and must show that Ms. Robinson's alleged injury will likely be redressed by the sought-after relief. ECF No. 8 at 8–9; *Lujan*, 504 U.S. at 561. Ms. Robinson's alleged injury is fear of PFAS exposure from her household water. ECF No. 8 at 8–9. But Ms. Robinson gets her water from the Lubeck Public Services District ("Lubeck"), which in turn gets its water from groundwater, not directly from the Ohio River where Chemours discharges its effluent. ECF No. 8 at 8; Ex. 8, ¶ 18 (referring to the "Lubeck well field"). Moreover, Lubeck already has a granular activated carbon filtration system to filter out PFAS. Ex. 8, ¶¶ 10, 24, 27. Accordingly, Ms. Robinson suffers no injury from direct discharge from the site's outlets, and any alleged harm is not redressable by the injunction sought.[1]

To elaborate, although river water containing Washington Works's discharges passes along the river edge near Lubeck's well field, the groundwater supplying Lubeck's system contains historical PFAS contamination presumably from permitted site emissions as well as other sources

---

[1] If Ms. Robinson alleges a medical condition resulting from past PFOA exposure, she can seek redress under the *Leach* Settlement Agreement, notwithstanding that the multi-district litigation established for such claims was recently dissolved. ECF No. 7-20 at ¶ 4; *In re: E.I. du Pont de Nemours & Co. C-8 Pers. Inj. Litig.*, No. 2:13-md-2433, 2025 WL 474225 (S.D. Ohio Feb. 12, 2025).

to the Ohio River. *Id.* at ¶ 18. Thus, PFAS compounds, including PFOA and HFPO-DA, reach the groundwater supplying Lubeck slowly over time as they migrate through soil. *Id.*

Because of that existing contamination, DuPont entered into a settlement in 2005 that required it to install a granular activated carbon treatment system at Lubeck. *Id.* at ¶ 10. The treatment system became operational in June 2007, and pursuant to an agreement with Lubeck, Chemours, as DuPont's successor, has monitored and maintained the filtration system monthly. *Id.* at ¶¶ 24, 27. When Chemours monitors the system, it analyzes samples for 18 PFAS, including HFPO-DA. *Id.* at ¶ 28. Based on 2023 and 2024 samples, Lubeck's treated water has annual average HFPO-DA concentrations well below EPA's 10-nanograms-per-liter MCL for HFPO-DA. *See* Ex. 7, ¶¶ 20, 27; 40 C.F.R. § 141.61(c)(2). The MCL is a conservative limit designed to protect public health. Ex. 7, ¶ 15. (For a full explanation of why there are no potential adverse human health effects from HFPO-DA in Lubeck's system, see generally Exhibit 7, a toxicology analysis from Catherine Boston, a board-certified toxicologist with over fifteen years of experience.[2])

Plaintiff has thus failed to show injury in fact and redressability and, by extension, standing to seek a preliminary injunction.

## II.　A Preliminary Injunction Is Not Appropriate.

### A. Legal Standard – Preliminary Injunctions

A preliminary injunction is an extraordinary remedy. *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017). The burden on the party seeking a preliminary injunction is "exceedingly high." *Mahmoud v. McKnight*, 102 F.4th 191, 203 (4th Cir. 2024). To obtain a preliminary injunction, Plaintiff must show that (1) it is likely to succeed on the merits; (2) it is likely to suffer

---

[2] Chemours acknowledges that, in the Spring of 2024, it discovered a valve malfunction in the Lubeck filtration system, which it promptly fixed and now systematically monitors. Ex. 8, ¶¶ 32–38. The short-term spike in HFPO-DA was not of a sufficient duration or magnitude to result in a risk to human health. Ex. 7, ¶¶ 23–27.

irreparable harm if preliminary relief is not granted; (3) the balance of equities favors it; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Each of the *Winter* factors must be established independently. *Pashby v. Delia*, 709 F.3d 307, 321 (4th Cir. 2013); *USA Farm Labor, Inc. v. Micone*, No. 23-2108, 2025 WL 586339, at *4 (4th Cir. Feb. 24, 2025) (same). Plaintiff's failure to satisfy any one of the factors permits the Court to deny an injunction without evaluating the remaining factors. *Vitkus v. Blinken*, 79 F.4th 352, 361 (4th Cir. 2023). Plaintiff has failed to demonstrate all four prongs.

