UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

WEST VIRGINIA RIVERS
COALITION, INC.,

        Plaintiff,

    v.                                    Civil Action No. 2:24-cv-00701

THE CHEMOURS COMPANY FC, LLC,

        Defendant.

PLAINTIFF'S REPLY IN SUPPORT OF ITS
MOTION FOR A PRELIMINARY INJUNCTION

DEREK TEANEY
AMANDA DEMMERLE
APPALACHIAN MOUNTAIN ADVOCATES, INC.
P.O. Box 507
Lewisburg, WV 24901
Telephone: (304) 646-1182
Email:  dteaney@appalmad.org
       ademmerle@appalmad.org

JAMES M. HECKER
PUBLIC JUSTICE
1620 L Street NW, Suite 630
Washington, DC 20036
Telephone: (202) 797-8600
Email: jhecker@publicjustice.net

Counsel for Plaintiff

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................1

ARGUMENT ...................................................................................................... 3

   I.   Plaintiff Has Standing ......................................................................... 3

   II.   Plaintiff Is Entitled to a Preliminary Injunction ............................... 6

      A.  Plaintiff Is Certain to Succeed on the Merits.............................. 7

      B.  Irreparable Harm is Occurring and Will Continue to Occur ...................... 8

          1.   In CWA Citizen Suits, Irreparable Harm Can Be Harm to the Plaintiff or the Public ............................................... ...................... 8

          2.   Irreparable Harm Already Exists and Does Not Depend on Finding a SDWA MCL Violation ....................................10

      C.  The Balance of Harms Favors Clean Drinking Water Sources Over Corporate Profits ..............................................14

      D.  An Injunction Is in the Public Interest .......................................17

   III.   No Bond Should Be Required ...........................................................20

CONCLUSION....................................................................................................20

## INTRODUCTION

Chemours admits that it "has had exceedances of its permit discharge limits for HFPO-DA." ECF No. 17 at 1 (hereinafter "Br."). It admits that it will continue violating those limits until it upgrades its treatment system, which "is expected to bring the company into compliance with the 2018 permit." Br. at 8. The upgrade will take at least two years. Id. That "time period assumes near-term [EPA] approval as some of the work is seasonal dependent." ECF No. 17-1 at 22. The actual compliance date is unknown and unenforceable, however, because as of March 4, 2025, Chemours has "had no response from EPA on the [compliance] Plan." Id. Meanwhile, the media reports the Trump Administration has indefinitely frozen all of EPA's enforcement litigation.[1] Thus, Chemours's compliance plan is vaporware.[2]

In the face of this noncompliance and inaction, Chemours argues that it has no obligation to do anything to improve its interim compliance, such as reducing production. Chemours admits that the amount of HFPO-DA that it discharges is scaled to its production rate: "it would be reasonable to expect lower production to reduce the overall mass of discharges." Br. at 19 n.3. But Chemours rejects any production decrease on the ground that it is too big and its products are too important to change its business in any way. Id. at 16–18. That argument flies in the face of Chemours's NPDES permit, which expressly states that "[i]t shall not be a defense for [Chemours] in an enforcement action that it would have been necessary to halt or reduce the permitted activity in order to maintain compliance with the conditions of this permit." ECF No. 7-6 at 97. Chemours wrongly believes that its permit is a paper tiger and this condition is superfluous.

---

[1] Reuters, Trump administration halts environmental litigation, sidelines lawyers, sources say (Jan. 24, 2024), available at https://www.aol.com/news/trump-administration-halts-environmental-litigation-211750389.html.

[2] In the computer context, "vaporware" is a touted product that "has not and may never become available." Vaporware, Merriam-Webster, https://www.merriam-webster.com/dictionary/vaporware.

To justify its noncompliance, Chemours argues that its illegal discharges are harmless: "no harm is occurring," Br. at 9; Plaintiff's member "suffers no injury," id. at 10; and drinking water complies with the maximum contaminant level ("MCL") under the Safe Drinking Water Act ("SDWA"), id. at 13. Chemours reaches those conclusions only by misinterpreting the 10 parts per trillion ("ppt") threshold (see generally Declaration of Jennifer Schlezinger, Ph.D., attached as Plaintiff's Reply Exhibit 1) and improperly reframing Plaintiff's action as an SDWA enforcement action. But this is a citizen suit under the Clean Water Act ("CWA"), and cognizable harm must be measured by that statute's purpose and structure. When it issued the permit, the West Virginia Department of Environmental Protection ("WVDEP") concluded that the HFPO-DA limits in Chemours's CWA permit were necessary "to be protective of the State's narrative water quality criteria for human health and the designated uses of the Ohio River." ECF No. 7-9 at 16. The Supreme Court recently observed that water quality-based effluent limitations—like Chemours's HFPO-DA limitations—are "set without regard to cost or technology availability" and "permit only those discharges that may be made without unduly impairing water quality." City & County of San Francisco v. EPA, 145 S.Ct. 704, 712 (2025) (internal quotation marks omitted). Those limitations are designed to ensure that water quality standards are actually achieved. Id. at 715. As a result, any violation of Chemours's HFPO-DA limits necessarily threatens human health and harms the river's designated use and the environment. Chemours is also barred from collaterally attacking its permit limits and conditions in this enforcement action.

Because Chemours is unwilling to achieve compliance on a meaningful timeframe, this Court should enjoin Chemours from violating its permit limits for HFPO-DA at Outlets 002 and 005 by any means necessary.

