## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

**WEST VIRGINIA RIVERS COALITION, INC., and**
**LITTLE HOCKING WATER ASSOCIATION, INC.**

   **Plaintiffs,**

**v.**           **CIVIL ACTION NO. 2:24-cv-00701**

**THE CHEMOURS COMPANY FC, LLC,**

   **Defendant.**

### <u>CHEMOURS' POST-HEARING BRIEF</u>

Defendant The Chemours Company FC, LLC ("Chemours"), pursuant to the Court's Order entered May 27, 2025, respectfully submits this Post-Hearing Brief addressing the incremental-harm issue that the Court directed Plaintiff West Virginia Rivers Coalition ("WVRC") and Chemours to analyze, among other attendant issues. Chemours also submits as Exhibit 1 its Proposed Findings of Fact and Conclusions of Law. This matter came before the Court on WVRC's Motion for a Preliminary Injunction ("WVRC's Motion"). WVRC's Motion was fully briefed by WVRC and Chemours. ECF Nos. 8, 17, 18, 75, 76. WVRC and Chemours also submitted pre-hearing Stipulations. ECF No. 55. The Court heard testimony of witnesses, argument of counsel, and accepted exhibits into evidence at a hearing on May 21, 22, and 23, 2025. *See* ECF Nos. 77–79.

The Court directed WVRC and Chemours in its May 27, 2025 Order to brief whether (1) incremental harm to human health is a cognizable Article III standing injury and (2) such harm amounts to irreparable injury warranting a preliminary injunction. ECF No. 70. Here, incremental harm to WVRC and its member Charlise Robinson is not occurring. Even if it was, such harm

does not present a likelihood of irreparable harm to WVRC between now and the September 16, 2025 trial date warranting the extraordinary remedy of a preliminary injunction. *See* ECF No. 69 at 1.

**I. For Standing and a Preliminary Injunction, WVRC Must Show Actual or Likely Harm—a Showing WVRC Has Failed to Make.**

    **A. To Establish Article III Standing or Irreparable Harm Warranting a Preliminary Injunction, WVRC Must Identify <u>Actual</u> or <u>Likely</u> Harm.**

To establish Article III standing, a plaintiff must show "injury-in-fact"—an injury that is "concrete and particularized" and "actual or imminent," not merely "conjectural or hypothetical." *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016)). Injury warranting a preliminary injunction, moreover, must meet an additional criterion: it must be irreparable. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

Although the *threat* of harm can support Article III standing or warrant an injunction, the threat of harm must be so significant that harm is *likely* to materialize. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (stating that "threatened injury must be *certainly impending* to constitute injury in fact" and that claims "'of *possible* future injury' are not sufficient") (emphasis in original); *Winter*, 555 U.S. at 20 (stating that harm warranting an injunction requires that the movant be "*likely* to suffer irreparable harm in the absence of preliminary relief") (emphasis added). Crucially, for a prohibitory preliminary injunction like WVRC seeks here, *see* ECF No. 8 at 2, the alleged irreparable harm must be likely during the case's pendency—i.e., in the interim time between now and this Court's ruling at trial in a little over two months. *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017); *Murray v. Terry*, No. 2:18-cv-00942, 2018 WL 3543076, at *2 (S.D.W. Va. July 23, 2018).

**B.  WVRC Has Failed to Show Actual or Likely Harm Based on the Incremental Risk of Exposure During the Pendency of the Litigation.**

*First*, WVRC has not identified any <u>actual</u> harm.  The crux of WVRC's argument is that Chemours' exceedances at Outlets 002 and 005 of the HFPO-DA limits in its NPDES Permit are negatively impacting drinking water.  ECF No. 8 at 1 ("Defendant . . . discharges wastewater containing . . . HFPO-DA . . . into the Ohio River, a source of drinking water for millions of people.").  But despite its focus on drinking water, WVRC has not alleged that past exceedances caused adverse health effects.  In fact, WVRC alleges that Permit violations have occurred intermittently for years but has not provided any concrete medical evidence.  The only identified harm is WVRC member and employee Charlise Robinson's alleged preeclampsia; her Declaration states that, "[i]n 2005, during [her] pregnancy, [she] had preeclampsia which led to emergency induced labor of [her] child 5 weeks early."  Robinson Decl., ECF No. 7-20 ¶ 11.  But the timing of Ms. Robinson's preeclampsia in 2005 predates Chemours' existence by ten years.  *See* ECF No. 17-1 ¶ 11.  It also predates the 2013 start of DuPont's use of HFPO-DA at Washington Works by several years.  Hartten Decl., ECF No. 17-8 ¶ 18.  Her alleged preeclampsia cannot have been caused by Chemours' HFPO-DA Permit limit exceedances.

