**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF WEST VIRGINIA**
**AT CHARLESTON**

**WEST VIRGINIA RIVERS**
**COALITION, INC.,**

      **Plaintiff,**

**v.**                              **Civil Action No. 2:24-cv-00701**

**THE CHEMOURS COMPANY FC, LLC,**

      **Defendant.**

**PLAINTIFF'S POST-HEARING BRIEF IN SUPPORT**
**OF ITS MOTION FOR A PRELIMINARY INJUNCTION**

**INTRODUCTION**

Plaintiff West Virginia Rivers Coalition has asked this Court to preliminarily enjoin Chemours from violating its water quality–based effluent limits for HFPO-DA at Outlets 002 and 005 of the Washington Works Plant because of the irreparable harm such violations will cause to the environment, the Ohio River, West Virginia Rivers Coalition member Charlise Robinson, other users on the Lubeck water system, and the broader public as far downstream as Louisville, Kentucky. The Court conducted a three-day preliminary injunction hearing from May 21 to May 23, 2025, to hear evidence on this issue, including testimony from six witnesses. At the conclusion of the hearing, the Court asked the parties to submit proposed findings of fact and conclusions of law, as well as a forty-page brief to more fully address legal questions with regards to standing and irreparable harm.

Specifically, the Court directed the parties "to brief the proposition that incremental harm to human health is a cognizable injury for Article III standing and irreparable harm for a preliminary injunction." ECF No. 70. As explained below, incremental harm to human health is

more than sufficient to establish either a cognizable injury for Article III standing or irreparable harm to support a preliminary injunction. Plaintiff has made a clear showing of incremental harm to human health from Defendant's illegal discharges through its briefing, exhibits, and live testimony at the three-day hearing.

However, Plaintiff's showing here is more than Congress or any court has required. To prove standing and irreparable harm in a Clean Water Act ("CWA") case, a plaintiff need only show that harm the CWA intended to protect against—the environmental integrity of our waters— is likely and will adversely affect Plaintiff and the public. That can of course include risks to human health, but it also broadly includes aesthetic, recreational, and other interests. As explained more fully in the Proposed Findings of Fact and Conclusions of Law, *see* Exhibit 1 hereto, because Plaintiff has established standing and has made a clear showing that irreparable harm is likely and that the three other injunction factors are also satisfied, the Court should preliminarily enjoin Chemours and order it to comply with its permit limits for HFPO-DA at Outlets 002 and 005 immediately and by any means necessary.

## BACKGROUND

Before addressing the standing and irreparable harm issues, Plaintiff believes it valuable to provide background on the CWA and the relevant provisions at issue here, as well as how the Safe Drinking Water Act ("SDWA") interacts with the CWA and this case.

Congress enacted the CWA to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). As the Fourth Circuit has observed, the CWA's "purpose . . . is to protect the waters of Appalachia and the nation and their healthfulness, wildlife, and natural beauty." *S. Appalachian Mountain Stewards v. A & G Coal Corp.*, 758 F.3d 560, 569 (4th Cir. 2014). In furtherance of that goal, the CWA mandates multiple mechanisms to

limit and control pollution entering the Nation's waters, several of which are relevant to Plaintiff's CWA enforcement action against Chemours. Section 301 of the CWA—which this Court has described as the "heart of the CWA," *Ohio Valley Env't Coalition, Inc. v. Hobet Mining, LLC*, 723 F. Supp. 2d 886, 901 (S.D. W. Va. 2010)—prohibits "the discharge of any pollutant" without a permit, such as a permit under CWA Section 402. 33 U.S.C. § 1311(a). Section 402 establishes a national permit program—the "National Pollution Discharge Elimination System" or NPDES—that may be administered by EPA or by states that seek and obtain delegated authority from EPA. 33 U.S.C. § 1342. The CWA codifies a form of "cooperative federalism," *Naturaland Tr. v. Dakota Fin. LLC*, 41 F.4th 342, 344 (4th Cir. 2022), and most states, including West Virginia, possess delegated authority to administer NDPES permits. 47 Fed. Reg. 22363 (May 10, 1982).

NPDES permits establish effluent limitations and other limits on a polluter's discharges. 33 U.S.C. § 1342; 40 C.F.R. Part 122. After delegation, EPA's role in these permits is one of oversight (of the program as a whole and of permit issuance) and enforcement of state-issued permits. 33 U.S.C. §§ 1342(c)(3), 1342(d), 1342(i). Section 505 authorizes citizen suits against any person who violates an effluent limitation, and allows those citizens to seek both injunctive relief and civil penalties. *Id.* § 1365. The CWA imposes strict liability for violations. *Sierra Club v. W. Va. Dep't Env't Prot.*, 64 F.4th 487, 503 (4th Cir. 2023).

Plaintiff has invoked Section 505 to bring a citizen suit enforcement action against Chemours for its unlawful discharges of HFPO-DA—a forever chemical—from Outlets 002 and 005 at its Washington Works Plant near Parkersburg, West Virginia. As Chemours admits in the Joint Stipulation, Chemours's limits for HFPO-DA are water quality–based effluent limits, otherwise known as "WQBELs." ECF No. 55 (hereafter "Joint Stip.") ¶ 5. WQBELs are required by 33 U.S.C. § 1311(b)(1)(C). They are one of two common type of permit limits—the other being

technology based effluent limitations (known as "TBELs"). *See generally Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of N.Y.*, 451 F.3d 77, 85 (2d Cir. 2006) (discussing those two categories of effluent limitations). When TBELs are insufficient to attain designated water quality standards (such as protecting the Ohio River as a drinking water resource), WQBELs are imposed "without regard to cost or technology availability." *City & County of S.F. v. EPA*, 145 S.Ct. 704, 712 (2025) (internal quotation marks omitted). WQBELs—like Chemours's limits for HFPO-DA at Outlets 002 and 005—"permit only those discharges that may be made without unduly impairing water quality." *Id.* The CWA provides that those water quality standards "shall be such as to protect the public health or welfare, enhance the quality of water and serve the purposes of this chapter." 33 U.S.C. § 1313(c)(2)(A). As the Fourth Circuit has explained, WQBELs are established "to attain a particular water quality" and "are set at the level necessary to protect the designated uses of the receiving waterways." *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 157 (4th Cir. 2000) (en banc) ("*Gaston Copper*"). WQBELs are required to protect all water quality standards, including a state's narrative criteria. 40 C.F.R. § 122.44(d)(1).

When WVDEP issued Chemours's NPDES permit that is at the center of Plaintiff's lawsuit, WVDEP set WQBELs for HFPO-DA at the "level necessary to protect human health and the environment." Joint Stip. ¶ 5. As WVDEP recognized in the permit fact sheet, it had "concerns with the toxicity from . . . HFPO-DA and its impact on the narrative water quality criteria found in 47 CSR 2, Section 3.2.e which prohibits discharges from discharging materials in concentrations which are harmful to or toxic to man, animal, or aquatic life." ECF No. 65-2 at 14. Thus, WVDEP recognized that it was required to set an effluent limit, and in so doing, WVDEP used "a health goal for HFPO-DA (GenX) in drinking water at 140" ppt from North Carolina to "be protective of

the State's narrative water quality criteria for human health and the designated uses of the Ohio River." Joint Stip. ¶ 4.

Since January 1, 2022, Chemours has had final limits on discharges of HFPO-DA from Outlets 002 and 005. Those limits at Outlet 002 are a monthly average of 1.4 ug/l, or 1400 ppt, and a daily maximum of 2.3 ug/l, or 2300 ppt. The limits at Outlet 005 are a monthly average of 1.1 ug/l, or 1100 ppt, and a daily maximum of 2.3 ug/l, or 2300 ppt. Joint Stip. ¶ 3. Thus, although WVDEP used the then-applicable health goal for HFPO-DA of 140 ppt to set those permit limits, Chemours is permitted to discharge waste with HFPO-DA concentrations far in excess of 140 ppt from its Outlets, which discharge into the Ohio River. Stated otherwise, WVDEP used the 140 ppt standard (for what was considered safe at the time) to reverse engineer permit limits at the end of pipe for Outlets 002 and 005 that would be protective of human health and the environment, while taking into account dilution in the Ohio River, mixing zones, and the fact that other outlets at the Washington Works Plant will also discharge HFPO-DA into the River.

