# Exhibit 1

1

 1              IN THE UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF WEST VIRGINIA
 2                         AT CHARLESTON

 3

 4    * * * * * * * * * * * * * * * * * * * * * * *

 5    WEST VIRGINIA RIVERS
      COALITION, INC, and
 6    LITTLE HOCKING WATER
      ASSOCIATION,
 7
              Plaintiffs,
 8
      vs.                              CIVIL ACTION
 9                                     NO.  2:24-cv-00701

10    THE CHEMOURS COMPANY FC, LLC,

11            Defendant.

12    * * * * * * * * * * * * * * * * * * * * * * *

13

14            Zoom deposition of MONTY FOWLER taken by the
      Defendant under the Federal Rules of Civil Procedure in
15    the above-entitled action, pursuant to notice before
      Teresa Reedy, a Registered Professional Reporter, on
16    the 29th day of July, 2025.

17

18

19
                       REEDY COURT REPORTING
20                        (304) 615-6725

21

22

23

24

7

1      A.  No, sir.

2      Q.  Are you aware of any other condition that may

3  affect your memory or affect your ability to testify

4  truthfully today?

5      A.  No, sir.

6      Q.  Okay.  Thank you.  I want to start with just

7  some general background.

8            What is your current address?

9      A.  My current address is ███ South - and you have

10 to spell the word out - Terrace, Huntington, West

11 Virginia, 25705.

12     Q.  Okay.  And how long have you lived at that

13 address?

14     A.  Almost ten years.

15     Q.  Okay.  Did -- before that did you live in

16 Huntington also?

17     A.  I lived in Cabell County, which is -- and my

18 address has always been Huntington, but it's been like

19 out in the county or in, you know, Barboursville or

20 another small town.

21     Q.  Okay.  How long have you been a resident of

22 Cabell County, ball park.

23     A.  We moved here in August of 1988, I believe,

24 so...

1   chemicals or compounds that Chemours discharges that

2   are at issue in this litigation?

3                  MR. SNYDER:  Same objection.  Go ahead

4   and answer, Mr. Fowler, if you can.

5      A.  That's the only one I can recall right now,

6   today.

7      Q.  Okay.

8                I think you mentioned this a minute ago.

9   Where do you -- what do you believe is the source of

10  the PFAS contamination in the Ohio River, at least

11  where you live in the Huntington area?

12     A.  Your client.

13     Q.  Do you think there are any other sources of

14  PFAS contributing to that?

15     A.  I don't know.

16     Q.  You don't know one way or the other?

17     A.  I don't know one way or the other.  I am aware

18  of that specific point source.

19     Q.  Okay.  Has anyone ever told you that you

20  should be concerned about PFAS contamination in the

21  Ohio River?

22                MR. SNYDER:  I'm going to object just to

23  the extent that that might go into attorney/client

24  privilege.  I don't think it's going to, though, so go

28

1    ahead, Mr. Fowler, but again don't disclose anything

2    that we may have discussed.

3        A.   Any person told me?

4        Q.   Sure.  Let's start with that.

5        A.   No, sir.

6        Q.   Okay.  And you kind of qualified that as

7    person.  Did anything else, any sort of document or

8    publications, or material tell you to be concerned

9    about PFAS contamination in the Ohio River?

10                   MR. SNYDER:  Object to the form.  Go

11   ahead, Mr. Fowler.

12       A.   There's been extensive coverage of this issue

13   in the Charleston connect -- Charleston Gazette --

14   excuse me, and other statewide media.

15       Q.   As you sit here today, do you recall the --

16   any of those specific stories?

17       A.   Specific discrete stories?

18       Q.   Yeah, you referenced, you know, I think

19   publication or stories in the Charleston Gazette and

20   other statewide media, and I'm just wondering if you

21   recall any of those specific stories, the titles or

22   when -- or authors, or when they would have been

23   published or anything like that?

24       A.   The only thing I can say to that is most of

1    the stories in the Charleston Gazette that I read were

2    written by Ken Ward Jr.  Other than that, no, no

3    specifics.

