# Exhibit 5

```
                                                                    1

 1              IN THE UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF WEST VIRGINIA
 2                         AT CHARLESTON

 3

 4   * * * * * * * * * * * * * * * * * * * * * * * *

 5   WEST VIRGINIA RIVERS
     COALITION, INC, and
 6   LITTLE HOCKING WATER
     ASSOCIATION,
 7
              Plaintiffs,
 8
     vs.                                   CIVIL ACTION
 9                                         NO.  2:24-cv-00701

10   THE CHEMOURS COMPANY FC, LLC,

11            Defendant.

12   * * * * * * * * * * * * * * * * * * * * * * * *

13

14          Zoom deposition of CHARLISE ROBINSON taken by
     the Defendant under the Federal Rules of Civil
15   Procedure in the above-entitled action, pursuant to
     notice before Teresa Reedy, a Registered Professional
16   Reporter, on the 29th day of July, 2025.

17

18

19
                      REEDY COURT REPORTING
20                       (304) 615-6725

21

22

23

24
```

35

1    science panel.  Is that what you're referencing?
2        A.   Yes, sir.
3        Q.   Okay.  Just want to make sure we're talking
4    apples to apples is all.
5        A.   Yes.
6        Q.   Prior to 2011, what sort of uses did you make
7    or have used the Ohio River for?
8        A.   I have been re-created on it when I was in a
9    boat.  I sit beside it, but it's also a source of my
10   drinking water.
11       Q.   Okay.  So the boat, when were you on a boat on
12   the Ohio?
13       A.   I can't give you an accurate date, but I've
14   been on a boat several times before but not currently.
15       Q.   Okay.  When?  Generally as best you can, when
16   were you -- when was the last time you were on a boat
17   on the Ohio River?
18       A.   I would have to say before -- I'm sorry.  I
19   can't give an accurate date on that.
20       Q.   You said you -- I think you -- your first --
21   you first began having concerns related to PFAS
22   contamination in the Ohio River in 2011.
23       A.   Yeah.  But I can't give you an accurate date
24   of when I was on the boat.

37

1              MR. SNYDER:  Objection.  Calls for
2     speculation.  Asked and answered.  Go ahead,
3     Ms. Robinson.
4          A.   I can't -- I do not recall exactly when it
5     was.
6          Q.   Okay.  Why haven't you been out on a boat on
7     the Ohio River any more than you have?
8          A.   Because of my knowledge of the violations at
9     the Chemours facility.
10         Q.   Those violations you're referencing are --
11    occurred when?
12         A.   They I believe started occurring 2015.
13         Q.   What kind of boat were you on -- have you been
14    on?
15         A.   I would say it's a speed boat.  Somebody was
16    driving it.
17         Q.   Okay.  Did you water ski or tube or anything
18    like that?
19         A.   No.
20         Q.   Do you have a boat?
21         A.   No, sir.
22         Q.   Do you do any sort of kayaking or canoeing in
23    the Ohio?  Let me strike that.  Have you ever kayaked
24    or canoed in the Ohio?

38

1  A. No, sir. But I do have a memory of the last
2  time I was on the boat. If you'd like to hear it.
3  Q. Sure.
4  A. It was last year with the Ohio River refuge to
5  do PFAS testing.
6  Q. Do you recall what the results of that testing
7  was -- were?
8  A. They were PFAS in the Ohio River.
9  Q. Do you know at what levels?
10 A. I cannot tell you right now, but I will send
11 that information over if you'd like to have it.
12 Q. Sure, that'd be great. And do you know which
13 particular PFAS were found in the Ohio River in that
14 sampling?
15 A. I do know there was PFOA/C8 but I can't
16 remember all the other ones. But this was not by the
17 Chemours facility.
18 Q. Where was this sampling conducted?
19 A. It was conducted by Neal Island.
20 Q. Is that upstream or downstream of the Chemours
21 facility?
22 A. That is upstream.
23 Q. So there's PFAS contamination upstream of the
24 facility according to the sampling that you

