## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

WEST VIRGINIA RIVERS COALITION, INC.,

                        Plaintiff,

                        and

LITTLE HOCKING WATER ASSOCIATION, INC.

                        Intervenor-Plaintiff,

v.                                 CIVIL ACTION NO.   2:24-cv-00701

THE CHEMOURS COMPANY FC, LLC,

                        Defendant.

### MEMORANDUM OPINION AND ORDER

This case is simple and all too familiar. For years, Defendant Chemours Company has discharged pollutants into the Ohio River. The level of discharge far exceeds the legal limits that bind Chemours. Those pollutants endanger the environment, aquatic life, and human health. Today, that unlawful, unpermitted discharge stops.

Congress, the Environmental Protection Agency, and the state of West Virginia have recognized that forever chemicals like PFAS and HFPO-DA are dangerous, persistent, and mobile pollutants. Because an increased exposure to these chemicals puts the public health at risk, the government regulates these compounds by setting limits on how much pollutant a facility can discharge. This agreement is memorialized in a permit.

But Defendant Chemours has treated its permit more as full permission to act without constraint. Chemours boldly violates its permit and admitted as much at the preliminary injunction

hearing. Chemours represents that—even with all reasonable efforts—it will take more than two years to achieve regular and consistent compliance with the permit.

The present circumstance is that individuals who live on and engage with the Ohio River face a terrible choice: abstain from using or drinking water that comes from the Ohio River or subject themselves to the adverse health effects associated with toxic pollutants. This choice violates the law.

When defendants like Chemours fail to abide by their own permits and when the government fails to intervene on behalf of the public, the Clean Water Act empowers citizens to bring an action to force compliance. That is this case.

Here, the Plaintiff does not stand in for the public in the abstract. Instead, it acts under a specific congressional grant of authority to enforce a specific permit, against a specific facility, for specific unlawful discharge. This is not a generalized grievance; it is a concrete statutory wrong visited on identifiable members of the public subject to irreparable harm.

Now the Plaintiff asks this court to force Chemours to comply with the law. That is what I do today. For the reasons that follow, the Plaintiff's Motion for a Preliminary Injunction is **GRANTED,** and the Defendant is **ORDERED** to comply with its permit.

## I.    PENDING MOTION

Pending before the court is Plaintiff's Motion for a Preliminary Injunction, [ECF No. 7]. The motion asks the court to enjoin the unpermitted and illegal discharges by Defendant, The Chemours Company FC, LLC, of per- and polyfluoroalkyl ("PFAS"), including hexafluoropropylene oxide dimer acid ("HFPO-DA" or "GenX") from its Washington Works Plant ("the Plant") in Wood County, West Virginia. HFPO-DA is an aid used by the Defendant in its fluoropolymer manufacturing process. [ECF No. 7-15, at 2]. Like perfluorooctanoic acid

("PFOA" or "C-8"), PFAS including HFPO-DA are forever chemicals due to their persistence in the environment. [ECF No. 8, at 3]; *see also Ctr. for Env't Health v. Regan*, 103 F.4th 1027, 1031 (4th Cir. 2024). HFPO-DA, in certain concentrations, is "harmful to or toxic to man, animal, or aquatic life." [ECF No. 65-2, at 14].

## II.    BACKGROUND

The Defendant's predecessor E.I. DuPont de Nemours & Co., Inc. ("DuPont"), began using HFPO-DA by 2013 as a replacement for PFOA.[1] [ECF Nos. 77–79 vol. 1, 27] (Preliminary Injunction Hearing Transcript) [hereinafter *Transcript*].[2] As noted by the Defendant's counsel during his opening statement at the preliminary injunction hearing, the court is familiar with PFOA and related PFAS compounds.[3] *Id.* Counsel was referring to two previous cases that I presided over, involving DuPont's Washington Works Plant and C-8 pollution from the Plant.

It is true that Defendant's history with persistent toxic discharges is long. Its predecessor, DuPont, was involved in well-known litigation over PFOA contamination. Chemours spun off from DuPont in 2015, inheriting both the Washington Works facility and its environmental record. That record includes two cases where plaintiffs alleged that DuPont was unlawfully discharging chemicals and contaminating water sources.[4] Neither case fully reached an adjudication on the

---

[1] Chemours was created in July 2015 as a spin-off of DuPont. *DuPont Completes Spin-off of The Chemours Company*, Chemours, (July 1, 2015), https://www.chemours.com/en/news-media-center/all-news/press-releases/2015/dupont-completes-spin-off-of-the-chemours-company.

[2] The transcript from the preliminary injunction hearing may be found on the Docket at ECF Nos. 77–79. Each cite to the transcript will be referred to by Volume. For purposes of this Memorandum Opinion and Order, Volume 1 is ECF No. 77, Volume 2 is ECF No. 78, and Volume 3 is ECF No. 79.

[3] DuPont had been using C-8 since the 1950s. *Rhodes v. E.I. du Pont de Nemours & Co.*, 253 F.R.D. 365, 368 (S.D. W. Va. 2008).

[4] In 1999, the Tennant family sued DuPont in an 11-count complaint under various theories of liability, including violations of the Clean Water Act ("CWA") at DuPont's Dry Run Landfill ("Landfill") also located in Wood County, West Virginia. *Tennant, et al v. E.I. DuPont de Nemours & Co., Inc.*, No. 6:99-cv-00488 (S.D. W. Va. filed October 21, 1999). The Tennants alleged that DuPont violated one of its National Pollutant Discharge Elimination System ("NPDES") permits issued by the West Virgina Division of Environmental Protection when it disposed or discharged toxic and/or hazardous waste at the Landfill resulting in the contamination of soil, surface and groundwaters. *Id.* The suit alleged that the contamination led to the death or injury of hundreds of the Tennants' cattle, and the Tennants suffered physical illnesses. *Id.* Later, in 2006 DuPont was sued for negligence: gross negligence, reckless, willful, and wanton

merits. They are, however, indicative that the Defendant is very familiar with these allegations as it (or its predecessor) has settled claims filed for PFOA exposure and drinking water claims by water utilities. *See e.g. In re: E.I. du Pont de Nemours & Co. C-8 Pers. Inj. Litig.*, No. 2:13-md-2433, 2025 WL 474225 (S.D. Ohio Feb. 12, 2025); *Aqueous Film-Forming Foam (AFFF) Prods. Liab. Litig. (MDL 2873)*, No. 2:18-MN-2873-RMG, 2024 WL 489326 (D.S.C. Feb. 8, 2024).

### A.  The Clean Water Act

The Clean Water Act's purpose is to "maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251. Primarily, the Act prohibits the "discharge of any pollutant" into the "navigable waters" of the United States, and the Act broadly defines its terms. *See Sacket v. Environmental Protection Agency*, 598 U.S. 651, 660 (2023). To put it plainly, Congress has identified harmful chemicals—"toxic pollutant[s] injurious to human health"—and has regulated their discharge. 33 U.S.C. § 1342(k).

In part, the Act controls through regulating "point sources," which are any means from which a pollutant flows or is discharged. 33 U.S.C. § 1362(14). Those who discharge pollutants into the water may apply for a permit to discharge from those points and, if granted, an authorizing agreement is formed. 33 U.S.C. § 1342(a). That permit allows the permittee to discharge restricted levels of pollutants. The government may enforce the permit. 33 U.S.C. § 1319.

When the government fails to enforce a permit, however, the CWA provides that citizens with an interest may step in and sue a polluter. 33 U.S.C. § 1365 The Clean Water Act gives a

---

conduct; private nuisance; past and continuing trespass; past and continuing battery; medical monitoring; and public nuisance for its contamination of human drinking waters supplies at the Plant. *William R. Rhodes, et al., v. E.I. DuPont de Nemours and Company*, No. 6:06-cv-00530 (S.D. W. Va. filed June 29, 2006). I granted in part and denied in part DuPont's motions for summary judgment on all of plaintiffs' claims. *Id.* Following my ruling on summary judgment, the plaintiffs filed a stipulation of voluntary dismissal under Federal Rule of Civil Procedure 41(a)(1) to appeal my decision on summary judgment and class certification. *Rhodes v. E.I. du Pont de Nemours & Co.*, 636 F.3d 88, 94 (4th Cir. 2011). This appeal was unsuccessful. *Id.*

district court jurisdiction to (1) enforce permit requirements and order compliance or (2) order the administrator of the Environmental Protection Agency ("EPA") to do the same. *Id.* § 1365(a); *Sanitary Board of City of Charleston, West Virginia v. Wheeler*, 918 F.3d 324 (4th Cir. 2019) ("This mechanism is a crucial part of the CWA's overall enforcement scheme, preventing federal regulators from thwarting the statute by failing to meet the law's demands.").

### B. The Complaint

Plaintiff brought this action on December 5, 2024. [ECF No. 1]. Plaintiff alleges the Defendant "has discharged and continues to discharge pollutants" into the Ohio River (waters of the United States) in violation of Sections 301 and 402 of the CWA, 33 U.S.C. §§ 1311, 1342. *Id.* ¶ 2. Plaintiff alleges that Defendant has violated effluent standards or limitations set by WV/NPDES Permit No. WV 0001279 ("the Permit") for PFOA, HFPO-DA, pH levels, and TSS at Outlets 001, 002, 005, 006, and 205. *Id.* ¶ 35; [ECF No. 1-1].

The Permit was most recently issued by the West Virginia Department of Environmental Protection ("WVDEP") on July 30, 2018, and became effective on September 1, 2018. [ECF No. 1, ¶ 25]. The Permit was set to expire on July 29, 2023, but has been administratively extended for Defendant to submit its renewal application. *Id.* The Permit requires compliance with limits on PFOA and HFPO-DA at outlets 001, 002, 005, and 006 in accordance with the schedule in the Permit. *Id.* ¶ 26.

