**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF WEST VIRGINIA**
**AT CHARLESTON**

| | | |
|---|---|---|
| **WEST VIRGINIA RIVERS COALITION, INC.** <br><br> Plaintiff, <br><br> **LITTLE HOCKING WATER ASSOCIATION, INC.** <br><br> Plaintiff-Intervenor, <br><br> v. <br><br> **THE CHEMOURS COMPANY FC, LLC**, <br><br> Defendant. | ) | Civil Action No. 2:24-cv-00701 |

**PLAINTIFF LITTLE HOCKING WATER ASSOCIATION'S MEMORANDUM REGARDING THE EFFECT OF SETTLEMENT AND THE CONSENT DECREE**

Having ruled that the Court could dismiss WVRC's claims with prejudice while leaving Little Hocking Water Association's ("LHWA") claims still active, this Court ordered Chemours and LHWA to file memoranda assessing the effect of the "agreement and Consent Decree" on LHWA's claims and this case. With the understanding that this Court has both this case (2:24-cv-00701) and the proposed Department of Justice ("DOJ")/Chemours Consent Decree (2:26-cv-00418) ("Decree") before it, LHWA submits this memorandum as required by the Court's August 3, 2026, Order.[1]

[1] The Decree covers 3 facilities including the Washington Works facility in West Virginia, the Chambers Works facility in New Jersey, and the Fayetteville Works facility in North Carolina. LHWA's references to the "Consent Decree" or "Decree" throughout this memorandum refer to all parts of the Decree, including attachments, that relate to the West Virginia Washington Works facility.

The effect of the Decree on this case will be determined by this Honorable Court after it independently considers whether the Decree adequately cleanses the environment of the harm caused by what this Court found to be the “unpermitted, dangerous, and ceaseless” Clean Water Act (“CWA”) violations. ECF No. 224, at PageID6430. The approvability of the Decree will be based on this Court’s searching evaluation of what the Decree document purports to do on its face, what it does not even attempt to do, what the commenters say about the scope and depth of the Decree’s defects, and what changes, if any, the parties to the Decree make in response to commenters. None of these material factors could be known at this stage of any consent decree evaluation process.

It is not so routine that the evaluation of the Court will also need to consider the final wording of the material plans—*integral to the operation of the Decree*—that astoundingly were not yet negotiated and were unavailable to the public at the time the Decree was lodged. Once these ongoing negotiations between the government and Chemours are completed, the Court will need to evaluate whether the public had a meaningful review and why the Decree was lodged before the negotiations were complete.

***A Stay of LHWA’s CWA Case Serves the Interest of Justice***

Since none of these factors, all material to the effect on this case and the approvability of the Decree, are known or knowable at this time, and since the approvability and final terms of the Decree will determine the extent to which LHWA’s CWA claims remain fully or partially unresolved even if the Decree is approved, it is in the interest of judicial economy and fairness to stay LHWA’s pending CWA case. Logically, the stay should extend until the entire Decree is available to the public, any changes to the Decree have been made, and this Court has made a final determination about whether the Decree will be approved, likely after a fairness hearing.

While Chemours and LHWA will undoubtedly have a different perspective on the Decree, the parties have already discussed the fairness and justice of a stay, without yet coming to any joint recommendation.

***The Agreement has No Effect on LHWA's CWA's Claims***

This Court's August 3 Order [ECF No. 224] also directs the parties to comment on the effect of the agreement between WVRC and Chemours ("Agreement") on LHWA's still pending CWA case. While LHWA has never seen a copy of the Agreement, WVRC was allowed to read the terms of the Agreement to LHWA's lawyers the morning after it was signed by the WVRC and Chemours. LHWA was not part of the Agreement negotiations between WVRC and Chemours and was never invited to join those discussions. LHWA agrees with WVRC, and the Court, that prevailing law supports the Court's conclusion that WVRC's decision to dismiss its case does not affect the remaining claims of LHWA.

Further, it seems clear from what LHWA has been told about the terms of the Agreement that it contains no injunctive relief or any other CWA remedy. It is also clear that WVRC is not allowed, by the terms, to act in any way adverse to the Decree and is barred from making or assisting anyone in making comments adverse to the Decree.

