# EXHIBIT 1

ALTMAN NEWMAN CO. LPA
Protecting Human Health & The Environment

**VIA EMAIL**

Assistant Attorney General
U.S. DOJ Environment and Natural Resources Division
P.O. Box 7611
Washington, DC 20044-7611
pubcomment-ees.enrd@usdoj.gov

**Re: Proposed Consent Decree in *United States and West Virginia Department of Environmental Protection v. The Chemours Company, et al.*, No. 2:26–cv–00418 (S.D. W.V.); D.J. Ref. No. 90–5–1–1–12112.**

To Whom It May Concern:

These comments are submitted on behalf of the Little Hocking Water Association ("LHWA" or "Little Hocking") regarding the proposed consent decree(Doc. 2) [1] noticed in the Federal Register at 91 Fed. Reg. 39122 (June 29, 2026) ("Consent Decree" or "Decree"). LHWA, located at 3998 Newbury Road, Little Hocking, Ohio 45742, is a rural non-profit water system in southeastern Ohio.

Little Hocking's 45-acre wellfield ("Wellfield") is located 1,300 feet directly across the Ohio River from the Chemours (formerly DuPont) Washington Works, West Virginia facility ("Washington Works"). Because its production wells draw in Ohio River water downstream from Washington Works' unlawful discharges, Little Hocking has a vital interest in whether the Consent Decree effectively cleanses the harm resulting from Chemours' years of pollution of the Ohio River. Chemours' own data shows a direct correlation between the illicit PFAS discharges and the uptake of the pollution into LHWA's most downstream well. Since 2018, when GenX first was detected in the Wellfield, the levels of GenX have skyrocketed, increasing in excess of 2,500%. In recent years, at least eight other PFAS, also released from Washington Works

[1] The consent decree involves three Chemours facilities in three states—Fayetteville Works in North Carolina, Chambers Works in New Jersey, and the Washington Works facility in West Virginia. The United States has alleged violations of the Clean Water Act, Toxic Substances Control Act (TSCA), the Resource Conservation and Recovery Act (RCRA). The DOJ has not filed any RCRA claim involving the Washington Works facility. The RCRA claims allege violations at the New Jersey and North Carolina facilities.

to the Ohio River, have been found in Little Hocking's Wellfield. Decades of data make it clear—***Little Hocking's Wellfield is the catchment reservoir for the mother lode of Washington Works' PFAS contamination.***

Since winning a finding of liability against DuPont for PFOA contamination of the Wellfield that led to a 2016 settlement with DuPont and being granted intervention in a federal citizen suit over Chemours' ongoing GenX Clean Water Act ("CWA") violations at Washington Works, Little Hocking has sought enforceable relief to stop the waves of PFAS emanating from Washington Works and restore the harm to the Ohio River, which serves as the source of drinking water for many millions. Sadly, a preliminary injunction that, if made permanent, would have done just that was overturned by the Fourth Circuit. The ongoing violations of the CWA were not in dispute, instead the Fourth Circuit concluded that the individual featured in preliminary injunction briefing had not clearly suffered irreparable harm from the violations. LHWA's co-plaintiff, which did an excellent job of securing the injunction from the federal trial court, when faced with the proposed Consent Decree, settled with Chemours and unilaterally dismissed its CWA case, and no longer has the right to comment on the Decree. Little Hocking is left, without the aid of its former co-plaintiff, to evaluate whether the Washington Works proposed Decree effectively cleanses the harm resulting from the years of illicit "forever chemical" discharges.[2]

It is remarkably clear that the Decree not only fails the "cleanse the harm" test for approvability by a court, but it actually deprives Little Hocking and other public water suppliers of some of the tools, such as prior USEPA Orders, they have long relied on to help them fight PFAS drinking water contamination. Under the proposed Decree as it is now worded, public water suppliers that have been operating their treatment systems to eliminate any detectable PFAS in their finished water are deprived of the long-implemented protocols needed to continue this level of control, thereby allowing the introduction of 10 ppt of GenX into the water consumed by users. What is worse, the

---

[2] On several occasions, Little Hocking's co-plaintiff was briefed on the terms of the proposed Decree before it was lodged. The co-plaintiff was not authorized to discuss those briefings with Little Hocking. Little Hocking's attempts to be similarly briefed were rebuffed. As a result, Little Hocking was not aware of any of the Decree's provisions until after the Decree became public. However, since then, Little Hocking has engaged in constructive dialogue with the Department of Justice about many of the problems outlined in these comments. Little Hocking knows changes to the Decree cannot be unilaterally approved by the USEPA and Department of Justice even if they agree a change is advisable. Chemours' agreement is required to make changes in the Decree unless and until the federal judge overseeing the approval of the Decree decides that changes are reasonable, fair, and in the public interest. Despite the vast deficiencies in the Decree, Little Hocking appreciates the professionalism and sincerity of the current team of the Department of Justice's front-line lawyers that have engaged with Little Hocking.