**B. Irreparable Harm Will Not Befall Plaintiff in the Absence of a Preliminary Injunction Because Water Samples Already Show No Harm.**

Plaintiff attempts to skirt its obligation to show that it will suffer irreparable harm without an injunction and suggests that showing injury to "the environment" and to "the general public interest" suffices to meet its irreparable-harm burden. ECF No. 8 at 13. Plaintiff is incorrect. *See Courtland Co. v. Union Carbide Corp.*, No. 2:21-cv-00101, 2021 WL 1255416, at *24–25 (S.D.W. Va. Apr. 5, 2021) (holding that a showing of environmental harm, without a corresponding showing "that the plaintiff itself will be irreparably harmed," is not enough to secure a preliminary injunction). Thus, Plaintiff must specifically show irreparable harm to itself. The closest Plaintiff gets is a statement about one of its members. Plaintiff states, "violations of th[e] [permit] limit [for HFPO-DA] will cause irreparable harm to the designated use of the Ohio River as a water source for Plaintiff's member." ECF No. 8 at 14–15. Because the only member that Plaintiff names in its Memorandum of Law is Charlise Robinson, *see* ECF No. 8, Chemours assumes that the reference to "Plaintiff's member" is a reference to Ms. Robinson. For several reasons, Plaintiff has failed to show that Ms. Robinson, and the West Virginia Rivers Coalition more broadly, will suffer irreparable harm without injunctive relief.

*First*, Chemours already monitors and maintains granular activated carbon filtration systems at Lubeck, Ms. Robinson's water supplier. Ex. 8, ¶ 24. Samples of Lubeck's treated water from 2023 and 2024 show the water's annual average HFPO-DA concentrations are well below 10 nanograms per liter. Ex. 7, ¶¶ 20, 27. The MCL for HFPO-DA in treated water that EPA established in 2024 for protecting human health is 10 nanograms per liter (measured in annual averages). *Id.* at ¶¶ 15, 17; 40 C.F.R. § 141.61(c)(2). Plaintiff, by reference to Ms. Robinson, is therefore claiming that it will suffer irreparable harm without immediate injunctive relief *even though Ms. Robinson's treated water is already under the 10-nanograms-per-liter limit intended to protect public health*. Moreover, when EPA established the HFPO-DA level in 2024, it gave public water systems five years—until 2029—to meet the limit. Far from imposing irreparable harm, the water that Ms. Robinson drinks is currently compliant with contaminant levels that do not become legally enforceable for another *four years*.

*Second*, the annual average concentration of HFPO-DA in the Ohio River's water just downstream of Washington Works, too, is below the MCL—at somewhere around 1.9 nanograms per liter to 3.1 nanograms per liter. Ex. 7, ¶¶ 21–22. Accordingly, the evidence refutes Plaintiff's contention that Chemours' discharges are endangering the Ohio River as a drinking water source.

*Third*, Chemours, EPA, and WVDEP are, and have been, working to reduce HFPO-DA concentrations in Washington Works's effluent. Ex. 1, ¶¶ 15–19, 22, 27–29, 32–36. Most recently, the B-22 Sump Treatment Project became operational in February 2025. *Id.* at ¶ 35. Additionally, Chemours, EPA, and WVDEP are advancing the Plan required under the AOC between Chemours and EPA; the Plan's project proposals will bring the company into compliance with its 2018 Permit limits. *Id.* at ¶¶ 32–34. In short, various projects and processes are already underway to address the Permit exceedances that occur primarily during wet weather.