# ARGUMENT

## I.  Plaintiff Has Standing

In evaluating a plaintiff's evidence of standing at the preliminary injunction stage, "the court must take such evidence as true and draw all reasonable inferences therefrom in a light most favorable to the plaintiff." Courtland Co., Inc. v. Union Carbide Corp., No. 2:21-CV-00101, 2021 WL 1255416, at *10 (S.D. W. Va. Apr. 5, 2021) (citations omitted). Plaintiff's evidence is that its member, Charlise Robinson, has been injured by her exposure to HFPO-DA in the household water she obtains from the Lubeck Public Service District and that she is reasonably concerned about that exposure. ECF No. 7-20 ¶¶ 7–22. Chemours admits that HFPO-DA from its plant is present in the Ohio River and in Lubeck's water. Br. at 11, 13. But Chemours argues that Plaintiff cannot satisfy the injury and redressability requirements for standing because Lubeck does not draw its drinking water from the Ohio River and Lubeck's treated water complies with the annual average standard of the SDWA MCL for HFPO-DA.[3] Id. at 9–10. The first argument is factually incorrect and the second is legally irrelevant.

Chemours claims that Lubeck "gets its water from the groundwater, not directly from the Ohio River." Br. at 9. Not so. Chemours's litigation position is contradicted by Chemours's own permit application, which stated that "[a] USGS study reports that about 39% of the volume pumped by Lubeck is derived from induced infiltration from the Ohio River." ECF No. 7-14 at 7–8 & n.5. The USGS study cited by Chemours specifically found that:

> Part of the flow to the Lubeck well field also is derived directly from the Ohio River, which could be a source of contaminants. . . . Of approximately 665,000 gal of water pumped daily from the Lubeck well field, about 261,600 gal (39 percent) is derived

---

[3] At bottom, Chemours's argument appears to be that, because it has already been required to install and maintain treatment systems to protect public health at downstream water systems, its NPDES permit violations are unenforceable.

from induced infiltration from the Ohio River and about 403,400 gal (61 percent) is derived from the capture of ground water in the alluvium.[4]

Chemours had to certify under penalty of perjury that this information in its permit application is true, accurate, and complete. W. Va. Code St. R. § 47-10-4.6.d. It is therefore bound by that statement in its application.

As to the second argument, Chemours cites no case holding that standing to sue under the CWA requires the violation of a public health standard in addition to a violation of a CWA permit limit, and there is none. The rule in this Circuit is that when "discharge restrictions are set at the level necessary to protect the designated uses of the receiving waterways, their violation necessarily means that these uses may be harmed." Friends of the Earth, Inc. v. Gaston Copper Recycling Corp., 204 F.3d 149, 157 (4th Cir. 2000). WVDEP set Chemours's HFPO-DA permit limits "at the level necessary to be protective of the State's narrative water quality criteria for public health and the designated uses of the Ohio River." ECF No. 7-9 at 16. Consequently, violations of those limits necessarily cause potential harm to the health of individuals who are exposed to the contaminated water, such as Ms. Robinson, regardless of whether Chemours has also violated the MCL under the SDWA.

Ms. Robinson's injury is also based on the fact—a fact that Chemours concedes (Br. at 11 n.2)—that Lubeck's PFAS treatment system is imperfect. It can and does fail. During its last recognized failure, HFPO-DA-contaminated drinking water was distributed to Lubeck's customers, with concentrations reaching at least 33 ppt, far above the MCL. ECF No. 17-7 ¶ 25; see also Pl.'s Reply Ex. 1 ¶ 17 (Dr. Schlezinger Decl.). Ms. Robinson was notified about those failures, and they adversely affected her quality of life. ECF No. 7-20 ¶ 20. That alone is a sufficient Article III injury.

---

[4] USGS, Geohydrology and Simulation of Ground-Water Flow in Ohio River Alluvial Aquifers near Point Pleasant, Lubeck, Parkersburg, Vienna, Moundsville, and Glendale, West Virginia: Scientific Investigations Report 2004-5088 at 24 (2004) (attached as Pl.'s Reply Ex. 2).

In any event, Plaintiff's rebuttal expert on the toxicological effects from PFAS exposure, Dr. Jennifer Schlezinger, has also determined that the levels of HFPO-DA found in Lubeck drinking water from 2023 and 2024 were enough to increase risks to human health. Pl.'s Reply Ex. 1 ¶¶ 11, 17, 20–24 (Dr. Schlezinger Decl.).

Moreover, Chemours's redressability argument is implicitly an attack on its HFPO-DA permit limits because it is claiming that there is no actionable CWA violation unless the exceedance also causes a violation of the MCL for HFPO-DA under the SDWA. In effect, Chemours is claiming that its permit limit is the CWA limit <u>plus</u> the SDWA limit. But courts "will not consider collateral attacks on the validity of permit conditions in the course of an enforcement action or citizen suit, whether those attacks arise offensively or defensively." <u>Puget Soundkeeper All. v. Port of Tacoma</u>, 104 F.4th 95, 105 (9th Cir. 2024); <u>see also</u> <u>OVEC v. Fola Coal Co., LLC</u>, No. 2:12-cv-3750, 2013 WL 6709957, at *13 (S.D. W. Va. Dec. 19, 2013). Furthermore, accepting Chemours's argument would impermissibly "raise the standing hurdle higher than the necessary showing for success on the merits." <u>Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.</u>, 528 U.S. 167, 181 (2000).