*Second*, WVRC has failed to show <u>likely</u> harm.  On the issue of likely harm, WVRC and Chemours have repeatedly cited U.S. EPA's Maximum Contaminant Level ("MCL") for HFPO-DA, which was finalized on April 26, 2024 under the Safe Drinking Water Act, 42 U.S.C. §§ 300f *et seq.*[1]  The Parties' reference to an MCL helps answer the question of likely harm because WVRC

---

[1] Chemours is one of several petitioners before the U.S. Court of Appeals for the D.C. Circuit challenging the HFPO-DA MCL.  Chemours' challenge to the MCL, however, does not change the fact that EPA has deemed the HFPO-DA MCL the concentration below which EPA does not expect risks to human health.  Relatedly, EPA announced in May 2025 "its intent to rescind" the HFPO-DA MCL.  EPA, *EPA Announces It Will Keep Maximum Contaminant Levels for PFOA,*

3

alleges *drinking water* impacts. MCLs are the "national primary *drinking water* regulations." *Courtland Co. v. Union Carbide Corp.*, No. 2:18-cv-01230, 2023 WL 6331069, at \*94 (S.D.W. Va. Sept. 28, 2023) (emphasis added). In particular, MCLs are set as close as possible to "Maximum Contaminant Level Goals" ("MCLGs"), which are "the level at which no known or anticipated adverse effects on the health of persons occur and which allows an adequate margin of safety." *City of Waukesha v. EPA*, 320 F.3d 228, 231 (D.C. Cir. 2003). Accordingly, drinking water that meets MCLs is, by regulatory design, unlikely to cause harm. Here, EPA set both the MCLG and MCL for HFPO-DA at 10 parts per trillion ("ppt"). 40 C.F.R. §§ 141.50(b); 141.61(c)(2).

To elaborate, an MCLG (as opposed to an MCL) is not an enforceable limit. Rather, an MCLG is a non-binding public health goal set at a level at which no adverse health effects are anticipated. 40 C.F.R. § 141.2. No adverse health effects are expected at MCLGs ***even with daily exposure over an entire lifetime***—which the EPA defines as ***70 years***.[2] *See* EPA, *How EPA Regulates Drinking Water Contaminants*, (last updated Oct. 21, 2024), https://www.epa.gov/sdwa/how-epa-regulates-drinking-water-contaminants ("MCLG is based on the reference dose . . . [which] is an estimate of the amount of a chemical that a person can be exposed to on a daily basis that is not anticipated to cause adverse health effects over a lifetime.").

The current 10 ppt value for both the MCLG and MCL additionally incorporates even more protective assumptions:

---

*PFOS*, (May 14, 2025), https://www.epa.gov/newsreleases/epa-announces-it-will-keep-maximum-contaminant-levels-pfoa-pfos.

[2] "Lifetime" exposure is 70 years by convention. EPA, *Risk Assessment Guidance for Superfund, Volume I, Human Health Evaluation Manual (Part A)*, at 6-22 (Dec. 1989), https://www.epa.gov/sites/default/files/2015-09/documents/rags_a.pdf.

- It takes into account "***sensitive populations and life stages***."  EPA Off. of Water, *Per- and Polyfluoroalkyl Substances Hazard Index: A Quick Reference Guide*, at 1–2 (Dec. 2024), https://www.epa.gov/system/files/documents/2024-12/hazard-index-qrg-dec24.pdf.  The value is thus designed to be conservative, taking into consideration sensitive groups like pregnant women and infants.

- It further includes "an adequate ***margin of safety***."  *Id.*

The value therefore provides that adverse health effects from HFPO-DA are unlikely even when a toddler regularly consumes water with HFPO-DA at 9.99 ppt over her lifetime into adulthood.  More broadly, the value is set such that *any* person drinking water every day with an average of 10 ppt HFPO-DA or less for a lifetime is protected against adverse health effects from HFPO-DA exposure, contrary to WVRC's indication of harm.  *See* EPA Off. of Water, *Drinking Water Health Advisory: Hexafluoropropylene Oxide (HFPO) Dimer Acid (CASRN 13252-13-6) and HFPO Dimer Acid Ammonium Salt (CASRN 62037-80-3)*, at 1, 35 (June 2022), https://www.epa.gov/system/files/documents/2022-06/drinking-water-genx-2022.pdf (stating that the 10 ppt value for HFPO-DA "protect[s] all Americans, including sensitive populations and life stages, from adverse health effects resulting from exposure throughout their lives to contaminants in drinking water."); *see also* EPA Off. of Water, *Technical Fact Sheet: Drinking Water Health Advisories for Four PFAS (PFOA, PFOS, GenX Chemicals, and PFBS)*, at 5 (June 2022), https://semspub.epa.gov/work/03/2335598.pdf (noting that applications of the 10 ppt value to scenarios less than a lifetime, such as in the case of WVRC member Ms. Robinson, "would provide a *conservative*, *health protective* approach in the absence of other information") (emphasis added).

Here, WVRC has failed to show that its member Ms. Robinson, the customers of the Louisville Water Company and Greater Cincinnati Water Works, or anyone else will be exposed

to more than an average of 10 ppt HFPO-DA over their lifetimes.  For both standing and the irreparable-harm injunction analysis, the relevant exposures are those of Charlise Robinson, the sole member included in WVRC's moving papers.  *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 169 (2000) ("The relevant showing for Article III standing is not injury to the environment but injury to the plaintiff."); *Courtland Co. v. Union Carbide Corp.*, No. 2:21-cv-00101, 2021 WL 1255416, at *24–25 (S.D.W. Va. Apr. 5, 2021) ("The traditional equitable analysis for obtaining preliminary relief requires a showing that the plaintiff itself will be irreparably harmed unless preliminary relief is granted.") (underline in original).