Since those 2018 limits were set, EPA has established new health guidelines of 10 ppt for HFPO-DA, which it formalized under the SDWA in a Maximum Contaminant Level Goal ("MCLG") and Maximum Contaminant Level ("MCL"). *See generally* 89 Fed. Reg. 32532 (April 26, 2024). WVDEP's 2018 health standard of 140 ppt is 14 times higher than EPA's 2024 health standard of 10 ppt. Although there are elements of cooperative federalism under the SDWA's regulation of underground injection wells, EPA has the sole authority to prescribe MCLGs and MCLs. 42 U.S.C. § 300g-1. Stated otherwise, the State of West Virginia played no role in setting the MCLG or MCL for HFPO-DA under the SDWA, but it looks to those limits when calculating NPDES permit limits. *See, e.g.*, W. Va. Dep't of Envtl. Prot., *Responsiveness Summary: West*

*Virginia/National Pollutant Discharge Elimination System (WV/NPDES) Permit No. WV0117986* (July 15, 2024) (attached as Exhibit 2).

The CWA is separate and distinct from the SDWA, which was enacted to "prescribe minimum national standards concerning the purity of drinking water for the protection of the public health." *Hudson River Fishermen's Ass'n v. City of N.Y.*, 751 F. Supp. 1088, 1099–1100 (S.D.N.Y. 1990), *aff'd*, 940 F.2d 649 (2d Cir. 1991). The SDWA aims to protect public health in drinking water, while the CWA has a broader purpose of protecting the *environmental* integrity of the Nation's waters so that these waters are swimmable, fishable, and drinkable. Thus, the objectives of the CWA and SDWA are not "mutually exclusive," nor are they in conflict, but rather they are "complementary." *Id.* As the Fourth Circuit has explained, the CWA reasonably imposes more stringent limits than those under the SDWA because "the regulated pollutants [under the CWA] could harm waterways and aquatic life, and could introduce chemicals which hamper treatment facilities' ability to treat wastewater, even at levels where they might not directly harm humans." *United States v. Hartsell*, 127 F.3d 343, 351–52 (4th Cir. 1997).

Ignoring these differences between the CWA and the SDWA, Chemours argues that Plaintiff must demonstrate a violation of the SDWA in Lubeck's treated drinking water to establish standing and irreparable harm. Not so. Chemours's position is not supported by statute, regulation, or case law. This is a CWA enforcement case, not a SDWA enforcement case. The relevant substantive policies are found in the CWA, not the SDWA. "[T]he Safe Drinking Water Act cannot be interpreted to deprive plaintiff of its statutory right under the Clean Water Act." *Hudson River*, 751 F. Supp. at 1099–1100. As the Tenth Circuit has explained, it is "preferable to base the determination of irreparable harm on the statutes that actually form the basis of plaintiffs' claims." *Greater Yellowstone Coalition v. Flowers*, 321 F.3d 1250, 1257 (10th Cir. 2003). Thus, it must be

the CWA, not the SDWA, that informs whether Plaintiff has proved standing and likely irreparable harm from Chemours's unlawful discharges of HFPO-DA. *See* ECF No. 78 (hereafter "May 22 Tr.") at 116:6–12 ("THE COURT: . . . Environmental harm must link to a CWA violation, which I take it the plaintiffs say is occurring here, and language from other statutes such as the ESA, my research says do not serve as a benchmark in deciding whether Plaintiffs have shown irreparable harm."). To put it another way, Plaintiff need not prove a violation of the SDWA MCLG for HFPO-DA (10 ppt), the MCL for HFPO-DA (10 ppt on an annual average), or that people are actually drinking water above such levels on a daily or annual basis to prove standing or irreparable harm, despite Chemours's unsupported arguments to the contrary.

Indeed, by trying to import SDWA standards into its CWA permit, Chemours is attempting to collaterally attack and weaken its own NPDES permit. Under Chemours's approach, a permit violation at the end of its discharge pipe is not enforceable (because no one would have standing) and does not cause irreparable harm unless and until it also causes an MCL violation in Lubeck's (or some other water system's) treated drinking water *on an annual average*. That argument is impermissible since the NPDES permit limits were set by WVDEP to protect human health and the environment. Courts "will not consider collateral attacks on the validity of permit conditions in the course of an enforcement action or citizen suit, whether those attacks arise offensively or defensively." *Puget Soundkeeper All. v. Port of Tacoma*, 104 F.4th 95, 105 (9th Cir. 2024); *see also OVEC v. Fola Coal Co., LLC*, No. 2:12-cv-3750, 2013 WL 6709957, at *13 (S.D. W. Va. Dec. 19, 2013). If Chemours thought that its limits were too strict or that it could have discharged more HFPO-DA while still being protective of human health, it could have prosecuted an appeal of its limits. It did not and it cannot now retroactively attack WVDEP's determination on that point in this lawsuit.

The foregoing discussion of the CWA and the SDWA provides the context for evaluating the proposition set forth by the Court: that incremental harm to human health is a cognizable injury for Article III standing and irreparable harm for a preliminary injunction. As explained further below, the Court's proposition is correct.

## ARGUMENT

The Court has asked the parties to address the proposition that "incremental harm" to human health is sufficient to establish an injury-in-fact *and* irreparable harm in a CWA case. As the Court explained during the preliminary injunction hearing, and defense counsel agreed, the CWA is "designed to prevent increments of harm from amounting to observable and serious harm." ECF No. 79 (hereafter "May 23 Tr.") at 63:8–16. The Court also explained that "incremental harm" is essentially a dose of a pollutant that does not on its own necessarily cause perceptible or quantifiable harm but, with enough repeated exposure or cumulation, could eventually lead to a manifested symptom of harm. *Id*. 64:18–65:3; 65:8–17; 66:24–67:9; 67:13–25; 68:7–13; 68:20–22. The CWA is undoubtedly designed to prevent incremental harm to the environment. But the CWA does not require proof that the plaintiff or the public is actually drinking contaminated water such that they are at risk of manifesting physical injuries before a court may preliminarily enjoin unlawful discharges. Nonetheless, even if that were the standard, Plaintiff has proven that Ms. Robinson and the public have been incrementally harmed by being exposed to water with HFPO-DA concentrations above 10 ppt from the Lubeck system.

## I.      Plaintiff Has Established Article III Standing

Incremental harm to human health is more than sufficient to establish standing in a CWA case. Indeed, as described below, standing in the citizen suit context presents a much lower hurdle. Imposing a requirement that a person actually be exposed to concentrations of pollution such that

one day they may suffer from adverse health effects would raise the standing bar far higher than Congress ever intended for CWA cases, and certainly higher than what Article III requires. Regardless, Plaintiff's primary standing witness meets that high bar because she is on a water system that is contaminated by Chemours's unlawful discharges and has been exposed to levels of HFPO-DA that are dangerous, thus receiving daily doses that unfortunately could one day manifest into serious illness or disease.

### A.  Basic Standing Principles for CWA Citizen Suits

Congress decides "who may enforce [statutory rights] and in what manner." *Davis v. Passman*, 422 U.S. 228, 241 (1979). Congress may "elevate to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016). It "has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before." *Id.*

In the CWA, Congress gave citizens a new cause of action to vindicate a mixture of public and private rights. Citizens assert their own rights to be free of harm from pollutant releases, but their enforcement and remedial powers are similar to those of the government. A citizen sues "on his own behalf," 33 U.S.C. § 1365(a), but also as a "private attorney[] general," *Middlesex County Sewerage v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 16–17 (1981).

Citizens bringing an enforcement action under this provision must have "an interest which is or may be adversely affected." 33 U.S.C. § 1365(g). Citizens have a limited cause of action to enforce violations of CWA requirements and thereby, in effect, to abate and deter a public nuisance—the pollution of the nation's environmental resources. *Cf. Tull v. United States*, 481 U.S. 412, 420 (1987) (CWA claim for filling wetlands without a permit "resembles . . . public nuisance."). The defendant's liability is the same whether the plaintiff is a citizen or the

government. The "standards for which enforcement would be sought either under administrative enforcement or through citizen enforcement procedures are the same." S. Rep. No. 414, 92d Cong., 1st Sess. 80 (1971). For example, citizen and government suits are subject to the same statute of limitations because citizen plaintiffs "effectively stand in the shoes of the EPA." *PIRG v. Powell Duffryn Terminals Inc.*, 913 F.2d 64, 76 (3d Cir. 1990). As to remedies, both citizens and the government may seek only injunctive relief and civil penalties payable to the U.S. Treasury. 33 U.S.C. §§ 1319(d), 1365(a).