4        Q.  And Ken Ward hasn't been at the Gazette for

5    several years; is that right?

6        A.  Correct.

7        Q.  Do you recall about when he left?

8        A.  I do not.

9        Q.  But the Charleston Gazette sure still -- sure

10   -- you know, sure to still put their, you know,

11   Pulitzer Prize winning newspaper -- you know, symbol at

12   the top of their -- top of their heading, I guess, you

13   know.  So he's still kind of -- they still -- they're

14   still latching onto that even though he's not there

15   anymore.

16              Any other Charleston Gazette articles

17   that come to mind.

18       A.  I cannot give you specific titles or dates.

19       Q.  Okay.

20       A.  I read stories, I recall in general the

21   contents of them.

22       Q.  Do you recall generally the time frame when

23   those would have been?  And would that have been in Ken

24   Ward's time frame?

1     A.  It would have been in Ken Ward's time frame up

2  to the current day.  Certainly over the last ten or 15

3  years.

4     Q.  Okay.  You mentioned other statewide media.

5  What are you referencing there?

6     A.  Some of the other newspapers in the state.  I

7  can't give you the exact names.  I would occasionally

8  see a headline on a TV station's website.  That's about

9  all I can recall.

10     Q.  Okay.  Have you discussed your concerns about

11  PFAS contamination in the Ohio River with anyone?

12     A.  Yes.

13     Q.  Have you discussed your concerns about PFAS

14  contamination in the Ohio River with anyone other than

15  your counsel in this matter, other than counsel for

16  West Virginia Rivers Coalition in this matter?

17     A.  Yes.

18     Q.  Who are those people, or groups of people?

19          MR. SNYDER:  I'm going to object to

20  relevancy grounds.  Again, I think that we're moving

21  far afield here from what Mr. Fowler is actually here

22  for.  I'm going to give Mr. Ford some leeway and ask

23  Mr. Fowler answer to the extent he can.

24     A.  My wife and I discuss everything Mr. Ford.

1      Q.   That's good, and, you know, I'm happy to hear

2   that.  I think that's good for a healthy marriage.

3   Anybody besides your wife that comes to mind?

4      A.   Not that I can recall.

5      Q.   Okay.  When did you first begin having

6   concerns related to PFAS contamination in the Ohio

7   River?

8      A.   I can't give you a specific date.  It's been

9   within the last ten years.

10      Q.   And was -- do you recall, was there an event

11   or a story, or what prompted you to have those concerns

12   at that time, if you recall?

13      A.   The only thing I can say to that is I'm

14   reasonably sure it was a story in the Charleston

15   Gazette, but specific date, story I can't tell you.

16      Q.   Do you think that that would have been a Ken

17   Ward story?

18      A.   It may have been.  I can't say specifically.

19      Q.   Have those concerns that we've been discussing

20   affected your use of the Ohio River?

21      A.   Yes.

22      Q.   How so?

23      A.   My drinking water comes from West Virginia

24   American Water Company, and it has since I moved here

32

1  in 1988.  Their water source is the Ohio River, so I

2  have an awareness and concern about all the pollutants

3  that are in the Ohio River.

4      Q.  Do you know where your water is sourced from?

5  Or specifically -- I understand that you said it was

6  the Ohio River, but do you know where on the Ohio

7  River?

8      A.  I believe it comes from West Virginia American

9  Water's Huntington treatment plant, but I don't know

10  specifically.

11      Q.  Okay.  And I want to talk about your drinking

12  water and stuff in a minute, but other than affecting

13  your drinking water, does the -- does your concerns of

14  PFAS contamination in the Ohio River affect how you use

15  the Ohio River in any other way?

16      A.  I don't swim in the Ohio River or eat anything

17  from the Ohio River.  Other than that, you know,

18  drinking, bathing, doing laundry, household chores,

19  that nature, watering my garden.

20      Q.  Why don't you swim or eat -- well, let's

21  start:  Why don't you swim in the Ohio River?