39

```
 1  participated in?
 2       A.  Yes, sir.
 3              MR. SNYDER:  Objection.  Misstates prior
 4  testimony.  Ms. Robinson, please take that pause.  I
 5  knows it's a little difficult, but please do so.
 6       Q.  Okay.  Have you ever swam in the Ohio River?
 7       A.  No, sir.
 8       Q.  Never?
 9       A.  Never.
10       Q.  Okay.  Have you ever fished in the Ohio River?
11       A.  No, sir.
12       Q.  Have you made any other use -- and I know you
13  mentioned earlier that your drinking water -- you
14  believe your drinking water is sourced from the Ohio
15  River so set that aside for one moment.
16              Are there any other uses that you have
17  made at any point ever of the Ohio River?
18       A.  Not anything but what I've previously said.
19       Q.  Okay.  Do you ever engage -- I think you
20  essentially limited your activity and use of the Ohio
21  River to boating a number of times.  Is that accurate?
22              MR. SNYDER:  Object to the extent that
23  mischaracterizes.  Ms. Robinson, please answer the
24  question.
```

47

1  　　　　　MR. SNYDER:  Same objection I mentioned
2  earlier.  Ms. Robinson, please answer if you can.
3  　　　A.   No, sir, I do not recall.
4  　　　Q.   Okay.  Do you filter your tap water at all?
5  　　　A.   I do not drink my tap water.
6  　　　Q.   Okay.  So you don't -- I'm assuming because
7  you don't drink it, I'm assuming you don't put it in
8  some sort of Brita filter or some other sort of
9  filtering system at home.  Is that fair?
10 　　　A.   Yes, sir.
11 　　　Q.   So you don't drink your tap water.  Do you use
12 your tap water for other purposes?
13 　　　A.   Yes, sir.
14 　　　Q.   For what purposes?
15 　　　A.   To shower, to brush my teeth, to do laundry,
16 to wash my dishes.  Normal everyday activities other
17 than drinking it.
18 　　　Q.   Do you cook with it?
19 　　　A.   No, sir.
20 　　　Q.   Why is it that you use the tap water for those
21 purposes?
22 　　　A.   Because it's my only source of water.
23 　　　Q.   Okay.  Does anybody else in your household
24 drink your tap water?

50

1   speculation.  She just said she doesn't test it.
2              MR. FORD:  She may know of some other
3   way, but she can answer.
4       A.   I'm not sure, but it would be less than the
5   contamination that I was exposed to prior, so I choose
6   to use the bottled water instead.
7       Q.   What's your basis for saying that it's less
8   than your prior exposure?
9       A.   Because the levels that were -- that we were
10  exposed to were more than -- than a plastic bottle of
11  water that I'm drinking out of.  And I can't say that
12  with certainty because I'm not a scientist, but --
13      Q.   But that's your belief nonetheless?
14      A.   Yes, sir.
15      Q.   Have you ever had your household water tested
16  for PFAS?
17      A.   Yes, sir.
18      Q.   When?
19      A.   December of 2024.
20      Q.   What were the results of that?
21      A.   There were minus one point trillion results.
22  I don't know.  I have -- I handed it over.  You can
23  refer to it if you like.
24      Q.   Did the result of that -- that testing affect

76

1     Did I read that correctly?
2     A.  Yes, sir.
3     Q.  What efforts have you made to limit exposure?
4          MR. SNYDER:  Objection.  Vague.  Limited
5  exposure to what?
6          MR. FORD:  Whatever she means in
7  paragraph 17.
8          MR. SNYDER:  Ms. Robinson, do you
9  understand the question?
10         THE DEPONENT:  Yes, sir.
11         MR. SNYDER:  Go ahead and answer if you
12 can.
13    A.  I stopped drinking the water.
14 BY MR. FORD:
15    Q.  Okay.
16    A.  To limit my exposure to C8 and the GenX.
17    Q.  Anything else?
18    A.  I stopped cooking with it eventually.
19    Q.  Okay.
20    A.  I don't get in the Ohio River.  That helps
21 limit my exposure.
22    Q.  Did you get into the Ohio River at anytime
23 before 2018?
24    A.  No.  I did not, but I would if it was clean.