It should be noted that the limits are not random or arbitrary. The PFOA limits at Outlets 002 and 005 were based on the EPA's 2016 human health advisory level of 70 parts per trillion (ppt) for PFOA and PFOS combined. *Id.* ¶ 27. Meanwhile, HFPO-DA limits were based on a North

Carolina health goal of 140 ppt. *Id.* Additionally, the Permit requires compliance with other chemical limits that are not the subject of the preliminary injunction.[5]

The limits for the different compounds are set by scientists and administrators. Chemours has routinely ignored these limits. Appendix A of the Complaint contains a table of alleged violations. [ECF No. 1-1]. These amount to an alleged 199 violations of the Permit limits and thus the Clean Water Act.[6]

For these violations, Plaintiff asserts that the Defendant is liable for civil penalties of $66,712 per day and should be subject to an injunction. Plaintiff seeks the following:

1. Declaring that Chemours has violated and is in continuing violation of the Clean Water Act;
2. Enjoining Chemours from operating the "Chemours Washington Works Plant" in a manner that would result in further violations of WV/NPDES Permit No. WV0001279;
3. Compelling Chemours to immediately comply with all terms and conditions, including the effluent limitations on PFOA, HFPO-DA, pH, and TSS, of WV/NPDES Permit No.WV0001279;
4. Compelling Chemours to pay an appropriate civil penalty of up to $66,712 per day for each CWA violation;
5. Ordering Chemours to conduct monitoring and sampling to determine the environmental effects of its violations, to remedy and repair environmental contamination and/or degradation caused by its PFOA, HFPO-DA, pH, and TSS violations, and to restore the environment to its prior condition;
6. Awarding Plaintiff its attorneys' fees, expert witness fees, and all other reasonable costs and expenses incurred in the pursuit of this action; and,
7. Granting any other such relief as this Court deems just and proper.

[ECF No. 1 at 11].

---

[5] The pH level limits for Outlet 002 are 6 S.U. minimum and 9 S.U. maximum. The Permit also requires compliance with net limits on TSS (total suspended solids) at Outlet 205. The limits for TSS were 3878 lbs/day maximum daily and 1197 lbs/day average monthly until November 13, 2020, after which time the limits increased to 3952 lbs/day maximum daily and 1217 lbs/day average.
[6] Violations of the pH limit date back to December 2019, TSS limit violations to January 2020, HFPO-DA limit violations to October 2020, and PFOA limit violations to October 2020. [ECF No. 1-1].

### C.  Motion for Preliminary Injunction

On February 25, 2025, Plaintiff filed its Motion for a Preliminary Injunction, [ECF No. 7], asking the court to prohibit the Defendant from further violating the HFPO-DA effluent limitations, specifically at Outlets 002 and 005, and to compel compliance with the Permit by any means necessary. *Id.*

Defendant's response in opposition asserts Plaintiff does not have standing to bring the suit as (1) there is no injury in fact and (2) even if there is an injury, the alleged injury is not redressable by the court. [ECF No. 17, at 9–11]. The Defendant further contends that even if the Court were to find that standing exists, the Plaintiff's motion for a preliminary injunction still fails. The Defendant alleges that Plaintiff cannot satisfy any injunction requirement. *Id.* at 12, 15, 18, 19.

From May 21–23, 2025, the court held a Preliminary Injunction Hearing in this case.[7] Prior to the hearing, the parties entered into a Joint Stipulation concerning a trial plan for the hearing as well as a Joint Exhibit Book and certain fact stipulations. [ECF No. 55, at 1]. The parties stipulated to the concentrations of HFPO-DA reported by the Defendant in its monthly discharge monitoring reports from Outlets 002 and 005. *Id.* at 3. The stipulated chart indicates a regular violation of the HFPO-DA discharge limit with sporadic compliance. *Id.* at 4–5.

At the conclusion of the hearing, I ordered supplemental briefing on multiple issues, including irreparable harm, to be submitted four weeks after the receipt of the hearing transcript. [ECF No. 70]. The parties timely filed their briefs. [ECF Nos. 75–76, 109–10, 119–20]. Overall, the court has reviewed more than 2,500 pages that make up or explain the record.

Since the briefings were submitted by the parties, the Defendant filed its Motion for Leave to Supplement the Record, which I granted. The Defendant's supplemental evidence pertains to

---

[7] The court heard the testimony of Defendant's witnesses: James Hollingsworth, Katelyn Walck, Andrew Harten, and Catherine Boston; and Plaintiff's rebuttal witnesses: Dr. Jennifer Schlezinger and Dr. Beth Hoagland.

recent efforts taken at the Plant under the Administrative Order on Consent ("AOC") entered into by the Defendant with the EPA.[8] Specifically, the Defendant has routed streams of condensation from "several large, industrial-size rooftop HVAC units and a roof drain" that flow to Outlets 002 and 005 to an existing treatment system. [ECF No. 142, at 4–5]. As a result, Defendants allege that concentrations of HFPO-DA have been "significantly reduced." *Id*. The new July 18, 2025 Declaration of Mr. Hollingsworth does not mention the Defendant's long term plan for HFPO-DA reductions testified about at the preliminary injunction. [ECF No. 142-1].

## III.   LEGAL STANDARD

Federal Rule of Civil Procedure 65 authorizes federal courts to issue a preliminary injunction. *See* Fed. R. Civ. P. 65(a). "A preliminary injunction is an extraordinary remedy afforded prior to trial at the discretion of the district court that grants relief *pendente lite* of the type available after the trial." *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 345 (4th Cir. 2009). "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *S.C. Coastal Conservation League v. United States Army Corps of Eng'rs, Charleston Dist.*, 127 F.4th 457, 466 (4th Cir. 2025). "All four requirements must be satisfied." *S.C. Progressive Network Educ. Fund v. Andino*, 493 F. Supp. 3d 460, 469 (D.S.C. 2020) (quoting *Real Truth*, 575 F.3d at 346). The movant must "demonstrate by 'a clear showing'" that it is entitled to the relief sought. *Real Truth*, 575 F.3d at 345 (quoting *Winter*, 555 U.S. at 22).

---

[8] The Defendant has been in discussions with the EPA since 2023 about its HFPO-DA violations. [ECF No. 17, at 9].

## IV.    DISCUSSION

The Defendant challenges Plaintiff's Motion for Preliminary Injunction on two grounds. First, Defendant argues that the Plaintiff lacks Article III standing. Second, Defendant argues that Plaintiff fails to prove the elements necessary for preliminary injunctive relief.

### A.  Standing

As a threshold matter, I am satisfied that the Plaintiff has established Article III standing. To establish Article III standing, a plaintiff must show that (1) she suffered an injury in fact that is both concrete, particularized, and either actual or imminent; (2) the injury was likely caused by the defendant; and (3) the injury is redressable by judicial relief. *Sommerville v. Union Carbide Corp.*, No. 2:19-CV-00878, 2024 WL 2139394, at *5 (S.D. W. Va. May 13, 2024) (Goodwin, J.) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).

An organization—Plaintiff West Virginia Rivers Coalition, Inc. in this case—may also have Article III standing to bring a claim in federal court. Organizational standing exists when either "the organization itself is injured or" one of its members is injured. *Ctr. for Biological Diversity v. United States Forest Serv.*, 764 F. Supp. 3d 349, 355 (S.D. W. Va. 2025) (Volk, J.) (citing *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 629 F.3d 387, 396–97 (4th Cir. 2011) ("*Gaston III*")). If a member is injured, an organization may sue when "(1) at least one member would otherwise have individual standing, (2) the interests at stake in the litigation are germane to the organization's purpose, and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Piney Run Pres. Ass'n v. Cnty. Comm'rs of Carroll Cnty., MD*, 268 F.3d 255, 262 (4th Cir. 2001) (citing *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 181 (2000)).

9

Recited above are bedrock standing requirements. Because Article III standing is constitutional, the standard does not *literally* change from case to case. Still, the courts have tweaked at the edges of standing jurisprudence in environmental litigation. "The Fourth Circuit has explained that '[i]n the environmental litigation context, the standing requirements are not onerous.'"[9]

This makes sense. Congress, through the Clean Water Act's citizen-suit provision, has recognized that exposure to unlawful discharges implicates a public interest in the environment. While Congress cannot override the requirements of Article III, it may define legal interests and authorize their enforcement. Where a statute identifies unlawful discharge of toxic pollutants like HFPO-DA as a harm, and where plaintiffs allege concrete exposure to that unlawful discharge— whether through use of affected water bodies, residence in proximity, or regular engagement with polluted natural resources—such plaintiffs have asserted an injury in fact sufficient to support standing.

Indeed, I am particularly concerned about the nature of the injury in this case. Injury to the environment, and those living in the affected environment, is often incremental, cumulative, and

---

[9] *Ohio Valley Environmental Coalition, Inc.. v. Horinko*, 279 F. Supp. 2d 732, 742 (S.D. W. Va. 2003) (quoting *Am. Canoe Ass'n v. Murphy Farms, Inc.,* 326 F.3d 505, 517 (4th Cir. 2003)). *See also Laidlaw*, 528 U.S. at 183 ("We have held that environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity.") (citation omitted); *Ctr. for Biological Diversity*, 764 F. Supp. 3d at 356 ("Although critical for subject matter jurisdiction, the injury-in-fact bar is set quite low for environmental matters[.]"); *In re Taylor*, 572 B.R. 592, 600 (Bankr. E.D.N.C. 2017) ("In another context," the plaintiff foregoing the use of contaminated waters for kayaking "may be too flimsy an allegation to establish standing." But in this case, the plaintiff adequately established an injury in fact through his "concerns about tributary waters based upon the odor of effluent and his decision to abstain from kayaking in such areas."); *Winyah Rivers Alliance v. Active Energy Renewable Power, LLC*, 579 F. Supp. 3d 759, 765 (E.D.N.C 2022); *Charleston Waterkeeper v. Frontier Logistics, L.P.*, 488 F. Supp. 3d 240, 253 (D.S.C. 2020); *West Virginia Highlands Conservancy v. Brooks Run Mining Company, LLC*, No. 2:19-cv-41, 2022 WL 677573, at *3–4 (N.D. W. Va. Mar. 7, 2022) ("Injury-in-fact is an easy standard to meet for a plaintiff in an environmental case." "[E]stablishing an injury-in-fact is a low bar to clear for an environmental plaintiff." Injury in fact was established because the plaintiff would be "more likely to fish and wade in the" affected waters, if the defendant "were to comply with its environmental permits."); *Potomac Riverkeeper, Inc. v. Virginia Electric and Power Company*, No. 2:21-cv-23, 2022 WL 4391433, at *5 (N.D. W. Va. Sept. 22, 2022) (holding that under Supreme Court precedent, *desiring* to fish in an affected waterway but never having actually fished in the affected waterway still constitutes injury in fact); *U.S. v. Arch Coal, Inc.*, No. 2:11-0133, 2011 WL 2493072, at *8 (S.D. W. Va. June 22, 2011).

not always immediately visible. That does not, however, render it speculative or abstract. Here, Congress and regulatory agencies have determined through scientific and legislative processes that such substances pose harm to ecosystems, public health, or both. A defendant who violates a permit is not "probably" harming the public—it is harming the public as a matter of law. Thus, a plaintiff alleging contact with contaminated water asserts a legally and factually recognized injury, not a conjectural one.[10]

In sum, the injury in this case is a micro-injury: a concrete statutory violation that, by legislative design, affects real-world interests. Having cast the appropriate light on the standing analysis, I now turn to its three elements and their application to this case.