LHWA, as a water provider that is profoundly adversely impacted by the Decree, could not have agreed to suspend its rights to object to the Decree once it reviewed and understood its terms. WVRC's decision to settle reflects the differing needs of a different set of clients. Thus, the Agreement, as it was represented to the Court by WVRC, has no effect on LHWA's remaining claims.

***The Lodged Decree is Not Approvable***

LHWA had the first opportunity to see the Decree late on the day it was lodged and had its first chance to speak to the DOJ/USEPA and Chemours via video conference one day later.[2] This was an opportunity to ask questions about the Decree, but not to change it. But it was immediately clear that the *still being negotiated* Operation, Maintenance, and Monitoring Plan (OMMP) was worded in a way that would authorize Chemours to escape honoring the carbon changeout trigger for LHWA (and other treatment systems) that has allowed LHWA to provide non-detect PFOA in its treated drinking water since 2007, when the LHWA GAC plant went on-line. For weeks after the Decree was lodged, LHWA worked collaboratively with the DOJ to try to find ways to revise the still-being-negotiated OMMP to preserve the status quo (i.e., avoid losing ground) on this one isolated but important issue. All of the other defects of the Decree needed to be relegated to formal comments.

To date, the efforts to maintain the OMMP status quo have failed, despite the joint recommendation of the DOJ and LHWA. It is difficult for LHWA to understand how any part of a consent decree that should be meant to cleanse the environment could authorize putting more poison in drinking water than was allowed before the Decree.

While still hoping to convince the parties to the Decree to "first do no harm" by maintaining the status quo on the changeout trigger, LHWA filed its Comments to the Decree. They are attached to this memorandum as **Ex. 1**. LHWA will explain a few exemplar Decree defects necessary to "assess the effect of the Decree" as this Court ordered.

[2] Little Hocking first learned of the Decree's terms on Wednesday, June 24, 2026. Plaintiff West Virginia Rivers Coalition (WVRC) had advanced notice of and access to the Decree's terms and settled its case against Chemours on June 22, two days before the Decree became public. WVRC had advocated for Little Hocking to get a preview of the Decree before it was publicly filed. Despite this advocacy, Little Hocking was denied any such pre-filing preview.

This Court is aware that years of "unpermitted, dangerous, and ceaseless" discharges of forever chemicals went into the Ohio River. Doc. 224, PageID 6430. The prime measure of the adequacy and reasonableness of a consent decree is its capacity to cleanse the environment of the effects of the pollution. *United States v. Lexington-Fayette Urban County Gov't*, 591 F.3d 484, 489 (6th Circ. 2010). In light of these realities, it would be reasonable to expect that the Decree would do something to cleanse the *Ohio River* of the ravages of years of river-damaging CWA violations. It is undeniable that the years of illicit discharges have polluted the water sources of millions of downstream users, including LHWA's members, all of whom draw their water from the river. But instead of repairing and cleansing the river contamination, *including river sediments*, the Decree shifts the focus to West Virginia's potentially contaminated wells that are not related to Ohio River contamination. Yet, the Decree, grants Chemours a broad release of liability for years of unpermitted discharges of ***nineteen*** different PFAS into the Ohio River. This is the *pro quo*, even though there is no cleansing remedy *quid* for any of those Ohio River discharges.

While it would clearly be in the public interest to do so, the Decree does not even take the first small step of ordering sediment testing for the river. No sediment testing, and no dredging of the Ohio River is even contemplated, even though evidence shows, for example, a clear correlation between the severity of Washington Works GenX discharges into the Ohio River and the 2500% growth of GenX contamination in the LHWA Wellfield. While the West Virginia Safe Drinking Water Act remedy is laudable, it is no substitute for cleaning up what the CWA violations have done to the Ohio River.