Decree expressly recognizes that one day there may well be no treatment standard for GenX and confirms that this outcome is contemplated by and built into the Decree. Seldom does an environmental consent decree flout the "first, do no harm" human health admonition.

But the unreasonableness and unfairness of the Consent Decree is indelibly exposed by the way it agrees to keep its remedial hands out of the Ohio River. The purpose of the CWA is to restore the integrity of the waters polluted, not substitute a laudable project under another statute while ignoring the long overdue remedy needed for water pollution that is the basis of the lawsuit. Yet, the Decree replaces any remedy that would restore the damage inflicted on the Ohio River, which received the pollution, with an elaborate plan that diverts attention from the Ohio River pathway. Although this Safe Drinking Water Act remedy is good for the entities that wind up getting treatment, it is not a substitute for an enforceable plan that would bring an end to the CWA violations and begin to reverse the harm the CWA violations caused. The CWA violations being enforced require a remedy that carries out the purposes of the statute being violated.

Hence, it is inexplicable that the Decree does not even require testing of Ohio River sediment to determine the level of its contamination so standard decisions can be made about what overdue remedial steps are needed to protect the millions downstream who draw their water from the Ohio River. To help understand what is at stake, if PFAS contamination is found in the sediment, which it almost certainly would be, the standard USEPA response would be to dredge the river, thereby costing DuPont and Chemours from $2,000,000,000 to $4,000,000,000. This puts the $22,000,000 penalty into perspective. While it is stunning that the United States is not demanding the river and sediment testing as the start of the remediation of the river, it is inexcusable that the remedy has not been expressly exempted from the language of the liability release. ***The release under this Decree may well forever eliminate the ability to achieve this remedy.***

The forever sacrifice of a remedy for contamination that will otherwise last forever should never be enshrined with the consent of the United States. But, as it turns out, the public and the USEPA do not even have reliable data on the full volume of PFAS that has been released from Washington Works and do not even have a full account of the sources from which the contamination has emanated. As explained in more detail below, Chemours purports to supply these vital pieces of information by a mass-balance model. Through a thorough set of inspections, the USEPA evaluated the Chemours/DuPont mass-balance model and found it to be "fundamentally flawed from its inception" because it relies on engineering assumptions and equations that Chemours' cannot substantiate and that Chemours knew were not representative of its

true GenX releases. Since the model has been used at Washington Works for years as the basis for its environmental representations and for project planning, it is difficult to understand how there can be any confidence in the projects the Consent Decree promotes to reduce PFAS pollution. Unfortunately, after doing excellent work to establish the profound mass-balance model deficiencies, the United States simply told Chemours to redo the mass balance and went ahead with a Decree based on information that cannot be validated. That means the Decree is claiming to remedy unknown pollution volumes from sources that cannot be identified.

Had the United States been willing to speak to Little Hocking before the Consent Decree was lodged, Little Hocking would have provided information about its knowledge of practices that put Chemours' unverifiable mass-balance model into an even more concerning context. Dr. Frank Schwartz, now a Professor Emeritus at Ohio State University, evaluated the DuPont/Chemours Ohio *River Model* and discovered how the insertion of about 20 high permeability model cells with no scientific or engineering basis caused river contamination to "disappear" before it reached the banks on the Ohio side of the river. These cells would not have been possible to detect on model validation, and they evaded detection by everyone until Dr. Schwartz found them and they were verified on deposition.

Chemours also denied the existence of the correlation between the releases of GenX from the Washington Works outlets and the pattern of the uptake of GenX by the most downstream reaching LHWA water production well, as shown by the discovery record in the CWA case. When asked about whether the correlation established that PFAS was entering the Wellfield through the Ohio River pathway, Chemours' witness testified that all of the contamination came from the air. When asked if he had any data from Ohio or the Wellfield to support his testimony, the witness said he did not. The witness was the same person who had overseen the development of the River Model when he worked for DuPont. The fact that Chemours has such an extreme interest in distracting scientific attention away from the Ohio River pathway calls for even more exacting attention by the United States now, and later by the US District Court, should the Decree not be substantially revised.

### *A. The Little Hocking Experience*

As a water provider with a PFAS-contaminated Wellfield, Little Hocking shares the same frustration and disbelief that other commenters have conveyed over the sheer deficiency and inefficacy of the Consent Decree in the face of over 40 years of DuPont and Chemours' illicit PFAS releases and PFAS-related secrecy, non-disclosure, and non-compliance, in the face of years of too little, too late agency action. USEPA should

withdraw the Decree and negotiate a settlement that refocuses on river-borne PFAS pollution and that actually protects Ohioans and Ohio water providers by: expressly requiring the development of effluent limits for all PFAS discharged by Washington Works and requiring strict compliance with those limits; requiring oversight or validation that will ensure the integrity of the new GenX mass balance proposed in the Decree; and, requiring Chemours to determine the full scope of the PFAS contamination that has resulted from Washington Works releases and to perform a comprehensive remediation of the contamination. As already noted, at a minimum, testing of Ohio River sediment starting between Washington Works and LHWA should begin promptly. Any settlement should also allow for meaningful involvement by water providers like Little Hocking which have years of experience with managing Chemours' PFAS pollution, particularly with the effectiveness of GAC treatment on removing PFAS from drinking water.