*Fourth*, Plaintiff waited years to bring this action and to move for an injunction, which undermines its claim that irreparable harm will befall Plaintiff without immediate relief. Plaintiff alleges that Chemours first exceeded the most stringent HFPO-DA Permit limits in February 2022. ECF No. 1 ¶ 35; ECF No. 1-1 at 2. Plaintiff then waited 34 months—nearly three years—to file its Complaint. ECF No. 1. Plaintiff then waited two and a half months to file its preliminary-injunction motion. ECF No. 7; *see Mary Ferrell Found., Inc. v. Biden*, No. 22-cv-06176-RS, 2023 WL 4551066, at *10 (N.D. Cal. July 14, 2023) (denying preliminary-injunction motion where movant "waited years . . . to file suit and did not move for a preliminary injunction until several months later"). Plaintiff admits that a primary motivation for bringing this action is not any alleged environmental harm, but a speculative fear that the new Administration will not resolve Chemours' exceedances. *See* ECF No. 8 at 8. Plaintiff's fear is not only an insufficient basis for showing irreparable harm, but is also baseless given that Chemours is continuing to work with EPA and WVDEP to install projects that will achieve compliance. *See* Ex. 1, ¶ 34 (Attachment A).

Plaintiff additionally refers to two public water systems downstream of Washington Works: the Greater Cincinnati Water Works and a Louisville, Kentucky system. ECF No. 8 at 4–5, 15. Plaintiff does not rely on the Cincinnati or Louisville systems to establish standing. *See generally id.* Instead, Plaintiff asserts that the Cincinnati and Louisville systems have detected increased HFPO-DA levels in recent months, levels that they allege "correspond to" Washington Work's HFPO-DA discharges. *Id.* at 4–5.

Cincinnati and Louisville are urban areas hundreds of miles downstream from Washington Works, as Plaintiff concedes. *Id.* Despite the 270-mile and 400-mile gaps between Washington Works and these systems, Plaintiff does not offer a fate-and-transport expert or analysis that explains how, despite the long distance, there would seem to be no dilution, but rather

concentration, of HFPO-DA in the River. *See generally id.* In other words, Plaintiff offers no explanation other than conjecture correlating Washington Works's wastewater discharges and the systems' HFPO-DA detections hundreds of miles downriver.

Furthermore, both Cincinnati and Louisville have equipment that removes contaminants, including PFAS, to levels below EPA's HFPO-DA MCL. Cincinnati's 2024 Water Quality Report shows HFPO-DA levels in finished water between non-detect and 6 nanograms per liter. *See* https://www.cincinnati-oh.gov/water/water-quality-and-treatment/water-quality-reports/2024-water-quality-report-updated-march-2025/ at 7–8. Similarly, Louisville's communications to customers state that "current research shows levels of PFAS that are below the EPA's proposed regulation." *See* https://louisvillewater.com/your-water/water-quality/pfas/. Finally, the Cincinnati and Louisville systems, and the other drinking water systems along the Ohio River that Plaintiff mentions in footnote 12 of its motion, are members of a defined class of nationwide water utilities that settled drinking water-related claims against Chemours as well as other co-defendants. This settlement provides payment for future water treatment costs at eligible systems unless the individual system chose to opt out. *See Aqueous Film-Forming Foam (AFFF) Prods. Liab. Litig. (MDL 2873)*, Master Dkt. No. 2:18-MN-2873-RMG, 2024 WL 489326 (D.S.C. Feb. 8, 2024) (discussing settlement agreements in the MDL).

### C. A Preliminary Injunction Is Not in the Public Interest Because an Injunction Will Negatively Affect Washington Works's Employees, Customers, and the Public.

The injunction sought is not in the public interest for multiple reasons. Plaintiff proposes two forms of injunctive relief: (1) "reducing the production that generates process wastewater containing HFPO-DA" or (2) "sending that wastewater off-site for disposal." ECF No. 8 at 20.