In any event, Plaintiff does not need to show any actual harm to the health of its member or the public to demonstrate standing. An increased risk of harm is sufficient. <u>Ecological Rights Found. v. Pac. Lumber Co.</u>, 230 F.3d 1141, 1151 (9th Cir. 2000). "Redressability merely requires a plaintiff show that a favorable decision will lessen or reduce the pollution released into a body of water." <u>OVEC v. Hobet Min., LLC</u>, 702 F. Supp. 2d 644, 651–52 (S.D. W. Va. 2010). "The prevention of an even trifling violation which is sufficient to establish injury and traceability is likely to satisfy redressability." <u>Id</u>.

Nor must Plaintiff show that the requested relief would fix the entire problem. Courts have recognized that "complete redressability" is not required, and that a plaintiff need only show that a favorable decision would alleviate its injury "to some extent." <u>S. Envtl. Law Ctr. v. Bernhardt</u>, 432

F. Supp. 3d 626, 634 (W.D. Va. 2020) (citing Consumer Data Indus. Ass'n v. King, 678 F.3d 898, 902 (10th Cir. 2012), which in turn cites Massachusetts v. EPA, 549 U.S. 497, 526 (2007)); see also Hobet Min., 702 F. Supp. 2d at 652 n.3 (discussing the doctrine of incremental redressability); Citizens for a Better Env't v. Caterpillar, 30 F. Supp. 2d 1053, 1071–72 (C.D. Ill. 1998) (finding redressability because plaintiff's citizen suit would "begin to redress" the river's environmental problems). "[T]he ability 'to effectuate a partial remedy' satisfies the redressability requirement." Uzuegbunam v. Preczewski, 592 U.S. 279, 291 (2021). Redressability is established when a favorable decision "would amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered." Utah v. Evans, 536 U.S. 452, 464 (2002). Consequently, if Chemours were required to reduce its HFPO-DA discharges by any amount, such as by reducing its production rate or sending some process wastewater offsite for disposal, Plaintiff's risk of exposure to HFPO-DA would be lessened and its injuries would be redressed.

## II.    Plaintiff Is Entitled to a Preliminary Injunction

Plaintiff is seeking a preliminary injunction to enforce a water-quality based effluent limitation in Chemours's NPDES permit under the CWA, "whose purpose it is to protect the waters of Appalachia and nation and their healthfulness, wildlife, and natural beauty." S. Appalachian Mtn. Stewards v. A & G Coal. Corp., 758 F.3d 560, 569 (4th Cir. 2014). The NPDES permitting program is the "centerpiece of the CWA." Am. Iron & Steel Inst. v. EPA, 115 F.3d 979, 990 (D.C. Cir. 1997). The HFPO-DA limits in that permit are based on West Virginia narrative water quality standards. ECF No. 7-9 at 16. Section "301(b)(1)(C) [of the CWA] expressly identifies the achievement of state water quality standards as one of the Act's central objectives." Arkansas v. Oklahoma, 503 U.S. 91, 106 (1992). The Supreme Court has stated that the CWA "permits the district court to order that relief it considers necessary to secure prompt compliance with the Act. That relief can include, but is not limited to, an order of immediate cessation." Weinberger v. Romero-Barcelo, 456 U.S. 305, 320 (1982).

### A.    Plaintiff Is Certain to Succeed on the Merits

Chemours admits that it "has had exceedances of its permit discharge limits for HFPO-DA." Br. at 1. It also admits that those exceedances will continue until it upgrades its treatment plant, which will take years. Id. at 8. It offers no argument why those past and continuing exceedances are not violations of its permit and the CWA. Id. at 20. Instead, it tries to obfuscate the first preliminary injunction factor by combining it with the other factors. Id. at 19–20. That is incorrect.

In this Circuit, "courts considering whether to impose preliminary injunctions must separately consider each Winter factor." Pashby v. Delia, 709 F.3d 307, 321 (4th Cir. 2013). In the case on which Chemours primarily relies, this Court analyzed them separately. GMRI, Inc. v. Garrett, No. 3:14-cv-0866, 2014 WL 1351126, at *2 (S.D. W. Va. Apr. 4, 2014) ("The Court finds that all four of the requirements for preliminary injunctive relief are met in this case and that, therefore, preliminary injunctive relief is warranted."). Indeed, in GMRI, this Court's evaluation of the movant's likelihood of success examined only the elements of liability for the claim. Chemours's attempt to conflate the factors is therefore wrong as a matter of law, and Plaintiff's likelihood of success on the merits is uncontested.[5]

---

[5] Chemours also suggests that Plaintiff is not likely to succeed on the merits because of "the compliance process already established by EPA's [Administrative Order on Consent]." Br. at 20. But that administrative action is irrelevant to the merits because it does not meet the requirements for preclusion under § 1319(g)(6) of the CWA because it did not impose any penalties. See United States v. Smithfield Foods, Inc., 191 F.3d 516, 526 (4th Cir. 1999); Sierra Club v. Powellton Coal Co., LLC, 662 F. Supp. 2d 514, 523–31 (S.D. W. Va. 2009); Save Our Bays & Beaches v. City & County of Honolulu, 904 F. Supp. 1098, 1128–29 (D. Haw. 1994). Congress expressly contemplated citizen enforcement of the CWA in such circumstances. OVEC v. Hobet Min., LLC, 723 F. Supp. 2d 886, 920 (S.D. W. Va. 2010).