Ms. Robinson gets her household water from the Lubeck Public Service District ("Lubeck") downstream from Chemours' Washington Works facility.  ECF No. 7-20 ¶¶ 4,7. Sampling data from March 2023 to November 2024 show that over half of the samples of Lubeck's treated water—26 out of 44—were "non-detect" for HFPO-DA.  In other words, HFPO-DA concentrations in 26 samples were so low that they measured less than 2 ppt, which represents the concentration below which certified testing laboratories cannot accurately measure.  ECF No. 17-7 ¶ 19.  The highest HFPO-DA sampling result, 40 ppt, is from May 20, 2024 and was collected from water emerging from one of Lubeck's two on-site water treatment units. ECF No. 17-7 ¶19; 17-8 at 37 ([BED2S-LAG, 05/20/24, 11:24 for HFPO-DA (GenX)]. A second sample from the same day, collected from water emerging from the parallel water treatment system, shows HFPO-DA at 11 ppt. ECF No. 17-8 at 36 ([BED2N-LAG, 05/20/24, 11:22 for HFPO-DA (GenX)]. At Lubeck, flows emerging from the two parallel treatment systems comingle before the finished water enters Lubeck's water distribution system.  ECF No. 17-8 ¶¶ 25, 26; ECF No. 17-8 at 24, see also www.lubeckpsd.com/water-process for a graphic depiction of the process.  Additionally,

WVRC's expert Dr. Schlezinger made clear that, *at most*, HFPO-DA will last 14 days in the human body.  ECF No. 78 at 236:1–2.[3]

WVRC has failed to put forth evidence showing that the available Lubeck sampling data, including the 40 ppt sample, establish likely harm.  Indeed, WVRC has not even shown that Ms. Robinson actually consumes drinking water from the Lubeck system as distributed.  *See* ECF No. 7-20 ¶ 16 (stating that Ms. Robinson has stopped drinking water "directly distributed from a tap"). If WVRC relies on the Lubeck sampling data to suggest likely harm, it would *at a minimum* need to offer evidence showing (1) that Ms. Robinson drank Lubeck's water throughout the sampling period, including on or shortly after May 20, 2024, when the 40 ppt sample was collected; (2) that the water that Ms. Robinson drank during the sampling period was not further treated or filtered in some way; and (3) that short-term exposure to HFPO-DA slightly above 10 ppt is likely to cause harm.  WVRC has shown none of the above.

In fact, water providers subject to the HFPO-DA MCL will show compliance with the 10 ppt level (once it is enforced in April 2029) by calculating running annual averages, not by referencing single sample results.  40 C.F.R. § 141.903 ("Compliance Requirements").  Explaining the averaging, EPA clarified that even if a single "sample result exceeds an MCL, the system will not be considered in violation of the MCL until it has completed one year of quarterly sampling at the sampling point with the triggering sample used as the first quarter of monitoring for the running annual average calculation."  40 C.F.R. § 141.903(e).  Using averages to measure compliance makes sense given that the 10 ppt value includes conservative assumptions like a lifetime of exposure by the most sensitive populations.  Here, using available sampling data on Lubeck's

---

[3] In comparison, Dr. Schlezinger testified that PFOA has a half-life of 2 to 10 years.  ECF No. 78 at 219:18–220:8.  Regardless, the use of the undefined, non-scientific moniker "forever chemical" conveys no scientific or legal meaning.

treated water, toxicologist Catherine Boston calculated running annual average HFPO-DA concentrations of 5.3 ppt in 2023 and 5.6 ppt in 2024—values well under 10 ppt. ECF No. 17-7 ¶ 20. Even WVRC's expert Dr. Jennifer Schlezinger concedes that "the HFPO-DA concentrations [in Ms. Robinson's drinking water] may be compliant with the annual averaging requirements of EPA's maximum contaminant level." ECF No. 18-1 ¶ 16.

Nevertheless, WVRC still argued at the preliminary-injunction hearing that HFPO-DA in Ms. Robinson's treated water fails to meet the MCL. WVRC is wrong. It made a two-part argument: First, it inaccurately described the way in which MCL compliance is determined. Second, using that inaccurate method, it computed a new running annual average. Chemours addresses each argument in turn.

First, WVRC urged the Court to disregard available Lubeck water sampling results, claiming incorrectly that EPA would consider only certain results when calculating the average for MCL compliance. Compliance, WVRC asserts, is calculated by averaging the four highest-concentration samples from each quarter. ECF No. 78 at 182:19–21, 183:2–3 ("EPA's compliance methodology only bases its annual average on four data points unless the state orders a confirmation sample . . . Did you calculate the annual average based on the highest sample from each quarter?"). But this argument mischaracterizes the nature of the available, and meaningful, Lubeck sampling data.