To establish standing to seek prospective relief, citizen-plaintiffs must prove they suffer ongoing or threatened harm that may be ameliorated by compelling the defendant to cease its unlawful conduct. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). The test is the same whether the prospective relief takes the form of an injunction or civil penalties to deter future violations. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 174 (2000) (describing civil penalties as "an alternative to an injunction"). Accordingly, their injuries need not be presently occurring, but instead may be "imminent." *Clapper*, 568 U.S. at 409. Put differently, plaintiffs seeking prospective relief meet the injury requirement if they are at "risk of real harm." *Spokeo*, 578 U.S. at 341. Plaintiffs need not wait to be sickened before suing to stop unlawful discharges of a toxic chemical, provided their concerns about future harm are reasonable. *See Laidlaw*, 528 U.S. at 183. Nor must plaintiffs allege a threat of physical injury. Harms to a plaintiff's aesthetic and recreational interests are concrete for purposes of Article III. *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009). Plaintiffs are also injured when they change their behavior or avoid certain areas due to reasonable concerns about pollution. *Clapper*, 568 U.S. at 419; *Laidlaw*, 528 U.S. at 183–84. In addition, when injunctive relief is at issue, redressability is generally presumed because courts can order defendants to cease their violations.

## B. Injury-In-Fact

As the Fourth Circuit and this Court have both explained, "[i]n the environmental litigation context, the standing requirements are not onerous." *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 517 (4th Cir. 2003); *see also* ECF No. 85 at 4–5. For injury-in-fact specifically, it "need not be great or substantial; an identifiable trifle, if actual and genuine, gives rise to standing." *Conservation Council of N.C. v. Costanzo,* 505 F.2d 498, 501 (4th Cir.1974); *see also Gaston Copper*, 204 F.3d at 156–57 (The claimed injury "'need not be large, an identifiable trifle will suffice.'") (quoting *Sierra Club v. Cedar Point Oil Co.,* 73 F.3d 546, 557 (5th Cir. 1996)); *Ohio Valley Env't Coalition v. Horinko*, 279 F. Supp. 2d 732, 745 n.15 (S.D. W. Va. 2003). As one district court explained, "Congress has identified NPDES violations, however trifling, as injurious to persons such as plaintiffs' members, who use bodies of waters into which a permittee's effluents flow." *Atl. States Legal Found., Inc. v. Universal Tool & Stamping Co.*, 735 F. Supp. 1404, 1412–13 (N.D. Ind. 1990) (cleaned up).

### 1. Article III and the CWA do not require proof of injury to the environment

In a CWA enforcement case, a plaintiff never has to prove harm to the environment to prove liability or standing. Courts have consistently rejected defendants' efforts to impose such an exacting standard.

In *Laidlaw*, the defendant argued that plaintiffs lacked standing because there was "no demonstrated proof of harm to the environment" or of "*any health risk*" from its unlawful discharges. *Laidlaw*, 528 U.S. at 181–82 (emphasis added). The Supreme Court explicitly rejected that argument and explained that citizen plaintiffs need not prove injury to the environment to establish Article III standing because that would "raise the standing hurdle higher than the necessary showing for success on the merits." *Id.*

Similarly, in *Gaston Copper*, the district court found that plaintiff failed to establish standing because there was "[n]o evidence was presented concerning the chemical content of the waterways affected by the defendant's facility. No evidence of any increase in the salinity of the waterways, or any other negative change in the ecosystem of the waterway was presented." *Gaston Copper*, 204 F.3d at 155–56 (cleaned up). The Fourth Circuit reversed, finding that the district court created "evidentiary barriers to standing that the Constitution does not require and Congress has not embraced. In fact, the legislative branch has invited precisely the type of suit brought by [plaintiff]. The judicial branch is not at liberty to impede its resolution on the merits." *Id.* The Fourth Circuit explained that denying standing in *Gaston Copper* would have essentially recreated "the old system of water quality standards whose failure led to the enactment of the Clean Water Act in the first place" and ignored Congress's "shift to end-of-pipe standards" in order to "eliminate the need to address complex questions of environmental abasement and scientific traceability in enforcement proceedings." *Id.* at 163. The Ninth Circuit has similarly explained that "the threshold question of citizen standing under the CWA is whether an individual can show that she has been injured in her use of a particular area because of concerns about violations of environmental laws, not whether the plaintiff can show there has been actual environmental harm." *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1151–52 (9th Cir. 2000) (citing *Laidlaw*, 528 U.S. at 180–82; *Gaston Copper*, 204 F.3d at 163–64).

Applying these principles to the case at hand, Plaintiff need not prove that the Ohio River or the Lubeck well field has unsafe levels of HFPO-DA due to Chemours's unlawful discharges to establish standing; evidence of Chemours's discharges of HFPO-DA above its permit limits, coupled with evidence of how that personally affects West Virginia Rivers Coalition's members, is evidence enough for both liability and standing.

### 2. Plaintiff's member's reasonable fear of exposure or increased risk of harm is sufficient for standing

Instead of requiring proof of actual environmental harm, courts have consistently held that risk of harm or a reasonable fear of exposure from unlawful discharges like Chemours's violations at Washington Works is enough to prove standing in a CWA case.

In *Laidlaw*, the Supreme Court determined that,

> several citizen affidavits attesting to reduced use of a waterway out of reasonable fear and concern of pollution adequately documented injury in fact. Each of the citizens alleged that he or she would make greater recreational use of some part of the affected waterway were it not for their concern about the harmful effects of the defendant's discharges. . . . We have held that environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity.

*Gaston Copper*, 204 F.3d at 159–60 (cleaned up) (citing *Laidlaw*, 528 U.S. at 182). Thus, a reasonable fear of exposure and cessation of activity in the affected waters due to that reasonable fear is enough to prove standing. *Laidlaw*, 528 U.S. at 183–84. Fears of exposure are reasonable when there is evidence of repeated violations, the chemical is capable of reaching the waters that plaintiff uses, and it can be attributable to the defendant. *Gaston Copper*, 204 F.3d at 156–58.

An increased risk or a threatened injury is also sufficient to prove standing. *Id*. at 160 ("increased risk thus constitutes cognizable harm"). "The Supreme Court has consistently recognized that threatened rather than actual injury can satisfy Article III standing requirements." *Id.* (citing *Valley Forge Christian College v. Ams. United for Separation of Church and State, Inc.*, 454 U.S. 464, 472 (1982); *Gladstone Realtors v. Vill. of Bellwood,* 441 U.S. 91, 99 (1979)). Evidence of permit violations into waters that plaintiff's member uses is enough to show an increased risk to that member:

> Gaston Copper's alleged permit violations threaten the waters within the acknowledged range of its discharge, including the lake on Shealy's property. *By*

> *producing evidence that Gaston Copper is polluting Shealy's nearby water source, CLEAN has shown an increased risk to its member's downstream uses.* This threatened injury is sufficient to provide injury in fact. Shealy need not wait until his lake becomes barren and sterile or assumes an unpleasant color and smell before he can invoke the protections of the Clean Water Act. Such a novel demand would eliminate the claims of those who are directly threatened but not yet engulfed by an unlawful discharge. Article III does not bar such concrete disputes from court.

*Gaston Copper*, 204 F.3d at 160 (emphasis added) (citing *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 560–61 (1992)). "As the *Gaston Copper* court cogently explained, to require actual evidence of environmental harm, rather than an increased risk based on a violation of the statute, misunderstands the nature of environmental harm, and would undermine enforcement of the Clean Water Act." *Ecological Rights Found.*, 230 F.3d at 1151–52.