22      A.  Because it's not clean.

23      Q.  Have you ever swam in the Ohio River?

24      A.  No, sir.

33

1    Q.  So you never swam in the Ohio River even

2    before you started having these concerns of PFAS

3    contamination in the Ohio River 10 to 15 years ago?

4    A.  No, sir.

5    Q.  Is that a correct or yes?

6    A.  Yeah, I said, no, sir.  I have not.

7    Q.  Okay.  Have you ever eaten anything out of the

8    Ohio River, to your knowledge?

9    A.  To my knowledge, no.

10    Q.  And why not?

11    A.  Because I was aware from the time I moved here

12    that among other things the West Virginia Department of

13    either Health or Environmental Protection issues annual

14    fish consumption advisories for the Ohio River.

15    Q.  Okay.  And those fish advisories say don't eat

16    fish from the Ohio River or something to that effect?

17    A.  They say you can eat the fish at your own

18    risk, but certain classes of people should limit their

19    quantities over time.

20    Q.  And you have never eaten fish or anything out

21    of the Ohio River, to your knowledge, I think you

22    testified to.

23    A.  Yes.

24    Q.  And so that -- strike that.

34

1          So you didn't eat anything out of the
2    Ohio River even before you had concerns about PFAS
3    contamination in the Ohio River 10 to 15 years ago?
4         A.   Correct.
5         Q.   Okay.  Do you do any sort of -- have you ever
6    done any sort of boating in the Ohio River?
7         A.   I have been on a couple of those, like, river
8    cruises where whatever the riverboat was that used to
9    be in Charleston.
10        Q.   The P.A. Denny?
11        A.   Yeah.  That, and another one I can't recall
12   the name of a few times.
13        Q.   Not something you do regularly?
14        A.   No, sir.
15        Q.   Okay.  What about any sort of kayaking or
16   canoeing?
17        A.   On the Ohio, no, sir.
18        Q.   Okay.  And I'm guessing you talked about not
19   eating things out of the Ohio, but do you ever fish for
20   sport in the Ohio or have you ever fished -- strike all
21   that.
22             Have you ever fished in the Ohio?
23        A.   No, sir.
24        Q.   Any sort of tubing or rowing or anything like

1    that in the Ohio?  Have you ever done any sort of

2    tubing or rowing or rafting in the Ohio River?

3         A.  No, sir.

4         Q.  Do you have any plans to recreate on the Ohio

5    River?

6         A.  No, sir.

7         Q.  Okay.  I want to talk about the water -- water

8    issues that you mentioned a minute ago.  And you said

9    you had some concerns about PFAS contamination being in

10   your water supply because your water provider sources

11   their river -- or sources their water from the Ohio

12   River.  Is that an accurate summary?

13              MR. SNYDER:  Objection to the extent that

14   mischaracterizes prior testimony.  He said "chemicals,"

15   as well.  Go ahead and answer if you can, though,

16   Mr. Fowler.

17        A.  Can you repeat the question, please?

18        Q.  I think it's fine.

19              MR. FORD:  I appreciate that

20   clarification, Dan.

21        Q.  Have you ever had any issues with the tap

22   water provided to your house, your home?

23              MR. SNYDER:  I'm going to object on

24   vagueness grounds on issues.  But go ahead, Mr. Fowler,

38

1   list of chemicals and substances that are tested for

2   and monitored.

3      Q.  Do you know if those -- if that testing occurs

4   before treatment?

5              MR. SNYDER:  Objection.  Calls for

6   speculation go ahead and answer if you can.

7      A.  I have no idea.

8      Q.  So you don't know if those testings results

9   are before the water has been treated by the water

10   company or after the water's been treated by the water

11   company?

12              MR. SNYDER:  Same objection on

13   speculation.  Go ahead and answer.

14      A.  I would hope and assume they're testing the

15   water after they treat it so they know what's in it,

16   but I don't know.

17      Q.  Okay.

18              Has anyone ever instructed you not to

19   drink or use your water because of PFAS contamination?

20      A.  No, sir.

21      Q.  So in those mailer yearly sampling results

22   that they send you, it doesn't say to do anything

23   different; is that -- with respect to your water usage;

24   is that fair?