87

1    Q.   Okay.  And how did you know that?
2    A.   Because that information is available if you
3 look it up.
4    Q.   And do you look it up on a regular basis?
5    A.   Yes, sir.
6    Q.   Do you know if there were any violations --
7 any Clean Water Act violations at the Washington Works
8 facility for June of 2025?
9         MR. SNYDER:  Objection.  Facts not in
10 evidence. Go ahead and answer if you can.
11   A.   I believe there were.
12   Q.   Okay.
13   A.   Also believe there were prior to that, years
14 before.  That's why we're here because of the
15 continuous violations of the GenX discharge.
16   Q.   If the Washington Works facility had no more
17 Clean Water Act violations, would you still have
18 concerns of a PFAS exposure relating to the Ohio River?
19        MR. SNYDER:  Objection.  Incomplete
20 hypothetical.  Go ahead and answer, Ms. Robinson.
21   A.   I would have concerns, but it would also give
22 me relief if they were not violating their permits.
23   Q.   Would you drink your tap water if Chemours no
24 longer had any Clean Water Act violations at Washington

88

1  Works?
2      A.  Not me currently, I wouldn't, but it would
3  also, but I would be relieved that they weren't having
4  it for the many customers they have below them,
5  downstream, you know, the downstream of the facility
6  that use that as a water supply.
7      Q.  Would you cook with your tap water if
8  Washington Works -- if the Washington Works facility
9  had no more Clean Water Act violations?
10     A.  Me cooking and drinking is a safe water
11 concern, but this is a Clean Water Act, so I don't find
12 it relevant, but, no, I wouldn't.
13     Q.  Okay.
14     A.  For me personally.
15     Q.  Would your -- would any use of -- strike that.
16 Would your use of the Ohio River change in any way if
17 Chemours had no future Clean Water Act violations at
18 Washington Works?
19     A.  If they had no violations, even though I don't
20 drink the water, I know that the people downstream and
21 upstream that are affected would probably use it more,
22 but I personally wouldn't only because of my past
23 exposure and experience.
24     Q.  Okay.  So if Chemours, you know, had no future

121

1  question I have for you is: When we're talking about
2  the use of the Ohio River and if Chemours stopped
3  violating, talk to me a little about what that would do
4  for your other recreational uses of the river. I think
5  you mentioned boating once upon a time.
6           Would you go boating again if the river
7  was less polluted because Chemours' complying with its
8  permit?
9           MR. SNYDER: Objection. Asked and
10 answered.
11      A.  Yes.
12      Q.  And tell me about your enjoyment of activity.
13 Would that be changed knowing that? Again, this is all
14 assuming that Chemours stopped discharging or violating
15 its permit at the Washington Works plant. Would your
16 enjoyment of that boating activity be higher or lower?
17          MR. FORD: Same objection.
18      A.  It would be higher if they stopped permanently
19 violating those.
20      Q.  I'm going to ask you a series of question now,
21 Ms Robinson, about your use of tap water in your home;
22 okay?
23      A.  Yes.
24      Q.  Do you -- and I think you may have testified

132

1  COUNTY OF WOOD, to wit;

2

3         I, Teresa Reedy, a Notary Public within and
   for the County and State aforesaid, duly commissioned
4  and qualified, do hereby certify that the foregoing
   deposition of CHARLISE ROBINSON was duly taken by me
5  and before me at the time and place and for the purpose
   specified in the caption hereof, the said witness
6  having been by me first duly sworn.

7         I further certify that the attached deposition
   transcript meets the requirements set forth within
8  Article 27, Chapter 47 of the West Virginia Code to the
   best of my ability.
9
          I do further certify that the said deposition
10 was correctly taken by me in shorthand notes, and that
   the same were accurately written out in full and
11 reduced to typewriting and that the witness did request
   to read her transcript.
12
          I further certify that I am neither attorney
13 or counsel for, nor related to or employed by, any of
   the parties to the action in which this deposition is
14 taken, and further that I am not a relative or employee
   of any attorney or counsel employed by the parties or
15 financially interested in the action and that the
   attached transcript meets the requirements set forth
16 within article twenty-seven, chapter forty-seven of the
   West Virginia Code.
17
          My commission expires March 13, 2028.  Given
18 under my hand this 3rd day of August, 2025.

19
   _____
20 Teresa L. Reedy, RPR

21

22

23

24