### 1. Injury in Fact

In this case I must start with the Clean Water Act and the purpose of Defendant's Permit. The Clean Water Act's purpose is to "maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251. The Act reflects Congress's determination that unpermitted discharges are harmful and presumptively unlawful. By establishing clear effluent limitations and strict liability for noncompliance, Congress has created a substantive legal interest in waterways being free from unauthorized pollution.

---

[10] This is distinguishable from *Sommerville v. Union Carbide Corporation.* No. 2:19-cv-878, 2024 WL 2139394 (S.D. W. Va. May 13, 2024). In *Sommerville*, I held that the putative plaintiff class lacked standing in a medical monitoring suit for damages because there was not sufficient evidence that the class suffered a present (or imminent) concrete injury. *Id.* at *6–9. Specifically, I noted that in a suit for damages the class's injury must be present and concrete. *Id.* This contrasts with the imminent injury sufficient to confer standing when a plaintiff seeks *injunctive* relief to stop a *future* action. *Id.* at *6. I also observed that the concreteness of an injury may be found if Congress had spoken on the matter. *Id.* at *8. The medical monitoring claim in *Sommerville*, however, was found neither in traditional common law nor congressional mandate. The Clean Water Act, and the citizen suits it created, is different. As I said in *Sommerville*, the Clean Water Act is a congressional directive and enforcement statute for injunctive, forward-looking relief. *Id.* at *6 n.3. Unlike in the medical monitoring context, it makes sense that a Clean Water Act plaintiff can satisfy the injury in fact requirement by providing evidence of the injury she is certain to face on a continuous basis.

The CWA also creates a cooperative state-federal system that manages the local public's right to clean water. When the WVDEP issued the Defendant the Permit, it considered the health goal set by the EPA of 140 nanograms per liter (ng/L) or parts per trillion (ppt) for HFPO-DA in drinking water. [ECF No. 55, at 3]. a Acknowledging that the health goal may change, the WVDEP used this value to "be protective of the State's narrative water quality criteria for human health." [ECF No. 55, at 3]. Such health interests are "constitutionally recognized as cognizable bases for injury in fact." *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 156–57 (4th Cir. 2000) ("*Gaston I*") (citing *Laidlaw* 528 U.S. at 182–83).

In short, the statutory framework provides, at least, a starting point for recognized rights that the waters of the United States should be free from harmful pollutants.[11] Naturally, persons who use or enjoy the Ohio River are protected by this statutory framework as well. Ms. Robinson is one of the people that gets her water from the Ohio River. Not only has her statutory right been violated, but she has also suffered a concrete and particularized injury.

Ms. Robinson, a member of the Plaintiff organization, satisfies the injury in fact requirement of standing in a number of ways: the use of her own tap water is severely diminished; she avoids any contact with the Ohio River; and she cannot enjoy the aesthetics of the Ohio River due to the Defendant's excess discharges of HFPO-DA. [ECF No. 7-20].

Ms. Robinson receives her water from the Lubeck Public Services District. *Id.* at 1–2. She has lived near the Defendant's Washington Works Plant for most of the past 24 years and took part in the C-8 Science Panel's health study in 2006. *Id.* The study showed varying levels of PFOA in her blood. *Id.*

---

[11] I note, of course, this does not create a presumption of injury in fact. *See TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021). As will be explained, Ms. Robinson has suffered a concrete, particularized injury and remains at risk of continuing to suffer injury because of the Defendant's excess discharges.

In 2018, Ms. Robinson became aware of the Defendant's violation of HFPO-DA limits at the Plant. Concerned about potential PFAS exposure, she stopped drinking tap water, and she no longer cooks with water directly from the tap. Because water is an essential resource for living, she still uses the water for "brushing [her] teeth, bathing, laundry, cleaning, and watering [her] plants, including vegetables and herbs." *Id.* at 3.

Her reaction is understandable. The record shows that HFPO-DA is indeed a dangerous pollutant. [ECF Nos. 7-24; 65-2, at 14]; *see generally Transcript*, vol. 2, at 200–04. While it is in waterways like the Ohio River, its long chain structure enables it to persist for long periods of time and travel to great distances. [ECF No. 7-24, at 2]. Pointedly, it is referred to as a "forever chemical." *Id.* It enters the body typically through drinking water, and animal studies have shown adverse health effects on "the liver, kidneys, the immune system, development of offspring, and an association with cancer." *Id.* at 2. *See also Transcript*, vol. 2, at 202–04; *Center for Environmental Health*, 103 F.4th at 1031. Considering the long life of HFPO-DA and its (and other PFAS compounds') association with serious health issues, it is entirely reasonable that Ms. Robinson has limited her exposure. For the same reason, it is absurd to suggest that Ms. Robinson cannot satisfy the injury in fact requirement of standing because she has taken steps to avoid greater injury and harm to her health.

Ms. Robinson's self-limiting behavior reflects more than a generalized grievance. Limiting or abandoning ordinary uses of one's water supply and avoiding a major river because of unpermitted pollution is more than "mere concern." Rather, this is a measurable intrusion into Ms. Robinson's daily life—concrete and particularized to her, a resident downstream of a plant that is unlawfully discharging an excess amount of HFPO-DA. *Laidlaw*, 528 U.S. at 184 (finding injury in fact because there is "nothing 'improbable' about the proposition that a company's continuous

and pervasive illegal discharges of pollutants into a river would cause nearby residents to curtail their recreational use of that waterway and would subject them to other economic and aesthetic harms"). A plaintiff's decision to severely limit or avoid use of her own tap water, particularly in response to repeated violations of environmental discharge limits, certainly constitutes a cognizable injury for purposes of Article III.[12]

Further, she avoids direct contact with the Ohio River to limit her exposure to various PFAS. She provides, "Even looking at the Ohio River downstream of Chemours offends me because I know of the Company's unlawful discharges." *Id.* at 4. This too is injury in fact.[13] Not only does she once again self-limit to avoid touching the Ohio River, but her ability to view it from

---

[12] *Kern v. Wal-Mart Stores, Inc.*, 804 F. Supp. 2d 119, 128–29 (W.D.N.Y. 2011) (injury in fact was established because the defendant's unpermitted discharge curtailed the plaintiffs' "*drinking* and recreational activities" of the affected waterway) (emphasis added); *Dubois v. U.S. Dept. of Agriculture*, 102 F.3d 1273, 1283 (1st Cir. 1996) ("[A] particular person, whose family home is located squarely within the geographical area allegedly directly affected by the proposed project, who visits the area regularly, *who drinks the water which will allegedly be tainted by pollutants*, and who will allegedly be deprived of his environmental . . ." alleges enough to satisfy the constitutional requirements for standing.) (emphasis added). *See also Wisconsin Resources Protection Council, Center for Biological Diversity v. Flambeau Mining Company*, 903 F. Supp. 2d 690, 704 (W.D. Wis. 2012) ("Additionally, injury in fact can be established by 'likely exposure' to pollutants.") (collecting cases); *Ohio Valley Environmental Coalition, Inc. v. Hernshaw Partners, LLC*, 984 F. Supp. 2d 589, 593–94 (S.D. W. Va.) (Goodwin, J.) (finding that injury in fact was established because plaintiffs' members would enjoy pollutant-affected waterways less due to defendant's unpermitted discharge of selenium); *Inland Empire Waterkeeper v. Corona Clay Co.*, 17 F. 4th 825, 832 (9th Cir. 2021) (Injury in fact was established when defendant's unpermitted discharge impacted the plaintiff's members' present and anticipated enjoyment of the waterway. Also, collecting cases that hold reasonable concerns of injury from polluted water constitute injury in fact.); *Riverkeeper, Inc. v. Mariant Lovett, LLC*, 675 F. Supp. 2d 337, 350–51 (S.D.N.Y. 2009) (Defendant's failure to comply with the requirements of the Clean Water Act reduced the plaintiff's members' recreational and aesthetic benefits derived from an affected waterway. The plaintiff's members' interests included: "fishing and boating, swimming, *drinking water*, and hiking," but the quality of the Hudson river adversely affected the organizational members' "health, recreational, aesthetic, commercial, and environmental interests.") (emphasis added); *Puerto Rico Campers' Ass'n v. Puerto Rice Aqueduct and Sewer Authority*, 219 F. Supp. 2d 201, 209–10 (D.P.R. 2002) (plaintiff's members grew distrustful of the affected waterway they enjoyed because of the defendant's pollution and consequent health effects); *Quad Cities Waterkeeper v. Ballegeer*, 84 F. Supp. 3d 848, 861–62 (C.D. Ill. 2015) ("alleged diminution of . . . aesthetic and recreational interests" satisfied injury in fact).

[13] *Idaho Conservation League v. Atlanta Gold Corp.*, 844 F. Supp. 2d 1116, 1128–29 (D. Idaho 2012) (member established injury in fact by alleging that he avoids contact with the affected waterway and did not permit his children to swim in it); *Waste Action Project v. Draper Valley Holdings LLC*, 49 F. Supp. 3d 799, 803–04 (W.D. Wash. 2014) (injury in fact was established because plaintiff, wanting to use the affected waterway, minimizes or avoids her contact with it); *Ohio Valley Environmental Coalition, Inc. v. Coal-Mac, Inc.*, 775 F. Supp. 2d 900, 912 (S.D. W. Va. 2011) (Chambers, J.) (injury in fact was established when plaintiffs' member could not enjoy the affected water like he used to and refrained from water-related activities after learning of the defendant's pollution); *PennEnvironment v. RRI Energy Northeast Management Co.*, 744 F. Supp. 2d 466, 478–79 (W.D. Penn. 2010) (injury in fact was established by plaintiff's members, aware of the defendant's pollution, feared contacting the affected water or otherwise the members could not enjoy it).

afar is curtailed by Defendant's discharge. "[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Laidlaw*, 528 U.S. at 183 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)).

Ms. Robinson remains subject to the Defendant's upstream discharges, and she is unable to use any of the Ohio River. This is an actual, concrete, and particularized injury.[14] Therefore, I **FIND** that Ms. Robinson has shown that her injury satisfies Article III standing: her injury is actual, concrete, and particularized.