Despite being touted as a "comprehensive" Decree, many other serious deficiencies render the Decree unapprovable in its present form. These include:

- The Complaint, filed by the United States on the same day as the Decree, represents that the USEPA diligently uncovered that the Chemours/DuPont "mass-balance model" was "fundamentally flawed from its inception" because it relies on engineering assumptions and equations that Chemours cannot substantiate and that Chemours knew underrepresented its true GenX releases. This "model" has long been the basis for Chemours' (false) claims that it has recovered, destroyed, or recycled 99% of the GenX in its effluent process streams and air emissions. While the mass-balance model revelations underscore Chemours' pattern of non-disclosure and evasion of the law and of regulation, the United States keeps the responsibility of completing a new mass-balance with Chemours. This "take a do-over" response to such a chronic and far-reaching deception, is not commensurate with its gravity. Moreover, even if this defect were corrected by more immediate and thorough oversight (such as a special master), the better remedy would still be forward looking only. It would do nothing to fix the full impact of years of false and misleading information generated by the model, i.e. it would not do anything to solve the problem that there is no verifiable information that can inform the public or regulators about how much GenX was released since 2009, or where it was released, or where it is now in the environment. Immediate river and sediment testing, for example, would at least begin to address the impacts of the mass-balance failures on the environment. Instead, the Decree grants Chemours gets a complete release for its unremedied years of mass-balance deception.
- But the release-driven disparity between remedy and future escape from liability does not remotely stop with the mass-balance. The release of legal liability in the Decree is far

broader than the injunctive relief obtained. For example, as noted, the Decree does nothing to remedy the unpermitted discharge of nineteen distinct PFAS yet grants Chemours a broad release of liability for those violations. These are the discharges of PFAS other than GenX and PFOA. There is no required cleanup of these 19 PFAS in river sediments, soil, and groundwater, no requirement to sample and treat drinking water for these 19 other PFAS, and none of the "treatment system projects" are required to reduce these PFAS.

- The Decree does not contain the detail on how the drinking water requirements will be implemented and requires only development of a work plan, the terms of which are not publicly available. Some public water suppliers have been operating treatment systems for decades to eliminate any detectable PFAS in their finished water, yet the proposed Decree deprives them of the long-implemented protocols needed to continue this level of control. What is worse, the Decree expressly recognizes that one day there may well be no treatment standard for GenX and confirms that this outcome is contemplated by and built into the Decree.

These are just a smattering of the institutional betrayals of the public trust that occur when the USEPA —as more fully explained below— has recently and publicly now joined Chemours in seeking to deregulate GenX. The regulator now sits alongside the polluter, and no one is on the other side of the table, in these Decree discussions, advocating for the public on GenX and other PFAS issues. The word "betrayal" may seem excessive, but the USEPA *knows* the granular activated carbon treatment like LHWA has is not designed to treat most of the "new" PFAS that are starting to be released by Washington Works. The USEPA *knows* the Decree *does nothing to limit or control* these PFAS releases. The agency, which is supposed to protect both

the environment and human health, *knows* that these acts and omissions will virtually ensure that the uncontrolled and unremedied releases of smaller chain PFAS will eventually break through the carbon treatment and be consumed. Yet, the Decree's release absolves the polluter from any further responsibility.[3] The word "betrayal" is actually restrained.

Fortunately, the Decree's excesses are not being solely exposed by one small rural water provider, albeit a water provider that is flooded with PFAS. The State of North Carolina and several major environmental organizations also submitted comments detailing the deficiencies in the Decree. These comments echo many of the concerns raised by LHWA, including that the broad release of liability given to Chemours without securing any meaningful CWA remedy, that the Decree leaves many of the key decisions under the control of the polluter, and that the most affected members of the public, including affected water utilities and governments, were shut out of negotiations. See **Ex. 2**, Comments from Southern Environmental Law Center; **Ex. 3**, Comments from North Carolina.