Little Hocking water users were first exposed to high levels of PFOA in the Wellfield for years—from at least 1984 (when DuPont knew about it and hid it from LHWA)—until Little Hocking discovered it in 2002 and until GAC treatment became operational in 2007. Following the 2002 revelation of the fact that PFOA was found in its Wellfield, Little Hocking went on to learn that its water users had elevated levels of both PFOA and PFOS in their blood. After years of efforts to protect its Wellfield and water users from additional exposure to PFOA and PFOS, Little Hocking learned in 2018 that its Wellfield was contaminated with yet another chemical released from Washington Works: HFPO-DA or "GenX," a different PFAS that Chemours had been using for an unknown length of time as a replacement for PFOA.

Little Hocking's 12,000 water users and countless other Ohioans, for years, unknowingly consumed (and many still consume) PFOA-contaminated drinking water. And, even for Little Hocking, while the GAC plant has reduced PFOA and HFPO-DA in the water Little Hocking delivers to its customers down to below reporting limits, Little Hocking is aware of the likely inability of the GAC plant, designed to remove PFOA, to effectively remove the rapidly growing amounts of HFPO-DA and the other PFAS that have been discovered in its water. For example, it is well established that GAC filtration is very inefficient at removing shorter chain PFAS. Six of the eight most recently discovered PFAS have a shorter carbon chain than PFOA (eight carbons). Moreover, it is also known that exposure to PFAS compromises the immune system. Thus, the already high body burden of PFAS in Little Hocking water users renders any exposure to additional chemicals that much more concerning.

This is all in addition to the serious environmental harm resulting from PFAS releases. Little Hocking determined, with its own testing, that PFOA is also in the flora

and fauna of its Wellfield and therefore is present in the food chain. To date, Chemours has not been compelled to perform comprehensive sampling and testing to determine the full scope of the PFAS contamination in the vicinity of Washington Works.

Yet, Little Hocking has consistently pointed out that the approach to "regulation" of PFAS discharges from Washington Works was too lax and not protective of human health and the Ohio River and that additional permits for expanded manufacturing operations, along with additional PFAS discharges, should not be issued until Chemours demonstrated it could meet existing CWA permit obligations. LHWA has also consistently urged regulators to begin a process of actual regulation with enforceable limits, rather than the "monitoring only" approach taken for the vast majority of PFAS that are being discharged. For example, in March 2024, Little Hocking urged WVDEP to deny Chemours' application for an NPDES permit for its then-proposed "PFA Finishing Line 2"[3] because Chemours' PFAS ***discharges and violations with respect to its other NPDES permit*** (the permit for "PFA Finishing Line 1")[4] foreshadowed violations to come if WVDEP issued the requested permit for PFA Finishing Line 2. WVDEP ultimately issued the permit anyway. As predicted—within the first seven months after the permit became effective in July 2024—Chemours had, "on numerous occasions," already violated its permit limits for PFOA and HFPO-DA. Doc. 1, PageID 50, ¶ 289. The Consent Decree perpetuates the failure to meaningfully address and regulate the vast majority of PFAS that are discharged from Washington Works. It is also clear that the Consent Decree does not acknowledge, let alone make provision for, expanded operations that will continue to result in increased PFAS discharges to the Ohio River.

### *B. The Vast Consequences of the Mass-Balance Model Defect*

Now the Complaint in this matter demonstrates that Chemours' disregard for laws that protect human health and the environment extends even to USEPA orders. The 2009 TSCA 5(e) Order described in the Complaint requires DuPont and now Chemours to recover and destroy or recycle GenX at an overall efficiency of 99% from all the effluent process streams and air emissions. Doc. 1, PageID 25, ¶ 116. Yet, Chemours has, for years, held out a "fundamentally flawed" and "outdated" mass-balance model as a means to falsely argue that it has complied with the TSCA 5(e) Order. Doc. 1, PageID 28, ¶ 143. Indeed, the Complaint lays bare that Chemours' mass-balance model was a failure from the start; that Chemours could not explain the

[3] NPDES Permit No. WV0117986.

[4] NPDES Permit No. WV0001279.

assumptions and equations used in the model; that Chemours made changes to its processes and failed to revise the model accordingly; that actual sampling and monitoring data shows that the model underrepresents GenX releases and overestimates the amount of GenX destroyed; that Chemours knew the actual data could not validate the model; and, that Chemours continued using the model anyway. Doc. 1, PageID 24-28, ¶¶ 115-143.