The second proposal is simply not feasible. Ex. 1, ¶¶ 80–84. Plaintiff compares apples to oranges, suggesting that Chemours could transport wastewater off-site because the company has

already done so for process wastewater at its North Carolina-based Fayetteville Works facility. ECF No. 8 at 7. When Chemours began transporting process wastewater offsite from Fayetteville Works, it needed about 10 trucks daily, from dawn to dusk, to haul the process wastewater to a deep well in Texas. *See* Ex. 1, ¶ 84. In contrast, Washington Works would require more than 884 trucks or 221 rail cars to haul its approximately 4.6 million gallons of process wastewater generated each day. *Id.* at ¶ 83. The trucks and rail cars would need to move the wastewater to an off-site facility, likely at great distance, taking days to return. *See id.* at ¶¶ 81–84. Washington Works is not constructed to allow for such processing, and there would be neither enough trucks and rail cars available nor hours in the day to undertake the project. *Id.* Putting aside the infeasibility of hiring thousands of trucks or hundreds of rail cars daily, the traffic impacts—and air-pollution impacts from vehicle emissions—would be substantial. *See Coal. to March on the RNC v. City of Milwaukee*, No. 24-cv-0704-bhl, 2024 WL 3358149, at *21 (E.D. Wis. July 8, 2024) (denying a preliminary injunction in part because an injunction would put at risk "orderly traffic regulation").

As off-site disposal is not feasible, the only remaining proposal proffered by Plaintiff is reducing production. *See* ECF No. 8 at 20. Washington Works is the largest chemical manufacturing facility in West Virginia, employing over 400 employees, and 148 contractors, in its fluoropolymer processes alone. *See* Ex. 1, ¶ 86. Scaling down production will reduce the demand for labor, thus reducing jobs. *Id.* Substantially trimming such a large facility's operations could harm Wood County and the local community's interests in maintaining employment and preserving job opportunities. *See Micone*, 2025 WL 586339, at *4–5 (affirming the denial of a preliminary injunction that, if granted, would have affected workers' wages).

*Finally*, Washington Works is not only important to Wood County, West Virginia; it also makes products that are critical to the United States. The processing units at issue—the PFA Line

1, FEP, PTFE Fine Powder, and PTFE Granular operations—create vital products for the medical-device, electric-vehicle, and semiconductor-manufacturing sectors, to name a few. Ex. 1, ¶¶ 38–79. Washington Works is the only facility in the country that produces Perfluoroalkoxy ("PFA"), a product needed for chip fabrication at all semiconductor manufacturing facilities. Ex. 9, Walck Decl. ¶¶ 9–11. The domestic semiconductor industry relies on the facility's PFA production. *Id.* at ¶ 16. An injunction affecting Outlets 002 and 005 would disrupt the PFA operations; a shutdown of those operations would cause an immediate shortage of multiple kilotons of PFA per year in the semiconductor market—impacting national security and the economy. *Id.* at ¶¶ 11, 17. Washington Works also produces FEP, a material inserted into medical devices including pharmaceutical stoppers, syringe plungers, and inhalers, and PTFE, which is used in medical guide catheters that are essential for performing minimally invasive surgeries. Ex. 1, ¶¶ 47–48, 54–56, 58–60, 67–69. Injunctive relief will inevitably disrupt the supply of such products, putting at risk people who need FEP-equipped devices for their health or would otherwise need to undergo riskier surgical procedures should PTFE-coated guide catheters become less accessible. *Id.* at ¶¶ 58–60, 69; *See Hybritech Inc. v. Abbott Lab'ys*, No. CV 86-7461/AK (PX), 1987 WL 123997, at *21 (C.D. Cal. July 14, 1987) (noting that an injunction impairing the supply of medical test kits would not be in the public interest).

Plaintiff omits key considerations in making its public-interest argument. An injunction, Plaintiff argues, would serve the public interest by "[p]rotecting water quality," "[p]rotecting human health," and "strengthen[ing] the state's economy." ECF No. 8 at 18–19. Not only is there no threat to human health given that the levels in any drinking water are below the MCLs, scaling down operations at the State's largest chemical manufacturing plant is likely to harm the State's

economy: reduced operations at the facility means reduced labor demand, which in turn means fewer jobs and overall less spending in the State. *See, e.g.*, Ex. 9, ¶ 19; Ex. 1, ¶ 86.