### B.    Irreparable Harm is Occurring and Will Continue to Occur

#### 1.    In CWA Citizen Suits, Irreparable Harm Can Be Harm to the Plaintiff or the Public

Chemours argues that the only measure of irreparable harm is harm to the plaintiff, not harm to the environment and the public. Br. at 12. The only decision that Chemours cites to support that contention is Courtland Co. v. Union Carbide Corp, No. 2:21-cv-00101, 2021 WL 1255416, at *24–25 (S.D. W. Va. Apr. 5, 2021). But Judge Copenhaver's statement about irreparable harm in that decision was dicta because he denied injunctive relief on other grounds—lack of standing and a defective pre-suit notice. Id. at *9–24. In a later ruling in a related case involving the same parties, he stated—twice—that a party can obtain an injunction in an environmental citizen suit where it shows that "it or the public has suffered an irreparable injury." Courtland Co. v. Union Carbide Corp., No. 2:19-cv-00894, 2024 WL 4339600, at *5–6 (S.D. W. Va. Sept. 27, 2024) (emphasis added). That view is consistent with how the Fourth Circuit has defined and applied the irreparable harm factor. See Hazardous Waste Treatment Council v. State of S.C., 945 F.2d 781, 788 (4th Cir. 1991) (evaluating whether "the absence of a new facility to handle waste, including out-of-state waste, would create irreparable harm, not only to HWTC but to the public, because of the possible creation of additional untreated waste"); see also E. Tenn. Nat. Gas Co. v. Sage, 361 F.3d 808, 829 (4th Cir. 2004) (finding irreparable harm sufficient to support preliminary injunction based on, inter alia, "negative impacts" on natural gas consumers and hindrances to economic development in the absence of an injunction).

Moreover, it is consistent with longstanding Supreme Court precedent. In Sierra Club v. Morton, the Supreme Court held that, although injury to a litigant is necessary to establish standing, "once review is properly invoked, that person may argue the public interest in support of his claim." 405 U.S. 727, 737 (1972); see also id. at 740 n.15 ("The test of [private] injury in fact goes only to the question of standing to obtain judicial review. Once this standing is established, the party may assert

the interests of the general public in support of his claims for equitable relief."). And in <u>Warth v. Seldin</u>, the Supreme Court held that, so long as a litigant establishes injury to itself, it may invoke the general public interest where "Congress has granted a right of action." 42 U.S. 490, 501 (1975). Congress granted such a right of action in the Clean Water Act. <u>Pub. Int. Rsch. Grp. of N.J., Inc. v. Powell Duffryn Terminals Inc.</u>, 913 F.3d 64, 73 (3d Cir. 1990); <u>see also</u> <u>Challenge v. Moniz</u>, 218 F. Supp. 3d 1171, 1179–80 (E.D. Wash. 2016) (RCRA citizen suit). Plaintiff can therefore invoke harm to the public and the environment in support of its claim of irreparable harm.

Significantly, in this case, the harm to the public and the environment extends hundreds of miles downstream and affects millions of people who draw their drinking water from the Ohio River. <u>See</u> Pl.'s Reply Ex. 3 ¶¶ 20–25 (Dr. Hoagland Decl.) (opining that the nature of HFPO-DA and the 2021 ORSANCO study cited by Chemours establishes that HFPO-DA from Chemours's discharges can travel downstream at least as far as Louisville, Kentucky). It is extraordinary that the protectors of the public drinking water systems in Cincinnati and Louisville have been so concerned with Chemours's HFPO-DA discharges that they submitted declarations supporting Plaintiff's motion. ECF Nos. 7-2 & 7-12. Those systems serve nearly two million people. <u>Id.</u> And Chemours's violations have only gotten worse in recent months. Pl.'s Reply Ex. 3 ¶ 23 (Dr. Hoagland Decl.).

Chemours does not dispute that its permit limits for HFPO-DA are based on West Virginia water quality standards. Rather, Chemours argues that neither Plaintiff's member nor the public can suffer any irreparable harm unless the amount of HFPO-DA in drinking water exceeds the SDWA MCL of 10 ppt on an annual average. However, the courts have consistently held that violations of water quality-based effluent limitations—like Chemours's HFPO-DA limits—constitute irreparable injury to the environment and the public in CWA citizen suits. <u>OVEC v. Fola Coal Co., LLC</u>, No. 2:13-cv-21588, 2016 WL 3190255, at *10 (S.D. W. Va. June 7, 2016) (violations of narrative water-quality based limit prohibiting biological impairment of streams); <u>Hobet Min.</u>, 723 F. Supp. 2d at 924

9

(violations of numerical water quality-based limits for selenium); <u>OVEC v. Apogee Coal Co., LLC</u>, 555 F. Supp. 2d 640, 648 (S.D. W. Va. 2008) (same); <u>Pub. Int. Rsch. Grp. of N.J., Inc. v. Rice</u>, 774 F. Supp. 317, 328–29 (D.N.J. 1991) (violations of numerical water quality-based limits for nutrients, chlorine and dissolved oxygen); <u>see also</u> <u>Sierra Club v. U.S. Army Corps of Eng'rs</u>, 645 F.3d 978, 995 (8th Cir. 2011) (recognizing that "irreparable harm to the environment necessarily means harm" to an environmental organization's interests). As a result, harm to the Ohio River's designated use as a drinking water source constitutes irreparable harm to the West Virginia Rivers Coalition and the public. <u>OVEC v. Apogee Coal Co., LLC</u>, 555 F. Supp. 2d 640, 648 (S.D. W. Va. 2008) (holding violations of permit limits cause irreparable harm to environmental plaintiffs whose members use the receiving waters).