In EPA's 2024 MCL rule, the agency explained that a water provider such as Lubeck must collect quarterly samples to determine MCL compliance and is not allowed to attempt to adjust its quarterly average by conducting additional voluntary sampling. EPA expressed concern that, should additional voluntary sampling be allowed, a water utility that received a particularly high value early in a given quarter might rush to collect additional samples to attempt to lower its

quarterly average. PFAS National Primary Drinking Water Regulation, 89 Fed. Reg. 32,532, 32,613 (Apr. 26, 2024). EPA acknowledged, however, that "the state may require a confirmation sample for any sampling results and, if this sample is required, the result **must be averaged** with the first sampling results and **used for the compliance determination**." *Id.* At Lubeck, no quarterly samples intended to officially determine MCL compliance are currently available, as Lubeck and similarly situated water utilities are not required to complete this quarterly sampling until April 26, 2027. *Id.* at 32,618. Instead, the sampling data currently before this Court was collected to comply with a 2006 Safe Drinking Water Act Order with EPA that requires the collection of periodic samples of Lubeck's drinking water after it has passed through carbon treatment. ECF No. 78 at 70:17–23, 71:7–17, 192:8–193:1; ECF No. 17-8 ¶ 11. WVRC, in its attempt to paint a picture of imminent and irreparable harm where none exists, urges this Court and Chemours' expert Catherine Boston to disregard valid water quality samples that have been collected at consistent monthly intervals for years as required. This Court should reject WVRC's attempted sleight-of-hand and consider all valid water quality data available when evaluating the likelihood of irreparable harm, as this data collected pursuant to an EPA Order is the equivalent of the state-ordered data that EPA requires to be considered when calculating MCL compliance.

Second, using its preferred compliance calculation, WVRC averaged the highest concentrations of HFPO-DA in Lubeck's treated water from each quarter and arrived at a value of 11.4 ppt, greater than 10 ppt. ECF No. 78 at 184:11–18. Assuming for the sake of argument that WVRC's averaging of the four highest-concentration samples from Lubeck is appropriate and that the 11.4 ppt running annual average is correct, Lubeck would *still* be in compliance with the HFPO-DA MCL: EPA requires rounding of the running annual average as the last step in the MCL compliance determination, and the 11.4 ppt value rounded in accordance with EPA's guidance is

10 ppt, compliant with the MCL. *See* EPA Off. of Water, *Per- and Polyfluoroalkyl Substances: Significant Figures and Rounding Requirements*, at 3–4 (Dec. 2024), https://www.epa.gov/system/files/documents/2024-12/pfas-sigfigs-rounding-dec24.pdf. Accordingly, WVRC has failed to show likely harm.

At bottom, WVRC's harm argument rests primarily on one premise: that Chemours has intermittently violated its HFPO-DA Permit limit at Outlets 002 and 005. This is not enough. The argument ignores that other federal courts have already held that NPDES Permit violations, without more, do not amount to irreparable harm warranting a preliminary injunction. *See, e.g.*, *Hudson Riverkeeper Fund, Inc. v. Yorktown Heights Sewer Dist.*, 949 F. Supp. 210, 212 (S.D.N.Y. 1996). This is illustrated by the fact that *thousands* of NPDES Permit violations happen every quarter in the United States,[4] but Federal Courts are not issuing preliminary injunctions, quarter after quarter, for all such violations. And in any event, Chemours already monitors and maintains a granular activated carbon system at Lubeck that treats for PFAS (including for HFPO-DA) all of the water delivered to WVRC member Ms. Robinson. ECF No. 17-8 ¶¶ 24–26, 28, 38; ECF No. 78 at 72:23–25. This treatment at Lubeck effectively intervenes between HFPO-DA in the environment and the drinking water that ultimately reaches WVRC.[5]

---

[4] EPA maintains an "NPDES Noncompliance Report Dashboard" that, as the name suggests, provides "information on [NPDES Permit] violations identified in the four" quarters of each fiscal year. EPA, *Annual NNCR Help*, (last updated June 30, 2025), https://echo.epa.gov/help/nncr/nncr-annual-report-help#category. The Dashboard shows thousands of NPDES Permit violations in EPA Region 3 (where Washington Works is located) in Quarter 2 of 2025 alone. EPA, *Quarterly NPDES Noncompliance Report Search*, (last accessed July 2, 2025), https://echo.epa.gov/facilities/npdes-noncompliance-search.

[5] The existence of this treatment system, which has been operational since 2007, *see* ECF No. 17-8 ¶ 24, is not something that WVDEP may consider when setting the numeric effluent limits for HFPO-DA in Chemours' Permit, but it is a factor that this Court must consider when evaluating whether Permit deviations are likely to cause irreparable harm to WVRC here.

**C. This Case's Record Compared to Relevant Case Law Further Demonstrates the Absence of Likely Harm and WVRC's Failure to Show Likely Irreparable Harm for a Preliminary Injunction.**

Cases with comparable evidence further show the absence of likely harm here. For instance, homeowners near an air station in *Washington v. United States Dep't of the Navy* sought to enjoin increased Navy flight activity. No. 2:19-cv-01059-RAJ-JRC, 2020 WL 8678103, at *1 (W.D. Wash. July 22, 2020). Their alleged injury was, in essence, incremental harm: they argued that "repeated exposure" to increased flight activity over time could eventually cause them hearing damage. *Id.* at *8. The court declined issuing an injunction, stating that the homeowners did not "me[e]t their heavy burden to show a concrete risk of irreparable harm attributable to the increased [flight] operations between [then] and the resolution of th[e] litigation." *Id.* The court reasoned as follows:

- *First*, although experts declared that repeated exposure to flyover activity could cause hearing damage, they never "link[ed] [the homeowners'] . . . increased exposure in the immediate future to a specific level of risk of hearing loss."

- *Second*, the homeowners "failed to provide . . . medical records" to substantiate their hearing-loss claims even though the increased flyover activity had already been "continu[ing] for more than a year."