Plaintiff has undoubtedly proven that Chemours has violated its CWA permit limits for HFPO-DA. Joint Stip. ¶ 6 (chart showing Chemours's discharges of HFPO-DA exceed permit effluent limitations for HFPO-DA). Plaintiff's member Ms. Robinson is impacted by those unlawful discharges because, for most of the past 24 years, she has obtained her household domestic water from the Lubeck Public Service District water system, which is the closest public water supply downstream from Chemours's Washington Works Plant. Robinson Decl., ECF No. 66-12 ¶¶ 4, 7; Joint Stip. ¶ 12. Lubeck's well field is adjacent to the Ohio River and 39% of the volume pumped by Lubeck from that wellfield is derived from induced infiltration from the Ohio River. Joint Stip. ¶ 12. Chemours admits that HFPO-DA is present in the Lubeck wellfield and that the HFPO-DA is attributable to the Washington Works Plant. May 23 Tr. 55:8-17. Thus, Ms. Robinson has an increased risk of harm by virtue of Chemours's unlawful discharges.

Plaintiff has also proven that Ms. Robinson has a reasonable fear of harm if she drinks her tap water and that, because of that fear, she refrains from drinking it. Robinson Decl., ECF No. 66-12 ¶ 16. Her injury-in-fact is therefore just like the injury-in-fact to plaintiffs' members in

*Laidlaw*—she stopped using the waters affected by the facility's discharge out of fear of contamination. And her fears are reasonable—there is "nothing 'improbable' about the proposition that a company's continuous and pervasive illegal discharges of pollutants into a river would cause nearby residents to curtail" their usage of water affected by those illegal discharges. *Laidlaw*, 528 U.S. at 184–85. However, unlike standing witnesses who could totally refrain from exposing themselves to a facility's toxic discharges by ceasing their recreation in the affected waters, Ms. Robinson cannot reasonably avoid all exposure to Lubeck water in her household unless she moves away from Lubeck. Robinson Decl., ECF No. 66-12 ¶ 17 (Ms. Robinson still uses her domestic household water for "brushing my teeth, bathing, laundry, cleaning, and watering my plants, including vegetables and herbs.").

### 3. Plaintiff need not prove harm to health to demonstrate standing

Because Plaintiff need not prove environmental injury to the Ohio River to satisfy Article III standing, but rather only need show that its member uses the affected waters and that such use is impaired by the unlawful discharges, it logically follows that Plaintiff also need not prove that its members have actually been exposed to drinking water with HFPO-DA at unsafe levels such that they suffer an "incremental harm" to their health.

If this case were about recreational harms to Ms. Robinson and the Ohio River, the case law is clear that she would not have to prove that there were actual harmful levels of HFPO-DA in the River to have an injury-in-fact. Rather, Ms. Robinson would have an injury-in-fact if she knew about Chemours's unlawful discharges into the Ohio River and decided to refrain from recreating in the River because of her concern over those discharges. Indeed, Article III would be satisfied even if Ms. Robinson *continued* recreating in the Ohio River but her use and enjoyment

were diminished because of her knowledge of the unlawful HFPO-DA discharges. *Laidlaw*, 528 U.S. at 184–85. That is a very typical standing scenario for a CWA case.

The only difference between that scenario and the present case is that Ms. Robinson is concerned about a river as her drinking water source, rather than a river she uses only recreationally. Her refusal to drink the water is a sufficient injury, just as if she refused to recreate in the Ohio River, because she has a reasonable concern for her health from that exposure. *Gaston Copper*, 204 F.3d at 160 ("Shealy's reasonable fear and concern about the effects of Gaston Copper's discharge, supported by objective evidence, directly affect his recreational and economic interests. This impact constitutes injury in fact.").

The cognizable Article III injury under the CWA is impairment of a person's use of a surface water protected by the CWA. Sometimes the use is recreation and sometimes it is ingestion of drinking water. Congress elevated injuries to both such uses to the status of legally cognizable injuries because both are designated uses protected by the CWA under 33 U.S.C. § 1313(c)(2)(a). *Spokeo*, 578 U.S. at 340.

Moreover, Plaintiff need not show actual exposure to contaminated water for standing because citizen suit claims are not tort claims. *W. Va. Highlands Conservancy v. Caperton*, No. 1:16CV70, 2017 WL 11742733, at *2 (N.D. W. Va. Oct. 10, 2017). "Traditional money damages are payable to compensate for the harm of past conduct, which subsists whether future harm is threatened or not; civil penalties are privately assessable . . . to deter threatened future harm to the plaintiff." *Laidlaw*, 528 U.S. at 212 (Scalia, J., dissenting). The CWA citizen suit provision has a savings clause that "permits persons to commence state common law actions founded in tort law for damages and appropriate injunctive relief." *Gutierrez v. Mobil Oil Corp.*, 798 F. Supp. 1280, 1283 (W.D. Tex. 1992); 33 U.S.C. § 1365(e). That provision would be superfluous if a citizen suit

were a tort. It is therefore incorrect to import tort concepts into a citizen suit, such as the requirements for proximate causation and a harmful level of exposure. *Powell Duffryn,* 913 F. 2d at 72, 73 n.10 (rejecting "tort causation" and finding an adverse effect to be sufficient for standing in CWA citizen suits); *Gaston Copper*, 204 F.3d at 161 (same).

The reason this issue is present in this case is because Plaintiff was able to prove tort-like harms—Plaintiff has shown that HFPO-DA is toxic in extremely small quantities and that, due to Chemours's unlawful discharges, Ms. Robinson's source and finished drinking water are contaminated with harmful quantities of HFPO-DA and she is exposed to it. Schlezinger Decl., ECF No. 66-11. But just because Plaintiff can prove harm to Ms. Robinson does not mean such harm is the standard for injury-in-fact in CWA cases. If Ms. Robinson's water (source water or finished drinking water) was not contaminated with HFPO-DA at all, or there was no evidence of such contamination, she would still have standing because Chemours's unlawful discharges threaten her drinking water and make her reasonably concerned that her water is unsafe.[1] *Gaston Copper*, 204 F.3d at 162 ("But to turn away a citizen who sits squarely in the discharge zone of a polluting facility seems more calculated 'to negate the strict liability standard of the [Clean Water] Act' than to articulate any meaningful distinction." (quoting *Powell Duffryn,* 913 F.2d at 73 n.10)); *see also Atl. States Legal Found., Inc.,* 735 F. Supp. at 1412–13 ("[D]efendant's assertions that its permit violations did not cause the water to become discolored, unsafe to drink, or unfit for animal

---

[1] In typical CWA cases, a person's drinking water very well might be contaminated due to a defendant's illegal discharge, but it would be expensive and time consuming to prove such contamination. This situation is unique in that Chemours's predecessor-in-interest DuPont has contaminated the Lubeck wellfield before and, as a result of a SDWA Consent Order, Chemours is now required to routinely monitor and treat the Lubeck water for PFOA. Without that prior history of contamination, Plaintiff may not have had testing data available to it to prove that Ms. Robinson's water is now, in fact, contaminated with HFPO-DA. But such lack of data is not and should not be a bar to citizen suits under the CWA.

life, even if true, are irrelevant in determining Atlantic's standing to sue based on its members' injuries.").

To require actual proof of injury to Ms. Robinson's water and that she drank that water in harmful quantities would "throw federal legislative efforts to control water pollution into a time warp by judicially reinstating the previous statutory regime in the form of escalated standing requirements. Courts would become enmeshed in abstruse scientific discussions as standing questions assumed a complicated life of their own." *Gaston Copper*, 204 F.3d at 163–64. The Fourth Circuit warned that to "have standing hinge on anything more in a Clean Water Act case would necessitate the litigation of complicated issues of scientific fact that are entirely collateral to the question Congress wished resolved—namely, whether a defendant has exceeded its permit limits." *Id.* at 162. Thus, simply put, "a plaintiff 'must merely show that a defendant discharges a pollutant that causes or contributes to the kinds of injuries alleged' in the specific geographic area of concern. In this way a plaintiff demonstrates that a particular defendant's discharge has affected or has the potential to affect his interests." *Id.* at 161 (citations omitted). Plaintiff clearly carries that burden here.