39

1              MR. SNYDER:  Objection.  Calls for
2    speculation.  Vague.  Go ahead and answer if you can,
3    Mr. Fowler.
4         A.  I don't recall the wording on the doc -- the
5    annual document.
6         Q.  But as you sit here today, you don't recall it
7    saying something to the effect of "Stop using your
8    water because of PFAS contamination."
9              MR. SNYDER:  Objection.  Calls for
10   speculation.  And asked and answered.  Mr. Fowler, you
11   can answer again.
12        A.  I don't recall.
13        Q.  Okay.
14              Do you use your tap water at your house?
15        A.  Yes.
16        Q.  Do you drink with -- do you drink it?
17        A.  I do.
18        Q.  Do you cook with it?
19        A.  Yes.
20        Q.  Do you bathe with it?
21        A.  Yes.
22        Q.  Do you clean with it?
23        A.  Yes.
24        Q.  Do you have any sort of filter system or

40

1    anything like that at your house that you use?

2         A.   We have a couple of the Brita filter pitchers

3    that we use for our morning coffee and my wife uses

4    more than I do.

5         Q.   When you drink water, do you drink water from

6    those Brita filters, or do you drink it from the tap?

7         A.   Both.

8         Q.   Is there anything that you don't use your tap

9    water at your house for?

10        A.   No.

11                  MR. SNYDER:  Mr. Fowler, before you

12   answer -- I was going to object to the form, but I

13   heard you say, "no," so let's move on.

14        Q.   Have you ever had your tap water at your house

15   tested for PFAS?

16        A.   No.

17        Q.   Do you know whether there has ever been any

18   PFAS contamination in your water at your house?

19                  MR. SNYDER:  I'm going to object.  Calls

20   for speculation.  Mr. Fowler, go ahead and answer if

21   you can.

22        A.   Our water's never been tested specifically for

23   PFAS, no.

24        Q.   And so your water has never been tested for

41

```
 1   PFAS, and so you don't know one way or the other

 2   whether there's ever been any PFAS contamination in

 3   your water; correct?

 4                  MR. SNYDER:  Objection.  Calls for

 5   speculation.  Misstates prior testimony.  Mr. Fowler,

 6   you can answer if you understand the question.

 7       A.  Can you repeat the question, please?

 8       Q.  Sure.  Do you know whether there has ever been

 9   any PFAS contamination in your water at your house?

10                  MR. SNYDER:  Same objections.

11       A.  I do not.

12       Q.  Okay.

13                  All right.  I want to switch gears a

14   little bit and talk about the clean water act

15   violations at the Washington Works facility.

16                  And I think you referenced that you're

17   generally aware of those violations; is that -- is that

18   fair.

19       A.  Yes.

20       Q.  Do you know the specifics of those violations

21   at all?

22       A.  Specifics, no.

23       Q.  So you don't know if the -- sure, sorry.

24       A.  Sorry.
```

1   on, Mr. Fowler.  Facts not in evidence.  Calls for

2   speculation.  Calls for a legal conclusion.  Go ahead

3   and answer if you can, Mr. Fowler.

4        A.  Yes.

5        Q.  You would still have concerns?

6        A.  Yes.

7        Q.  And why is that?

8        A.  Because the nature of those chemicals, they

9   are persistent.  They do not break down in nature.

10       Q.  And I think you testified to this earlier.

11  And I'm sure that Mr. Snyder will call me out on it if

12  I've asked this before, but the basis for you saying

13  that those chemicals don't break down in nature is

14  those various articles that you've read that you

15  mentioned earlier?

16              MR. SNYDER:  I'm going to object to the

17  extent that misstates the prior testimony.  Mr. Fowler,

18  go ahead and answer.

19       A.  Correct.

20       Q.  Okay.  If Washington Works -- if the

21  Washington Works facility had no more Clean Water Act

22  violations would you still have concerns over PFAS

23  contamination in the Ohio River?

24              MR. SNYDER:  Objection.  Incomplete

50

1      A.   Hang on one second.

2                 (Pause.)