### 2. Traceability

Ms. Robinson's injuries are fairly traceable to the Defendant's unpermitted discharge of HFPO-DA into the Ohio River. "The 'fairly traceable' requirement ensures that there is a genuine nexus between a plaintiff's injury and a defendant's alleged illegal conduct." *Gaston I*, 204 F.3d at 161 (citing *Lujan*, 504 U.S. at 560). To satisfy the traceability prong of standing, "a plaintiff 'must merely show that a defendant discharges a pollutant that causes or contributes to the kinds of injuries alleged' in the specific geographic area of concern." *Gaston I*, 204 F.3d at 161 (quoting *Natural Resources Defense Council, Inc. v. Watkins,* 954 F.2d 974, 980 (4th Cir. 1992)).

Here, the Plaintiff has shown that the Defendant discharges HFPO-DA from its Plant to the Ohio River. Ms. Robinson receives her water from Lubeck and has limited her use, contact, and enjoyment of the Ohio River due to fear of exposure to HFPO-DA. Therefore, I **FIND** the

---

[14] In fact, Ms. Robinson suffers injury long before she develops a noticeable malady. I address this fully when analyzing the irreparable harm that Ms. Robinson and all those using the Ohio River suffer. In short, because of the nature and toxicity of HFPO-DA, Ms. Robinson suffers an injury (standing) and irreparable harm (injunction standard) each time she is exposed to an unpermitted discharge of HFPO-DA. This is an incremental injury where each instance is an injury/harm. I note that that injury/harm also reaches far beyond Ms. Robinson as the environment and the public is also harmed by the Defendant's actions. Still, for the Article III standing analysis, I consider the whole of injuries suffered only by the Plaintiff's member, Ms. Robinson.

Plaintiff has established that its member's alleged injury is fairly traceable to the Defendant's discharges of HFPO-DA from its Plant.

### 3. Redressability

Ms. Robinson's injuries are redressable by this court. A plaintiff seeking injunctive relief shows redressability by "alleg[ing] a continuing violation or the imminence of a future violation" of the statute at issue. *Gaston I*, 204 F.3d at 162. Further, "[s]atisfaction of the redressability prong of individual standing requires that a plaintiff show that it is "likely, and not merely speculative, that a favorable decision will remedy the injury." *Hobet Min., LLC*, 702 F. Supp. 2d at 651.

Plaintiff's alleged injury is clearly redressable by this court. Here, the Plaintiff has shown that the Defendant is continuing to violate the Permit and until as recently as June 2025 had no plans to stop. [ECF No. 55, at 4–5]; *Transcript* vol. 1 at 104–05; [ECF No. 142]. Those violations contaminate the Ohio River, and because Ms. Robinson gets her drinking water from Lubeck,[15] she does not use it for fear of contamination.

But if I order Defendant to comply with the Permit, Ms. Robinson's fears will be abated, and she will be able to use and enjoy water from the Ohio River. This is redressability. In the same way, Defendant cannot be relied on to redress the problem on its own.[16] At the hearing, Defendant estimated that it will take 27 months to comply.[17] *Id.* at 106.

---

[15] Plaintiff cites the Permit application which provides, "[a] USGS study reports that about 39% of the volume pumped by Lubeck is derived from induced infiltration from the Ohio River." [ECF No. 7-14, at 7–8 n. 5].

[16] Defendant attempted to persuade the court at the hearing that an injunction would not redress Ms. Robinson's injury because even if I were to grant the motion for preliminary injunction, the Plant *still* would not comply with the Permit due to air deposition of HFPO-DA. *Transcript* vol. 2, 66:11–19 ("MR. YAUSSY: Well, we're saying that you shouldn't enter a preliminary injunction that would stop us from operating the plant because that won't stop necessarily exceedances from occurring. THE COURT: So I'm not supposed to enjoin you because you've already caused such a mess that it's going to keep happening no matter what? MR. YAUSSY: Well, I wouldn't put it quite that way."). This convoluted argument is not persuasive.

[17] I recognize Defendant's single month of recent compliance but because it had sporadically complied with its permit before, I do not find that Defendant has redressed Ms. Robinson's injuries.

By granting the pending motion, I can order the Defendant to comply by any means necessary with the Permit. The Defendant could shut down its Plant, modify its manufacturing processes, reduce production, or send process wastewater off-site to achieve compliance. Compliance may be expensive and burdensome, but it is possible. Therefore, the Plaintiff's injury is redressable.

### 4. Representational Standing

I **FIND** that Ms. Robinson has individual standing to bring a claim under the CWA. As explained by her declaration, Ms. Robinson is a member of the Plaintiff organization. [ECF No. 7-20, at 1]. Plaintiff works to promote the overall health of West Virginia's water and seeks preservation of improvement of the waters in the state. *Id.* The Ohio River makes up West Virginia's western border, and many West Virginians use the river for drinking water, recreation, and aesthetic activities. This makes the health of the Ohio River and any downstream impact germane to the Plaintiff's purpose. Accordingly, I **FIND** that Plaintiff has representational standing.[18] *Piney Run Pres. Ass'n*, 268 F.3d at 262.

### B. Preliminary Injunction

I begin the preliminary injunction analysis with a simple premise: Congress has specifically authorized citizens to step into the shoes of the government to enforce the Clean Water Act. When the government allows defendants to violate discharge standards of pollutants, an adversely affected citizen may ask the court to enforce the permit between a government and a defendant.

---

[18] Plaintiff has also clearly demonstrated statutory standing under the Clean Water Act. "[I]n addition to the . . . constitutional standing requirements, an individual also must satisfy any applicable statutory requirements for standing." *Gaston III*, 629 F.3d at 396 (explaining the standing requirements in a citizen suit brough under the Clean Water Act). "[T]he citizen suit provision of the Clean Water Act confers standing on any 'person or persons having an interest which is or may be adversely affected.'" *Gaston I*, 204 F.3d at 155 (4th Cir. 2000) (quoting 33 U.S.C. § 1365(g)). "Thus, if a Clean Water Act plaintiff meets the constitutional requirements for standing, then he *ipso facto* satisfies the statutory threshold as well." *Gaston I*, 204 F.3d at 155. In addition to these requirements, the Plaintiff has satisfied the prerequisites to file suit and prosecute a citizen suit—neither of which the parties contest.

At first glance, this simple premise appears to foreclose any complicated judge-made doctrine that would stand in the way of enforcing a statute. Not so. Even when citizens manage to clear the Article III standing barrier, they often crash into the wall of *Winter v. Natural Resources Defense Council*, the Supreme Court's modern standard for preliminary injunctions. 555 U.S. 7, 20 (2008). Under *Winter*, a plaintiff must show: (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm, (3) that the balance of equities tips in her favor, and (4) that an injunction is in the public interest. *Id.*

To some—and to many district courts—these requirements are reasonable in every context. In practice, they amount to a slow suffocation of the Clean Water Act's citizen suit. Courts, leaning heavily on *Winter*, often deny injunctive relief even when the Clean Water Act has clearly been violated. That is not enforcement.

Judicial formalism turns the citizen suit into a paper right. Congress gave the people a way to enforce clean water protections, but the courts have quietly taken it back, not by challenging the statute, but by layering procedural and remedial hurdles that make meaningful relief elusive.

There is a way through. Courts should, without ignoring *Winter*, interpret its factors in light of the Clean Water Act's purpose. A continuing violation of federal environmental law should presume irreparable harm and clearly demonstrate a likelihood of success on the merits. The balance of equities and public interest should tilt sharply toward the preservation of public resources and ecological health. The Supreme Court said injunctions are "extraordinary," but Congress already made the judgment that clean water is an extraordinary priority.

In this case, injunctive relief is appropriate. Where, as here, violations are admitted, liability is clear, and the statute embodies a legislative judgment that unlawful discharges harm the public, the first three factors—likelihood of success, irreparable harm, and public interest—will

almost invariably favor the plaintiff. And because equity does not protect the continued commission of a statutory wrong, the balance of equities will rarely favor a violator in this posture.

### 1. Irreparable Harm

I turn first to the irreparable harm prong because it is especially punishing in environmental cases.[19] Pollution's effects are cumulative, diffuse, and often invisible until it is far too late. Proving irreparability in that context is not just difficult, it is nearly impossible for the poisoned plaintiff who has not *yet* been diagnosed with cancer. Still, the Plaintiff has demonstrated that Defendant's unpermitted discharge irreparably harms its members and the public.

### a. Irreparable Harm to the Plaintiff's Members

The evidence shows that *every day* the Plaintiff's member and those that use the Ohio River suffer irreparable harm as the Defendant discharges an unpermitted amount of HFPO-DA. With each incremental exposure, the Plaintiff's harm accumulates. This is irreparable harm.

Issuing a "preliminary injunction based only on a possibility of irreparable harm" is insufficient. *Winter, 555* U.S. at 22. To succeed, a plaintiff must demonstrate that "irreparable injury is *likely* in the absence of an injunction." *Id*. (collecting cases) (emphasis in original). The possibility of a future injury is not enough. *Id.*

Generally, irreparable harms are the ones that "cannot be fully rectified by the final judgment after trial." *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 217 (4th Cir. 2019) (citing *Stuller, Inc. v. Steak N Shake Enters*, 695 F.3d 676, 680 (7th Cir. 2012)). Irreparable harm, however, looks different in the environmental context. Environmental injury, "by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." *Amoco*

---

[19] Because a preliminary injunction may only be granted if all four elements are satisfied, the order does not matter.

*Production Co. v. Village of Gambell, AK*, 480 U.S. 531, 545 (1987).

Even for the far more rigid constitutional standing inquiry, the environmental context matters. The standing requirements in the environmental litigation context "are not onerous." *Am. Canoe Ass'n*, 326 F.3d at 517. "This is so because '[t]he extinction of a species, the destruction of a wilderness habitat, or the fouling of air and water are harms that are frequently difficult or impossible to remedy' by monetary compensation." *Beck v. McDonald*, 848 F.3d 262, 274 n.5 (4th Cir. 2017) (quoting *Cent. Delta Water Agency v. United States*, 306 F.3d 938, 950 (9th Cir. 2002)).

Therefore, it makes sense for me to return to the Clean Water Act, which provides for the protection of the nation's waterways from pollutants. *City of Newburgh v. Sarna*, 690 F. Supp. 2d 136, 165 (S.D.N.Y. 2010) ("Instead, in determining whether a plaintiff has shown that irreparable harm is imminent, a court must look to the underlying purpose of the [Clean Water Act]."). Irreparable harm must be considered in light of the CWA's purpose. *National Wildlife Federation v. National Marine Fisheries Service*, 886 F.3d 803, 818 (9th Cir. 2018) ("Irreparable harm should be determined by reference to the purposes of the statute being enforced.").