As noted above a particularly disquieting issue is that since this Court considered the need for a CWA injunction, USEPA has joined Chemours in opposing GenX regulation. This is a starkly drastic change from just months ago where USEPA took the position that GenX regulation was needed based on all the science that is still before the agency. Critically and unsurprisingly in light of the sudden shift, the Decree appears to "grease the skids" in favor of GenX deregulation. While this shared position is not *de jure* collusive, it has the same effect as collusion and requires an answer to the question of how the public interest will be served on the GenX and other PFAS issues in the Decree. The answer is that the Decree needs clear, verifiable,

[3] The GAC systems are designed to use carbon that "catches" longer chain chemicals, particularly C8. In fact, it is likely that other technologies, e.g., Resin filters, will be needed to remove the smaller chain PFAS from river water taken up into water providers' treatment systems.

and enforceable terms so the Court can correct violations that are brought to its attention by a party, by a special master, or by a third party.

Now that the Decree comments have been received, it is the responsibility of Chemours and the government to face the profound deficiencies of the Decree and to fix them. If the parties fail to do that, then the responsibility falls to the Court to assure that the case law and Rule 65 standards for approvability are met before approving and signing any decree. To that end, LHWA will be filing a motion for limited intervention to protect the rural water provider's interests and to more fully inform the Court of LHWA's concerns. While this consent decree process is being completed, it is in the interest of judicial economy to stay these proceedings. *Ohio Valley Envtl. Coal. v. Coal-Mac, Inc.*, 775 F. Supp. 2d 900, 903, 929 (S.D. W. Va. 2011) (staying the effect of its order granting plaintiffs' motions for summary judgment until final decision on the Decree is reached).

To the extent problems are resolved, that will determine whether the Decree is approvable and whether there are parts of this CWA litigation that need to go forward based on whether any or all of the Decree is approved or if any conditions are placed on the approval (e.g., clarifications that CWA remedies for the Ohio River are not being foreclosed). Further, this process must be completed before any mootness arguments, likely to be raised by Chemours, can be evaluated, i.e., to determine whether there is a real likelihood the violations will continue after entry of the Decree. *Ohio Valley Envtl. Coal., Inc. v. Hobet Mining, LLC*, 723 F. Supp. 2d 886, 903 (S.D. W. Va. 2010), quoting *Envtl. Conservation Org. v. City of Dallas.*, 529 F.3d 519, 528-29 (5th Cir. 2008) (brackets in original).

LHWA will soon file a motion to intervene in the United States' action for the limited purpose of participating in the Decree approval process to protect LHWA's interests, to seek a fairness hearing, and to inform the Court of its significant concerns with the Decree.

With respect to this matter, LHWA respectfully requests that the Court stays this matter until such time as the DOJ's comment review and any approval process before this Court in the *US v. Chemours* action has fully run its course, only then will the parties be able to fully evaluate and brief for the Court what parts of the LHWA action can and should proceed.

Dated: August 17, 2026

Respectfully submitted,

*s/ Kirk R. Auvil*

Kirk R. Auvil (WV Bar # 12953)
The Employment Law Center, PLLC
1208 Market Street
Parkersburg, West Virginia 26101
Phone Number: (304) 485-3058
theemploymentlawcenter@gmail.com

*s/ D. David Altman*

D. David Altman (*Pro Hac Vice)*
Justin D. Newman (*Pro Hac Vice*)
Amy J. Leonard (*Pro Hac Vice*)
*AltmanNewman Co. LPA*
15 E. 8th Street
Cincinnati, Ohio 45202
Phone: (513) 721-2180
Fax: (513) 721-2299
daltman@environlaw.com
jnewman@environlaw.com
aleonard@environlaw.com

*Attorneys for Plaintiff-Intervenor Little Hocking Water Association*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF WEST VIRGINIA**
**AT CHARLESTON**

| | | |
|---|---|---|
| **WEST VIRGINIA RIVERS COALITION, INC.**<br><br>Plaintiff,<br><br>**LITTLE HOCKING WATER ASSOCIATION, INC**.<br><br>Plaintiff-Intervenor,<br><br>v.<br><br>**THE CHEMOURS COMPANY FC, LLC**,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 2:24-cv-00701 |

**CERTIFICATE OF SERVICE**

I hereby certify that on August 17, 2026, I electronically filed the foregoing brief with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to all parties in the case by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*s/ Kirk R. Auvil*

Kirk R. Auvil (WV Bar # 12953)
*An Attorney for Little Hocking*