The extent of Chemours' mass-balance model failures as set forth in the Complaint was a revelation to Little Hocking, particularly in light of: (1) the massive increase in GenX in the Wellfield since 2018; (2) Chemours' claims that its thermal oxidizer destroys 99% of GenX in air emissions; and, (3) Chemours' reliance on a groundwater model that it manipulated in order to claim that no discharges into the Ohio River can reach the Wellfield. The mass-balance model revelations underscore Chemours' pattern of non-disclosure and evasion of the law and of regulation. In fact, the overarching implication from Chemours' mass-balance model failures is that Chemours has precluded regulators, water providers like Little Hocking, and exposed populations from knowing the true extent of the PFOA and GenX releases from Washington Works, including releases of PFOA and GenX into the River.

The Consent Decree does nothing to correct this deficit of information that is crucial to protecting public health and the environment.

Instead, the solution the Consent Decree offers to the failures in Chemours' mass-balance model is to again give Chemours the responsibility for completing a ***new*** mass balance (i.e. "compliance demonstration"). But requiring Chemours to perform a new mass balance ***going forward*** does not solve the problem that there is ***no verifiable information that can inform the public about how much GenX was released since 2009, or where it was released, or where it is now in the environment***. The public does not know, for example, how much of the unaccounted for GenX has accumulated in river sediments, soils, plants, or groundwater sources. Merely requiring Chemours to perform a new mass balance and providing a legal escape for years of evasion of the truth about all of the GenX it released into the environment from each of the facilities identified in the Complaint from the time it entered into the 2009 TSCA 5(e) Order. A settlement, like the Decree, which is devoid of any measure aimed at verifying and rectifying all those untracked, unlawful releases, cannot adequately protect the public or the environment. In other words, the Decree offers lax enforcement creatively marketed as comprehensive resolution.

### *C. Additional Deficiencies Render the Consent Decree Unapprovable*

The Consent Decree fails to hold Chemours accountable for any of this harm and fails to ensure that ongoing harm will cease. In fact, its current terms wholly fail to meet the standard of approval in the Fourth Circuit, under which a consent decree (1) must be fair, adequate, and reasonable and (2) must not be illegal, the product of collusion, or contrary to the public interest. Of particular concern to Little Hocking, the Decree:

- **Releases liability for violations it fails to remedy.** The Complaint alleges numerous violations of Washington Works' two NPDES permits, including unpermitted discharges of 19 distinct PFAS and a long list of violations of PFOA and HFPO-DA discharge limits. Instead of holding Chemours accountable for the extensive violations, and the resulting contamination, the proposed Decree would give Chemours broad liability protections from all unlawful discharges occurring through the date of its lodging. Further, the Decree does so without securing any remedy for the PFAS that have accumulated in the environment, including, e.g., river sediments, soil, and groundwater. The Decree therefore fails to address the breadth of Chemours' misconduct while proposing liability protections that are far broader than the relief secured. The Decree should be withdrawn and/or modified to require relief for this contamination. Or, at a minimum, if no such relief is achieved, then claims relating to the fate and transport of PFAS released from Washington Works into the Ohio River—including river sediment—must be expressly carved out from the Decree's general release of claims. Without express relief or a tailored carve-out, the Decree is inadequate, unreasonable, and contrary to the public interest.

- **Fails to even address, let alone resolve, Chemours' unauthorized discharges of multiple PFAS.** The Complaint recognizes 19 PFAS (in addition to PFOA and HFPO-DA) have been unlawfully discharged from Washington Works. Many of these same PFAS have been found in Little Hocking's Wellfield. The Decree ignores these other PFAS, addressing only Washington Works' discharges of PFOA and HFPO-DA. By failing to exercise its remedial powers to secure a remedy for the Ohio River, the Decree leaves the Little Hocking Wellfield especially vulnerable to ongoing harm.

- **Fails to require that Chemours will spend what is necessary to come into compliance.** The only spending amount specifically discussed in the Decree is a $90 million ***cap*** on spending for unidentified "additional projects." While USEPA press releases suggest that Chemours will spend, e.g., $60 million to

ensure compliance with the law at Washington Works and $280 million to supply clean drinking water in West Virginia and New Jersey, that spending is not required by the actual language of the Decree. Further, the Decree provides no level of assurance that the agency-reported spending will even be enough to bring Washington Works into compliance or to supply clean drinking water in West Virginia and New Jersey. To serve the public interest, the Decree must require Chemours to come into compliance with all laws and it should explicitly state that there is no spending cap on work necessary to bring Chemours into compliance.