### D. The Balance of the Equities Weighs in Chemours' Favor Because Plaintiff Faces No Harm in the Absence of an Injunction, and an Injunction Would Burden Chemours, Its Employees, and Its Customers.

The harm to Chemours from a preliminary injunction outweighs any harm to Plaintiff from the absence of an injunction—especially in light of the demonstrated lack of harm here. *See* Section II.B. above. To evaluate the balance of the equities, courts weigh potential harm to the movant in the absence of injunctive relief against potential harm to the nonmovant from an injunction. *See Mountain Valley Pipeline, LLC v. W. Pocahontas Props. Ltd. P'ship*, 918 F.3d 353, 366 (4th Cir. 2019); *Courtland Co.*, 2021 WL 1255416, at *26 (same).

In *Courtland*, the balance-of-equities analysis weighed in the nonmovant's favor. *Id.* at *27. There, a property owner brought a Clean Water Act citizen suit against its neighbor, alleging that the neighbor illegally discharged contaminants to navigable waters. *Id.* at *1–3. The claimant moved for a temporary restraining order pertaining to the discharges. *Id.* at *6. The court reasoned that, on one hand, the movant's property allegedly contained "somewhere between 15 and 70 years' worth" of contamination from the neighbor's discharges, so any additional harm to the movant in the absence of temporary relief would "seem[] to pale in comparison" and would be "difficult to estimate." *Id.* at *27. On the other hand, the movant's desired restraining order would have forced the neighbor to swiftly eliminate its discharges, despite the fact that "developing . . . a comprehensive study and plan to eliminate and remediate such discharges would require much more time." *Id.* The equities, this Court held, tipped in the nonmovant's favor. *Id.*

Here, Plaintiff's insistence that immediate injunctive relief is warranted is not supported: sampling data show that the Lubeck system's treated water (which is treated by Chemours) and the Ohio River's water just downstream of Washington Works are both already under the EPA's

10-nanograms-per-liter MCL for HFPO-DA. Ex. 7, ¶¶ 20–22, 27. Therefore, in the absence of a preliminary injunction, Plaintiff (i) will be left with treated water for its member that is already under EPA's HFPO-DA MCL from groundwater and (ii) can expect that the EPA-led AOC process will result in even further reductions in HFPO-DA discharges.

Harm in the event of an injunction to Chemours, its employees and contractors, the community surrounding Washington Works, and the world more generally outweighs any harm to Plaintiff in the absence of an injunction. If the Court granted Plaintiff's desired relief and required scaling down of Washington Works's operations, even assuming such scaling down would result in Permit compliance,[3] Chemours and its employees, contractors, customers, and other stakeholders would suffer multiple types of loss, as discussed in the public-interest section above. Plaintiff incorrectly argues that the Court cannot consider Chemours' economic harm in the balance-of-the-equities analysis. ECF No. 8 at 17. It provides no support for the proposition that regulations that bar a defense in an enforcement action also prevent the Court from considering economic loss to Chemours in evaluating a preliminary-injunction motion that, under applicable law, requires the Court to balance the equities.

### E. Plaintiff Has Failed to Show Likelihood of Success on the Merits Because Permanent Injunctive Relief Is Unlikely Where Chemours, EPA, and WVDEP Are Already Addressing Exceedances.