Chemours ignores the most on-point decision: <u>Idaho Conservation League v. Atlanta Gold Corp.</u>, 879 F. Supp. 2d 1148, 1159 (D. Idaho 2012). In that case, the defendant mining company exceeded its water quality-based permit limits for arsenic. <u>Id.</u> at 1156, 1158–59. The court found irreparable harm even though "there is no evidence that the untreated waters of Montezuma Creek or the Middle Fork of the Boise River serve as a source of drinking water for Atlanta, Idaho or any other downstream community, and therefore no evidence that AGC's discharges are currently causing or contributing to a serious public health problem." <u>Id.</u> at 1159–60. The court concluded that "this makes no difference with respect to the Court's analysis on injunctive relief. Harm to the environment exists, even if municipal suppliers eventually remove the toxins from the water before it enters household taps." <u>Id.</u> at 1160.

### 2.   Irreparable Harm Already Exists and Does Not Depend on Finding a SDWA MCL Violation

Chemours does not dispute that HFPO-DA is a toxic, forever chemical. Rather, Chemours insists that, because people may not yet be drinking water with an annual average HFPO-DA

concentration in excess of the SDWA MCL for that toxin, Plaintiff cannot show irreparable harm. That is wrong both factually and legally, and Chemours is trying to impermissibly impose in this CWA citizen suit a threshold more suited to a toxic torts case, where a plaintiff must show actual exposure to a harmful substance at unsafe levels.

Factually, Chemours admits that the Lubeck treatment system failed in March 2024, which directly affected Plaintiff's member. Br. at 11 n.2. Further, as seen in Lubeck's data, Lubeck customers were exposed to drinking water that exceeded the MCL during three separate "significant and sustained contamination events" over the past two years. Pl.'s Reply Ex. 1 ¶ 17 (Dr. Schlezinger Decl.). According to Dr. Schlezinger, those exposures increase health risks to Lubeck water users, including Ms. Robinson, particularly because those users may already have a high body burden of PFAS (due to past contamination from the same Washington Works facility), and combined interactions of different PFAS compounds "produce combined toxicity that is greater than the toxicity of each individual PFAS." Id. ¶¶ 17, 20–23.

As a legal matter, a violation of a Clean Water Act water quality-based effluent limitation causes irreparable harm regardless of whether there are also violations of an SDWA standard. As the Fourth Circuit has explained, the CWA reasonably imposes more stringent limits than those under the SDWA because "the regulated pollutants [under the CWA] could harm waterways and aquatic life, and could introduce chemicals which hamper treatment facilities' ability to treat wastewater, even at levels where they might not directly harm humans." United States v. Hartsell, 127 F.3d 343, 351–52 (4th Cir. 1997). "It is not necessary for Plaintiffs to establish that an immediate and catastrophic threat to public health exists before a federal Court can step in and order a defendant to stop its illegal discharges." Atlanta Gold Corp., 879 F. Supp. 2d at 1160. In other words, preliminary injunctions need not be last minute remedies. Mountain Valley Pipeline v. 6.56 Acres of Land, 915 F.3d 197, 217 (4th Cir. 2019).

Furthermore, although Chemours contends (Br. at 13) that HFPO-DA concentrations in the Ohio River are low, the data paint a more alarming picture. For instance, in September 2022, Chemours measured HFPO-DA at concentrations of 14 to 15 ppt along the east bank of the Ohio just upstream of the Lubeck Public Service District drinking water facility. ECF No. 7-26; Pl.'s Reply Ex. 3 ¶¶ 32 (Dr. Hoagland Decl.). Chemours's toxicologist ignored those data, instead using lower values obtained from sampling the middle of the river channel to calculate her annual average. Pl.'s Reply Ex. 3 ¶¶ 31. Chemours's annual average ignores the "cross sectional variability in HFPO-DA concentrations" at its downstream sampling location, which results from incomplete mixing across the channel. Id.

Chemours's declarant Mr. Hartten points to ORSANCO's monitoring of HFPO-DA in the Ohio River downstream of Washington Works in 2021, in an effort to imply that there is no connection between downstream HFPO-DA concentrations and Chemours's discharges. ECF No. 17-8 ¶¶ 20–22. That is wrong. Dr. Hoagland explains that the values Mr. Hartten cites are attributable to differences in river flow rates on the various sampling dates and to the fact that Chemours's HFPO-DA discharges precipitously dropped before ORSANCO's second sampling round. Pl.'s Reply Ex. 3 ¶¶ 19 & 22. Chemours's role in HFPO-DA concentrations downstream of its plant is further corroborated by the fact that, during ORSANCO's 2021 sampling campaign, it detected no HFPO-DA in the Ohio River upstream from the Washington Works facility. Id. ¶¶ 12–13.

On brief, Chemours questions whether concentrations of HFPO-DA are "concentrating" at long distances from Washington Works. Br. at 14–15. But, as Dr. Hoagland explains, "HFPO-DA concentrations in the Ohio River are a function of both the concentrations of HFPO-DA from sources discharging to the Ohio River, as well as the streamflow of the Ohio River at the time of sampling." Pl.'s Reply Ex. 3 ¶ 19. Dr. Hoagland concludes that the HFPO-DA levels found in the

Ohio River at Louisville, Kentucky, by ORSANCO are, at least in part, attributable to Chemours's discharges. Id. ¶¶ 24–25.

Chemours next touts its "work" with regulators to reduce HFPO-DA, including the new B22 Sump treatment, as evidence that irreparable harm is not occurring. But EPA's administrative action has been pending for just shy of two years with no results, ECF No. 7-18, EPA recently rejected key components of Chemours's proposed plan under the administrative action, ECF No. 7-19, Chemours has not heard from the EPA since that rejection, Br. at 8, and, by its own admission, Chemours's compliance with its 2018 permit limits is, at best, two years away, id. at 3. Furthermore, Chemours admits that its new B22 treatment system will not result in permit compliance. See ECF No. 7-16 at 31.