- *Third*, no declarant claimed causation between hearing loss and the exact increased flight activity at issue. The sole declarant claiming hearing loss alleged that it "occurred *before* the increase in operations."

- *Finally*, homeowners could have "protect[ed] their hearing in other ways" and could have "continue[d] to do so until th[e] matter [wa]s finally resolved."

11

*Id.* (emphasis in original).  The court concluded that possible incremental harm was insufficient, stating that the homeowners "ha[d] yet to come forward with the type of concrete, scientific evidence linking their levels of exposure to a particular quantum of risk of hearing loss that would merit the extraordinary remedy of preliminary injunctive relief."  *Id.* at *9.

Here, the record is akin to *Washington*'s record, albeit even more unfavorable for WVRC:

- *First*, like the experts who claimed that repeated exposure to flyovers could cause hearing loss, WVRC expert Dr. Schlezinger opines that HFPO-DA exposures could adversely affect health.  *See, e.g.*, ECF No. 18-1 ¶ 14 ("HFPO-DA is toxic").  But like the *Washington* experts' failure to "link[] . . . increased exposure in the immediate future to a specific level of risk of hearing loss," Dr. Schlezinger declined to link WVRC member Charlise Robinson's HFPO-DA exposure in the immediate future to a specific level of risk of adverse health outcomes.  When the Court asked Dr. Schlezinger whether Ms. Robinson will likely suffer irreparable harm between now and trial due to Chemours' HFPO-DA discharges, Dr. Schlezinger stated, "I cannot come to a conclusion."  ECF No. 78 at 216:19–217:16.  There is no evidence in the record that would support that conclusion, either.

- *Second*, like the *Washington* flight activity, the violations here pre-date WVRC's Motion.  *See* ECF No. 17 at 4.  Though WVRC's Complaint alleges that the violations have occurred intermittently for years, WVRC has failed—just like the *Washington* homeowners—to provide concrete medical evidence substantiating WVRC's health claims.

- *Third*, like in *Washington*, no declarant here claims causation between Chemours' HFPO-DA Permit violations and adverse health outcomes.  Ms. Robinson claims that her health

problem, preeclampsia, arose in 2005, *before* the challenged HFPO-DA Permit violations and ten years before Chemours came into being.  ECF No. 7-20 ¶ 11.

- *Finally*, a reasonable expectation is that, if WVRC is concerned about health impacts from HFPO-DA in Lubeck's water, WVRC (through it members) is taking precautionary measures before trial, just like the *Washington* homeowners.  Indeed, Ms. Robinson's Declaration implies that she filters her tap water or takes some similar measure.  *See* ECF No. 7-20 ¶ 16 ("I stopped drinking the water *directly distributed from a tap*.") (emphasis added).  And like the *Washington* homeowners, Ms. Robinson has identified no reason why she cannot "continue to do so until this matter is finally resolved."  To the contrary, her Declaration implies that she will continue to refrain from drinking water directly from her tap regardless of what Chemours does.

In short, before the Court is the same insufficient irreparable-harm showing as the showing in *Washington*.

WVRC has claimed, for example, that HFPO-DA exposures can cause incremental harm leading to liver, hematological system, and immune system impacts.  ECF No. 18-1 ¶ 14.  But when Chemours' counsel asked Dr. Schlezinger at the preliminary-injunction hearing whether Ms. Robinson's specific HFPO-DA exposures from her drinking water are likely to cause irreparable harm to WVRC between now and trial, Dr. Schlezinger provided a puzzling response.  She stated that a single HFPO-DA exposure above the 10 ppt MCLG means that Ms. Robinson is likely to suffer an adverse health impact: "[t]hat's what the MCLG stands for."  ECF No. 78 at 238:1–14.  But in EPA's own words, MCLGs are "the maximum level of a contaminant in drinking water at which no known or anticipated adverse effect on the health of persons would occur, allowing an

adequate margin of safety"—nothing more, nothing less.  Dr. Schlezinger misinterprets EPA's language, using the confusion-of-the-inverse logical fallacy:

- That is, if HFPO-DA is at or below 10 ppt, then EPA expects no adverse health effect.

- Dr. Schlezinger reasons from that statement that, if HFPO-DA is *above* 10 ppt (even 0.001 ppt above), then adverse health effects are *expected*.

EPA has not gone so far.  In fact, Congress and EPA made clear that MCLGs incorporate "an adequate margin of safety."  42 U.S.C. § 300g-1(b)(4)(A); 40 C.F.R. § 141.2.  And courts recognize MCLGs as "aspirational."  *Chlorine Chemistry Council v. EPA*, 206 F.3d 1286, 1287 (D.C. Cir. 2000).  If EPA believed that any HFPO-DA MCLG exceedance, no matter how slight, means *likely* adverse health effects, the agency would not have allowed drinking-water providers to show compliance with the MCL by using running annual averages.  *See Chem. Weapons Working Grp. Inc. v. U.S. Dep't of Army*, 935 F. Supp. 1206, 1215 (D. Utah 1996) (recognizing that a state environmental agency's methodology for "calculat[ing] safe levels of exposure . . . does not determine levels at which harm is likely to occur.").