### C. Although Article III and the CWA Do Not Require It, Plaintiff Has Shown That Chemours's HFPO-DA Discharges Are Causing Incremental Harm to Human Health

Even assuming Plaintiff needed to show incremental harm to Ms. Robinson's health to prove that West Virginia Rivers Coalition has organizational standing to bring this lawsuit, Plaintiff has made that showing. As the Court explained, "incremental injury" is essentially a dose that, on its own, would not be enough to manifest in a perceptible human health harm but cumulatively could. May 23 Tr. 64:18–65:3; 65:8–17; 66:24–67:9; 67:13–25; 68:7–13; 68:20–22.

EPA has set the MCLG for HFPO-DA at 10 ppt under the SDWA. 89 Fed. Reg. 32532, 32744 (April 26, 2024); 40 C.F.R. § 141.50(a)(35). The MCLG for HFPO-DA is the "health-based risk assessment value." May 22 Tr. 197:7–198:21. EPA has stated that the MCLG is based on a chronic toxicity value that "represents the daily exposure to the human population (including sensitive subgroups) that is likely to be without an appreciable risk of deleterious effects during a lifetime." 89 Fed. Reg. at 32546. EPA defines it as "the maximum level of a contaminant in drinking water at which no known or anticipated adverse effect on the health of persons would occur, and which allows an adequate margin of safety." 40 C.F.R. § 141.2. The MCLG is "based on a reference dose," which is "the amount of a chemical or contaminant that can be consumed on a daily basis without an increase in risk of an adverse health effect over a lifetime." May 22 Tr. 197:7–198:21. A person has to "avoid exceeding that value [the MCLG of 10 ppt] every day for [her] life to avoid increased risks of adverse health effects." *Id*. 197:7–198:21.

Plaintiff has shown that Ms. Robinson has been exposed to harmful daily doses of HFPO-DA on at least six different occasions. Joint Stip. ¶ 14 (HFPO-DA levels above 10 ppt in Lubeck finished drinking water on April 17, 2023, October 16, 2023, November 13, 2023, April 9, 2024, April 29, 2024, May 20, 2024, and October 21, 2024). Dr. Schlezinger testified that Ms. Robinson suffered an "actual injury" as "defined by the MCLG." May 22 Tr. 209:15–19; 216:4–16, 216:19–217:16. Dr. Schlezinger based her opinion, in part, on Ms. Robinson's previous PFAS exposure from DuPont in the early 2000s, as well as the more recent treatment failure when Ms. Robinson was exposed to PFOA levels of 179.5 ppt. Due to her past exposure to PFAS and high body burden, Ms. Robinson is "starting with already an increased health risk" because exposure to multiple PFAS compounds "produce[s] combined toxicity that is greater than the toxicity of each individual PFAS." *Id.* 205:3–206:22, 240:14–25; Schlezinger Decl., ECF No. 66-11 ¶¶ 17, 20–23.

These are not just theoretical harms or risks, but are "actual harms" because there "has been a history of . . . drinking water HFPO-DA levels above 10-part per trillion," and future harms are also imminent because the Washington Works Plant Manager Mr. Hollingsworth testified "that [Chemours] expected that there would be continued noncompliance with the -- the HFPO-DA leaving the Washington Works plant." May 22 Tr. 202:1–19. Even Chemours admitted during the preliminary injunction hearing that there is an increased risk from exposure to HFPO-DA above 10 ppt on just one day. *Id*. 238:17–239:13 ("Q. I agree with you, there's an increased risk."). Thus, while not necessary to prove standing, Plaintiff has shown that Ms. Robinson has suffered an incremental injury from her exposure to HFPO-DA in her drinking water.

## II.     Plaintiff Has Established That Irreparable Harm Is Likely Without a Preliminary Injunction

Just as Plaintiff is not required to show incremental harm to human health for Article III standing in a CWA case, it is also unnecessary to make that showing to prove irreparable harm in the preliminary injunction context. Nonetheless, Plaintiff has shown that both Ms. Robinson and the public on the Lubeck water system are likely to suffer incremental harm to their health from exposure to their tap water with HFPO-DA levels above 10 ppt due to Chemours's unlawful discharges.

### A.  Irreparable Harm Principles

The existence of irreparable harm to support injunctive relief is a different inquiry from whether a plaintiff has demonstrated injury-in-fact sufficient to support standing. *Free Speech Coal., Inc. v. Att'y Gen. U.S.*, 825 F.3d 149, 173 n.21 (3d Cir. 2016). But they can both be based on similar harms. *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 86 (2d Cir. 2020). The standards for proving irreparable harm are the same for either a preliminary injunction or a permanent injunction. *Winter v. NRDC*, 555 U.S. 7, 32 (2008); *see also Cantley v. W. Va. Reg'l*

*Jail & Corr. Facility Auth.*, 771 F.3d 201, 207 (4th Cir. 2014) (recognizing similarity of tests for preliminary and permanent injunctions); *Bethesda Softworks, L.L.C. v. Interplay Ent. Corp*, 452 F. App'x 351, 354–55 (4th Cir. 2011) (unpublished opinion) ("Despite the differences between preliminary and permanent injunctive relief, the same equitable principles undergird the courts' authority in each posture.").

In the Fourth Circuit, irreparable harm must be actual and imminent, rather than remote or speculative. *See, e.g.*, *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 982 F.2d 802, 812 (4th Cir. 1991). But the Fourth Circuit has never adopted the D.C. Circuit's characterization of irreparable harm as "both certain *and great*" to which Chemours points. *All. for Retired Ams. v. Bessent*, 770 F.Supp.3d 79, 107 (D.D.C. 2025) (emphasis added) (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). Indeed, that characterization of irreparable harm does not appear in any Fourth Circuit opinion except in a district court opinion appended to a Fourth Circuit decision, in which the district court characterized the D.C. Circuit's "certain and great" standard as higher than the standard it was bound to apply. *Am. Fed. of State, County & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, No. 25-1411, 2025 WL 1249608, at *77 (4th Cir. Apr. 30, 2025) (unpublished opinion).

Plaintiff need not prove quantifiable or measurable harm to prove irreparable harm. *Blackwelder Furniture Co. of Statesville, Inc. v. Seilig Mfg. Co., Inc.*, 550 F.2d 189, 197 (4th Cir. 1977) (recognizing that irreparable harm is "not incalculably great or small, just incalculable"), *abrogated on other grounds by Real Truth About Obama*, 575 F.3d 342 (4th Cir. 2009). "[F]uture injury of uncertain date and incalculable magnitude is irreparable harm, and protection from such an injury is a legitimate end of injunctive relief." *Phillips v. Crown Cent. Petroleum Corp.*, 602 F.2d 616, 630 (4th Cir. 1979); *see also City of N.Y. v. Anglebrook Ltd. P'ship*, 891 F. Supp. 908,

927 (S.D.N.Y. 1995) ("Quantifiable harm is, of course, not a prerequisite to irreparable harm."), *aff'd*, 58 F.3d 35 (2d Cir. 1995).

**B. Irreparable Harm in the CWA Context**

In environmental cases, both the Fourth Circuit and this Court assess irreparable harm to the plaintiff *or* the public in the context of injunctive relief, whether preliminary or permanent. *Hazardous Waste Treatment Council v. South Carolina*, 945 F.2d 781, 788 (4th Cir. 1991); *Courtland Co. v. Union Carbide Co.*, No. 2:19-cv-00894, 2024 WL 4339600, at *5–6 (S.D. W. Va. Sept. 27, 2024). That conclusion is consistent with the principle that where, as here, Congress has granted citizens a right of action and the plaintiff has established jurisdiction (i.e., standing), they may invoke the general public interest in support of their claim for injunctive relief. *Warth v. Seldin*, 422 U.S. 490, 501 (1975). Although injury to a litigant (or its members) is necessary to establish standing, "once review is properly invoked, that person may argue the public interest in support of his claim. *Sierra Club v. Morton*, 405 U.S. 727, 737 (1972); *see also id.* at 740 n.15 ("The test of [private] injury in fact goes only to the question of standing to obtain judicial review. Once this standing is established, the party may assert the interests of the general public in support of his claims for equitable relief."). In a CWA citizen suit, plaintiffs may invoke "[t]he general public interest in clean waterways" to establish irreparable harm. *Powell Duffryn*, 913 F.2d at 73 (citing *Warth*, 422 U.S. at 501).