3      Q.   And with respect to Paragraph 7, would you

4  have become aware of Chemours' contamination from

5  Washington Works because of those -- as a result of

6  those newspaper articles we discussed earlier?

7      A.   Yes.

8      Q.   Okay.  Anything else?

9      A.   Not that comes to mind.

10     Q.   Okay.

11               MR. SNYDER:  Mr. Fowler, if you could

12  just give me one more second to get an objection on the

13  record, I'd appreciate it.

14               THE DEPONENT:  Sorry.

15     Q.   Paragraph 9 references a USGS scientific

16  investigation report 2022-5067, "Occurrence of Per- and

17  Polyfluoroalkyl Substances and Inorganic Analytes in

18  Groundwater and Surface Water Used as Sources for

19  Public Water Supply in West Virginia."  Are you

20  familiar with that investigative report?

21     A.   Yes.

22     Q.   How are you familiar with it?

23     A.   I read it.

24     Q.   Okay.  What do you recall about the report?

52

1      Q.   Okay.   Paragraph 12 states that "I am aware

2   that West Virginia American Water's Huntington system

3   is older and has had problems in the past with treating

4   pollutants.   I am concerned that American Water will

5   not be able to consistently remove the PFAS from the

6   source water before it comes to my tap."

7            Did I read that correctly?

8      A.   Yes.

9      Q.   What's your basis for that first paragraph or

10   first sentence of Paragraph 12?

11      A.   Newspaper stories I have and read and probably

12   some TV website stories that briefly discussed the fact

13   that the treatment plant in Huntington is older.

14      Q.   Do you recall any of the specifics of those

15   articles or TV stations or websites?

16      A.   Just broadly what I told you.

17      Q.   Okay.   Nothing to add to what we discussed

18   earlier?

19      A.   No, sir.

20      Q.   Okay.   Do you know what sort of water

21   treatment is in place at West Virginia American Water's

22   Huntington system?

23      A.   No.

24      Q.   And with respect to the second sentence of

53

1   Paragraph 12, what is the basis for that assertion?

2       A.   What I do understand about the chemicals in

3   question is they are complex manmade chemicals and they

4   are difficult to mitigate through conventional water

5   treatment means, as I understand it.

6       Q.   Okay.  And, again, the basis for that

7   understanding is the news articles and TV and website

8   articles that we've discussed earlier.

9       A.   Correct.

10              MR. SNYDER:  I'm going to object --

11              THE DEPONENT:  Sorry.

12              MR. SNYDER:  I'm going to object to the

13  extent that that mischaracterizes the prior testimony.

14  The answer's out.

15      A.   Okay.

16      Q.   Paragraph 13 states that "I regularly consume

17  tap water from my home in Huntington and have no

18  treatment system installed to remove PFAS from the

19  water."

20              Did I read that correctly?

21      A.   Yes.

22      Q.   And we discussed your regular uses of tap

23  water at your home earlier in this deposition; correct?

24      A.   Yes.

54

1      Q.  And you stated that you do, in fact, have a

2   Brita filter that you use to filter at least some of

3   your drinking water and coffee -- water for coffee at

4   your home.

5      A.  Yes.

6              MR. SNYDER:  Object to the extent that

7   mischaracterizes.  Mr. Fowler, if you could just give

8   me that one quick second --

9              THE DEPONENT:  Sorry.  I -- yeah.

10             MR. SNYDER:   Thank you.

11     Q.  Is the basis for Paragraph 14 of your

12  declaration the same -- the same stuff that we've

13  talked about with respect to Paragraph 12, as far as

14  the source (Zoom glitch) and the worry.

15             MR. SNYDER:  Objection.  Vague.  Go ahead

16  and answer.

17     A.  Yes.

18     Q.  Is the basis for Paragraph 15 of your

19  declaration the same as Paragraph 14 and 12?

20             MR. SNYDER:  Objection to the form, and

21  it's vague.  Go ahead and answer if you understand the

22  question, Mr. Fowler.

23     A.  Yes.

24     Q.  Okay.  Paragraph 16 of your declaration states

55

1    that "My enjoyment of living in the Huntington area is

2    diminished due to a fear of potential PFAS exposure."