Plaintiff argues that "[w]ater quality standards are at the heart of the substantive policy of the CWA and violations of those standards directly and critically undermine that policy." [ECF No. 110, at 24 n.2]. I agree. The CWA achieves this through a cooperative federal-state system where states issue permits to prevent the excessive discharge of pollutants. Those water quality-based effluent limits, "WQBELs," allow "only those discharges that may be made without unduly impairing water quality." *City and County of San Francisco, CA v. EPA*, 145 S.Ct. 704, 712 (2025). The purpose of the WQBELs is to "protect the public health or welfare, enhance the quality of water and serve the purposes of" the chapter—Water Pollution Prevention and Control. 33 U.S.C. § 1313(c)(2)(A); *Gaston I*, 204 F.3d at 157 (Discharge limitations "are set at the level necessary

to protect the designated uses of the receiving waterways, their violation necessarily means that these uses may be harmed.").

Notably, the parties agree on the WQBELs' purpose. [ECF No. 55, ¶ 5] (a joint stipulation). The West Virginia Department of Environmental Protection recognized that certain concentrations of HFPO-DA were "harmful to or toxic to man, animal, or aquatic life." [ECF No. 65-2, at 14] (a joint exhibit). Therefore, it set a limit that was the "appropriate level necessary to protect human health and the environment." [ECF No. 55, ¶ 5]; [ECF No. 7-6, at 3] (referencing the permit and an accompanying correspondence from the WVDEP).

Considering this, I am led to a simple conclusion: when the Defendant discharges pollutants in violation of those WQBELs—the limits designed to protect the nation's waterways— the Defendant harms those waterways. Here, Defendant has undoubtedly violated its CWA HFPO-DA permit limits at outlets 002 and 005. [ECF No. 55, ¶ 6]. The violations are multiple, continuous, and excessive. *Id.* Based on the purposes of the CWA and Defendant's permit, excess discharge of HFPO-DA clearly causes irreparable harm.[20]

HFPO-DA discharge also irreparably harms the Plaintiff's member. Ms. Robinson gets her drinking water from the Lubeck system which converts the water from the Ohio River into finished drinking water. The problem is—the water is not clean as shown in samples from 2023 and 2024. [ECF No. 55, ¶ 14].

HFPO-DA in the body is dangerous. It "very easily enters the body. About 100 percent of HFPO-DA that is consumed will actually enter the body," and it does not leave the body as

---

[20] My analysis does not rest solely on violations of the permit, although I note that at least another judge in the district has found that excess discharge violations do constitute irreparable harm. *Ohio Valley Environmental Coalition, Inc. v. Hobet Min., LLC*, 723 F. Supp. 2d 886, 924 (S.D. W. Va. 2010) ("Plaintiffs have demonstrated that Hobet is in continuing violation of these effluent limits. . . . This is sufficient to establish irreparable harm."). This is consistent with the congressional mandate found in the Clean Water Act.

efficiently as it enters. *Transcript*, vol. 2, 235:21–25. And once in the body, studies show that HFPO-DA disrupts liver function, gene expression, cellular pathways, and fetal development. [ECF No. 66-11, at 4–8]. This harm, although certain, is difficult to quantify and cannot be undone or remedied by monetary damages.

Because the harm is hard to quantify, Defendant argues that an injunction is not available to the Plaintiff. Defendant's argument posits a dangerous premise: exposure to a harmful pollutant like HFPO-DA is acceptable on some average,[21] despite many permit violations, and the purpose of the Clean Water Act. Under this theory, a plaintiff exposed to concentrations of HFPO-DA has no recourse until she develops a serious illness. This theory of irreparable harm cannot be.

Instead, Ms. Robinson and all those who use the Ohio River, suffer irreparable harm with each incremental exposure to HFPO-DA. Incremental exposure, resulting in incremental harm, is irreparable harm. It need not be calculable. *Blackwelder Furniture Co. of Statesville, Inc. v. Seilig Mfg. Co., Inc.*, 550 F.2d 189, 197 (4th Cir. 1977) (irreparable harm is "incalculable not incalculably great or small, just incalculable"), *abrogated on other grounds Stinnie v. Holcomb*, 77 F. 4th 200, 208 (4th Cir. 2023). Therefore, incremental exposure is necessarily irreparable harm as long as any exposure to HFPO-DA harms the Plaintiff's members, even if they does not have obvious health issues at the time of the lawsuit.[22]

---

[21] The Defendant argues that the amount of HFPO-DA in the Lubeck drinking water is safe or could be considered safe under other standards based on mathematical manipulations or yet-to-be implemented standards. This is not persuasive. Any standard under the Safe Drinking Water Act is irrelevant. Plaintiff brought this action to enforce effluent limitations under the Clean Water Act.

> [T]he regulatory program for discharge into sewers, treatment facilities and, eventually, creeks and rivers created by the pollutant discharge provisions of the CWA serves a different purpose and uses different means than the drinking water standards. For instance, the regulated pollutants could harm waterways and aquatic life, and could introduce chemicals which hamper treatment facilities' ability to treat waste water, even at levels where they might not directly harm humans.

*U.S. v. Hartsell*, 127 F.3d 343, 351–52 (4th Cir. 1997). Therefore, I need not rely on safe drinking water standards to enforce the Clean Water Act.

[22] This too is consistent with the Learned Hand's observation of irreparable harm. *Foundry Servs., Inc. v. Beneflux Corp.*, 206 F.2d 214, 216 (2d Cir. 1952) (Hand, J., concurring). He wrote that irreparable harm has always included the "impossibility of ascertaining with any accuracy the extent of the loss." *Id.* In *Foundry Servs.*, he observed the

The preliminary injunction hearing testimony and evidence clearly demonstrate that exposure to HFPO-DA irreparably harms all those served by Lubeck. That harm occurs with every incremental exposure to HFPO-DA. Dr. Schlezinger testified that there have been "multiple long term and high level exceedances" of HFPO-DA beyond certain science-based limits concerning adverse health affects of consuming HFPO-DA. *Transcript*, vol. 2, 199–200. She also testified that that exposure more likely than not caused adverse health effects to developing fetuses exposed. *Id.* at 201:1–15. The adverse health effects, however, are difficult to calculate and cannot be attributed a monetary value. *Id.* at 201:16–25. This makes a preliminary injunction all the more necessary.

The exposure—and resultant harm—is neither speculative nor remote. Instead, the harm is actual, especially as the Plant will continue to discharge exceeding levels of HFPO-DA. *Id.* at 202:1–10. Each unlawful discharge of HFPO-DA is a direct toxic exposure to every person served by the affected water system. Even a single day of exposure is a micro-injury, a distinct invasion of the legally protected interest in safe water. Those micro-injuries accumulate over time and can cause serious adverse health effects, such as liver damage. *Id.* at 233–35. In the same way, a single exposure permits nearly 100 percent of HFPO-DA to enter the body, and once it enters it is "very long-lived." *Id.* at 205:14–22. And lastly, a single exposure is likely to lead to at least one identified adverse health effect—that is, fatty liver, as studied in human exposure to PFOAs. *Id.* at 204–05; 237–39.

Therefore, Defendant's argument is untenable. At the preliminary injunction hearing, Dr. Schlezinger admitted to defense counsel that it would be impossible to exactly calculate the resultant harm of a single exposure to HFPO-DA. *Transcript*, vol. 2, 201:16–25; 231–34. This,

---

difficulty a plaintiff faces if he had to prove exactly the business losses resulting from a defendant's actions. *Id.* That same barrier to injunction exists here if Ms. Robinson is forced to wait until her incremental exposure to HFPO-DA results in liver disease.

however, is not the standard. Where a Clean Water Act plaintiff alleges ongoing exposure of a human population to a pollutant capable of causing cumulative health effects, the fact that symptoms have not yet emerged before trial does not negate the showing of irreparable harm. Even if no judicial relief can guarantee full prevention of harm from past exposures, preliminary injunctive relief remains warranted where continued unlawful discharges involve a pollutant that has been deemed hazardous by EPA.

In such cases, the exposure itself—particularly when unpermitted and bioaccumulative— is an irreparable harm. The irreparability lies not in the immediacy of symptoms, but in the unpredictability and permanence of future health consequences that may follow from today's exposure. The continued exposure to a recognized human health hazard constitutes irreparable harm within the meaning of *Winter* where injury accumulates with each passing day.

### b. Irreparable Harm to the Public

The Defendant's actions, however, wreck irreparable harm on the public. The discharge of toxic forever chemicals into the Ohio River harms all those downstream.

Start with *Winter*. In addition to the other preliminary injunction elements, a plaintiff must establish "that *he* is likely to suffer irreparable harm in the absence of preliminary relief." 555 U.S. at 20 (emphasis added). On its face, this forecloses consideration of the irreparable harm to the *public.* This cannot be.

First, *Winter* is different in kind. In *Winter*, plaintiffs sought an injunction against the Navy for its alleged violations of the National Environmental Policy Act—an act that does not contain a citizen suit provision.[23] 555 U.S. at 17–18. Nothing in the opinion, however, suggested that

---

[23] The district court also found that plaintiffs had "demonstrated a probability of success" on their claim under the Coastal Zone Management Act of 1972, which also does not contain a citizen-suit provision. *Winter*, 555 U.S. at 17. The Court vacated the Ninth Circuit's decision based on its use of a "too lenient" standard of irreparable harm. *Id.* at 22. The Court held that a "probability" of harm was not enough for a preliminary injunction. *Id*. Rather, the court

preliminary relief cannot be granted in the face of irreparable harm to the public. Moreover, the "ultimate legal claim" in *Winter* was if "the Navy must prepare an EIS, not that it must cease sonar training." 555 U.S. at 32. At base, Plaintiffs sought to enforce a *procedural action*.

Here, Plaintiff seeks to stop the precise conduct Congress has declared harmful—the unlawful discharge of pollutants above permit limits. The Clean Water Act does not merely require agencies to check procedural boxes; it imposes substantive limits on discharges because Congress determined those discharges cause real, physical harm to human health and the environment. Each unlawful discharge is a micro-injury, a distinct invasion of the legally protected interest in safe water, and those injuries accumulate over time, contributing to serious adverse health effects such as liver damage. Enjoining an ongoing violation here directly halts the very harm the statute was designed to prevent.

And unlike the statutes in *Winter*, the Clean Water Act commands greater action from the district court. The Clean Water Act is not only about protecting individuals. Congress declared that unlawful discharges injure the public as a whole by degrading the Nation's waters. When those unlawful discharges occur, citizens adversely affected take the role of private attorney generals to defend the rights of the public. That statutory mechanism for public protection from harm is the core of this statute.