- **Fails to assess an adequate civil penalty.** The $22.5 million "penalty"—spread over three years—is far from sufficient to deter Chemours from future violations and is not remotely commensurate with Chemours' years of knowing CWA and TSCA violations, including its years of reliance on a mass-balance model that it knew was not and could not be validated by real data, and is not commensurate with the scope and extent of the harm to public health and the environment. The Decree claims that Chemours has a "limited ability to pay" the total civil penalty the US "could seek" for the alleged violations. That is a dubious claim with respect to a multi-billion-dollar company but, in any event, $22.5 million amount remains an inappropriately weak fraction of what the US is authorized to seek under the law.

Alone, these broad failures render the Consent Decree inadequate, unreasonable, and contrary to the public interest. What is more, those broad failures—along with the additional, more specific problems detailed below—expose the Decree as merely the latest example in the history of lax agency oversight and Chemours' self-regulation that has resulted in and perpetuated the ubiquitous PFAS contamination surrounding Washington Works.

### D. *Other Defects that Require the Consent Decree's Withdrawal and Modification*

1. **The drinking water requirements in the Consent Decree (Appendix E) cannot be fully, fairly, or adequately evaluated because they are largely based on a required "work plan," the terms of which are not publicly available.**

The Consent Decree requires Chemours to develop a "Work Plan" that has to be approved by USEPA. The Work Plan establishes procedures and requirements on five-

pages of topics[5] that range from, e.g., eligibility and sampling plans to treatment/installation to treatment operation and maintenance. The bare bones topic descriptions provide little information for the public to evaluate and raise a number of concerns.

For example—of great concern to Little Hocking—it is unknown from the terms of the Decree what impact the Decree will have on the operation and maintenance ("O&M") of currently-in-place treatment systems. The Decree, if approved, would terminate the January 6, 2017 Administrative Order on Consent issued pursuant to Section 1431 of SDWA at Washington Works and essentially replace its terms with those of the publicly unavailable Work Plan. With respect to existing treatment systems, Appendix E to the Decree states that "[t]he manner of operation and maintenance ***as described in the Work Plan*** shall be consistent with requirements for Public Water Systems under the Safe Drinking Water Act."

For Little Hocking, this means that the terms of the Work Plan could threaten longstanding (nearly 20 years of) agreed-to protections for Little Hocking's water users. Little Hocking first started to learn about the extensive contamination of its Wellfield in 2002 and went on to learn that its water users had grossly elevated levels of both PFOA and PFOS in their blood. To protect its users from further drinking water exposure, Little Hocking and DuPont, and now Chemours, have implemented O&M practices for the GAC plant. The GAC plant and O&M practices at Little Hocking are designed to ensure that Little Hocking's finished water is non-detect for PFOA, a goal imperative to protecting Little Hocking's already highly dosed water users. Little Hocking's GAC plant began treating its source water on November 2, 2007. Since then, the GAC has been operating pursuant to agreed-to O&M terms, including the requirements that (1) bi-weekly water samples are collected after the water passes through the lead carbon beds and (2) when the lead bed has a PFOA concentration above 15 ppt the carbon is required to be changed out. Other O&M practices, including sampling locations, frequency and contaminants sampled, have been developed and implemented as part of the parties' course of dealing over the years. The Consent Decree should not weaken these, or other, GAC treatment operation and maintenance standards and practices that prevent further exposure of historically highly dosed water users.[6]

---

[5] Appendix E specifically states that the Work Plan is not even limited to those five pages of topics.

[6] Appendix E also states that, if the MCLs for PFOA and HFPO-DA are both invalidated, Chemours only needs to continue to maintain existing public water treatment systems until the system's source water prior to treatment has a PFOA concentration less than or equal to 70 ppt for four consecutive quarters (as

Additionally, the topics to be covered by the Work Plan include "Procedures for Chemours to propose and for EPA to review and accept other treatment systems (other than POE GAC and POU RO)." This topic raises a host of questions in itself, including, e.g.: (1) what will the "procedures" be; (2) who will the "other treatment systems" apply to; (3) who chooses which treatment system to use (i.e. a water provider or Chemours); (4) will water systems already receiving treatment get to choose "other" treatment or could other treatment be imposed on them; and (5) if public water providers are allowed to choose, how are they supposed to choose given that the only effective way to choose is to perform a source water study to determine which technology to use.

The United States should not have even considered moving for entry of the Consent Decree until the final proposed Work Plan is put out for public review and comment.

**2. The Consent Decree perpetuates harm to human health and the environment because it is not targeted to resolve Chemours' Clean Water Act permit effluent limit violations at Washington Works.**

The Consent Decree proposes CWA injunctive relief for Washington Works that includes "treatment system projects" designed, installed, and implemented solely by Chemours to reduce PFOA and HFPO-DA discharges from various internal facility components. But nothing in the Decree ensures or requires compliance with NPDES permit limits, even where such limits do exist.