To analyze success on the merits, courts often evaluate movants' complaints holistically, looking not only at asserted causes of action but also at requested relief. *See, e.g.*, *GMRI, Inc. v. Garrett*, No. 3:14–0866, 2014 WL 1351126, at *2 (S.D.W. Va. Apr. 4, 2014) ("The Court finds that GMRI is likely to succeed on the merits of its Complaint—that is, GMRI is likely to succeed

---

[3] While it would be reasonable to expect lower production to reduce the overall mass of discharges, Plaintiff does not explain how reducing production will result in meaningfully fewer HFPO-DA exceedances, which typically occur during wet weather unrelated to production.

in obtaining declaratory and permanent injunctive relief"); *DJR Assocs., LLC v. Hammonds*, 241 F. Supp. 3d 1208, 1229 (N.D. Ala. 2017) ("ChemStation has a substantial likelihood of succeeding in obtaining permanent injunctive relief"); *Fed. Deposit Ins. Corp. v. Jackson-Shaw Partners No. 46, Ltd.*, No. CIV. 92–20556 SW, 1994 WL 695376, at *3 (N.D. Cal. Dec. 8, 1994) ("[T]he Court cannot conclude that FDIC is likely to succeed in obtaining a permanent injunction").

Here, Plaintiff misses the mark when it argues that it "is all-but-certain to succeed on its claim that Chemours's HFPO-DA exceedances are violations of its NPDES permit and the CWA." ECF No. 8 at 12. Under the merits analysis from cases like *GMRI*, Plaintiff must additionally show likelihood of success in securing desired relief, particularly the injunctive relief sought in its Complaint. *See* ECF No. 1 at 11 ("Relief Requested"). Permanent injunctive relief requires a showing of standing and irreparable harm. *Courtland Co. v. Union Carbide Corp.*, Nos. 2:19-cv-00894, 2:21-cv-00487, 2024 WL 4339600, at *21 (S.D.W. Va. Sept. 27, 2024) (noting that a Clean Water Act claimant failed to make the necessary showing for injunctive relief where "the record [wa]s devoid of any evidence that it or the public will suffer irreparable harm"). Plaintiff, as noted above, fails to show standing and harm here, particularly in light of (1) water sampling data from the Lubeck system and from the Ohio River which show low annual levels of HFPO-DA which are protective of public health according to EPA's MCL and (2) the compliance process already established by EPA's AOC, which is well underway. *See* the irreparable-harm analysis above in Section II.B.; *see also Jonathan R. v. Morrisey*, No. 3:19-cv-00710, 2025 WL 655811, at *2 (S.D.W. Va. Feb. 28, 2025) (declining to "assume the responsibilities of those who were elected to lead").

## **CONCLUSION**

For the reasons stated above, Chemours respectfully requests that the Court deny Plaintiff's Motion for a Preliminary Injunction.

**The Chemours Company FC, LLC**

**By: Spilman Thomas & Battle, PLLC**

*/s/  Clifford F. Kinney, Jr.*
David L. Yaussy (WV State Bar No. 4156)
Clifford F. Kinney, Jr. (WV State Bar No. 6220)
SPILMAN THOMAS & BATTLE, PLLC
300 Kanawha Boulevard, East
Charleston, WV  25301
(304) 340-3800
(304) 340-3801 (*facsimile*)
dyaussy@spilmanlaw.com
ckinney@spilmanlaw.com


James A. Walls (WV State Bar No. 5175)
SPILMAN THOMAS & BATTLE, PLLC
48 Donley Street, Suite 800
Morgantown, WV  26501
(304) 291-7920
(304) 291-7979 (*facsimile*)
jwalls@spilmanlaw.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**AT CHARLESTON**

**WEST VIRGINIA RIVERS COALITION, INC.,**

**Plaintiff,**

**v.**                                                    **Civil Action No. 2:24-cv-00701**

**THE CHEMOURS COMPANY FC, LLC,**

**Defendant.**

### CERTIFICATE OF SERVICE

I, Clifford F. Kinney, Jr., hereby certify that on March 11, 2025 I electronically filed the foregoing "**Defendant's Response in Opposition to Plaintiff's Motion for a Preliminary Injunction**" via the Court's CM/ECF electronic filing system, which will send notification to all e-filing participants in this action.

/s/ *Clifford F. Kinney, Jr.*
Clifford F. Kinney, Jr. (WV State Bar No. 6220)