Finally, Chemours asserts that Plaintiff's delay in seeking a preliminary injunction undermines Plaintiff's claims of irreparable harm. Br. at 14. Not so. "[A] plaintiff need not challenge an illegal act immediately after it happens; it may wait until it can estimate whether the act threatens it with irreparable harm." Steves & Sons, Inc. v. JELD-WEN, Inc., 988 F.3d 690, 718 (4th Cir. 2021) (internal quotation omitted). Furthermore, "delay may be excused where the party seeking a preliminary injunction delays only in the reasonable belief that negotiations may resolve the dispute." Lanin v. Borough of Tenafly, 515 F. App'x 114, 118 (3d Cir. 2013) (unpublished opinion). Plaintiff acted reasonably in waiting to pursue injunctive relief until the circumstances established that (1) Chemours's negotiations in 2023 through 2024 with federal and state enforcers would not diligently put an end to Chemours's unlawful discharges, (2) Chemours told WVDEP in December 2024 that it wanted a three-year compliance schedule, and (3) Cincinnati and Louisville officials informed Plaintiff in January 2025 that recent spikes in HFPO-DA discharges from Chemours's facility were showing up in the domestic water source for millions of people hundreds of miles downstream. The ongoing environmental harm from Chemours's permit violations for a forever chemical is still irreparable,

regardless of any delay. PennEnvironment v. PPG Indus., Inc., No. 12-cv-342, 2014 WL 6982461, at

*15 (W.D. Pa. Dec. 10, 2014) ("[H]arm to the environment has been classified as irreparable. That

harm did not become reparable (or 'less immediate') because of Plaintiffs' delay in filing for a

preliminary injunction, whatever the reason."). Further, "given the ample potential justifications for

[Plaintiff's] delay," the irreparable environmental harm from Chemours's toxic discharges should

"override[] any concern about delay." Ctr. for Individual Freedom, Inc. v. Ireland, 613 F. Supp. 2d

777, 806–07 (S.D. W. Va. 2009).

*          *          *

At bottom, Chemours is arguing that this Court cannot enjoin its unlawful HFPO-DA

discharges unless and until enough HFPO-DA breaks through the water treatment systems it had to

install the last time it polluted the Ohio River to send drinking water concentrations above 10 ppt on

an annual average. But the law does not so constrain this Court's equitable powers. Weinberger, 456

U.S. at 320. And health risks are presently increasing for water consumers downstream. Pl.'s Reply

Ex. 1 ¶¶ 11, 17, 20–24 (Dr. Schlezinger Decl.). The irreparable harm to drinking water sources that

Chemours is causing must stop.

**C.    The Balance of Harms Favors Clean Drinking Water Sources Over Corporate Profits**

The harm to Plaintiff, the public, and the environment from Chemours's continuing permit

violations is contamination of the Ohio River with excessive amounts of a toxic "forever chemical."

The only harm that Chemours seeks to balance in its favor is its claimed economic harm from not

being able to continue using and discharging that chemical. Br. at 18–19. In balancing the equities,

financial harms are less important because "[m]oney can be earned, lost, and earned again." OVEC v.

U.S. Army Corps of Eng'rs, 528 F. Supp. 2d 625, 632 (S.D. W. Va. 2007). Regardless, Chemours's

harm is self-inflicted, because in 2013 Chemours chose to use HFPO-DA as a substitute for the even

14

more toxic PFOA that it had used previously. Br. at 5. Chemours then failed to take all necessary actions to comply with its permit limits for that chemical by WVDEP's January 1, 2022 deadline. Id.

The Fourth Circuit has recognized that "self-inflicted harm may be discounted or ignored altogether in the preliminary-injunction analysis." Mountain Valley Pipeline, 915 F.3d at 219. That rule is based on the principle that "a party may not claim equity in his own defaults." Long v. Robinson, 432 F.2d 977, 981 (4th Cir. 1970). Chemours's economic harm is not cognizable because it is the result of its own chemical selection and failed chemical treatment. Thus, the economic impacts that Chemours points to are ones it should have already faced had it taken its permit limits for HFPO-DA seriously; instead, it fumbled the ball and externalized its problems onto the Ohio River and the public at large. Chemours cannot now insist that the monetary cost of reducing its current discharges justifies permitting it to discharge a recognized toxic chemical into the drinking water supply for millions of Americans. Chemours, "having made its bed, it must now lie in it." Project Control Servs., Inc. v. Westinghouse Savannah River Co., 35 F. App'x 359, 366 (4th Cir. 2002) (unpublished opinion).

Chemours's arguments based on its claimed economic losses are also irrelevant because its permit clearly bars consideration of its costs of reduced production. ECF No. 7-6 at 97. If it is no defense that Chemours would have to reduce production to achieve compliance, it is also no defense that Chemours would have to incur costs and cut output to achieve compliance. Reducing production necessarily involves incurring costs and cutting output. By categorically refusing to do so, Chemours is either violating this permit condition or collaterally attacking it. Chemours is strictly liable for permit violations. Stoddard v. Western Carolina Regional Sewer Auth., 784 F.2d 1200, 1208 (4th Cir.1986) ("Liability under the Clean Water Act is a form of strict liability."). Collateral attacks on an NPDES

permit in an enforcement action are prohibited. <u>Puget Soundkeeper</u>, 104 F.4th at 105. By failing to challenge its 2018 permit in state court, it "forever lost its right to do so." <u>Id.</u> at 106.[6]