Accordingly, this Court needs something more—not just assertions that HFPO-DA exposure can cause incremental harm, paired with a misreading of an EPA limit—to find that irreparable harm is likely to befall WVRC between now and trial.  WVRC bares this evidentiary burden.  Its exact burden is to show that ***it*** will ***likely*** suffer ***irreparable*** harm between now and trial in the absence of relief and that its harm outweighs Chemours' harm in the event of an injunction.  *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008); *Mountain Valley Pipeline, LLC v. W. Pocahontas Props. Ltd. P'ship*, 918 F.3d 353, 366 (4th Cir. 2019).  But it cannot meet this burden.  When the Court asked Dr. Schlezinger whether Ms. Robinson is likely to suffer harm between now and trial and reminded her that Ms. Robinson allegedly only uses household water

14

to "brush[] her teeth and so forth," Dr. Schlezinger conceded that she "***cannot come to a conclusion***." ECF No. 78 at 216:19–217:15.

The most on-point case, in conjunction with today's *Winter* standard, further shows that a preliminary injunction would be inappropriate here. In *Reserve Mining Co. v. EPA*, environmental groups moved to enjoin a corporation's permitted discharges to Lake Superior. 514 F.2d 492, 499 (8th Cir. 1975). The plaintiffs claimed that the corporation violated the Clean Water Act (among other laws) and contaminated communities' drinking water with asbestos. *Id.* at 501. Even though "about 3,000 workers" worked at the corporation's facility, which was "central to the economic livelihood of . . . [the] surrounding communities," the trial court enjoined the corporation, effectively shutting down its plant. *Id.* at 499, 500 n. 4.

The Eighth Circuit held on appeal that the trial court abused its discretion, stating that risk of harm was "potential, not imminent or certain." *Id.* at 537. While the "record d[id] show that the ingestion of asbestos fibers pose[d] some risk to health," the risk was "to an undetermined degree." *Id.* at 517. The evidence before the court, moreover, was "insufficient to support the kind of demonstrable danger to the public health that would justify the immediate closing of [the corporation's] operations." *Id.* at 507. The incremental risk from additional exposure instead created only "a *possibility* of future harm." *Id.* at 535 (emphasis added). By contrast, a shutdown of the corporation's facility would, with a high degree of certainty, cause "unnecessary economic loss, including unemployment" and would "jeopardize a continuing domestic source of critical metals without conferring adequate countervailing benefits." *Id.* at 537.

The court accordingly modified the injunction, giving the corporation "a reasonable opportunity and a reasonable time to construct facilities to accomplish an abatement of its pollution of air and water and the health risk created thereby." *Id.* at 537. The court particularly provided

the corporation with time to (1) receive responses from the State of Minnesota on the corporation's pollution-handling plan and (2) to construct the necessary abatement facilities. *Id.* at 538.

Today, the *Reserve Mining* outcome would be different in that the Eighth Circuit would have vacated the injunction entirely, rather than merely limiting it substantially. *Winter* holds that a possibility of harm alone does not suffice for an injunction: "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008) (citation omitted). If *Reserve Mining*—which involved only a "possibility of future harm"—was decided today, the court would likely have applied the *Winter* standard and reversed altogether the trial court's decision.

Here, WVRC's evidence is similar to the *Reserve Mining* evidence in that it purports to show that ingestion of the discharged material (HFPO-DA) poses *some* additional health risk. For example, Dr. Schlezinger testified that HFPO-DA elicits fatty liver in mice, ECF No. 78 at 204:7–12, and that shorter-term HFPO-DA exposure could disrupt placental development and birth weight of rodent pups, *id.* at 201:11–15. But like the plaintiffs in *Reserve Mining*, WVRC has not taken the extra step to show an "imminent hazard to health or welfare" justifying drastic injunctive relief. *Reserve Mining*, 514 F.2d at 537.

*First*, Dr. Schlezinger conceded that she "did not review any human data" in forming her opinions. ECF No. 78 at 227:24. Her admission is significant because humans' response to PFAS exposure differs from rodents' response to PFAS exposure. *Id.* at 185:6–14. Rodent studies thus "need[] to be interpreted with caution," as explained by toxicologist Catie Boston. *Id.*

*Second*, when Chemours' counsel inquired about the specifics (i.e., whether harm is likely to befall WVRC between now and trial due to the violations at issue), Dr. Schlezinger internally contradicted herself.  She stated at first that, "[a]ccording to the MCLG," consuming water with HFPO-DA above 10 ppt for even "one day" will make it likely that Ms. Robinson will suffer liver disease.  *Id.* at 238:7–14.  A few moments later, when asked whether a one-time exposure to HFPO-DA above 10 ppt will make it "likely" that the person drinking the water will "suffer a liver disease," she responded, "No."  *Id.* at 239:6–9.  Out of the two responses, the latter is the credible one: EPA never stated when promulgating the HFPO-DA MCLG that a one-time exposure to drinking water with HFPO-DA above 10 ppt means that liver disease is likely.  *See generally* 40 C.F.R. Part 141.  What EPA *has* stated is that "***some*** people who drink water containing HFPO-DA in excess of the MCL ***over many years*** ***may*** have increased health risks such as immune, liver, and kidney effects."  40 C.F.R. Subpart O, App. A (emphasis added).

*Finally*, Dr. Schlezinger conceded that WVRC did not provide her with enough information about Ms. Robinson to allow Dr. Schlezinger to opine on health impacts to Ms. Robinson between now and trial due to HFPO-DA discharges.  Dr. Schlezinger testified as follows:

- Ms. Robinson's statement in her Declaration that she uses her household water for limited purposes, like brushing her teeth, "would limit [Ms. Robinson's] exposure."  ECF No. 78 at 217:4–8.