Thus, the scope of cognizable irreparable harm from Chemours's discharges includes not only harm to the Ohio River and to Lubeck's drinking water system, where Plaintiff's member Ms. Robinson obtains her household water, but also harm to others on the Lubeck water system and others on public water systems downstream (such as those in Cincinnati and Louisville), and harm to the Ohio River itself.

As the Court explained from the bench during the preliminary injunction hearing, to trigger the underlying substantive concerns of the CWA to show irreparable harm, "the violation must have three general characteristics: First, the violation of the statute must degrade a human environmental factor," creating "aesthetic harm or impact[ing] human water use." Second, the harm "must not . . . be adequately affixed by money" damages. And third, "the violating discharges must be . . . ongoing or continuous." May 22 Tr. 116:6–20; *see also* Danny Lutz, *Harming the Tinkerer: The Case for Aligning Standing and Preliminary Injunction Analysis in the Endangered Species Act*, 20 Animal L. 311, 329–30 (2014). Plaintiff satisfies all three characteristics in a multitude of ways: (1) Chemours is violating its permit limits for HFPO-DA, which were deliberately set to protect the Ohio River's ability to serve as a drinking water source; (2) the Ohio River and the Lubeck wellfield have unsafe levels of HFPO-DA; and (3) the people in Lubeck have been and will continue to drink water with HFPO-DA levels above what EPA considers safe.

### 1. Violation of WQBELs is evidence of irreparable harm

"Irreparable harm should be determined by reference to the purposes of the statute being enforced." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv*., 886 F.3d 803, 818 (9th Cir. 2018); *Sierra Club v. Marsh,* 872 F.2d 497, 502–03 (1st Cir. 1989) (stating that the kinds of harms that may be irreparable "will be different according to each statute's structure and purpose"); May 22 Tr. 116:6–12; *see also* Lutz, 20 Animal L. at 329–30 (compiling cases). This is a CWA citizen suit, and one of the central purposes of the CWA is achieving water quality standards. *Arkansas v. Oklahoma*, 503 U.S. 91, 106 (1992). When states issue NPDES permits under the CWA, they must include WQBELs that prevent violations of those standards. 40 C.F.R. § 122.44(d)(1).

Violations of WQBELs cause irreparable harm.[2] *PIRG v. Powell Duffryn Terminals, Inc.*, 720 F. Supp. 1158, 1162 (D.N.J. 1989), *aff'd in relevant part*, 913 F.2d 64 (3d Cir. 1990) ("[A]ny violation of . . . water quality-based effluent limitations causes some degree of harm to the water quality of the receiving body of water."). Chemours has undisputedly violated its WQBELs for HFPO-DA. When it set those limits, WVDEP found that the limits were necessary to prevent harm to designated uses of the Ohio River and public health. ECF No. 65-2 at 14. Violation of WQBELs is enough to prove irreparable harm because only a "presently existing actual threat must be shown"—"[t]he injury need not have been inflicted when application is made or be certain to occur . . . ." Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2948.1 (3d ed.). In other words, the violation of a WQBEL, which was set to protect public health, creates a "presently existing actual threat" to human health, even though an actual or incremental injury to human health (via consuming the water at unsafe levels) may not have perceptibly occurred. *Idaho Conservation League v. Atlanta Gold Corp.*, 879 F. Supp. 2d 1148, 1160 (D. Idaho 2012).

The harm from these excessive HFPO-DA discharges is also irreparable because Chemours's pollutants cannot be recaptured and remain in the environment essentially "forever." *United States v. Westvaco Corp.*, CV MJG-00-2602, 2015 WL 10323214, at *9 (D. Md. Feb. 26, 2015) (finding no adequate remedy at law "for the damaging effects of the pollutants emitted by

---

[2] As Plaintiff explained in prior briefing, *see* ECF No. 45, while WQBEL violations are sufficient to show irreparable harm, not all permit violations are created equal and thus not every violation of the CWA is evidence of irreparable harm. Polluters may violate a variety of permit effluent limitations under the Clean Water Act, and a plaintiff "must prove more than procedural permit violations in order to secure an injunction." *City of N.Y. v. Anglebrook Ltd. P'ship*, 891 F. Supp. 908, 926 (S.D.N.Y. 1995), *aff'd*, 58 F.3d 35 (2d Cir. 1995). "But in distinguishing between procedural and substantive violations, courts look to the substantive policy of the Act, which is, here, the protection and maintenance of our Nation's navigable waterways." *Id.* Water quality standards are at the heart of the substantive policy of the CWA and violations of those standards directly and critically undermine that policy. *Id.* at 927.

the Luke Mill" because "pollutants cannot be recaptured"). This reasoning is especially true for a pollutant like HFPO-DA since it is a "forever chemical" that can "reach any area in the world before any significant amount of substance degradation has occurred." ECF No. 65-19 at 39–40. In addition, the harm is irreparable because it cannot be measured or quantified and therefore cannot be redressed by monetary damages. The EPA has recognized that "all pollutants introduced into the environment create some harm or risk, of course, and it will be difficult in many cases to precisely quantify the harm or risk caused by the violation in question." *Powell Duffryn*, 720 F. Supp. at 1167. Therefore, "the court may grant an injunction even where plaintiffs have not established that measurable harm will otherwise result." *Pub. Int. Rsch. Grp. of N.J. v. Yates Indus., Inc.*, 757 F. Supp. 438, 454 (D.N.J. 1991).

Citizens have no adequate remedy at law to redress Chemours's violations. *See Sierra Club v. City of Colo. Springs*, 2009 WL 2588696 at \*16 (D. Colo. Aug. 20, 2009) (observing that a discharge without the availability of money damages as a remedy in a citizen suit is a factor in showing irreparability leading to the need for an injunction). Citizens have no right to compensatory damages under the CWA for harm from those discharges. They can seek civil penalties, but those are only designed to deter future violations, not to remedy the harm to themselves or the environment from the discharges. Moreover, absent an injunction, citizens would suffer continuing harm and would have to bring a multiplicity of civil penalty actions. Legal remedies are inadequate when effective legal relief can be secured only by a multiplicity of actions, such as when the injury is of a continuing nature. Wright & Miller, 11A Fed. Prac. & Proc. § 2944, nn.18–19 (3d ed.); *United States v. Colvard*, 89 F.2d 312, 314 (4th Cir. 1937); *Greene v. Ablon*, No. 09-10937, 2013 WL 4714344, at \*2 (D. Mass. Aug. 28, 2013), *aff'd in relevant part*, 794 F.3d 133 (1st Cir. 2015).

In determining irreparable harm, it is important to recognize that another purpose of the CWA is to simplify enforcement. When it enacted the CWA, Congress found that "there should be a considerable record available to the courts in any enforcement proceeding resulting from the Federal and State administrative standard-setting procedures." *United States v. Hooker Chems. & Plastics Corp.*, 749 F.2d 968, 980 (2d Cir. 1984) (quoting S. Rep. No. 414, 92d Cong., 1st Sess. 78, 79 (1971)). "Consequently, the factual basis for enforcement of requirements would be available at the time enforcement is sought, and the issues before the courts would be a factual one of whether there had been compliance." *Id.* Congress did not intend for the courts to relitigate WVDEP's "factual basis" for setting HFPO-DA limits in subsequent enforcement actions. Congress wished to "avoid the necessity of lengthy fact finding, investigations, and negotiations at the time of enforcement. Enforcement of violations of requirements under this Act should be based on relatively narrow fact situations requiring a minimum of discretionary decision making or delay." *Nat. Res. Def. Council, Inc. v. County of L.A.*, 725 F.3d 1194, 1208 (9th Cir. 2013) (quoting S. Rep. No. 92–414 at 64).

To obtain an injunction, Plaintiff therefore need not make a factual showing that there is measurable and quantifiable harm—incremental or otherwise—to the Ohio River, to public health, or to Ms. Robinson's health. *See Ecological Rights Found.*, 230 F.3d at 1152 (noting that the CWA is "designed precisely to prevent the irreparable environmental degradation of the nation's waters before it occurs"). WVDEP made the factual determination at the time it issued Chemours's permit that HFPO-DA violations would cause that harm. Thus, Chemours's violations of its WQBELs for HFPO-DA and its admission that these violations will continue, *see, e.g.*, ECF No. 77 (hereafter "May 21 Tr.") at 105:2–7, is sufficient evidence of irreparable harm.