3             Did I read that correctly?

4         A.   Yes.

5         Q.   Could you please elaborate or explain that

6    assertion to me?

7         A.   I know these chemicals are in the water I

8    drink and every time I shower or bathe and when I wash

9    our clothes in it.  It's in the back of my mind that

10   these are chemicals that modern science has created and

11   does not know how to make safe for humans.

12        Q.   I believe you just testified that you know

13   these chemicals are in the water that you drink.  I

14   thought earlier you testified that your water had never

15   been tested and you didn't know one way or another

16   whether there were PFAS in the water that comes through

17   your tap.

18        A.   I know they find them at the water intake.

19        Q.   But you don't know if those are filtered out

20   at your water provider -- the filtration system at the

21   water company; correct?

22        A.   Specifically, no.

23        Q.   And you don't -- as you sit here today, you

24   don't know whether or not there are PFAS -- PFAS

56

1    compounds in the water that comes through your tap;

2    correct?

3        A.  I do not.

4        Q.  Okay.

5             Paragraph 17 states that "I want to

6    reduce my risk of exposure to PFAS as much as possible

7    so as to have more peace of mind when I drink my tap

8    water and am otherwise exposed to it."

9             Did I read that correctly?

10       A.  Yes.

11       Q.  How do you reduce your risk of PFAS --

12   exposure to PFAS?

13       A.  I'm not aware of anything I can personally do

14   other than stop drinking the water.

15       Q.  Okay.  And Paragraph 18 of your declaration

16   states that "If Chemours complied with its permit

17   limits for PFOA and HFPO-DA at Washington Works, I

18   would be less concerned about PFAS exposure in my tap

19   water and my use and enjoyment of my water would

20   increase."

21             Did I read that correctly?

22       A.  Yes.

23       Q.  I thought when I asked you earlier that if

24   Chemours would have no future Clean Water Act

65

1              MR. SNYDER:  Objection.  Relevancy.

2    Mr. Engle's been withdrawn.  Go ahead and answer,

3    Mr. Fowler.

4         A.  I do not.

5         Q.  Okay.

6              Okay.  Paragraph 11, the second sentence

7    of Paragraph 11 says that "The use and enjoyment of the

8    Ohio River by plaintiffs members including Ms. Robinson

9    and Mr. Engle are adversely affected by Chemours'

10   unlawful discharges."

11             Did I read that correctly?

12        A.  Yes.

13        Q.  Are you aware of any adverse effects -- or

14   excuse me.  Are you aware of any use and enjoyment or

15   adverse effects of any members of West Virginia Rivers

16   Coalition, including yourself, other than what we have

17   discussed today already?

18             MR. SNYDER:  Objection.  Calls for

19   speculation.  Facts not in evidence.  What members?

20             MR. FORD:  I'm asking him if he's aware.

21   He can say "no" if he -- you know, I'm not asking him

22   to speculate at all.

23             MR. SNYDER:  Same objections.

24   Mr. Fowler, you can answer if you can.  Calls for a

67

1   discussed already today; correct?

2        A.   Correct.

3        Q.   Okay.  Do you know an individual named

4   Jonathan Shefftz, S-H-E-F-F-T-Z?

5        A.   I do not.

6        Q.   Okay.  Do you know an individual that's -- by

7   the name of Dr. Jennifer Schlezinger?

8        A.   I do not.

9        Q.   Do you know a Dr. Beth Hoagland?

10       A.   Was that Beth or Ben?

11       Q.   Beth.  Hoagland?

12       A.   I do not.

13       Q.   Okay.  What about a Doctor Issam Najim?  I

14   think I'm saying that close to right.

15       A.    I think he's a doctor in Huntington, but

16   that's all I know about that name.

17       Q.   Okay.  Do you have any reason to believe that

18   using the water in your house that's sourced from the

19   Ohio River will be harmful to you because of the

20   discharges from Washington Works?

21              MR. SNYDER:  Objection to the extent it

22   calls for expert testimony.  Go ahead and answer if you

23   can, Mr. Fowler.