Second, there is no risk that this analysis inappropriately broadens the plaintiffs before the court. Article III standing and the statutory CWA citizen-suit provision remain high barriers to plaintiffs. *See Lujan*, 504 U.S. at 560–61 (a plaintiff must demonstrate that she has or will imminently suffer injury in fact, her injury is caused by the defendant, and court action would redress her injury); 33 U.S.C. § 1365 (a citizen whose interests are adversely affected may sue to

---

reiterated its standard that "plaintiffs seeking preliminary relief [must] demonstrate that irreparable injury is *likely* in the absence of an injunction." *Id.*

enforce a permit if she gives sufficient notice and the government has not acted to enforce the permit). Article III standing is a jurisdictional bar, while the CWA is a statutory bar—said to have a "judicial proceeding bar" and a "diligent prosecution bar." *Naturaland Trust v. Dakota Finance LLC*, 41 F. 4th 342, 346 (4th Cir. 2022). Together, they ensure that the right person is before the court to vindicate her rights. On the other hand, the irreparable harm requirement is a remedial standard born of equity. Irreparable harm is only analyzed after a plaintiff satisfies both constitutional and statutory standing. Here, as already discussed, the plaintiff has satisfied them.

Third, preliminary injunction analyses consider the public harm in a variety of ways. Sometimes it is explicitly in the irreparable harm prong. *Courtland Company v. Union Carbide Corporation*, Nos. 2:19-cv-894, 2:21-cv-487, 2024 WL 4339600, at *5 (S.D. W. Va. Sept. 27, 2024) (to get a permanent injunction, the plaintiff must show that "it *or the public* has suffered an irreparable injury") (emphasis added); *Justice v. Commissioner of Social Security*, No. MJM-24-1372, 2024 WL 2863578, at *2 (D. Md. June 6, 2025) (considering the plaintiff's argument that "members of the public face irreparable harm as a result of his reduced Social Security payments"). Other times, the courts consider public harm in the other preliminary injunction elements. *See, e.g.*, *Oregon State Public Interest Research Group v. Pacific Coast Seafoods Company*, 374 F. Supp. 2d 902, 908 (D. Oregon 2005) ("Applying equitable principles, the balance clearly weighs in favor of plaintiffs because the harm to the environment and to the public outweigh financial interests defendants may have."); *City of Moundridge v. Exxon Mobil Corp.*, 429 F. Supp. 2d 117, 129 (D.D.C. 2006) (The "'broad public interest' in addition to the interest of the consumers of the product at issue is appropriate in assessing the public interest prong of the preliminary injunction test but does not relieve the movants of demonstrating irreparable harm to themselves.") (citation omitted); *Pennsylvania v. Centre Lane Partners, LLC*, No. 2:24-cv-1502, 2024 WL 4792043, at

*10 (W.D. Penn. Nov. 14, 2024).

Fourth, there is no overlap between this analysis and the other elements of a preliminary injunction. The "balance of the equities" and the "consideration of the public interest" are "pertinent in assessing the propriety of any injunctive relief, preliminary or permanent." *Winter*, 555 U.S. at 32. Although separate, these elements are often analyzed together. *Id.* Regardless, these two elements do not consider the public harm of the action a plaintiff seeks to enjoin.

Balancing the equities is simply choosing between different public interests. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 609 (1952) (Frankfurter, J., concurring) ("'Balancing the equities' when considering whether an injunction should issue, is lawyers' jargon for choosing between conflicting public interests."). Here, the question is one of balance between (1) the public's *interest* in clean water and (2) the public's *interest* in the manufacturing processes and products of the Plant. Neither, however, consider the public harm.

As for the public interest prong itself, the court considers the *consequences* of an injunction. In the irreparable harm prong, the court considers the harm to the public as a result of a defendant's actions. One might consider it the "pre-injunction" harm. But under public interest, the court considers the effect of an injunction on the defendant, the public, and the plaintiff— essentially a "post-injunction" effect resulting from the injunction.

"In exercising their sound discretion, courts of equity should pay particular regard for *the public consequences* in employing the extraordinary remedy of injunction." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982). Under this prong, the Supreme Court found that the lower court's injunction in *Winter* "jeopardize[ed] national security," as a consequence of the injunction. *Winter*, 555 U.S. 381. The public interest prong, while considering consequences, does not consider the public harm that Plaintiff seeks to enjoin.

27

Therefore, considering the public, I find that Defendant's unpermitted discharge of forever chemicals in the Ohio River irreparably harms the public. The toxicity of HFPO-DAs, as already explained, endangers not just the Plaintiff's members but all those served by facilities along the Ohio River. Together they face the same impossible dilemma: "Water, water, every where, Nor any drop to drink." Samuel Taylor Coleridge, *The Rime of the Ancient Mariner* (1798).

HFPO-DA has compromised the Ohio River. *Transcript*, vol. 2, 211:13–18. Not only does this put the public at risk, but it blatantly violates the Clean Water Act. It makes sense, then, that I can find irreparable harm based on the "general public interest in clean waterways" and the harm inflicted on the public when the nation's water is compromised. *Public Interest Research Group of New Jersey, Inc. v. Powell Duffryn Terminal Inc.*, 913 F.2d 64, 73 (3d Cir. 1990) ("Where Congress has expressly granted a right of action and plaintiffs have shown 'a distinct and palpable injury,' plaintiffs 'may invoke the general public interest in support of their claim.'") (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975)).

But the nation's waters will be contaminated by HFPO-DA for a long time and the toxic pollutant will travel across the world. [ECF No. 65-19, at 39–40] (studying long range transport of HFPO-DA). It is, after all, a "forever chemical," that can "reach any area in the world before any significant amount of substance degradation has occurred." *Id.*

The same is happening with the HFPO-DA discharged by the Plant. Excess amounts of HFPO-DA have been recorded as far downstream as Cincinnati, OH, and Louisville, KY. *Transcript*, vol. 3, 35–36. The detectable amount of GenX chemicals in those cities is correlated to the discharge from the Plant, the only known source of HFPO-DA within 100 miles of the Plant that could discharge enough. *Id.* at 36:1–13. In short, the public downstream the Plant suffers the same irreparable harm as the Plaintiff and its members.

Based on HFPO-DA's ability to travel and resistance to degradation, "all users of the Ohio River for drinking water, including Ms. Robinson and those as far downstream as Louisville, Kentucky, are harmed from Chemours's discharges." [ECF No. 110, at 28]. Those discharges "harm waterways and aquatic life, and could introduce chemicals which hamper treatment facilities' ability to treat waste water, even at levels where they might not directly harm humans." *U.S. v. Hartsell*, 127 F.3d 343, 351–52 (4th Cir. 1997). This pernicious and prevalent contamination affects those far beyond the Ohio Valley, and even then, notice is not timely given. [ECF No. 55, ¶ 13] (Lubeck Public Service District customers were notified about a March 2024 PFOA excess discharge in June 2024).

The public faces an irreparable harm that the court can only address through injunction. Robert L. Glicksman & Johanna Adashek, *Agency Authority to Address Chemicals of Emerging Concern: EPA's Strategic Use of Emergency Powers to Address PFAS Air Pollution*, 48 Harv. Envtl. L. Rev. 369, 377 (2024) ("Because PFAS exposures have been linked to reproductive and health problems and various forms of cancer, they pose a public health problem of potentially enormous magnitude."). The public's harm by contaminated waterways "can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." *Amoco*, 480 U.S. at 545 (considering environmental injury); *Beck v. McDonald,* 848 F.3d 262, 274 n.5 (4th Cir. 2017) ("'The extinction of a species, the destruction of a wilderness habitat, or the fouling of air and water are harms that are frequently difficult or impossible to remedy' by monetary compensation.") (quoting *Cent. Delta Water Agency v. United States*, 306 F.3d 938, 950 (9th Cir. 2002)).

Considering all of this, a preliminary injunction is necessary. The irreparable harm analysis here reflects the nature of the right being violated: one created by Congress to protect the public

from precisely the type of gradual, accumulative injury that cannot be easily seen, quantified, or reversed. To insist that the same standard of irreparability used in private contractual disputes be applied here—where the harm is both environmental and structural—would ignore the difference between protecting private interests and enforcing public statutory obligations.

This distinction is particularly vital in the context of substances like HFPO-DA, which by its nature eludes detection, resists breakdown, and compounds over time. The irreparability lies not merely in the difficulty of cleaning a river, but in the ongoing breach of a prophylactic system Congress created to prevent that pollution in the first place. The irreparable harm to the public, in addition to the Plaintiff, satisfies the irreparable harm prong.

### 2.  Likelihood of Success on the Merits

A plaintiff seeking a preliminary injunction must establish that "he is likely to succeed on the merits." *Winter*, 555 U.S. at 20. "To justify an injunction before trial on the merits, it is incumbent upon [Plaintiff] to make a *clear showing* that it is likely to succeed at trial on the merits." *Real Truth*, 575 F.3d at 351 (emphasis in original).

Except as stated in the CWA, "discharge of any pollutant by any person shall be unlawful." 33 U.S.C. § 1311(a).[24] "'The discharge of a pollutant' is defined broadly to include 'any addition of any pollutant to navigable waters from any point source.'" *Rapanos v. United States*, 547 U.S. 715, 723 (2006) (quoting 33 U.S.C. § 1362(12)). "Pollutant" includes industrial waste.[25]

Section 1342 of the CWA establishes the National Pollutant Discharge Elimination System ("NPDES"), which permits discharge of pollutants. 33 U.S.C. § 1342. Pursuant to § 1342, either

---

[24] *See also Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 52 (1987); *Ohio Valley Environmental Coalition, Inc. v. Fola Coal Co., LLC*, 845 F.3d 133, 135 (4th Cir. 2017) ("The Clean Water Act forbids all discharges of pollutants into waters of the United States, unless the discharger holds a permit.").

[25] "Pollutant" is defined to include "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6).

the EPA or a state agency such as the WVDEP may issue a permit for discharging a pollutant into navigable waters. A permit holder is shielded from liability under the CWA "as long as . . . the permit holder complies with the express terms of the permit" and with CWA disclosure requirements. *Fola Coal Co., LLC*, 845 F.3d at 142 (citing *Piney Run Pres. Ass'n v. Cty. Comm'rs*, 268 F.3d 255, 259 (4th Cir. 2001)). Strict liability, however, attaches to permit violations. *Sierra Club v. W. Va. Dep't of Env't Prot.*, 64 F.4th 487, 503 (4th Cir. 2023).

To succeed in a citizen suit brought under the Clean Water Act for violation of a NPDES permit, the plaintiff must show that the defendant (1) has a NPDES permit and (2) is discharging a pollutant in violation of the permit into the navigable waters of the United States.