Rather than requiring compliance with permit effluent limitations, the Consent Decree perpetuates the unsubstantiated notion that the proposed "projects" will ensure compliance with permit limits. But none of the "projects" listed in the Decree (at Appendix F) require reduction of PFOA or HFPO-DA in Washington Works outfalls discharges. Rather, the projects are only supposed to reduce the levels of PFOA and HFPO-DA coming out of specified facility components (e.g. sumps, tanks, belts, wells) with the hope that those incremental internal reductions might amount to compliance with permit effluent limitations at the outfalls. Doc. 2-7, PageID 325 (the objective of the projects is "to reduce PFOA and HFPO-DA levels in the effluent from Washington Works"). In fact, the record in the *WVRC* lawsuit shows that Chemours represented that it would comply with permit limits by achieving specified percent reductions of PFOA and HFPO-DA discharges at Washington Works' outfalls. Yet, despite Chemours' representation, expert opinions provided during the *WVRC* lawsuit established that

---

opposed to 4 ppt for PFOA). Again, such a drastic change would have serious consequences for historically highly dosed populations like Little Hocking water users. Doc. 2-6, PageID 315, ¶22.

compliance with permit effluent limits would still be highly unlikely even if Chemours achieved the claimed percent reductions in discharges. Aside from the fundamentally flawed mass-balance model—the factual basis for every representation Chemours has made about the amounts of pollutants discharged and its predictions about discharge reductions—Chemours' own numbers fail to add up to the reductions that would be necessary to achieve compliance.[7]

In any event, the Consent Decree provides no assurance that any of the projects' "target PFAS Control Levels"[8] will even be met. The Decree gives the responsibility of designing, installing, and implementing the projects solely to Chemours to meet the target PFAS levels for each project. It is only after allowing Chemours two failed attempts at demonstrating that the "target PFAS Control Levels" have been achieved that the Decree finally provides for an "independent Third-Party Consultant" to evaluate the performance of the failed treatment system. Doc. 2-7, PageID 331. But, even then, the "independent" consultant is approved by USEPA from a pool of candidates chosen by Chemours and is then "hired" (i.e. paid) by Chemours. Doc. 2-7, PageID 333.

Allowing a polluter with a history of non-compliance to have control over compliance with project control levels is fundamentally inappropriate and improper, particularly in light of Chemours' prior mass-balance model failures. To have any level of reliability, the Consent Decree must require, at minimum, third party oversight and evaluation that is truly independent, i.e. a third-party evaluator that is not paid with money under Chemours' control. Further, such oversight and evaluation should be required from the start, not after two failed compliance demonstrations.

What is more, the Consent Decree requires the selected consultant to recommend options for achieving greater PFOA/HFPO-DA reductions only "to the extent practicable to achieve" the target control levels. Doc. 2-7, PageID 334. The Decree fails to explicitly state what "extent practicable to achieve" means. Yet, in its requirement that Chemours submit a plan in response to the consultant recommendations, the Decree allows Chemours' proposed actions to include "technical feasibility" and "cost

---

[7] Additionally, Washington Works has several stormwater outlets that are known to discharge extremely high levels of HFPO-DA and PFOA from outlets not addressed in the treatment system projects in Appendix F (Doc. 2-7). A comprehensive settlement that is protective of the Ohio River and those exposed through it would include requirements to eliminate, or at least reduce, those discharges. The Consent Decree includes no such requirements.

[8] The target control levels for the majority of the projects are less than 10 ppt for HFPO-DA and less than 4 ppt for PFOA. For the B22 sump, the target control levels are less than 50 ppt for HFPO-DA and less than 9.5 ppt for PFOA.

considerations." Doc. 2-7, PageID 335. Technical feasibility should not be an excuse because, currently, there are thousands of water systems treating PFOA to below 4 ppt and HFPO-DA to below 10 ppt because they have to comply with those enforceable maximum contaminant levels (MCLs). Cost considerations should not be an excuse for failure to achieve any PFAS project control level or outfall effluent limitation. Holding a PFAS polluter to a more lenient standard than the water providers that are essentially managing the polluters' contamination is not in the public interest.

Finally, the Consent Decree allows the project target control levels to be increased. First, it goes so far as to allow the consultant to "provide an assessment of an alternative control level" in the event it does not identify any recommendation for greater PFOA or HFPO-DA reductions to achieve target control levels. Again, failure should not be an option when, e.g., water providers are required to meet the same levels. Second, the Decree allows the target control levels to be increased to a laboratory reporting level when the laboratory reporting level is above the listed target control level. Yet, there should never be an instance where the reporting limit is above the target control levels (i.e. 4 ppt for PFOA and 10 ppt for HFPO-DA). That is because, as experts in the field point out, there are numerous commercial labs across the country that can test for PFOA and HFPO-DA at reporting limits that are half of the Decree's project control levels. Thus, any future EPA PFAS testing method should have a reporting limit no higher than 2 ppt for PFOA and 5 ppt for HFPO-DA.