Chemours argues that <u>Courtland</u> supports its position. Br. at 18. It does not. In that case, Judge Copenhaver denied a TRO and held that the balance of equities favored the defendant. The court reasoned that the harm to the plaintiff from the incremental addition of unpermitted discharges during the 14-day TRO period was outweighed by the cost to the defendant of immediately eliminating and remediating those discharges. <u>Courtland</u>, 2021 WL 1255416, at *27. Judge Copenhaver "agree[d] with the plaintiff that a Clean Water Act violator should not escape the costs – even high costs – of its violation," but viewed a TRO as a "blunt instrument" to achieve that goal in a very short time frame. <u>Id.</u>

Plaintiff is seeking a preliminary injunction, not a TRO, and is not seeking to require Chemours to comply within 14 days. Like the defendant in <u>Courtland</u>, Chemours should not escape the costs of CWA compliance. Plaintiff is asking the Court to require Chemours to take interim steps to improve compliance with its permit limit within a reasonable time and well before the end of its proposed three-year compliance schedule. When the Court balances the harms, the equities tip strongly in favor of that approach.

---

[6] Even assuming arguendo that production costs could be considered, Chemours has not shown that any reduction in production (even a small amount) is infeasible. Not all of Chemours' end users are in critically important industries. Some of the products made with HFPO-DA are used for ordinary products. For example, products manufactured from PFA are used in "consumer electronics, automotive, oil and gas, chemical processing, and wireless applications." ECF No. 17-1 at 8 ¶ 42. At a minimum, the Court should require Chemours to establish the percentage of end uses that are not critical and reduce its production by an amount proportional to those uses. "'The essence of equity jurisdiction has been the power of the Chancellor … to mould each decree to the necessities of the particular case.'" <u>SAS Inst., Inc. v. World Programming Ltd.</u>, 952 F.3d 513, 527 (4th Cir. 2020) (quoting <u>Hecht Co. v. Bowles</u>, 321 U.S. 321, 329 (1944)).

### D.    An Injunction Is in the Public Interest

As this Court has noted, protecting water quality is "a critical public interest that profoundly outweighs a company's bottom line." OVEC v. Fola Coal Co., No. 2:13-cv-21588, 2016 WL 3190255, at *11 (S.D. W. Va. June 7, 2016). Chemours argues the opposite—that the public interest requires it to continue its illegal discharges of HFPO-DA without any interim controls. Br. at 15–18. That argument defies logic and is unsupported by case law.

Plaintiff raised two possible methods of making interim reductions in those discharges—reduced production or offsite disposal. Chemours does not deny that reducing production would improve its permit compliance[7] and admits that it is "reasonable to expect lower production to reduce the overall mass of discharges." Br. at 19 & n.3. Chemours argues that such reductions are impracticable because they would impose high social costs in the form of reduced jobs and reduced supplies of critically important products. Id. at 16–17.

But Congress has already weighed the public interests in jobs and domestic manufacturing against the public interest in clean water and found that the former yields to the latter. As the Supreme Court has observed, "Congress foresaw and accepted the economic hardship, including the closing of some plants, that effluent limitations [under the Clean Water Act] would cause." EPA v. Nat'l Crushed Stone Ass'n, 449 U.S. 64, 79 (1980). Moreover, that Congressional determination is embedded in Chemours's permit: "it shall not be a defense for [Chemours] in an enforcement action that it would

---

[7] Chemours claims that its HFPO-DA violations are tied to wet weather events. Br. at 1, 3, 6, 19 n.3. But the correlation it describes is "weak." Pl.'s Reply Ex. 3 ¶ 28 (Dr. Hoagland Decl.) A review of Chemours's own charts shows that there were HFPO-DA violations on January 3, 2025, when there was no rainfall, and on multiple other occasions when there was minimal precipitation. ECF No. 17-8 at 14; see also Pl.'s Reply Ex. 3 ¶¶ 27–29 (Dr. Hoagland Decl.). Further, Chemours admits that HFPO-DA violations during wet weather are due in part to "[a]ir deposition, the settling of HFPO-DA emissions to the ground." Br. at 7. This air deposition of HFPO-DA comes from the stacks associated with Chemours's facility. Curtailing production from the facility will reduce the amount of air deposition, thus reducing or eliminating Chemours's violations during wet weather events.

have been necessary to halt or reduce the permitted activity in order to maintain compliance with the conditions of this permit." ECF No. 7-6 at 97. That language is mandatory and unequivocal. That condition effectively prohibits this Court concluding that halting or reducing production to comply is not in the public interest.

The West Virginia Legislature has also already weighed the public interest in the PFAS Protection Act, determining that it is "in the public interest . . . to reduce toxic chemicals in drinking water supplies to . . . strengthen the state's economy." W. Va. Code § 22-11C-1(a)(12) (emphasis added). "[W]hen the legislature has spoken, the public interest has been declared in terms well-nigh conclusive." Berman v. Parker, 348 U.S. 26, 32 (1954). The Ohio River is a drinking water supply for millions of people, including many West Virginians, ECF No. 7-11 at 27, and HFPO-DA is toxic, ECF No. 8 at 13–14. Thus, according to the Legislature, enjoining Chemours's toxic discharges will strengthen the state economy.