- Dr. Schlezinger did not have enough information regarding the "contribution of [Ms. Robinson] brushing her teeth and washing her . . . vegetables and cooking her . . . food in that water . . . versus how much drinking water she would have drank."  *Id.* at 217:11–15.

- Because WVRC failed to supply sufficient information, Dr. Schlezinger could not "come to a conclusion" regarding whether Ms. Robinson will "suffer additional harm or injuries" due to Chemours' violations at Outlets 002 and 005. *Id.* at 216:19–217:10.

Concluding whether irreparable harm is likely to befall WVRC through Ms. Robinson between now and trial—and whether WVRC's harm without an injunction outweighs Chemours' harm with an injunction—is a key element of WVRC's burden here. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008); *Mountain Valley Pipeline, LLC v. W. Pocahontas Props. Ltd. P'ship*, 918 F.3d 353, 366 (4th Cir. 2019). WVRC has not met that burden, leaving this Court only with evidence that HFPO-DA exposure in the abstract could possibly cause harm. In *Reserve Mining*, the court noted that this kind of showing—a showing of possible harm—did ***not*** warrant cessation of a facility's discharge activities. 514 F.2d at 537. And under today's *Winter* standard, mere possible harm is insufficient to warrant preliminary injunctions. 555 U.S. at 22; *see also Chem. Weapons Working Grp.*, 935 F. Supp. at 1215, 1220 (denying injunctive relief because, "[a]lthough plaintiffs [we]re able to put forward a scenario in which a breast-feeding infant would be exposed at levels significantly higher than levels determined by Utah DEQ to be safe, they have not submitted evidence that any plaintiff, or any person at all, would in fact be placed at risk by the projected dioxin emissions").

Notably, the *Reserve Mining* court's modified injunction mirrors the process already taking place here. The court there provided time for the defendant to create a pollution-compliance plan, time to receive feedback on the plan from the applicable governmental authorities, and time to install abatement projects—all of which Chemours and EPA already have in motion. *Compare Reserve Mining*, 514 F.2d at 537–38, *with* ECF No. 17 at 5–8.

**D. Relevant Case Law Further Demonstrates that Any Alleged Harm Here Is Not Enough to Confer Standing.**

As noted, the *threat* of harm—e.g., from repeated exposure to a pollutant over time—is insufficient to confer standing where the threat is so insignificant that harm is unlikely to materialize. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). In *Beck v. McDonald*, the threat of identity theft from a data breach (due to a laptop getting stolen) was not sufficient to "establish a substantial risk of harm" conferring standing. 848 F.3d 262, 275 (4th Cir. 2017) (quotations omitted). Even a 33% chance of identify theft was not sufficient to establish the necessary harm for standing. *Id.* at 276; *see also South Carolina v. United States*, 912 F.3d 720, 729 (4th Cir. 2019) (holding that injury for standing cannot arise from a "chain of possibilities"); *see also Sierra Club v. EPA*, 754 F.3d 995, 1001 (D.C. Cir. 2014) (denying standing to an environmental group, stating that even while "environmental and health injuries often are purely probabilistic," there must still be a "substantial probability that [the plaintiff] will be injured" and that the "increased risk must be nontrivial" to meet the injury-in-fact standard) (internal quotations omitted).

Here, WVRC has put forth evidence that Chemours has violated its HFPO-DA Permit limits at Outlets 002 and 005 and that HFPO-DA in the abstract could cause adverse health effects. But there cannot be a "substantial risk" or "substantial probability" that WVRC will be injured through its drinking water due to Chemours' Permit violations where:

- WVRC's member's drinking water is meeting the HFPO-DA MCL (*see* discussion *supra* pp. 6–10);

- Chemours is monitoring and treating for PFAS the water delivered to WVRC's member and will continue to do so (ECF No. 17-8 ¶¶ 24–26, 28, 38; ECF No. 78 at 72:23–25);

- Chemours is actively addressing its HFPO-DA Permit violations with on-the-ground abatement efforts (e.g., designing, constructing, and operating the recent B-22 Sump Treatment Project) (ECF No. 17-1 ¶ 35) and its HFPO-DA Permit violations by way of an Administrative Order on Consent with EPA specifically designed to "address the violations" (ECF No. 7-18 at 11); and,

- WVRC has failed to allege that its member is even drinking her household water.

On this record, WVRC cannot show a substantial risk of harm. To the extent that there is *any* threat to WVRC here, it is less than the 33% chance of identify theft deemed insufficient to confer standing in *Beck v. McDonald*. 848 F.3d at 275–76. The Court would need to assume a "chain of possibilities" to arrive at the conclusion that there is substantial risk here; it would need to assume, for example, that Ms. Robinson will drink her household water, that the granular activated carbon system that Chemours maintains at Lubeck will not filter out HFPO-DA sufficiently to avoid a substantial risk of harm to Ms. Robinson, etc. Accordingly, even though the threat of harm can in some instances confer Article III standing, the threat here (if any) is not enough.

## II. Injunctions Must Be Narrowly Tailored to Alleged Harms. WVRC's Sought-After Injunction "Prohibiting Chemours from Violating its Permit Limits . . . By Any Means Necessary" Is Improper Obey-the-Law Relief.