### 2. Impairment to the Ohio River and other source water is evidence of irreparable harm

Although evidence of WQBEL violations is enough in this case to show irreparable harm, where discharges impact a river's capacity to serve as a domestic water source, irreparable environmental harm also occurs. *Nat. Res. Def. Council, Inc. v. Texaco Ref. & Mktg., Inc.*, 2 F.3d 493, 506 (3d Cir. 1993). The EPA has set the MCLG for HFPO-DA at 10 ppt. A person has to "avoid exceeding that value [the MCLG of 10 ppt] every day for your life to avoid increased risks of adverse health effects." *Id*. 197:7–198:21. Plaintiff has presented evidence that the Ohio River and other drinking water sources influenced by the River are impaired for HFPO-DA above 10 ppt.

In September 2022, Chemours measured HFPO-DA at concentrations of 14 to 15 ppt along the east bank of the Ohio River approximately 0.5 miles upstream of the Lubeck Public Service District drinking water facility. ECF No. 65-11; Hoagland Decl., ECF No. 66-13 ¶ 32. In late 2024 and early 2025, Chemours measured HFPO-DA at concentrations above 10 ppt at this same location on multiple occasions. *See* ECF No. 66-15 (Report Result column); May 23 Tr. 18:15–21:19 (Hoagland). In 2023 and 2024, Lubeck's well field, which draws water from the Ohio River, had HFPO-DA levels ranging from 29 ppt to 62 ppt. *See* ECF No. 66-6 at 36–38 (Table 18, see "Prior to Treatment Sample" entries); *see also* May 23 Tr. 23:2–24:6. HFPO-DA levels above 10 ppt have also been recorded in the Ohio River as far downstream as Cincinnati and Louisville in late 2024. ECF No. 66-16 (as high as 17 ppt); ECF No. 66-17 (as high as 52 ppt). There are also many other drinking water plants along the Ohio River downstream from Chemours that may be at risk. ECF No. 66-8 at 8–9. One plant in Kentucky had an annual average HFPO-DA

concentration of approximately 25 ppt and it is unknown if that water system has treatment capable of removing the HFPO-DA. *Id.*

Critically, Chemours is the only known source of HFPO-DA within 100 miles of its Washington Works Plant that could account for the levels of that chemical found at Lubeck or in the Ohio River. May 21 Tr. 67:3–6 (Hollingsworth); May 23 Tr. 25:14–26:4 (Hoagland), 55:8–17, 62:12–15, 71:14–72:7 (Hoagland). As Dr. Schlezinger testified, based on the levels of HFPO-DA Chemours is discharging, the Ohio River is "compromised" as a drinking water source. May 22 Tr. 211:16–24. Thus, all users of the Ohio River for drinking water, including Ms. Robinson and those as far downstream as Louisville, Kentucky, are harmed from Chemours's discharges. This harm will also continue until trial because, at the time of the preliminary injunction hearing, Chemours admitted it will not stop violating its HFPO-DA Permit limits for at least 27 months. May 21 Tr. 105:2–7; May 22 Tr. 19:11–17.

The CWA protects the use of surface waters as drinking water *sources*. Accordingly, whether or not drinking water treatment systems may be currently reducing HFPO-DA levels below public health thresholds is legally irrelevant. *Atlanta Gold Corp.*, 879 F. Supp. 2d at 1160. That is why the Fourth Circuit held that the CWA imposes more stringent limits than the SDWA: pollutants regulated under the CWA threaten to "harm waterways and aquatic life" and can interfere with efficiency of treatment facilities "even at levels where they might not directly harm humans." *Hartsell*, 127 F.3d at 351–52. A pollutant thus does not need to be present in treated drinking water at levels harmful to human health to establish irreparable harm in a CWA case. *Atlanta Gold Corp.*, 879 F. Supp. 2d at 1160 (the absence of a serious public health problem is irrelevant to irreparable harm because "[h]arm to the environment exists, even if municipal suppliers eventually remove the toxins from the water before it enters household taps" and "[i]t is

not necessary for [a plaintiff environmental organization] to establish that an immediate and catastrophic threat to public health exists before a federal court can step in and order a defendant to stop its illegal discharges").

It is also logical that treatment systems are not legally relevant in CWA cases because treatment systems can and do fail, as seen in Lubeck. And setting aside failure, the typical treatment systems in place that are capable of removing HFPO-DA—granulated activated carbon ("GAC") treatment—are not very effective at removing HFPO-DA (compared to PFOA) according to Chemours's own witness Mr. Hartten. May 22 Tr. 72:23–73:3; *see also* Joint Stip. ¶ 14 (six occasions where HFPO-DA levels exceed 10 ppt at Lubeck in finished water despite GAC treatment system in place). When treatment systems fail, the public is not always notified or there is a lag time in notifying the public. Joint Stip. ¶ 13 (public notification of March 2024 treatment failure at Lubeck not made until June 2024); *see also* May 22 Tr. 73:12–16. Thus, the public cannot know if its drinking water is contaminated with HFPO-DA above 10 ppt until it is too late (i.e., after they have already been exposed to the contaminated drinking water).

### 3. Although not required, impairment of finished drinking water is evidence of irreparable harm

Finally, Plaintiff has also made the showing that actual finished drinking water at Lubeck is above levels safe to drink, and that this is likely to cause irreparable harm both to Ms. Robinson and the public on the Lubeck system. Daily measurements of Lubeck's finished drinking water have exceeded the MCLG of 10 ppt on at least six separate occasions, with levels as high as 40 ppt. Joint Stip. ¶ 14. Lubeck public water users, including Ms. Robinson, have been and are likely to continue to be exposed to treated domestic water with HFPO-DA concentrations above 10 ppt before trial because Chemours will continue violating its permit limits for HFPO-DA until it completes installation of an upgraded treatment system, which at the time of the preliminary

injunction hearing Chemours expected to take 27 months. May 21 Tr. 105:2–7; May 22 Tr. 19:11–17. While this level of harm is not necessary to prove irreparable harm in the CWA context, nonetheless "[t]he risk of injury to the public health posed by substandard drinking water fulfills the irreparable harm requirement." *United States v. City of N. Adams*, No. 89-30048-F, 1992 WL 391318, at *5 (D. Mass. May 18, 1992).

### C. Even Though Irreparable Harm Principles and the CWA Do Not Require It, Plaintiff Has Shown That Chemours's HFPO-DA Discharges Are Causing Incremental Harm to Human Health

Even assuming Plaintiff needed to show incremental harm to the public or Ms. Robinson, Plaintiff has made that showing, which is more than sufficient to prove that irreparable harm is likely in the absence of Plaintiff's requested preliminary relief.

In the Clean Air Act context, courts have found that "increased air pollution can constitute irreparable harm." *See State v. Bureau of Land Mgmt.*, 286 F. Supp. 3d 1054, 1074 (N.D. Cal. 2018). One district court explicitly rejected the argument that "increased air pollution is 'incremental in nature' and [thus] does not require immediate relief." *Id.* That court cited a Supreme Court decision recognizing the "irreparable injury that air pollution may cause during [a two month] period, particularly for those with respiratory ailments." *Beame v. Friends of the Earth*, 434 U.S. 1310, 1314 (1977). The D.C. district court has also found irreparable harm where a coal plant expansion would "emit substantial quantities of air pollutants that endanger human health and the environment." *Sierra Club v. U.S. Dep't of Agric., Rural Utils. Serv.*, 841 F.Supp.2d 349, 358 (D.D.C. 2012). As one article put it, in demonstrating irreparable injury in Clean Air Act and CWA cases, "experts may be able to demonstrate that the added contaminants introduced by unlawful discharges may result in irreversible adverse increments to health. This type of demonstration must be sufficiently clear to overcome defendant's argument that the plaintiff

cannot point to any illnesses directly related to the contaminants issuing from the defendant's plant." Daniel Riesel, *Preliminary Injunctions and Stays Pending Appeal Environmental Litigation*, SX029 ALI-CLE 247 (2016).