24       A.   I do.

68

1       Q.  And what is your basis for saying that?

2       A.  What I've read.

3       Q.  Okay.  And I think you testified earlier that

4   no one's ever told you that using the water at your --

5   at your home could be harmful to you; correct?

6                   MR. SNYDER:  Objection.

7   Mischaracterizes.  Go ahead and answer.

8       A.  With regards to PFOA specifically, no one has

9   told me verbally, no.

10      Q.  Okay.  And what about for the category of PFAS

11  more generally?  Has anyone told you that the PFAS

12  contamination in the Ohio River may be harmful to you

13  because of the water you use in your home?

14                  MR. SNYDER:  Objection.  Calls for expert

15  testimony.  Go ahead and answer if you can.

16      A.  No.

17      Q.  Okay.

18                  Let's just take a quick five-minute break

19  and I think I'm done. Let me just look over my notes

20  real quick.

21                  MR. SNYDER:  Okay.

22                  (Break taken.)

23  BY MR. FORD:

24      Q.  All right.  We're back on the record.  Monty,

77

1              MR. FORD:  Yeah, just real quick.

2    BY MR. FORD:

3         Q.  Mr. Fowler, in Paragraph 12, you reference

4    that you are aware of West Virginia American Water

5    Huntington system is older and has had problems in the

6    past with treating pollutants.  I'm not sure I asked

7    you the first go-around:  What problems in the past

8    with treating pollutants are you referencing there?

9         A.  I've read stories about them having issues of

10   breakdowns and trying to deal with newer pollutants.  I

11   think that was specifically what came to mind was the

12   water crisis in Charleston a few years ago when

13   everybody's water downstream tasted and smelled like

14   licorice or something off and that was an issue in

15   Huntington as well.

16        Q.  Okay.  Are you aware whether West Virginia

17   American Water's Huntington system has had any problems

18   with treating PFAS in the past?

19        A.  I am not.

20        Q.  Okay.  Mr. Snyder was asking you some

21   questions about your understanding of the Clean Water

22   Act permit for Washington Works.  For the Washington

23   Works facility.  Do you recall that testimony a minute

24   ago?

1     A.   Yes.

2     Q.  Do you know what the limits are for PFOA set

3 in that permit?

4     A.  I do not.

5     Q.  Do you know what the limits for HFPO-DA or

6 dimer acid or GenX are as set by that permit?

7     A.  I do not.

8     Q.  Okay.  I don't have anything further.

9         MR. SNYDER:  Okay.  Teri, we'll review

10 and sign.  We can go off the record.

11         (Signature not waived.)

12         (Concluded at 11:09 AM.)

13

14

15

16

17

18

19

20

21

22

23

24

79

1    STATE OF WEST VIRGINIA,

2    COUNTY OF WOOD, to wit;

3

4           I, Teresa Reedy, a Notary Public within and
     for the County and State aforesaid, duly commissioned
5    and qualified, do hereby certify that the foregoing
     deposition of MONTY FOWLER was duly taken by me and
6    before me at the time and place and for the purpose
     specified in the caption hereof, the said witness
7    having been by me first duly sworn.

8           I further certify that the attached deposition
     transcript meets the requirements set forth within
9    Article 27, Chapter 47 of the West Virginia Code to the
     best of my ability.

10
            I do further certify that the said deposition
11   was correctly taken by me in shorthand notes, and that
     the same were accurately written out in full and
12   reduced to typewriting and that the witness did request
     to read his transcript.

13
            I further certify that I am neither attorney
14   or counsel for, nor related to or employed by, any of
     the parties to the action in which this deposition is
15   taken, and further that I am not a relative or employee
     of any attorney or counsel employed by the parties or
16   financially interested in the action and that the
     attached transcript meets the requirements set forth
17   within article twenty-seven, chapter forty-seven of the
     West Virginia Code.

18
            My commission expires March 13, 2028.  Given
19   under my hand this 3rd day of August, 2025.

20
     _____
21   Teresa L. Reedy, RPR

22

23

24