First, the parties have stipulated that Defendant has a NPDES permit for the alleged discharge. "Chemours holds WV/NPDES Permit Number WV0001279 . . . which regulates discharges into the Ohio River from its Washington Works Plant in Washington, West Virginia. That permit was reissued in 2018, has been administratively extended since 2023, and is still in effect."[26] [ECF No. 55, at 2]. The Permit provides a discharge limit for HFPO-DA. [ECF No. 7-6]. The first element is therefore satisfied.

Second, the question is whether the Defendant is discharging a pollutant in violation of its permit. The short answer is yes—an admission stipulated to by the Defendant and elicited at the preliminary injunction hearing.

At issue here is the discharge of HFPO-DA from Outlets 002 and 005 at the Plant.[27] [ECF No. 7]. The HFPO-DA limits for Outlet 002 are a monthly average of 1.4 µg/l and a daily

---

[26] The permitting process is not a foreign process to Defendant or its predecessor in interest, DuPont. The WVDEP first issued this Permit in 2003 to DuPont. [ECF No. 7-5]. The Permit was renewed by Defendant Chemours in 2018. [ECF No. 7-6, at 12].

[27] "Outlet 002 discharges stormwater, boiler blowdown, steam condensate, process wastewater, and non-contact cooling water into the Ohio River at River Mile 190.45." [ECF Nos. 1, ¶ 32; 7-6, at 12]. "Outlet 005 discharges non-contact cooling water and stormwater, process wastewater, sanitary wastewater, and Dry Run landfill leachate in the Ohio River at River Mile 190.81. Outlet 205 is an internal outlet that discharges cooling water, stormwater runoff,

maximum of 2.3 µg/l. The limits for Outlet 005 are a monthly average of 1.1 µg/l and a daily maximum of 2.3 µg/l. [ECF No. 55, ¶ 3]. There is no exception in the Permit for discharges occurring during precipitation events.[28]

The parties have stipulated to concentrations of HFPO-DA found in the Defendant's monthly discharge monitoring reports from Outlets 002 and 005 between August 2023 and March 2025.[29] [ECF No. 55, at 4–5]. The reports shown numerous violations of the Permit at Outlets 002 and 005 for HFPO-DA. *Id.*

The Defendant even admits to violating the Permit in its filings and at the Preliminary Injunction Hearing. "Yes, Chemours has had exceedances of its permit discharge limits for HFPO-DA." [ECF No. 17, at 3]. When asked by the court, Defense counsel admitted Defendant has been in noncompliance for at least seven years. *Transcript* vol. 1, 76:10–15 ("THE COURT: Well, . . . you've known about this for, to my knowledge, at least seven years that you've been in noncompliance. MR. WALLS: We have. And we've been in discussions with EPA and DEP for that long."). The Defendant explains that it has been working towards compliance since the 2018 permit went into effect. [ECF No. 17, at 8 ("Within weeks of WVDEP issuing the 2018 Permit, Chemours hired consultant AECOM to identify abatement projects to meet the effluent limits.")].

---

process water, and other wastewater into Outlet 005." [ECF Nos. 1, ¶ 33; 7-6, at 12].

[28] Beyond the final limits set for HFPO-DA, the Permit also provides duties and obligations of the permittee in Appendix A. These duties and obligations are of particular interest to the court when considering the actions of the Defendant. Here, the Defendant as the permittee "must comply with all conditions of this permit. Permit noncompliance constitutes a violation of the CWA." [ECF No. 7-6, at 96]. Importantly, "The permittee shall take all reasonable steps to minimize or prevent any discharge in violation of this permit, which has a reasonable likelihood of adversely affecting human health or the environment." *Id.* Lastly, as pointed out by the Plaintiff numerous times in this proceeding, "It shall not be a defense for a permittee in an enforcement action that it would have been necessary to halt or reduce the permitted activity in order to maintain compliance with the conditions of the permit." *Id.* at 97. These duties and obligations should be no surprise to the Defendant as they are also found in the 2003 Permit. [ECF No. 7-5, at 127–28].

[29] Though the Joint Stipulation lists violations beginning in August 2023, the Plaintiff's Complaint includes alleged violations of HFPO-DA dating back to October 2020. [ECF No. 1-1].

In fact, "Chemours has actively been working for six years to reduce HFPO-DA in its effluent and to resolve these issues." *Id.* Under the 2018 Permit, more stringent effluent standards went into effect on January 1, 2022. *Id.* at 7. The Defendant attempts to couch its continued violations of the more stringent standard on the wet weather conditions. *Id.* at 5 ("Complying with the 2018 Permit's much lower HFPO-DA limits has proven to be technologically challenging, particularly for stormwater."). In April 2021, the Defendant notified the WVDEP that "complying with the HFPO-DA limits during stormwater events by September 2021 (the original effective date for the most stringent limits) would not be attainable." *Id.* at 8. The effective date was then pushed out to January 1, 2022. *Id.* The first violation of the more stringent effluent standard occurred in February 2022 after days of rain and snowmelt.[30] *Id.* at 9.

Despite these abatement efforts, Defendant's violations continued. As part of this effort, the Defendant entered into an AOC in April 2023 to address its violation of the Permit. [ECF No. 17, at 9]. As of May 16, 2025, the EPA had approved one of the Alternatives and Analysis and Implementation Plan, conditionally approved others, and deemed one project "not approvable at this time." [ECF Nos. 109-1, at 10; 65-14, at 2–4]. At the Preliminary Injunction Hearing, I noted that the AOC is not an enforcement action and counsel for the Defendant agreed. *Transcript* vol. 1, 23:16–18. In response to my comment he said, "we are obligated under the consent order to take whatever steps are necessary to get into compliance with the permit. And that's exactly what the plaintiff is asking the Court to do in this case." *Transcript* vol. 1, 23:18–22.

The Defendant believes that the abatement efforts make it unlikely for Plaintiff to succeed on the merits. I do not find this argument convincing. The Defendant's recent efforts to comply

---

[30] The Permit does *not* contain an exception for wet weather conditions. *Transcript* vol. 1, 105:8–12 ("THE COURT: . . . Is there anywhere in the permit that says you can violate it if it rains? THE WITNESS: No, sir.").

with the Permit do not eliminate the cause of the violation. Though HFPO-DA concentrations have been "significantly reduced" by routing small flows to treatment systems, the 27-month plan discussed at the Preliminary Injunction Hearing would route "multiple large flows of process water over significant distance to new or existing treatment systems." [ECF No. 142, at 3]. There is more work to be done, and a single month of compliance which Defendant has achieved before is unreliable evidence that the Defendant will remain compliant.

Since being renewed in 2018, the Permit requires the Defendant to "comply with all conditions of this permit." [ECF No. 7-6, at 96]. There is certainly no evidence that the Defendant will not violate the AOC in the same manner it has continued to violate the Permit that has the same requirement.

The testimony of James Hollingsworth, the plant manager, is even further evidence of Defendant's violations. When I asked what could be implemented at the Plant to achieve compliance immediately Mr. Hollingsworth said, "Nothing that we've thought of that we could do immediately that would allow us to get into compliance. We've looked hard at that." *Transcript* vol. 1, 76:7–9.

Notably, the Defendant has not considered reducing production.

Q. Do you admit that Chemours has not tried to reduce its production to come into compliance with its permit limits?
A. We have not looked at production.
Q. And you have not looked at it or tried reducing it, correct?
A. We have not reduced production.
THE COURT: Have you tried reducing it? Tried reducing production?
THE WITNESS: We have not tried to reduce production.

*Transcript* vol. 1, 116:10–15. The amount of HFPO-DA that is discharged from Outlets 002 and 005 is scaled to production. *Transcript* vol. 1, 108:20–22 ("Q. But is it fair to say that the more you produce, the more HFPO-DA there will be permitted into the air? A. Yes, ma'am."). Mr.

Hollingsworth explained this is based on the amount of HFPO-DA used in each recipe. *Transcript* vol. 1, 108:4–5.

Throughout Mr. Hollingsworth's testimony he plainly admitted that the Defendant is violating the Permit and will continue to do so.

> Q. Is it fair to say that Chemours is violating its permit limits for HFPO-DA at Outlets 2 and 5?
> A. Yes, ma'am, we do.
> Q. And is it fair to say that you will continue violating those limits until the EPA plan is finally approved and the 27 months have elapsed until the treatment is installed?
> A. We will continue to have issues during wet weather events until we have all that equipment installed, yes, ma'am.

*Transcript* vol. 1, 76:23–25, 77:1–7.

The record, evidence, and testimony point to one inescapable conclusion: the Defendant has a history of violating its permit, knows it is violating its permit, and intends to continue violating its permit.[31] This is unacceptable under the Clean Water Act. Therefore, I **FIND** the Plaintiff has made a clear showing that it is likely to succeed on trial on the merits of the underlying Clean Water Act violations for discharging HFPO-DA in violation of the Permit limits.

### 3.  Balance of Equities

As stated, balancing the equities is simply choosing between different public interests. *Youngstown Sheet & Tube Co.*, 343 U.S. at 609. Here, that is the public's interest in clean water versus the public's interest in the production at the Plant. I have discussed it at length, but it cannot be overstated that the public's interest in clean water is absolute—and Congress took steps to codify it in the Clean Water Act. This alone favors an injunction.

---

[31] Defendant's recent reduction in HFPO-DA at Outlets 002 and 005 is commendable, but it is unclear whether the cause of the violation has been "completely and clearly eradicated." The Defendant now claims to be in compliance with the Permit, when previously Mr. Hollingsworth testified there was nothing that could be done to immediately get the Defendant into compliance. *Transcript* vol. 1, 76:7–9.

"If [environmental] injury is sufficiently likely, . . . the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco*, 480 U.S. at 545. Even so, "[h]arm to environment outweighs a defendant's financial interests, particularly where violations are of a longstanding and continual nature." *Idaho Conservation League v. Atlanta Gold Corp.*, 879 F. Supp. 2d 1148, 1161 (D. Idaho 2012)

The Plaintiff asserts the balance of equities clearly favor it as irreparable harm will occur to the Plaintiff and public absent injunctive relief. [ECF No. 8, at 18]. Additionally, the Permit precludes the court from considering the economic loss of the Defendant. *Id.* at 19; [ECF No. 7-6, at 97 ("It shall not be a defense for a permittee in an enforcement action that it would have been necessary to halt or reduce the permitted activity in order to maintain compliance with the conditions of the permit.")]. The Defendant claims balance of equities weighs in its favor inasmuch as there is a lack of harm to the Plaintiff and there would national security concerns if an injunction were issued in this matter. [ECF Nos. 17, at 20; 109-1, at 35].