**3. The Consent Decree creates additional confusion for public water suppliers that are already receiving treatment.**

For public water suppliers that are already receiving treatment, the Consent Decree requires Chemours to continue to maintain the existing treatment systems until, e.g., the systems' source water, prior to treatment, has an HFPO-DA concentration that is equal to or less than the HFPO-DA trigger for treatment for four consecutive quarters. The Decree is incomplete and confusing because it fails to address the situation where—as with Little Hocking—the public water supplier is receiving treatment specifically for PFOA. The Decree leaves water providers guessing as to whether their treatment will be changed to account for HFPO-DA. The Decree should be revised to make clear that—for systems that are already receiving treatment—Chemours is required to reevaluate, in consultation with the water provider, what if any operational, maintenance, and monitoring changes should be made to current treatment systems to account for HFPO-DA. This evaluation should be undertaken at Chemours' sole expense.

**4. The Consent Decree fails to require Chemours to even reduce its discharges of PFAS other than PFOA and HFPO-DA.**

The Complaint recognizes that Washington Works has discharged 19 PFAS other than PFOA and HFPO-DA without a permit. Doc. 1, ¶ 270. It also alleges unauthorized discharges at Washington Works of PFPrA, PMPA, PPF Acid, and PEPA, all of which the Complaint states are PFAS. Doc. 1, ¶¶ 273, 274. But the Consent Decree wholly fails to address any of those discharges, even though the Complaint acknowledges that PFAS, "forever chemicals," can harm human health and the environment. Doc. 1, ¶ 1.

First, the Consent Decree does not require any sampling and treatment for any of these other PFAS in its drinking water requirements (Appendix E). Fragmenting relief for PFAS in drinking water does not serve the public interest, especially when some PFAS are already known to accumulate in the human body, when the combined impacts of multiple PFAS in people are not fully understood, and when some populations have already been highly exposed. To protect the public interest, the Decree should require sampling and treatment for the fullest range of PFAS that testing technology allows. At minimum, the Decree should require any other PFAS that receives a federal MCL to be automatically added to the Decree requirements in the same manner and degree as the MCLs for PFOA and HFPO-DA are used in the Decree as it stands now (e.g., using MCLs as triggers for drinking water treatment).

Second, the Consent Decree does not require any CWA injunctive relief "projects" that have the objective of reducing the levels of any of the other 19 PFAS in effluent from Washington Works. Washington Works' years of unfettered discharge of these PFAS is particularly alarming to Little Hocking given that eight of the 19 PFAS have already been found in its Wellfield and given the already high PFAS body burden of its water users. If USEPA or WVDEP is not going to impose strict effluent limitations on these additional PFAS, then the Decree should at very least require the levels of those PFAS be reduced at specific facility components.

**5. The Consent Decree should not keep water systems from getting sampling and treatment just because they were eligible for inclusion in PFAS class action litigation.**

Under Appendix E of the Consent Decree, only public water systems that were not eligible for inclusion in the Aqueous Film-Forming Foam (AFFF*)* class action

litigation[9] are eligible for sampling. Doc. 2-6, PageID 297. That means that the Decree precludes sampling even for water systems who were eligible for inclusion in the AFFF litigation but chose to opt out. The AFFF litigation eligibility preclusion is particularly unfair considering that the AFFF litigation involved DuPont and 3M, not Chemours. This term should be eliminated.

**6. The Consent Decree should not give Chemours the right to blame someone else for its releases.**

Appendix E to the Consent Decree provides that if a "proximate separate source(s) of PFAS in the Washington Works Geographic Scope" is identified "Chemours may submit to EPA for consideration information about that source's contribution to the contamination." Doc. 2-6, PageID 312. This allows Chemours to try to evade responsibility for its releases even though it was admitted in court during the *WVRC* litigation that Chemours is the only source of PFAS within 100 miles of the Washington Works facility. What is worse, any source Chemours attempts to blame may only be a secondary source of PFAS because DuPont/Chemours contaminated the "source" in the first place. The "proximate separate source" term is wholly inappropriate and should be removed.

**7. It is improper and inadequate for a settlement that is supposed to provide injunctive relief to address "forever chemicals" in the environment and drinking water to have a short, fixed termination period.**

Under Appendix E to the Consent Decree, the duration of Chemours' treatment obligations is not defined by a number of years. Rather, "Chemours shall maintain the treatment systems to treat water to a PFOA concentration that is equal to or less than 4 ppt and an HFPO-DA concentration that is equal to or less than the HFPO-DA Trigger for Treatment (or 70 ppt for PFOA in the event both MCLs are invalidated)." Doc. 2-6, PageID 315. But the Decree contradicts this by stating that, if—after just 15 years—Chemours, e.g., has met its requirements under the Decree, has maintained compliance with NPDES permits, and has paid its penalties, it can ask to terminate the Decree. Doc. 2-1, PageID 183. This termination provision ignores the long-lasting compounds at issue and the harm that they cause. PFAS are called forever chemicals because they persist in the environment. That is why treatment duration is based on source water concentration, not on an arbitrary number of years. Water treatment, especially for

---

[9] *Aqueous Film-Forming Foam (AFFF) Prods. Liab. Litig. (MDL 2873)*, Master Dkt. No. 2:18-MN-2873-RMG (D.S.C.)