Chemours alludes to national security concerns from reducing its production. Br. at 16–17. That argument is an illusion based on unsupported beliefs, not credible evidence. See, e.g., ECF No. 17-1 ¶¶ 53–54, 65, 71, 79 ("Chemours believes . . ."); ECF No. 17-9 ¶¶ 11–18.[8] Chemours's declarants do not identify any knowledge, education, or experience to qualify them to analyze national security. Although the rules of evidence are relaxed at the preliminary injunction stage, the Court must still evaluate the weight of the evidence before it, and "statements based on belief rather than personal knowledge may be discounted." Imagine Medispa, LLC v. Transformations, Inc., 999 F. Supp. 2d 862, 869 (S.D. W. Va. 2014) (citing Federal Practice & Procedure § 2949); see also G.G. ex rel. Grimm v. Gloucester County Sch. Bd., 822 F.3d 709, 725 (4th Cir. 2016), vacated and remanded on other

---

[8] For example, Chemours's chief Perfluoroalkoxy marketer brags that Chemours's product "has been identified as vital to the U.S. national security and economy." ECF No. 17-9 ¶ 11. But her passive voice hides the identity of exactly who—beyond Chemours itself—regards Chemours's manufacturing to be a matter of national security.

grounds, 580 U.S. 1168 (2017) (recognizing that, even though the Federal Rules of Evidence may be relaxed at the preliminary injunction stage, the nature of the evidence still informs the weight the court should give the evidence). Because Chemours's declarants rely only on their unsubstantiated beliefs, the Court should discount their testimony as nothing more than puffery and hyperbole.

Finally, while Chemours also protests (Br. at 15–16) that transporting all 4.6 million gallons of its process wastewater offsite would be infeasible, that all-or-nothing approach is a strawman. The real issue is whether it is feasible to transport any substantial amount of process wastewater offsite for disposal. On that issue, Chemours concedes that it has been feasible to send 10 truckloads of wastewater every day from its North Carolina plant to a deep well in Texas, over a thousand miles away. Br. at 16. A truck holds about 5,200 gallons, so 10 trucks can carry about 52,000 gallons a day.[9] A large portion of Chemours's HFPO-DA loading is in a small percentage of the total 4.6 million gallons of process wastewater. The flow at the B22 sump is about 60,000 gallons per day and that waste stream contains 38 pounds of HFPO-DA per year. ECF No. 8 at 6 (citing ECF No. 7-13 at 4 tbl. 3). The flow at the Granular Sump is 160,000 gallons per day and that waste stream contains 16.9 pounds of HFPO-DA per year. Id. Three other wastewater streams are 20,000, 20,000, and 30,000 gallons per day and those three together contain 5.7 pounds of HFPO-DA per year. Id. Chemours has not shown that it is infeasible to send any of these wastewater streams off-site for disposal, and their total or partial elimination would make a substantial reduction in the total process wastewater loading of 75.6 pounds per year. Id.

The public interest in protecting water quality supports, at a minimum, a preliminary injunction requiring Chemours to take some interim steps such as these to improve its permit compliance.

---

[9] 4.6 million gallons divided by 884 trucks equals 5203 gallons. Br. at 16.

### III.   No Bond Should Be Required

Chemours has not made any argument that a bond should be required under Rule 65(c).  As a result, it has waived the bond requirement and the Court need not impose any bond. "A bond is not mandatory and can be waived." Hernandez v. Montes, No. 5:18-CV-5-D, 2018 WL 405977, at *2 (E.D.N.C. Jan. 12, 2018); see also Poindexter v. Strach, 324 F. Supp. 3d 625, 636 (E.D.N.C. 2018) (waiving bond requirement when plaintiff's request for no bond was unopposed).

## CONCLUSION

The Court should issue a preliminary injunction that prohibits Chemours from violating its permit limits for HFPO-DA at Outlets 002 and 005 by any means necessary, including (1) reducing the production that generates process wastewater containing HFPO-DA, and/or (2) sending that wastewater off-site for disposal by deep-well injection or incineration.

DATED: March 18, 2025

Respectfully submitted,

**/s/ Derek Teaney**
DEREK TEANEY (WVBN 10223)
AMANDA DEMMERLE (WVBN 13930)
APPALACHIAN MOUNTAIN ADVOCATES, INC.
P.O. Box 507
Lewisburg, WV 24901
Telephone: (304) 646-1182
Email:   dteaney@appalmad.org
              ademmerle@appalmad.org

**/s/ James M. Hecker**
JAMES M. HECKER (PRO HAC VICE)
PUBLIC JUSTICE
1620 L Street NW, Suite 630
Washington, DC 20036
Telephone: (202) 797-8600
Email: jhecker@publicjustice.net

Counsel for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

WEST VIRGINIA RIVERS
COALITION, INC.,

     **Plaintiff,**

v.                               Civil Action No. 2:24-cv-00701

THE CHEMOURS COMPANY FC, LLC,

                      **Defendant.**

## CERTIFICATE OF SERVICE

     I, Derek O. Teaney, do hereby certify that, on March 18, 2025, I electronically filed the

foregoing document with the Clerk of the Court using the CM/ECF filing system, which will notify

the following participants:

JAMES A. WALLS
SPILMAN THOMAS & BATTLE, PLLC
48 Donley Street, Suite 800
Morgantown, WV 26501
(304) 291-7920
jwalls@spilmanlaw.com

CLIFFORD F. KINNEY, JR.
JOSEPH CREIGHTON UNGER
DAVID L. YAUSSY
SPILMAN THOMAS & BATTLE, PLLC
P.O. Box 273
Charleston, WV 25301
(304) 340-3844
ckinney@spilmanlaw.com
junger@spilmanlaw.com
dyaussy@spilmanlaw.com

                      **/s/ Derek O. Teaney**
                      **DEREK O. TEANEY (WVBN 10223)**