Injunctions normally must "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994). The Fourth Circuit follows that directive. *Mayor of Balt. v. Azar*, 973 F.3d 258, 293 (4th Cir. 2020); *see also Roe v. Dep't of Def.*, 947 F.3d 207, 231 (4th Cir. 2020) (stating that courts issuing injunctions "should 'mold [their] decree to meet the exigencies of the particular case'" and "ensure" that injunctions are "no more burdensome to the defendant than necessary") (internal citations omitted).

20

For instance, the district court in *Hughey v. JMS Development Corp.* issued an overly broad injunction.  78 F.3d 1523, 1531 (11th Cir. 1996).  It specifically ordered the defendant to "not discharge stormwater into the waters of the United States . . . if such discharge would be in violation of the Clean Water Act."  *Id.*  The Eleventh Circuit dissolved the injunction on appeal, reasoning that the order was an impermissible "obey the law" directive with "[b]road, non-specific language" that ran counter to the rule that injunctions "must be tailored to remedy the specific harms shown."  *Id.* at 1531–32.

Here, WVRC's Motion seeks an injunction requiring Chemours to stop "violating its permit limits for HFPO-DA at Outlets 002 and 005 by any means necessary."  ECF No. 8 at 2, 20.  WVRC thus seeks a vague obey-the-Clean Water Act injunction that would be burdensome to Chemours.  The specific harm that WVRC seeks to remedy is drinking water impacts.  *See generally* ECF No. 8.  An injunction "tailored to remedy the specific harms" asserted, *Hughey*, 78 F.3d at 1531, would apply to drinking water.  The only WVRC member discussed in WVRC's Motion and during the preliminary-injunction hearing is Charlise Robinson.  Ms. Robinson gets her household water from Lubeck.  A narrowly tailored injunction might, for example, require more frequent monitoring and subsequent filter changeouts or other measures in the granular activated carbon system that Chemours maintains at Lubeck.  Such an injunction would reduce the HFPO-DA concentrations in Ms. Robinson's treated drinking water (which are low and compliant with the HFPO-DA MCL already).

A tailored injunction is of particular importance here, where the evidence shows that Lubeck's drinking water is sourced from a groundwater aquifer that contains levels of HFPO-DA higher than the levels observed in the Ohio River. ECF No. 79 at 23:17–26:6. Given that Lubeck sources its drinking water from an aquifer, rather than the Ohio River directly, it can take a

substantial amount of time for HFPO-DA present in the river or deposited onto the ground to migrate through the aquifer and into Lubeck's intake. ECF No. 79 at 38:11–17; 61:16–19; 79:2–15. As such, the levels currently detected at Lubeck's intake do not reflect Washington Works' current discharges, but the facility's discharges from past years (*id.* at 70:7–9), potentially including prior to when the Permit even included a numerical limit for HFPO-DA. Therefore, the quality of finished drinking water at Lubeck today and for years to come is directly dependent on the effectiveness of the Chemours operated treatment system rather than the concentrations of HFPO-DA in Washington Works' current discharges.

In short, if the Court finds that WVRC has met its heavy burden to secure a preliminary injunction and fashions relief in favor of WVRC, such relief should not be punitive and should be designed to address WVRC's specifically alleged harms.

WHEREFORE, for the reasons on set forth herein, in the pleadings and papers filed by Chemours, the testimony of the witnesses and hearing exhibits, and the arguments of counsel, the Court should deny WVRC's motion for a preliminary injunction.

**THE CHEMOURS COMPANY FC, LLC**

**By: SPILMAN THOMAS & BATTLE, PLLC**

*/s/ Clifford F. Kinney, Jr.*
David L. Yaussy (WV State Bar No. 4156)
Clifford F. Kinney, Jr. (WV State Bar No. 6220)
Niall A. Paul (WV State Bar No. 5622)
Joseph A. Ford (WV State Bar No. 12984)
SPILMAN THOMAS & BATTLE, PLLC
300 Kanawha Boulevard, East
Charleston, WV  25301
(304) 340-3800
(304) 340-3801 (*facsimile*)
dyaussy@spilmanlaw.com
ckinney@spilmanlaw.com

22

npaul@spilmanlaw.com
jford@spilmanlaw.com

James A. Walls (WV State Bar No. 5175)
SPILMAN THOMAS & BATTLE, PLLC
48 Donley Street, Suite 800
Morgantown, WV  26501
(304) 291-7920
(304) 291-7979 (*facsimile*)
jwalls@spilmanlaw.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**WEST VIRGINIA RIVERS COALITION, INC., and
LITTLE HOCKING WATER ASSOCIATION, INC.**

       **Plaintiffs,**

**v.**                        **CIVIL ACTION NO. 2:24-cv-00701**

**THE CHEMOURS COMPANY FC, LLC,**

       **Defendant.**

**<u>CERTIFICATE OF SERVICE</u>**

    I, Clifford F. Kinney, Jr., hereby certify that on July 3, 2025, I electronically filed the foregoing "**Chemours' Post-Hearing Brief**" via the Court's CM/ECF electronic filing system, which will send notification to all e-filing participants in this action.

                                  */s/ Clifford F. Kinney, Jr.*
                                  Clifford F. Kinney, Jr. (WV State Bar No. 6220)