Thus, case law supports that incremental harm to human health is also evidence of irreparable harm, without the need to prove manifested symptoms of harm. This should be especially true for a forever chemical like HFPO-DA since it is toxic at extremely small quantities, stays in the body longer than a normal chemical would, and does not break down in the environment. *See generally* Schlezinger Decl., ECF No. 66-11; Hoagland Decl., ECF No. 66-13. As explained above, Plaintiff has presented uncontroverted evidence that the finished drinking water at Lubeck has exceeded HFPO-DA concentrations of 10 ppt on multiple occasions. Joint Stip. ¶ 14. Plaintiff has also shown through EPA standards and expert testimony that a person's exposure to drinking water with HFPO-DA above 10 ppt on just one day causes actual and imminent harm. *See* May 22 Tr. 198:14–199:9, 201:16–25, 202:1–19; 233:23–25, 235:17–18. That harm cannot be quantified or calculated, May 22 Tr. 201:22–25, and no monetary value can be assigned to it, *id.* 201:24–25, rendering remedies at law inadequate.

Even if the standard for harm were what Chemours's claims it is—a violation of the MCL for HFPO-DA (10 ppt on an annual average)—Plaintiff established during the preliminary injunction hearing that the Lubeck system, more likely than not, distributed water in violation of what will be the MCL for HFPO-DA. A system is immediately out of compliance with the MCL when a single analytical result is high enough to render it mathematically impossible for the annual average to meet the MCL of 10 ppt regardless of subsequent quarterly monitoring results. 40 C.F.R. § 141.903(e). On May 20, 2024, the HFPO-DA concentration in Lubeck water after treatment was 40 ppt. Joint Stip. ¶ 14. Even if that single analytical result of 40 ppt were not enough

to constitute a violation of what will be the MCL, the existence of detectable concentrations of HFPO-DA in two of three immediately prior quarters and two of three immediately subsequent quarters makes it more likely than not that the running annual average of HFPO-DA has exceeded 10 ppt on a running annual average. May 22 Tr. 212:14–214:19. Specifically, the annual average for Lubeck was actually 11.4 ppt, which exceeds the MCL. *Id*. 176:20–184:18, 212:1–214:19.

Not only that, Plaintiff has shown through expert testimony that this incremental harm to Lubeck water users, including Ms. Robinson, from their exposure to HFPO-DA contaminated water could one day manifest into serious illness. As Dr. Schlezinger testified,

> HFPO-DA very easily enters the body. About 100 percent of HFPO-DA that is consumed will actually enter the body. One of the problems with PFAS is that they do not leave the body as efficiently as they enter the body. So even [a] single day of consumption of HFPO-DA, the chemical will not completely leave [the] body for 14 days.

May 22 Tr. 235:21–236:2. Dr. Schlezinger further described exposure to HFPO-DA as "put[ting] one on the pathway" to serious liver disease. *Id.* 237:12–13. Thus, Plaintiff has shown incremental harm from exposure to the Lubeck water. Consequently, whatever way you slice this issue, Plaintiff has established that it and the public are likely to suffer irreparable harm without a preliminary injunction.

## CONCLUSION

Incremental harm to human health is certainly an injury sufficient for Article III standing and is also sufficient to prove irreparable harm. Plaintiff has presented evidence that both Ms. Robinson and the public are threatened with non-quantifiable incremental harm every time they are exposed to water with HFPO-DA above 10 ppt, and thus Plaintiff satisfies such burden of proof. But requiring proof of actual, measurable incremental harm to someone's health to prove

standing or irreparable injury would raise the bar far higher than Congress ever intended for CWA citizen suits.

Because Plaintiff has carried its burden of proving irreparable harm and the other *Winter* factors, *see* Exhibit 1, the Court can and should hold Chemours responsible for its brazen violations of its CWA permit limits. On the first day of the three-day evidentiary hearing, the Court rightfully posited that if the "law says you can't drive over 70 miles an hour . . . I'm not sure it would be rational for me as a traffic court judge to fine you a big ticket or do something if you went 71" even though "you have violated the law. If you have a permit that says the level and you go above it, you violated the law even if they're getting ready to raise the limit to 80." May 21 Tr. 36:10–17. Building on that analogy, Chemours has not gone 71 mph—it has gone 318 mph in November 2024 at Outlet 002 and has hit speeds far exceeding 100 mph on a regular basis at both Outlets 002 and 005 over the past year. And the 70 mph speed limit is not going to be increased to 80 mph, but rather it may be reduced to as low as 5 mph since the amount of HFPO-DA that is considered safe has been reduced by a factor of 14 compared to when the current permit limits were set. Even if the 10 ppt MCL is eventually rescinded by the Trump Administration and a new MCL is set, there is no evidence whatsoever that the new MCL will be above 140 ppt. Nor does it change the sound science behind the 10 ppt MCL. Thus, there is no evidence that the speed limit will be raised to 80 mph; at worst, the speed limit will remain 70 mph, or in this case 140 ppt.

This is all to say that Chemours is not just slightly violating the law or slightly violating its permit limits such that a "big ticket" or severe penalty in the form of a preliminary injunction is unwarranted. Chemours is undisputedly violating its limits by large margins, and Plaintiff has proven that the violations are within Chemours's control—the more product Chemours produces, the more HFPO-DA it discharges. *See, e.g.*, May 21 Tr. 106:24–107:8, 130:5–8. In essence,

Chemours thinks that it can drive as fast as it wants, or discharge as much HFPO-DA as it wants, without consequences, all to make a multi-billion-dollar company and its shareholders richer. But this is being done at the expense of Ms. Robinson and others like her, including millions of people as far as Louisville, Kentucky, who get their drinking water from the Ohio River. The CWA clearly gives the Court the authority to enjoin these violations. The Court should thus use its equitable powers to stop the irreparable harm Ms. Robinson and millions of others will likely experience if Chemours's HFPO-DA violations are allowed to continue.

DATED:      July 3, 2025                    Respectfully submitted,

/s/ Amanda Demmerle
AMANDA DEMMERLE (WVBN 13930)
DEREK TEANEY (WVBN 10223)
APPALACHIAN MOUNTAIN ADVOCATES, INC.
P.O. Box 507
Lewisburg, WV 24901
Telephone: (757) 650-2774
Email:  ademmerle@appalmad.org
        dteaney@appalmad.org

JAMES M. HECKER (*pro hac vice*)
DANIEL SNYDER (*pro hac vice*)
PUBLIC JUSTICE
1620 L Street, N.W. Suite 630
Washington, DC 20036
(202) 797-8600 ext. 225
Email:  jhecker@publicjustice.net
        dsnyder@publicjustice.net

*Counsel for Plaintiff WVRC*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF WEST VIRGINIA**

**WEST VIRGINIA RIVERS**
**COALITION, INC.,**

          **Plaintiff,**

v.                                        **Civil Action No. 2:24-cv-00701**

**THE CHEMOURS COMPANY FC, LLC,**

          **Defendant.**

## CERTIFICATE OF SERVICE

I, Amanda Demmerle, do hereby certify that, on July 3, 2025, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF filing system, which notified the following participants:

KIRK R. AUVIL
The Employment Law Center, PLLC
1208 Market Street
Parkersburg, WV 26101
theemploymentlawcenter@gmail.com

D. DAVID ALTMAN
JUSTIN D. NEWMAN
AltmanNewman Co. LPA
15 E. 8th Street
Cincinnati, OH 45202
daltman@environlaw.com
jnewman@environlaw.com

*Counsel for The Little Hocking Water*
*Association, Inc.*

JAMES A. WALLS
Spilman Thomas & Battle, PLLC
48 Donley Street, Suite 800
Morgantown, WV 26501
(304) 291-7920
jwalls@spilmanlaw.com

CLIFFORD F. KINNEY, JR.
NIALL A. PAUL
JOSEPH CREIGHTON UNGER
DAVID L. YAUSSY
JOSEPH A. FORD
Spilman Thomas & Battle, PLLC
P.O. Box 273
Charleston, WV 25301
(304) 340-3844
ckinney@spilmanlaw.com
npaul@spilmanlaw.com
junger@spilmanlaw.com
dyaussy@spilmanlaw.com
jford@spilmanlaw.com

*Counsel for The Chemours Company FC, LLC*

**/s/ Amanda P. Demmerle**
**AMANDA P. DEMMERLE (WVBN 13930)**