Even when irreparable harm has been established the court must still complete the remaining of the *Winter* factors. *Atlanta Gold Corp.*, 879 F. Supp. 2d at 1161. Having previously found irreparable harm exists, Defendant's argument that the balance of equities weighs in its favor as there is no harm occurring is now a meritless contention. As to the national security concerns raised by the Defendant, these concerns are better considered under the public interest factor of *Winter* and will be discussed below.

Thus, the only remaining injury that would befall the Defendant is an economic injury. The Defendant understands that the instant matter is an enforcement action. *Transcript* vol 1, 149:24–25, 150:1. The Permit makes clear "It shall not be a defense for a permittee in an enforcement action that it would have been necessary to halt or reduce the permitted activity in order to maintain

36

compliance with the conditions of the permit." [ECF No. 7-6, at 97]. Prior to this action being filed the Defendant could have reduced production to achieve compliance. It never did.

Accordingly, the balance of the equities favors Plaintiff and the public. The Clean Water Act's purpose is clear, and the public's interest (and Congress's mandate) is in clean waterways.

### 4. Public Interest

Lastly, I must determine whether granting the preliminary injunction is in the public interest. "In exercising their sound discretion, courts of equity should pay particular regard for the public *consequences* in employing the extraordinary remedy of injunction." *Winter,* 555 U.S. 7 at 24 (emphasis added) (quoting *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312 (1982)). Plaintiff claims protecting the water quality is a critical public interest. [ECF No. 8, at 20]. While the Defendant asserts the products produced at its Plant is critical to the national security of the United States and the local economy. [ECF No. 17, at 18].

At the preliminary injunction hearing, the Defendant's American Sales Director for the Advance Performance Materials Business Unit, Katelyn Walck, testified about the main product lines at the Plant. *Transcript* vol. 2, 24:24–25, 25:1, 27:3–8. These lines include PFA, PTFE, FEP, and FER which are all used in the semiconductor manufacturing process. *Transcript* vol. 2, 27:3–8. She explained that Defendant's customers operate in myriad industries including aerospace, telecommunications, energy, and national security.[32] *Transcript* vol. 2, 31:9–16. Ms. Walck testified that the Plant is the only domestic source of PFA and one of two domestic producers of PTFE. *Transcript* vol. 2, 37:1–8. However, the Defendant has a joint venture in Japan that

---

[32] Those industries include "aerospace and national defense industry, automotive industry, telecommunications industries, semiconductor industry and domestic energy industry like oil or gas or hydrogen nuclear energy, as well as some healthcare and pharmaceutical customers" putting them into the "category of National Security or economic security" with the United States. *Transcript* vol. 2, 31:9–16. For example, Ms. Walck testified PTFE is used by the military in countermeasure flares and in sensors and telecommunications cabling in aircrafts. *Transcript* vol. 2, 31:24–25, 32:1–2. Additionally, fabrication facilities for microelectronic chips and lithium-ion batteries are heavily reliant on PFA. *Transcript* vol. 2, 36:19–25, 37:1–8.

manufactures PFA, and Daikin, a competitor of the Defendant, makes up roughly 50% of the PFA semiconductor market. *Transcript* vol. 2, 59:18–20, 60:4–5.

As to the local economy, Mr. Hollingsworth testified that if the Plant was ordered to reduce production to zero, 500 employees will no longer have jobs.[33] *Transcript* vol. 1, 68:20–24. The 500 employees account for $70 million of annual payroll in the local community. *Id.* This would be compelling, but the Plant does periodically shut down to complete a turnaround or "TAR." *Transcript* vol. 1, 85:15–25, 86:1–10. A turnaround is a complete outage at the plant done by the Defendant to perform maintenance and safety inspections. *Id.* A turnaround typically takes 50 to 55 days to complete depending on the scope of the work. *Id.* During this time the employees are working on the equipment and *there is no production*. *Id.* There is no evidence that these planned outages—at least akin to a long-litigated injunction—endangers national security as testified to.

After the Preliminary Injunction Hearing, the Defendant reduced HFPO-DA output at Outlets 002 and 005 by routing streams of condensate from "several large, industrial-size rooftop HVAC units" and a roof drain to an existing GAC treatment system. [ECF No. 142, at 3]. But these modifications did not require the Defendant to halt production or shut down the plant, nor is there any evidence that employees have lost their jobs because of these changes. [ECF No. 142]. Instead, it appears that Defendant's momentary compliance has not negatively affected the local economy or national security interests.

Thus, balancing between the consequences of an injunction, the court places little weight on the overwrought testimony of potential national security implications and impact to the local economy. Plaintiff has satisfied the public interest element as the consequences of an injunction

---

[33] To be clear, the Clean Water Act does not require, and the Plaintiff does not ask this court to shut down the Defendant's Plant. Also, this injunction does not automatically force the Defendant to shutter its production. Rather, the Defendant must comply with its permit.

against the Defendant do not outweigh the effect it will have on maintaining the integrity of the Nation's waters. The public interest is coextensive with the statutory purpose. And equity does not protect the continued commission of a statutory wrong. When Congress has struck the balance, the courts should enforce it.

### 5.   Preliminary Injunction Analysis Conclusion

Certainly, other courts have applied the *Winter* factors in Clean Water Act citizen-suit actions as though they were identical to any other preliminary injunction request. That uniformity is understandable: *Winter* is an emphatic statement from the Supreme Court, and lower courts naturally hew closely to it. But the fact that most decisions recite the formula does not mean they have faced the precise question presented here: how to apply those factors in a statutory-enforcement context where violations are admitted, liability is strict, harm is legislatively recognized, and Congress has directed the availability of injunctive relief.

Procedural norms developed in equity and relied upon in *Winter* remain important tools for ensuring fairness. They cannot, however, be applied in a way that nullifies a clear legislative command. In the citizen-suit context, the traditional factors will almost always align with Congress's judgment: admitted violations establish a strong likelihood of success; the statutory harm determination satisfies irreparable harm; the public interest mirrors the legislative purpose; and equity does not protect the continued commission of a statutory wrong. In that sense, *Winter* can be applied faithfully here without distorting Congress's chosen enforcement scheme.

The point here is not to disregard precedent but to apply it faithfully to the actual case before me. My role is to enforce the law Congress wrote, not to reflexively extend language from one factual setting to another without regard for statutory purpose. Where the facts and statutory

framework align so decisively in favor of enforcement, the equitable principles underlying *Winter* (fairness, caution, and proportionality) are not only satisfied; they compel granting the injunction.

For the reasons explained, I **FIND** that (1) the Plaintiff is likely to succeed on the merits, (2) the Plaintiff will continue to suffer irreparable harm, (3) the balance of the equities favors the Plaintiff, and (4) the public's interest is served by the consequences of an injunction. The Plaintiff is entitled to a preliminary injunction, and it is appropriate for the court to grant one, especially in light of congressional mandate to protect the integrity of the nation's waterways.

### C. Bond Requirement

Pursuant to Rule 65(c), "[t]he court may issue a preliminary injunction . . . only if the movant gives security." Fed. R. Civ. P. 65(c). Though, "the district court has discretion to set the bond amount 'in such sum as the court deems proper,' it is not free to disregard the bond requirement altogether." *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 (4th Cir. 1999); *Pashby v. Delia*, 709 F.3d 307, 332 (4th Cir. 2013) ("[T]he district court must expressly address the issue of security before allowing any waiver."). "Courts have exercised this discretion to set nominal bond amounts in public interest litigation." *South Carolina v. United States*, 329 F. Supp. 3d 214, 238 n.35 (D.S.C. 2018), *vacated on other grounds*, 912 F.3d 720 (4th Cir. 2019); 11A Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice and Procedure § 2954 (3d ed. 2018).

The issuance of a bond was only raised by the Plaintiff in its Memorandum in Support of its Motion for Preliminary Injunction and its Reply to Defendant's Response in Opposition. [ECF Nos. 8, at 19–20; 18, at 20]. The Defendant failed to make any argument regarding bond. Though the monetary damages to Defendant in this case may be very costly, it is unlikely that any plaintiff would have the ability to post bond adequate to cover the damages that may accrue during the

pendency of the preliminary injunction. The Plaintiff in this matter is a nonprofit organization suing under the CWA citizen suit provision. As explained above, it is likely that the Plaintiff will succeed on the merits of its claim and there is a strong public interest in the matter. Anything more than a nominal bond would stifle the citizen suit provision of the CWA. Accordingly, I **FIND** $200.00 to be an appropriate bond in this matter.

## V.    CONCLUSION

In this case, there is no ambiguity: Defendant Chemours has discharged unpermitted levels of toxic pollutants into the Ohio River. Defendant knows that it has been violating its permit, and it is likely to continue. As a direct result, the public is exposed to real and ongoing harm.

The Clean Water Act prohibits this. The public need not bear the burden or cost of Defendant's inaction. Instead, Congress has vested citizens with the power to enforce environmental protections in the face of governmental indifference. That enforcement power exists precisely for cases like this one.

Defendant's permit is not a suggestion; rather, its permit protects public health and environmental life while balancing the needs of manufacturing. But I cannot weigh the scales of that balance to inflict further harm on the communities that rely on clean water for life and livelihood. The Clean Water Act protects the public, and I will enforce it.

Accordingly, the Plaintiff's Motion for Preliminary Injunction, [ECF No. 7], is **GRANTED**. It is therefore **ORDERED** that:

1. Defendant Chemours Company FC, LLC is **ENJOINED** from discharging HFPO-DA in excess of the effluent limits set by its Permit.
2. Defendant Chemours **SHALL TAKE** any measures necessary to achieve and maintain compliance, including but not limited to production changes, process modifications, off-site treatment, or temporary cessation of operations.
3. Plaintiff is **DIRECTED** to post security in the amount of **$200** for the payment of costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

4. Plaintiff is **DIRECTED** to post bond **by Friday, August 8, 2025, at 12:00 p.m.**
5. This injunction **SHALL REMAIN** in effect until further order of the court or until Chemours demonstrates sustained compliance with the permit's HFPO-DA limits.

The court **DIRECTS** the Clerk to send a copy of this Memorandum Opinion and Order to counsel of record and any unrepresented party.

The court further **DIRECTS** the Clerk to post a copy of this published opinion on the court's website, www.wvsd.uscourts.gov.

ENTER:        August 7, 2025

JOSEPH R. GOODWIN
UNITED STATES DISTRICT JUDGE