Little Hocking, will likely need to continue for hundreds of years. To even suggest an arbitrary date upon which termination can be requested is improper.[10]

**8. Specific concerns with the new mass balance (compliance demonstration) requirement.**

In addition to the fact that the Consent Decree allows Chemours to escape accountability for its years of untracked GenX releases, its "Terms for Compliance with the TSCA GenX 5(e) Order" (Appendix B) raises the following specific concerns.

First, despite Chemours' history of mass-balance model failures, including ignoring data that invalidated its model, the Consent Decree does not provide for any validation or oversight of Chemours' application of the new mass balance. Instead, the Decree should impose some measure or measures to ensure the integrity of the results. One possibility is the use of elemental fluorine as a starting point for a focused mass-balance model at Washington Works in addition to the new mass balance required in the Decree. As Little Hocking understands, fluorine is a critical component of GenX and is trackable, chemically stable, and easily measured (i.e. would allow for continuous measurements). Performing a mass balance on a chemical like fluorine may result in information that would shed light on how GenX is moving in and escaping from Washington Works.

Second, for forced air point sources, the Consent Decree requires sampling only every two years. Doc. 2-3, PageID 210. For non-forced air point sources, the Decree requires Chemours to take direct measurements for 10% of the locations once each year on a rolling basis ("e.g., in Year 1 of monitoring—measure the top 10%; Year 2 of monitoring—measure the top 11-20%, etc."). Doc. 2-3, PageID 211-212. That means a single location will be sampled only once every ten years. ***Such infrequent sampling is utterly inadequate for a mass balance***. Every forced air and non-forced air point source should be sampled quarterly.

Third, the compliance demonstration calculation for Washington Works incorporates a variable for "Facility Water Discharges" that does not appear to account for stormwater runoff. Omitting stormwater discharges to outfalls leaves a serious gap in accounting for GenX discharges.

---

[10] Termination after 15 years is also nonsensical given that the Consent Decree requires Chemours to track property sales and transfers for those properties that declined sampling, refused treatment, or did not respond ***for 20 years***. Doc. 2-6, PageID 315-16.

Fourth, the Consent Decree appears to allow unrestricted emissions of another PFAS, "E1." Doc. 2-3, PageID 211. More specifically, it appears that Washington Works has certain forced-air point sources where Chemours claims that the GenX in the processing equipment is "fully converted" to E1. E1[11] appears to be a GenX byproduct that, like other PFAS, is extremely persistent in the environment and is highly soluble in water. GAC is highly ineffective at removing E1 since it is a short chain PFAS (five carbons). Other than its chemical name, the Decree does not provide any information about E1 or require Chemours to provide any information, including, e.g. the potential health risks associated with E1 or the quantities of E1 that may be released. Nor does the Decree place any limits on the E1 that can be released. Again, as the catchment reservoir for the PFAS contamination emanating from Washington Works, any releases of PFAS are of particular concern to Little Hocking. The fact that one known, dangerous PFAS might potentially be replaced by another, lesser-known PFAS with similar properties provides little reassurance that the Decree is protective of public health and the environment.

***E. Conclusion***

In sum, the Decree's failure to provide a CWA remedy that cleanses the environment of Chemours' illicit river contamination, its failure to even require testing of Ohio River sediment, its allowance of dubious land-based projects that defy enforceability and which were planned in reliance on a defective mass-balance model, its systemic diversion of attention from Ohio River remediation by implicit approval of Chemours' denial of the correlation between the release of GenX from the Washington Works outlets and its uptake at Little Hocking, and its broad liability release blocking the prospect of a future River remedy, all render the Decree unapprovable. The legion of other non-Little Hocking focused Decree defects outlined above echo that the Decree in its present form cannot be approved. Little Hocking stands ready to work with the United States to remedy the essential defects needed to turn the Decree into an approvable instrument, or to further *detail* for the Court *why* the lodged Decree is unapprovable.

Little Hocking appreciates the opportunity to provide comments on the Consent Decree. Please contact me or Justin Newman directly if you have any questions about these comments.

---

[11] The Consent Decree defines E1 as "heptafluoropropyl 1,2,2,2-tetrafluoroethyl ether," Chemical Abstracts Service Registry Number 3330-15-2. Doc. 2-3, PageID 197.

Comments submitted on behalf of the Little Hocking Water Association by:

D. David Altman
Justin D. Newman
*AltmanNewman Co. LPA*
15 E. 8th St., Suite 200W
Cincinnati, OH 45202
(513) 721-2180
jnewman@environlaw.com
daltman@environlaw.com