# EXHIBIT 2

SOUTHERN ENVIRONMENTAL LAW CENTER

136 East Rosemary Street, Suite 500
Chapel Hill, NC 27514

Telephone 919-967-1450
Facsimile 919-929-9421

July 29, 2026

*Via email*

Mr. Scott Bauer
Assistant Attorney General
U.S. Department of Justice
Environment and Natural Resources Division
Environmental Enforcement Section
P.O. Box 7611, Washington, DC 20044–7611
pubcomment-ees.enrd@usdoj.gov

**Re: Public Comments Opposing Proposed Consent Decree**
***Proposed Consent Decree for The Chemours Company, D.O.J. Ref. No. 90-5-1-1-12112***

Dear Mr. Bauer:

The Southern Environmental Law Center and the below organizations submit these comments in opposition to the Proposed Consent Decree through which the U.S. Environmental Protection Agency seeks to resolve claims against The Chemours Company and The Chemours Company FC, LLC ("Chemours" or "the company") for violations of the Clean Water Act, Toxic Substances Control Act, Safe Drinking Water Act, and Resource Conservation and Recovery Act:

Cape Fear River Watch
Clean Cape Fear
Earthjustice
Natural Resources Defense Council
NC League of Conservation Voters
North Carolina Conservation Network
Sierra Club North Carolina
Sustainable Sandhills
Toxic Free North Carolina

For almost 90 years, Chemours and its corporate predecessor have unlawfully released per- and polyfluoroalkyl substances ("PFAS") from Chemours' facilities in North Carolina, West Virginia, and New Jersey, contaminating rivers, groundwater, drinking water supplies, farmland, wildlife, and entire communities across the three states. Because of this pollution, over 500,000 North Carolinians unknowingly consumed contaminated drinking water; over 10,000 private wells were polluted; and families continue to live with the consequences of Chemours' releases of these highly persistent toxic chemicals. Given the extraordinary scope of that harm, the public should expect a settlement that delivers meaningful accountability, comprehensive remediation, and court-enforceable protections against future pollution.

EPA has proposed a settlement that delivers none of these things.

Although EPA and the Department of Justice have publicly characterized this as a "$450 million settlement," that description is false and misleading. There is no requirement that Chemours pay or spend anywhere close to $450-million dollars; that figure is nowhere in the proposed agreement and has no basis in the actual terms. Instead, the purported settlement value is largely derived from an inadequate penalty, a spending cap, low stipulated penalties, and projects that may never occur and whose benefits remain uncertain:

| **DOJ and Chemours' claims**[1] | **The reality** |
|---|---|
| Chemours will pay a civil penalty of $22.5 million for alleged violations | Chemours will pay a $22.5 million penalty to the United States Treasury and the State of West Virginia. The settlement states that Chemours cannot afford to pay more, despite the fact that it is a multi-billion-dollar company.[2] |
| $90 million program to mitigate PFAS discharges | There is no $90 million program to mitigate discharges. **There is only a $90 million dollar limit that Chemours negotiated as the maximum that it is willing to spend on mitigation projects.** |
| $60 million on pollution controls for surface water discharges and air emissions in West Virginia | There is no requirement that Chemours spend $60 million—that number is not in the settlement, and there is no evidence that the company will spend close to that amount. |
| Drinking water for West Virginia and New Jersey communities at an estimated cost of $280 million | There is no requirement that Chemours spend $280 million—that number is not in the settlement, and there is no evidence that the company will spend close to that amount. Moreover, the agreement focuses largely on just two PFAS chemicals in drinking water, even though Chemours is known to release hundreds of PFAS substances—many of which contaminate local water sources. |

[1] Press Release, U.S. EPA, EPA Obtains Over $450 Million In Penalties and Relief in Agreement with Chemours to Settle Claims Over PFAS Pollution in Three States (June 24, 2026), https://perma.cc/L3UQ-3L9F (Attachment 1).
[2] The Chemours Company (CC), N.Y. Stock Exchange (July 27, 2026), https://perma.cc/835Q-38CX (Attachment 2) (showing Chemours currently has a market cap of over $2.5 billion dollars and revenue of $5.8 billion).

More broadly, the Proposed Consent Decree offers promises rather than performance. Instead of requiring concrete, court-enforceable actions to reduce PFAS contamination and exposure, the Proposed Consent Decree relies on undefined plans and potential mitigation projects, all of which are subject to future agency discretion. The settlement ignores the hundreds of PFAS chemicals released by Chemours. Instead, it focuses primarily on just two compounds; leaves significant ongoing sources of contamination insufficiently addressed; and provides no assurance that funds will reach the communities most affected or meaningfully reduce pollution. Communities that have already waited decades for relief are left with little reason to believe that the most significant harms caused by Chemours' contamination will actually be addressed.

Even more troubling, the Proposed Decree does not approach the scale of the underlying problem. Although it provides relief for West Virginia and some drinking water-related relief for New Jersey, the settlement largely leaves North Carolina—the location of some of Chemours' most significant and well-documented PFAS contamination—to fend for itself.

This settlement is a remarkably poor bargain for North Carolina. EPA's Complaint identifies 245 unlawful discharges of 23 PFAS chemicals from Fayetteville Works in 2017–2019,[3] yet EPA seeks to give Chemours broad protection from liability for all unlawful discharges before this Proposed Consent Decree is lodged. That relief goes too far.

At most, the Proposed Decree may resolve claims arising from the specific violations alleged in the Complaint, and only to the extent those violations involve the two PFAS chemicals addressed by the settlement insofar as they are actually remedied through its terms (if at all). The unlawful discharges of the other 21 PFAS chemicals identified in the Complaint—and the numerous additional PFAS compounds not mentioned—remain unaddressed and outside the settlement's scope. Instead of ensuring accountability for the full extent of Chemours' violations, the settlement creates the appearance of a comprehensive resolution while leaving substantial violations and ongoing harms untouched. It therefore fails to address the breadth of Chemours' misconduct while proposing liability protections that are far broader than the settlement warrants.

The Proposed Consent Decree also fails to comply with both the Clean Water Act and the Toxic Substances Control Act. The Clean Water Act, for example, prohibits discharges of pollutants to the Nation's waters without a permit and requires compliance sufficient to restore and maintain the chemical, physical, and biological integrity of those waters. But the Proposed Decree does not require Chemours to stop the unlawful PFAS discharges EPA identified in its Complaint or provide consequences sufficient to ensure compliance. Nor does it ensure that Chemours' chemicals do not present an unreasonable risk of injury to health or the environment, as the Toxic Substances Control Act requires. Instead, the Proposed Decree leaves core violations unresolved while purporting to resolve them through a court-approved settlement.

The Proposed Decree's failure to require compliance is especially concerning because North Carolina officials were excluded from settlement negotiations and given no meaningful

[3] *See* Complaint, *United States and State of West Virginia v. The Chemours Company*, Civil Action No. 2:26-cv-00418, ¶ 352, App. B, Table 1 (S.D.W.Va. filed June 24, 2026), https://perma.cc/Q6KG-ZGMQ.

role in reviewing, approving, or overseeing actions affecting the State. A settlement that purports to address PFAS contamination in North Carolina while excluding the State from both the negotiation and implementation processes cannot credibly claim to reflect the public interest.

The Proposed Consent Decree's treatment of Chemours' carbooxohalide operations further illustrates a broader accountability and transparency problem.

The Proposed Decree imposes a series of restrictions and safety requirements governing carbooxohalide, which strongly suggest that the chemical poses significant health, safety, and environmental concerns. Yet the Proposed Decree appears to be the first public disclosure that carbooxohalide is manufactured, processed, or used at Fayetteville Works (and only at Fayetteville Works). Despite this revelation, the Proposed Decree provides virtually no information about the chemical itself, the quantities involved, its emissions, its potential risks, or the scope of Chemours' current and future operations involving the substance. The State of North Carolina and communities that have lived with the consequences of Chemours' PFAS contamination are entitled to more than assurances that protective measures exist; they are entitled to sufficient information to understand the risks and evaluate whether those measures are adequate to protect public health and the environment.

EPA should withdraw the Proposed Consent Decree and negotiate a settlement that adequately protects the public by requiring Chemours to undertake comprehensive remediation, eliminate all ongoing PFAS emissions and discharges from its facilities—including releases of *all* PFAS compounds, not just select chemicals—and provide relief commensurate with the extraordinary scope of the contamination and harm Chemours has caused. Any such settlement should also ensure meaningful involvement by North Carolina in the development, review, and implementation of measures affecting the State,[4] or alternatively remove the State from the Proposed Decree altogether. If these changes are not made, the reviewing court should deny EPA's request for entry of the Proposed Consent Decree.

## I. Chemours' History of PFAS Contamination

For nearly 90 years,[5] Chemours and its corporate predecessor, DuPont, manufactured and processed PFAS compounds from facilities in North Carolina, West Virginia, and New Jersey. Throughout that time, the companies also knowingly released the toxic chemicals into air, groundwater, surface waters, drinking water sources, and surrounding communities.

In June 2017, residents of southeastern North Carolina learned that their drinking water had been contaminated with GenX, a PFAS chemical released from Chemours' Fayetteville Works facility. These residents soon discovered that GenX was only *one of hundreds* of PFAS

---

[4] The same can be said for New Jersey. However, these comments focus largely on the proposed Consent Decree's issues related to North Carolina given SELC's and the other signatories' presence in North Carolina and experience with the harm from Chemours' pollution in the state.

[5] *See* Compl. ¶ 235 (PFAS has been released by Chemours, and its predecessor, DuPont, before it from Washington Works since the 1940s).

released from the facility *for over 40 years* into the Cape Fear River basin.[6] As a result, Chemours' PFAS pollution contaminated drinking water for more than 500,000 people.[7]

Communities in southeastern North Carolina later learned that the harm extended beyond the 500,000 people who rely on the Cape Fear River for drinking water to thousands more who depend on private wells. Chemours had released PFAS from its stacks into the air; those chemicals then settled onto surrounding land and migrated into more than 10,000 drinking water wells across ten counties, including wells over 100 miles away.[8] PFAS from the facility contaminated North Carolina's air, water, and soil, and Chemours' chemicals have since been detected in the air that people breathe,[9] residents' blood,[10] the dust in people's homes,[11] domestic pets,[12] fish that people eat,[13] and other food products (such as berries, squash, tomatoes, and lettuce).[14] Sadly, the damage caused by DuPont's and Chemours' pollution will reverberate for generations. PFAS stay in the blood of mothers and are transferred to babies during their time in the womb and through breastmilk.[15] Children who are not even born yet may suffer from the PFAS chemicals that Chemours has released from its facilities.

---

[6] The Chemours Co. FC, LLC, *PFAS Non-Targeted Analysis and Methods Interim Report #10* at 2 (2024) [hereinafter "PFAS Analysis and Methods Interim Report #10"], https://perma.cc/SS8U-TXCV (Attachment 3) (discussing that Chemours' facility is a source of 255 potential unique unknown PFAS).

[7] Press Release, Jeff Jackson, Attorney General, Gov. Stein and AG Jackson Denounce EPA-Chemours Backroom PFAS Deal (June 24, 2026) [hereinafter "NC Press Release"], https://perma.cc/XA4M-YYF6 (Attachment 4); *see also* Vaughn Hagerty, *Toxin Taints CFPUA Drinking Water*, Wilmington Star-News (updated June 8, 2017, at 10:38 a.m. ET), https://perma.cc/FQ93-FVQ5 (Attachment 5); *see also* Cape Fear Pub. Util. Auth., *Emerging Contaminants*, https://perma.cc/5Z79-LAGS (Attachment 6).

[8] *See* Chemours, *Consent Order Progress Report For First Quarter 2026* at 2-3, 8-9 (2026) [hereinafter "First Quarter 2026 Progress Report"], https://perma.cc/6MX7-LNTB (Attachment 7) (describing sampling and detections in Cumberland, Bladen, Robeson, Sampson, Hoke, Harnett, New Hanover, Brunswick, Pender, Columbus counties); *NC DEQ Directs Chemours to Significantly Expand Well Testing*, N.C. Dep't Env't Quality (Mar. 10, 2025) [hereinafter "DEQ Expanded Well Testing Announcement"], https://perma.cc/Y3FY-UHYY (last visited July 28, 2026) (Attachment 8); Chemours, *Consent Order Progress Report For Fourth Quarter 2024* at 3, 10 (Jan. 23, 2025) [hereinafter "First Quarter 2024 Progress Report"], https://perma.cc/2TUN-BVYN (Attachment 9).

[9] Jiaqi Zhou et al., *Legacy and Emerging Airborne Per- and Polyfluoroalkyl Substances (PFAS) Collected on PM2.5 Filters in Close Proximity to a Fluoropolymer Manufacturing Facility*, 24 Env't Sci. Processes & Impacts 2272–2283 (2022) (Attachment 10).

[10] Nadine Kotlarz et al., *Measurement of Novel, Drinking Water-Associated PFAS in Blood from Adults and Children in Wilmington, North Carolina*, 128 Env't Health Persp. 077005 (2020) (Attachment 11).

[11] Susie Proctor et al., *Per- and Polyfluoroalkyl Ether Acid (PFEA) Concentrations in Indoor Dust Are Higher in Homes Closer to a Fluorochemical Manufacturing Facility*, 59 Env't Sci. & Tech 7200-7210 (2025) (Attachment 12).

[12] Kylie D. Rock et al., *Domestic Dogs and Horses as Sentinels of Per- and Polyfluoroalkyl Substance Exposure and Associated Health Biomarkers in Gray's Creek North Carolina*, 57 Env't Sci. & Tech. 9567–9579 (2023) (Attachment 15).

[13] N.C. Dep't of Env't Quality, *Preliminary PFAS Study in a Privately-Owned Man-Made Lake*, PowerPoint Presentation (June 18, 2018), at slides 6–7, https://perma.cc/R4Y9-CSYX (Attachment 13).

[14] Pingping Meng et al., *Residential Garden Produce Harvested Near a Fluorochemical Manufacturer in North Carolina Can Be an Important Fluoroether Exposure Pathway*, 72 J. Agric. & Food Chemistry 26874–26883 (2024) (Attachment 14).

[15] *See* PFAS National Primary Drinking Water Regulation, 89 Fed. Reg. 32532, 32537 (Apr. 26, 2024).

In 2018, Cape Fear River Watch and the North Carolina Department of Environmental Quality sued Chemours over its pollution and failure to disclose its PFAS releases to the public and the State.[16] After months of negotiations, those actions led to a Consent Order[17] and later Addendum[18] between the Department, Cape Fear River Watch, and Chemours. Those hard-fought agreements established strict controls and an aggressive schedule for Chemours to nearly eliminate its PFAS pollution[19] and protect nearby and downstream communities. Over the past two years, however, it has become increasingly clear that Chemours never fully disclosed the extent of its PFAS pollution, met its obligations, or stopped its releases. The 2019 NC Consent Order addressed only what Chemours had disclosed in its wastewater at the time, which we now know gave an incomplete picture of the scope and nature of its PFAS pollution.[20] As a result, residents whose wells are contaminated with PFAS that Chemours failed to disclose cannot obtain the NC 2019 Consent Order's drinking water relief, because that relief is limited to the PFAS Chemours disclosed and listed in the 2019 NC Consent Order.[21] Under the Proposed Decree, EPA would miss a real opportunity to close the gap between the Proposed Consent Decree's requirements and the full scope of the Chemours' continuing, now-known pollution in North Carolina.

The harms associated with Chemours' PFAS pollution are not limited to North Carolina. Near Parkersburg, West Virginia, PFAS contamination from the Washington Works facility has

[16] Compl. for Declaratory & Injunctive Relief, *Cape Fear River Watch v. Chemours Co. FC, LLC*, No. 7:18-cv-00159 (E.D.N.C. 2018), https://perma.cc/5BQV-QWCH. Cape Fear River Watch also sued the Department for the narrow scope of the state's initial lawsuit against Chemours. Petition for Jud. Review, *Cape Fear River Watch v. N.C. Dep't of Env't Quality*, No. 18 CVS 2462 (New Hanover Cnty., N.C., Super. Ct. 2018), https://perma.cc/WR8X-LLHN.

[17] Consent Order, *State v. The Chemours Co. FC, LLC*, 17 CVS 580 (N.C. Super. Ct. Feb. 25, 2019) [hereinafter the "2019 NC Consent Order"], https://perma.cc/5RNX-G569 (Attachment 16).

[18] Addendum to Consent Order Paragraph 12, *State v. The Chemours Co. FC, LLC*, 17 CVS 580 (N.C. Super. Ct. Oct. 12, 2020), https://perma.cc/558R-HB9D (Attachment 17).

[19] *E.g.*, 2019 NC Consent Order, *supra* note 17, at ¶¶ 7(c), 12(e)(i) (requiring Chemours to route its sources of PFAS emissions to a thermal oxidizer—a type of treatment technology that had to control "all PFAS at an efficiency of 99.99%" and install a treatment system that would "be at least 99% effective" at reducing PFAS from a groundwater stream on the site).

[20] *See e.g.*, Remote Videotaped Deposition of 30(b)(6) Designee of EDIP, Inc., The Chemours Company and The Chemours Company FC, LLC, Christel Compton, Volume II, *Cape Fear Public Utility Authority v. The Chemours Company FC, LLC*, No. 7:17-CV-00195-D, at 12–13, 38 (Nov. 29, 2023), https://perma.cc/TD97-BWLF (explaining that Chemours did not disclose the presence of TFA, HFPO trimer, as well as other PFAS compounds in its wastewater during the negotiations of the Consent Order). While Chemours initially disclosed the presence of another PFAS—PFPrA—in its wastewater, it stopped testing for the chemical *before* initiating testing of potential wastewater treatment technologies, citing analytical issues. Parsons, *Old Outfall 002 Surface Water Sampling Results Chemours Fayetteville Works* at App. B (Sept. 30, 2019), https://perma.cc/SA9U-GT2K (Attachment 18). This is despite evidence that PFPrA has been quantified in the site's wastewater as early as 2012. Amy Delinsky, *PFPrA Analytical Capabilities and Environmental Occurrence*, PowerPoint Presentation (Oct. 4, 2023), at 8–9, https://perma.cc/TG6T-WQRW (Attachment 19).

[21] 2019 NC Consent Order, *supra* note 17, at ¶¶ 19, 20; *Well Sampling Information for Residents in Bladen, Cumberland, Harnett, Hoke, Robeson and Sampson Counties*, N.C. Dep't of Env't Quality, https://perma.cc/5ZMS-XFLD (last visited July 23, 2026) (Attachment 20); *see also* Delinsky, *supra* note 20, at 20 (showing that PFPrA contamination in private drinking water wells is not effectively treated with the filtration technology installed on those wells, granular activated carbon ("GAC")).

been the subject of decades of litigation, scientific study, and public concern.[22] Releases from that facility contaminated drinking water supplies serving tens of thousands of residents in communities along the Ohio River and subsequent litigation helped expose the health and environmental consequences of PFAS contamination.[23]

Likewise, Chemours' Chambers Works facility in Deepwater, New Jersey has long been associated with PFAS contamination and concerns affecting surrounding waterways and communities. State and federal regulators have spent years investigating and responding to contamination linked to industrial PFAS operations in the region.[24]

Together, these facilities represent decades of Chemours' PFAS production and pollution across multiple states and watersheds and harm to hundreds of thousands of people. The contamination Chemours has caused is not the result of an isolated incident, an accidental release, or a legacy problem that ended years ago. It is the result of persistent, knowing releases of toxic chemicals that remain in the environment (and in our bodies) and continue to affect communities long after they are released.

Despite the magnitude of this past and ongoing harm, this Administration would allow Chemours to resolve liability on terms that are neither fair nor adequate.

The magnitude of Chemours' contamination is precisely why the public deserves a settlement that delivers measurable environmental benefits and meaningful accountability. Any proposal that aims to resolve EPA's claims against Chemours must be evaluated against the backdrop of this extraordinary and long-running harm. By that measure, this proposal is woefully inadequate.

The Proposed Consent Decree is not fair, not reasonable, and not consistent with the law. EPA should not seek entry of the Proposed Decree unless it is substantially revised to require comprehensive, enforceable measures that address the full scope of Chemours' contamination, ensure effective remediation, and provide real protection for affected people. If EPA refuses to revise the Proposed Consent Decree, the reviewing court should reject the Proposed Decree.

---

[22] *See* Nathaniel Rich, *The Lawyer Who Became DuPont's Worst Nightmare*, N.Y. Times (Jan. 6, 2016), https://perma.cc/YS6D-L5SS (Attachment 21).

[23] *Id*.

[24] *See* Michael Sol Warren, *Landmark trial pits NJ against DuPont over 'forever chemical' pollution in South Jersey*, NJ Spotlight News (May 19, 2025), https://perma.cc/3BBJ-M29G (Attachment 22); U.S. Env't Prot. Agency, *Hazardous Waste Cleanup: Chemours Chambers Works in Deepwater, New Jersey*, Corrective Action Cleanups Around the Nation (Nov. 5, 2025), https://perma.cc/8485-PQWU (Attachment 23).

## II. The Proposed Consent Decree Is Not Fair, Not Reasonable, and Not Consistent with the Law.

The Fourth Circuit's standard for approving a consent decree is well settled. The proposed decree must be fair, adequate, and reasonable, and it must not be illegal, the product of collusion, or contrary to the public interest.[25] This Proposed Decree fails that standard.

### A. The Proposed Consent Decree Is Unfair: a Predetermined Outcome Designed to Shield Chemours from Accountability.

Although EPA characterizes it as "diligent prosecution,"[26] this settlement does not reflect meaningful federal enforcement.[27] Instead, it is a backroom deal[28] designed to shield Chemours from real accountability for years of unlawful PFAS contamination across three states.

Courts evaluating environmental consent decrees have emphasized that a consent decree must both be procedurally and substantively fair. Procedural fairness depends on the integrity of the negotiation process, including its candor, openness, and arm's-length negotiations, while substantive fairness requires that the proposed relief be likely to achieve effective remediation and advance the public interest.[29] The Proposed Decree fails on both fronts.

The process raises serious questions about whether the Proposed Consent Decree reflects independent enforcement judgment or simply accommodates Chemours' preferred approach. It also can hardly be described as open, when it completely excluded North Carolina—a critical party. As a result, skepticism is warranted for a proposed settlement that gives Chemours broad discretion over how, when, and where it will address its contamination, while offering affected communities only limited and uncertain relief.

---

[25] *United States v. North Carolina,* 180 F.3d 574, 581 (1999); *United States v. Arch Coal, Inc*., 829 F. Supp. 2d 408, 415 (S.D. Va. 2011) (quoting *North Carolina*, 180 F.3d at 581).

[26] *See generally* Notice of Lodging of Consent Decree, *United States and West Virginia Dep't of Env't Prot. v. Chemours Company*, No. 26-CV-00418 (S.D.W.Va. June 24, 2026) [hereinafter "Proposed Consent Decree" or "Proposed Decree"] at 2.

[27] *See Friends of Milwaukee's Rivers v. Milwaukee Metro. Sewerage Dist.,* 382 F.3d 743, 760 (7th Cir. 2004) ("[A] diligent prosecution analysis requires more than mere acceptance at face value of the potentially self-serving statements of a state agency and the violator with whom it settled regarding their intent with respect to the effect of the settlement. Our diligent prosecution analysis of [a settlement] will examine whether it is capable of requiring compliance with the [Clean Water] Act and is in good faith calculated to do so"); *Sierra Club v. Elk Run Coal Co.*, No. 2:10-00673, 2010 WL 4867909, at *10 (S.D.W.Va. Nov. 23, 2010) ("[A]n agency's own conclusion regarding the preclusive effect of its enforcement efforts should not be accepted at face value").

[28] NC Press Release, *supra* note 7.

[29] *United States v. Duke Energy Carolinas, LLC*, 499 F. Supp. 3d 213, 218–19 (M.D.N.C. 2020) (citing *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 86–88, 90 (1st Cir. 1990)).

**1. The Settlement Is Procedurally Unfair.**

The United States filed its Complaint and lodged the Proposed Consent Decree on the same day, leaving no opportunity for adversarial litigation to develop, for factual allegations to be tested, or for a court to assess the government's claims before the settlement terms were finalized.[30] This procedural posture is particularly concerning given the Administration's broader pattern of favoring deregulation and accommodating industry interests. This Administration has repeatedly taken actions favorable to regulated industry—including appointing Chemours and other industry executives to EPA's Science Advisory Board,[31] proposing to further narrow the scope of Clean Water Act jurisdiction,[32] withdrawing effluent limitation guidelines for PFAS,[33] proposing broad exceptions to PFAS reporting requirements under the Toxic Substances Control Act,[34] eliminating a PFAS-research-producing office of EPA,[35] and rolling back the much-needed federal drinking water standards for GenX and several other PFAS compounds.[36] Against this backdrop, the settlement appears less like the product of rigorous, independent bargaining and more like a predetermined outcome. Chemours' ongoing conduct heightens these concerns.

While negotiating this settlement, Chemours has continued to:

---

[30] *See United States and State of West Virginia v. The Chemours Company et al*., Civil Action No. 2:26-cv-00418 (S.D.W.Va. filed June 24, 2026), https://perma.cc/Q6KG-ZGMQ. The practice of filing an enforcement action coupled with a consent decree is not per se improper, but where the negotiations leading to the decree lack the protections of an adversary system, courts should employ a more searching review of a consent decree's fairness. *United States v. Telluride Co.*, 849 F. Supp. 1400, 1403-05 (D. Colo. 1994) (declining to approve a consent decree where the government filed the complaint and decree together, the record and adversarial process were limited, EPA relied heavily on the violator's expert to prepare remediation and mitigation work plans, and the presence of a single defendant provided far less justification for EPA to serve in an oversight role).

[31] Press Release, U.S. EPA, *Administrator Zeldin Announces Selection of Members to the Science Advisory Board* (Apr. 17, 2026), https://perma.cc/ZL3Z-63SL (Attachment 24) (naming two Chemours scientists to the Board, along with scientists from Dow Chemical and Exxon–Mobil).

[32] Updated Definition of "Waters of the United States," 90 Fed. Reg. 52498 (Nov. 20, 2025) (to be codified at 33 C.F.R. pt. 328 & 40 C.F.R. pt. 120) (proposing to remove protections from even more stream, wetlands, and other waterways than is required by *Sackett v. U.S. Environmental Protection Agency*, 598 U.S. 651 (2023), the United States Supreme Court precedent it purports to follow).

[33] Off. of Info. and Regul. Aff., *Conclusion of EO 12866 Regulatory Review*, REGINFO.GOV (Jan. 1, 2025), https://perma.cc/24K4-22Q9 (Attachment 25).

[34] Perfluoroalkyl and Polyfluoroalkyl Substances (PFAS) Data Reporting and Recordkeeping Under the Toxic Substances Control Act (TSCA); Revision to Regulation, 90 Fed. Reg. 50923 (Nov. 13, 2025) (to be codified at 40 C.F.R. pt. 705).

[35] Press Release: *U.S. EPA, EPA Announces Reduction in Force, Reorganization Efforts to Save Taxpayers Nearly Three-Quarters of a Billion Dollars* (Jul. 18, 2025), https://perma.cc/V99F-ZSZ9 (Attachment 26); U.S. Gov't Accountability Off., *Persistent Chemicals: Additional EPA Actions Could Help Public Water Systems Address PFAS in Drinking Water,* EPA-HQ-OW-2025-1742-0047 (2024), at 15, https://perma.cc/ZP9F-DLF5 (Attachment 27) (stating "EPA's Office of Research and Development provides technical assistance to Tribes, states, and territories to help characterize the PFAS found in their communities. In some cases, this work can include efforts to identify sources of PFAS detected in the environment.").

[36] Rescission of Regulatory Determinations and Removal of Related Provisions for Four PFAS Substances (PFHxS, PFNA, HFPO-DA (GenX), and the Mixture of These Three PFAS Plus PFBS), 91 Fed. Reg. 29413 (May 20, 2026) (to be codified at 40 C.F.R. pts. 141 & 142); Extending the Compliance Deadline for the PFOA and PFOS Maximum Contaminant Levels, 91 Fed. Reg. 29425 (May 20, 2026) (to be codified at 40 C.F.R. pt. 142).

- dispute that exposure to PFAS "may be linked to harmful health effects in humans,"[37]
- challenge the federal PFAS drinking water standards in court,[38]
- pursue a substantial expansion of its Fayetteville Works facility that would double its capacity at one of its largest PFAS sources[39] and likely increase emissions,[40]
- violate its 2019 NC Consent Order entered into with the State of North Carolina and Cape Fear River Watch,[41]
- fail to route major sources of PFAS air emissions to its thermal oxidizer—the treatment system the company built and promoted as virtually eliminating its PFAS air pollution,[42] and
- release extraordinarily high concentrations[43] of previously undisclosed ultra-short-chain PFAS[44] that are reaching drinking water supplies serving roughly half a million North Carolinians.

These concerns are further underscored by the Proposed Decree's drinking water provisions for West Virginia and New Jersey, which call into question whether the settlement reflects an independent enforcement determination.

The Proposed Decree's drinking water protections for GenX in West Virginia and New Jersey are triggered by the current federal drinking water standards for GenX (10 parts per

---

[37] Proposed Consent Decree, *supra* note 26, at 1.
[38] *The Chemours Company FC, LLC v. U.S. Environmental Protection Agency*, No. 24-1192 (D.C. Cir. Filed June 10, 2024), https://perma.cc/9ZUS-MYH2 (Attachment 28).
[39] Geosyntec Consultants for The Chemours Company, *Air Permit Application, Vinyl Ethers Expansion Chemours Fayetteville Works* at 7 (Aug. 14, 2025) [hereinafter "2025 Air Permit Application"], https://perma.cc/34MY-MUBN (Attachment 29) ("Chemours plans to install the necessary equipment to support a capacity increase of approximately 100% within the Vinyl Ethers North process area.").
[40] *See* Letter from Seth Bailey, Plant Manager, Chemours Company – Fayetteville Works to Mark J. Cuilla, Div. of Air Quality, re Responses to Additional Information Request at tbl. A2, A3 (Nov. 19, 2025) [hereinafter "2025 Letter from the Chemours Company"], https://perma.cc/3VXK-HUPC (Attachment 30) (showing potential emissions increases from the vinyl ethers expansion of over 3,000 pounds per year. The potential emission estimates in Chemours' 2024 application were even higher, and Chemours failed to explain why these emissions estimates inexplicably decreased from one application to the next).
[41] *See, e.g.*, Notice of Violation/Notice of Recommendation for Enforcement from Div. of Air Quality, N.C. Dep't of Env't Quality, to Dawn Hughes, Chemours Company – Fayetteville Works, Air Permit No. 03735T48 (Aug. 26, 2021), https://perma.cc/8833-B8GU (Attachment 31) ("Chemours' failure to reduce facility-wide annual emissions of GenX Compounds to less than 23.027 pounds per year constitutes an ongoing violation of [2019 NC Consent Order] Specific Limitation and Condition 2.2.D. 1" and "Chemours' failure to properly operate and maintain Carbon Adsorber ID No. NCD-Q3 constitutes violation of General Condition 3.F.").
[42] *See* Air Quality Permit No. 03735T48, at 16, 32, 35 (May 13, 2020), https://perma.cc/EYD2-EYWK (Attachment 32) (showing that the IXM resins fluorinator, the semi-works polymers unit, and the polymer processing aid are not routed to the thermal oxidizer under Chemours' current operations).
[43] Letter from Jean Zhuang & Hannah Nelson, Southern Environmental Law Center, to Sushma Masemore & Richard Rogers, N.C. Dep't Env't Quality (Oct. 24, 2025), https://perma.cc/KW3N-K2PK (Attachment 33) (summarizing North Carolina State University, Cape Fear River & Chemours Sampling Results (Oct. 7, 2025)).
[44] Letter from Dianne Fields, Chemours Fayetteville Works, to Sergei Chernikov, N.C. Dep't Env't Quality (Feb. 24, 2025) [hereinafter "Chemours TFA Letter"], https://perma.cc/Z9TB-UVRN (Attachment 34).

trillion)[45]—the very standard EPA is proposing to rescind and that Chemours is actively challenging in court. If EPA adopts a weaker standard, Chemours' obligations under the Proposed Decree could be significantly reduced.[46] Worse still, if the federal standards for both GenX and PFOA are invalidated, Chemours would no longer be required to maintain affected Public Water Systems' treatment systems to meet the current drinking water limits of 10 ppt for GenX and 4 ppt for PFOA. Instead, its obligation would fall back to a far weaker requirement tied only to 70 ppt of PFOA,[47] with no corresponding protection for GenX. [48] When both negotiating parties draft settlement terms with underpinnings they are each actively attempting to invalidate, it is difficult to view the Proposed Decree as the product of truly arm's-length negotiations focused on delivering accountability for affected communities.[49]

Equally concerning, North Carolina officials, affected communities, and public-interest organizations were excluded from the negotiation process and denied any meaningful opportunity to inform the settlement discussions.[50] Because the Proposed Consent Decree was negotiated behind closed doors and lodged simultaneously with the Complaint, state regulators, impacted residents, and other stakeholders similarly had no meaningful opportunity to intervene in the lawsuit, participate in establishing Chemours' violations, or otherwise advocate for court-ordered relief sufficient to address the harms caused by the company's misconduct. The absence of such participation is significant given the very limited relief afforded to North Carolina under the proposed settlement, the scope and duration of Chemours' violations, and the profound impacts those violations have imposed on North Carolina communities, drinking water resources, and the environment.

Because both the Proposed Consent Decree and the process that produced it lack the indicia of fairness, transparency, and arm's-length bargaining that courts require before approving a negotiated settlement,[51] the United States should not seek its entry in its current form. Before asking the Court to approve this Proposed Decree, the federal government should remedy these deficiencies by providing greater transparency, allowing meaningful input from

---

[45] Proposed Consent Decree, *supra* note 26, at App. E (Drinking Water Requirements) ¶ 1.g.
[46] *Id*.
[47] *Id.* ¶ 22.
[48] *Id*.
[49] *See United States v. Telluride Co.*, 849 F. Supp. 1400 (D. Colo. 1994) (citing *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 87 n.4 (1st Cir. 1990) ("To the extent that the process was fair and full of 'adversarial vigor,' . . . the results come before the court with a much greater assurance of substantive fairness."). *Cannons Eng'g Corp.* suggests an adversarial process where parties have distinct interests tends to support a finding of substantive fairness. *See* 899 F.2d at 84 ("Respect for the agency's role is heightened in a situation where the cards have been dealt face up and a crew of sophisticated players, with sharply conflicting interests, sit at the table . . . [to] hammer[] out an agreement at arm's length and advocate its embodiment in a judicial decree."). Here, however, the parties' interests align.
[50] NC Press Release, *supra* note 7.
[51] *See Cannons Eng'g Corp.*, 899 F.2d at 86 (procedural fairness examines the negotiation process for "candor, openness, and bargaining balance"); *see also United States v. Duke Energy Carolinas, LLC,* 499 F. Supp. 3d 213, 218 (M.D.N.C. 2020) (citing 899 F.2d at 86–88) (citing *Cannons Eng'g Corp.*, 899 F.2d at 86–88) (embracing the *Cannons Eng'g Corp.* test for procedural fairness).

North Carolina officials, and securing relief that fully reflects the scope of the harms Chemours has caused.

### 2. The Proposed Decree Fails to Provide Sufficient Transparency Regarding Chemours' Carbooxohalide Operations at Fayetteville Works.

The Proposed Consent Decree contains a series of highly unusual and restrictive provisions governing Chemours' manufacture and handling of "carbooxohalide" at Fayetteville Works.[52] Nonetheless neither the Proposed Decree nor the accompanying documents provides sufficient information for the public or a reviewing court to evaluate the significance of these provisions, the risks they are intended to address, or their implications for surrounding communities.

Notably, the Proposed Decree provides that Fayetteville Works is the only domestic Chemours facility permitted to manufacture, process, or use carbooxohalide.[53] The Proposed Decree further prohibits Chemours from distributing the substance to third parties for manufacturing or processing and prohibits Chemours from storing it onsite.[54] At the same time, the Proposed Decree mandates specialized safety training and personal protective equipment for employees and contractors who may handle carbooxohalide-containing materials.[55] In some circumstances, the Proposed Decree contemplates protective equipment consistent with the Occupational Safety and Health Administration's hazardous waste operations standard.[56]

These provisions strongly suggest that EPA and Chemours view carbooxohalide as a substance requiring extraordinary handling precautions. But the Proposed Decree provides virtually no explanation of the chemical, its properties, the quantities to be produced, the nature of the associated manufacturing processes, the potential for environmental releases, or the risks posed to workers and nearby communities.[57] Although in the Complaint, EPA states that Chemours produced 10,000 pounds of carbooxohalide at Fayetteville Works in 2015, 2016, and 2017,[58] neither the Complaint nor the Proposed Decree and its accompanying documents explain whether Chemours is continuing to produce carbooxohalide at Fayetteville Works, whether production is expected to increase in the future, or how the Proposed Decree's provisions relate to any planned facility expansion.

This lack of transparency is particularly worrisome given Fayetteville Works' history of PFAS contamination and the substantial public concern surrounding undisclosed or inadequately characterized chemical releases from the site. Communities that have borne the consequences of past contamination should not be asked to accept another set of potentially significant industrial

---

[52] *See* Proposed Consent Decree, *supra* note 26, at App. D ¶ 7.
[53] *Id*. ¶ 7(a).
[54] *Id*. ¶ 7(b), (f).
[55] *Id*. ¶ 7(e).
[56] *Id*. ¶ 7(e)(iii) (requiring personal protective equipment consistent with Hazardous waste operations and emergency response regulations where "the highest level of respiratory protection is necessary." 29 C.F.R. § 1910.120 app. B, ¶ II (2026)).
[57] *See* Compl. ¶¶ 42–45, 162–64, 209–10, 457–64; *see also* Proposed Consent Decree, *supra* note 26, at App. D.
[58] Compl. ¶ 210.

operations without access to basic information necessary to understand the risks and evaluate the adequacy of the proposed safeguards.

Accordingly, EPA should provide additional information regarding the nature of the carbooxohalide processes at Fayetteville Works, including the identity and characteristics of the substance, current and anticipated production activities, potential emissions pathways, and the basis for the Proposed Decree's unique operational restrictions and safety requirements. Until such information is made available, the public lacks a meaningful opportunity to evaluate whether this aspect of the settlement adequately protects public health and the environment.

### 3. The Proposed Civil Penalty Is Not Substantively Fair and Undermines Deterrence.

The Proposed Consent Decree imposes a $22.5 million civil penalty, payable to the United States and West Virginia,[59] over several years. That amount is not substantively fair nor adequate: it does not reflect the gravity, scope, or duration of Chemours' violations; it was reduced based on Chemours' questionable assertion that it cannot pay more; and it is too small to meaningfully deter future violations. It also fails to benefit either New Jersey or North Carolina despite the magnitude of harm Chemours caused to those states.

#### a. The Proposed Penalty Does Not Reflect the Gravity, Scope, or Duration of Chemours' Violations.

The proposed $22.5 million civil penalty to be paid to the United States and the State of West Virginia is not substantively fair because it does not account for the gravity, scope, or duration of Chemours' decades-long violations, nor does it adequately compensate the public. Courts in the Fourth Circuit require consent decrees to meaningfully protect the public and provide appropriate relief.[60] This one does not.

Here, Chemours' misconduct spans multiple facilities in three states, involves long-term releases of persistent and bioaccumulative PFAS chemicals, and has caused widespread drinking water contamination affecting large populations. Even if the penalty were to be divided equally among the three states, it would amount to only about $2 million per state per year for three years[61]—grossly disproportionate to the scale of the harm and the duration of Chemours' unlawful conduct.

This deficiency is especially evident in North Carolina, where Chemours' conduct has inflicted sweeping and continuing harm. Chemours secretly contaminated the air and drinking

---

[59] Proposed Consent Decree, *supra* note 26, at ¶¶ 8, 10, 12.

[60] *See Bragg v. Robertson*, 83 F. Supp. 2d 713, 717 (S.D.W.Va. 2000) ("A consent decree is also a continuing order, one having prospective effect."); *United States v. North Carolina*, 180 F.3d 574, 581 (4th Cir. 1999) (requiring a consent decree be in the public interest); *United States v. City of Welch, W. Va.*, No. 11-00647, 2012 WL 385489, at *3 (S.D.W.Va. Feb. 6, 2012) (finding a consent decree "fair and reasonable in light of . . . factors" such as "the seriousness of the violation or violations" and "the economic impact of the penalty to the violator" which "appropriately" penalize the City of Welch for Clean Water Act violations).

[61] NC Press Release, *supra* note 7.

water across southeastern North Carolina for over forty years. Even after enforcement actions by Cape Fear River Watch and the North Carolina Department of Environmental Quality produced a landmark settlement requiring Chemours to control and remediate its PFAS pollution, the company continued discharging PFAS through its outfalls, air emissions, and contaminated groundwater—breaching obligations and putting nearby and downstream communities at continued risk. Its air emissions contaminated private wells across ten counties,[62] while PFAS from outfalls, groundwater, and seeps still enter the Cape Fear River and downstream drinking water supplies.[63] Many private drinking well owners are not getting the relief they need due to Chemours' failure to adequately disclose the full extent of its PFAS pollution in reaching the 2019 NC Consent Order.[64] Moreover, downstream drinking water utilities were not part of the relief negotiated by the 2019 NC Consent Order. As a result, drinking water utilities in southeastern North Carolina have spent millions of dollars to protect the public from Chemours' PFAS. For example, the Cape Fear Public Utility Authority, which provides drinking water for hundreds of thousands of residents in the Wilmington area, has spent more than $92 million to remove Chemours' PFAS from the drinking water it provides.[65] And Brunswick County Public Utilities, which serves up to 350,000 people, expanded and upgraded its water treatment plant to treat for PFAS at a total project cost of $167 million.[66] In the face of Chemours' ongoing violations and widespread harm, as well as the costs borne by drinking water utilities and communities, the proposed penalty is not merely inadequate; it is indefensible.

**b. EPA Improperly Relied on Chemours' Claimed Inability to Pay to Justify an Inadequate Penalty.**

EPA expressly relied on Chemours' claimed financial constraints in proposing the penalty. Indeed, Chemours' purported "limited ability to pay" provided the rationale for EPA's decision not to seek "the total penalty the United States could seek for the violations alleged in this case."[67] That decision is unreasonable.

[62] First Quarter 2026 Progress Report, *supra* note 8; DEQ Expanded Well Testing Announcement*, supra* note 8.
[63] *See e.g.*, Caliber Insights NC Inc., *Cape Fear River PFAS Mass Loading Assessment – Fourth Quarter 2025, Chemours Fayetteville Works* tbls. A5, A6, A7 (March 2026), https://perma.cc/QB65-PLXR (Attachment 35); Caliber Insights NC Inc., *Cape Fear River PFAS Mass Loading Assessment – First Quarter 2026*, Chemours Fayetteville Works tbls. A5, A6, A7 (June 2026), https://perma.cc/E9T2-FXWA (Attachment 36); Chemours TFA Letter, *supra* note 44; Letter from Jean Zhuang & Hannah M. Nelson, *supra* note 43.
[64] *See supra* notes 20–21 and accompanying text.
[65] CFPUA Budget Presentation, Cape Fear Pub. Util. Auth. Bd. (May 13, 2026), https://perma.cc/HBD3-A2M8 (Attachment 37); *PFAS: The CFPUA Experience*, Cape Fear Pub. Util. Auth., 2, 7 10 (May 9, 2025), https://perma.cc/67PQ-T673 (Attachment 38); *PFPrA and Other UltraShort-Chain PFAS*, Cape Fear Pub. Util. Auth., https://perma.cc/P24W-WP95 (last visited July 27, 2026) (Attachment 39) (explaining that the utility needed to adjust the operations of its PFAS treatment system, adding "about another $1 million per year to operating costs").
[66] John Nichols, *Brunswick County, NC Utilities 36+ mgd Low Pressure Reverse Osmosis Solution to Contaminants of Environmental Concern in the Cape Fear River*, Brunswick Cnty. Pub. Utils. (2025), https://perma.cc/8XMD-L5QA (Attachment 40).
[67] Proposed Consent Decree, *supra* note 26, at ¶ 9(a).

First, Chemours is a multi-*billion*-dollar company, with approximately $5.8 billion in revenue in 2025,[68] making its claim of an inability to pay difficult to reconcile with its financial position. Chemours itself characterizes settlements not as extraordinary hardships, but as a foreseeable cost of doing business and part of its long-term strategy, and its earnings from Opteon™—a PFAS-based product line—alone was $313 million in just the first quarter of 2026.[69] Given the company's resources and settlement strategy, EPA has not provided sufficient justification for a reduced penalty based on Chemours' inability to pay. Instead, EPA lists 14 financial reports as the basis for EPA's ability-to-pay determinations, but copies of those documents were not made available to the public.[70] Chemours withheld the contents of those documents claiming them to be "confidential business information."[71] Without a greater explanation and support demonstrating Chemours' alleged financial hardship, EPA should not reduce the penalty on this basis.[72]

While a true inability to pay may be a consideration in setting a penalty for violations of the Clean Water Act and Toxic Substances Control Act, it cannot displace other statutory factors such as the seriousness and duration of the violations and the economic benefit derived by Chemours for its noncompliance.[73] The proposed penalty pales when compared to the harm Chemours has caused. To be adequate, the penalty must require the responsible party to bear the full cost of the harm they have caused and the remediation required—not a reduced amount based on claimed (but unsubstantiated) constraints.[74] By anchoring the penalty to Chemours' claimed financial limitations, the Proposed Decree improperly shifts the burden of unremedied harm onto the public and is inadequate.

---

[68] Press Release, The Chemours Company, *The Chemours Company Reports Fourth Quarter and Full Year 2025 Results* (Feb. 19, 2026), https://perma.cc/6VUG-GGSA (Attachment 41).
[69] Chemours, *Q1 2026 Earnings Presentation* (May 5, 2026), https://perma.cc/8UCH-V9XA (Attachment 42).
[70] Proposed Consent Decree, App. A (List of Financial Information Provided by Chemours) (Attachment 43).
[71] *Id*.
[72] *See, e.g.*, *United States v. Coeur d'Alenes Co.*, 767 F.3d 873, 875, 878 (9th Cir. 2014) (finding the government adequately considered the financial position of the company and its ability to pay, reaching its final amount "with the assistance of a financial analyst" who "reviewed numerous records in accordance with EPA procedures for determining ability to pay"); *United States v. IMC E. Corp.*, 627 F. Supp. 3d 166, 179 (E.D.N.Y. 2022) ("The United States and IMC entered this ability to pay settlement based on a review of IMC's financial, tax, and insurance records by a financial expert retained by the EPA. . . . Reliance on these types of records and an expert's interpretation thereof comports with the flexibility afforded to the government in crafting settlements with [potentially responsible parties] that will best serve the public interest.").
[73] *See* 33 U.S.C. § 1319(d); 15 U.S.C. § 2615(a)(2)(B).
[74] *See United States. v. Cannons Eng'g Corp.*, 899 F.2d 79, 87 (1st Cir. 1990) ("Substantive fairness introduces into the equation concepts of corrective justice and accountability: a party should bear the cost of the harm for which it is legally responsible. . . . The logic behind these concepts dictates that settlement terms must be based upon, and roughly correlated with, some acceptable measure of comparative fault.").

### c. The Inadequate Penalty Is Insufficient to Deter Future Violations.

Penalties under the Clean Water Act "should be large enough to deter noncompliance."[75] Here, the Proposed Consent Decree and its proposed penalty are insufficient to deter future misconduct by Chemours and similarly situated entities and is therefore unreasonable.

If the Proposed Decree is entered as proposed, it risks signaling to the regulated community that even large-scale, long-term PFAS releases—affecting hundreds of thousands of people, three states, and multiple rivers—may be resolved at relatively low cost. This weakens the deterrent function of enforcement under the Clean Water Act.[76] It also erodes public confidence that this Environmental *Protection* Agency is upholding its obligation to protect human health and the environment;[77] instead, it appears this Environmental *Protection* Agency is continuing to choose to protect polluters over people.

Because the proposed penalty neither reflects the seriousness of the violations nor ensures meaningful deterrence, it is insufficient. Based on the violations alleged in the Complaint, EPA could seek approximately $54 million in Clean Water Act penalties alone,[78] including at least $17 million attributable to violations in North Carolina, even before accounting for gravity-based adjustments or Chemours' economic benefit from noncompliance.[79] Given the duration and extent of Chemours' contamination, the risks imposed on downstream communities, and Chemours' substantial financial resources, a penalty approaching $100 million—or equivalent funding for cleanup and drinking water utilities, including in North Carolina—would more appropriately serve the Clean Water Act's goals of deterrence, accountability, and remediation. Only a substantially larger penalty will ensure that Chemours' continued noncompliance is not treated as a cost of doing business.

---

[75] U.S. Env't Prot. Agency, *Interim Clean Water Act Settlement Penalty Policy* 3 (1995), https://perma.cc/PD9C-GLPS (Attachment 44). *See United States v. Lexington-Fayette Urb. Cnty. Gov't*, 591 F.3d 484, 489–90 (6th Cir. 2010) (finding a Clean Water Act-related consent decree's civil penalty reasonable because it "will have a deterrent effect and will therefore prevent future violations"). The court looked to statute for guidance on assessing whether the civil penalty at issue was "too high," indicating "the seriousness of the violation or violations" and "the economic impact of the penalty on the violator" are factors that underscore the importance of civil penalties under the Clean Water Act. *See id.* at 488.

[76] *See Lexington-Fayette Urb. Cnty. Gov't*, 591 F.3d at 488–90 (underscoring the importance of deterrence and retribution under the Clean Water Act).

[77] U.S. Env't Prot. Agency, *Our Mission and What We Do*, https://perma.cc/7STE-AQAH (last updated Oct. 20, 2025) (Attachment 45). *See also, e.g.*, 42 U.S.C. § 6949a(a) (requiring EPA to evaluate whether certain guidelines and criteria are "adequate to protect human health and the environment from ground water contamination" under the Resource Conservation and Recovery Act); 33 U.S.C. § 1251(a) (stating it is the purpose of the Clean Water Act "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters").

[78] Complaint, App. B & Tbl. 1 (calculated by multiplying the number of alleged Clean Water Act violations at all three facilities by the maximum statutory penalty ($68,445), except five violations in Table 5 occurring before November 2, 2015, which were multiplied by the maximum statutory penalty for violations before that date ($37,500)).

[79] *Id.* (calculated by multiplying the number of alleged Clean Water Act violations at Fayetteville Works Facility—245 from 6/14/2017 through 4/8/2019—by the maximum statutory penalty ($68,445)).

**B. The Proposed Decree Is Not Reasonable Because It Fails to Address the Full Scope of Harm and Relies on Vague, Non-Binding Mitigation Plans.**

Courts evaluating environmental consent decrees have emphasized that the proposed relief must be reasonable, meaning it is likely to achieve effective remediation and advance the public interest.[80] In the context of the Clean Water Act, "where the government is entrusted to act on behalf of its citizens, the question becomes whether the Agreement that the government struck for those citizens is fair to those citizens."[81]

As explained below, the Proposed Decree is inadequate because it largely focuses narrowly on GenX and PFOA,[82] leaves hundreds of PFAS unaddressed, lacks enforceable outcomes, fails to meaningfully reduce harm to North Carolina communities, allows a 15-year compliance timeline, and relies on Chemours to self-report compliance and select remedial actions despite its history of noncompliance and nondisclosure.

**1. The Proposed Decree Does Not Meaningfully Address the Full Scope of Ongoing Harm to North Carolina Communities.**

A consent decree must address the nature and extent of the hazards at issue and provide a remedy reasonably commensurate with those risks. A settlement is not reasonable if it leaves substantial sources of pollution, significant exposure pathways, or ongoing environmental harms largely unaddressed.[83] Although EPA characterizes the settlement as a significant response to Chemours' PFAS pollution, the Proposed Decree touches on only a limited subset of Fayetteville Works' PFAS releases and leaves many of its most significant sources of ongoing contamination and exposure untouched.

---

[80] *See United States v. Cannons Engineering Corp.*, 899 F.2d 79, 86–90 (describing the reasonableness of a consent decree as basically "a question of technical adequacy, primarily concerned with the probable effectiveness of proposed remedial responses"); *United States v. Telluride*, 849 F. Supp. 1400, 1402 (D. Colo. 1994) (emphasizing how evaluating the reasonableness of a consent decree is a "'multifaceted exercise'" requiring consideration of multiple factors, including "whether the decree is technically adequate" for cleaning the environment, whether it will sufficiently compensate the public for remediation costs, and whether it represents the relative strength or weakness of the case against the polluter).

[81] *United States v. District of Columbia*, 933 F. Supp. 42, 49 (D.D.C. 1996).

[82] The proposed decree also includes insubstantial procedural requirements for HFPO and carbooxohalides, which leaves far too much discretion in the hands of Chemours.

[83] *See United States v. District of Columbia*, 933 F. Supp at 50 (reasonableness of a consent decree requires a court to determine "whether the decree is technically adequate to accomplish the goal of cleaning the environment"); *Telluride Co.*, 849 F. Supp. at 1402 (emphasizing a consent decree must be "technically adequate" to clean the environment); *Cannons Eng'g Corp.*, 899 F.2d at 89–90 (evaluating whether the proposed remedy effectively addresses the underlying environmental problem).

### a. The Proposed Decree Is Not Reasonable or Protective of Human Health Because It Focuses Narrowly on GenX and PFOA While Leaving Numerous Other PFAS Compounds Unaddressed.

The Proposed Decree fails to address all but a few of the PFAS chemicals that Chemours releases, despite Chemours' long history of releasing *hundreds* of PFAS chemicals from its Fayetteville Works facility in southeastern North Carolina.[84] Among others, Chemours uses, processes, and/or releases the following PFAS compounds:

- hexafluoropropylene oxide dimer acid ("HFPO-DA" or "GenX"),
- perfluoro-2-methoxyacetic acid ("PFMOAA"),
- perfluoro-3-methoxypropanoic acid ("PMPA"),
- perfluoro-2-methoxypropanoic acid ("PFMOPrA"),
- perfluoro-2-ethoxyhexanoic acid ("PFO2HxA"),
- perfluoroethoxypropanoic acid ("PEPA"),
- perfluoro-4-methoxybutanoic acid ("PFMOBA"),
- perfluoro-3-oxahexanoic acid ("PFO3OA"),
- perfluoro-4,8-dioxa-nonanoic acid ("PFO4DA"),
- perfluoro(2-ethoxyethane)sulfonic acid byproduct 1 ("PFESA-BP1" or "Nafion Byproduct 1"),
- perfluoro(2-ethoxyethane)sulfonic acid byproduct 2 ("PFESA-BP2" or "Nafion Byproduct 2"),
- perfluoroether carboxylic acid G ("PFECA-G"),
- tetrafluoro(alkoxy) fluorinated compound 4 ("TAFN4" or "PFO5DA"),
- perfluoroheptanoic acid ("PFHpA"),
- Peflouropropanoic acid ("PFPrA"),
- Pefluoro-3,6-dioxaheptanoic acid ("PFECA B"),
- 2,2,3,3-Tetrafluoro-3-[1,1,1,2,3,3-hexafluoro-3-(1,2,2,2-tetrafluoroethoxy)propan -2-yl]oxypropanoic acid ("Eve Acid"),
- 2,2,3,3-Tetrafluoro-3-((1,1,1,2,3,3-hexafluoro-3-(1,2,2,2-tetrafluoroethoxy)propan-2-yl)oxy)propanoic acid ("Hydro-Eve Acid"),
- Pentanoic acid, 2,2,3,3,4,5,5,5-octafluoro-4-(1,1,2,2-tetrafluoro 2-sulfoethoxy) ("R-PSDA"),
- Ethanesulfonic acid, 1,1,2,2-tetrafluoro-2-[1,2,2,3,3-pentafluoro 1-(trifluoromethyl)propoxy] ("R-PSDCA"),
- Acetic acid, 2-fluoro-2-[1,1,2,3,3,3-hexafluoro-2-(1,1,2,2 tetrafluoro-2-sulfoethoxy)propoxy] ("Hydrolyzed PSDA"),
- 1,1,2,2,4,5,5,5-heptafluoro-3-oxapentanesulfonic acid; or 2 (1,2,2,2-ethoxy)tetrafluoroethanesulfonic acid; or 1-(1,1,2,2 tetrafluoro-2-sulfoethoxy)-1,2,2,2-tetafluoroethane ("NVHOS"),

[84] PFAS Analysis and Methods Interim Report #10, *supra* note 6 (discussing that Chemours' facility is a source of 255 potential unique unknown PFAS).

- Perfluoro-2-ethoxyethanesulfonic acid ("PES"),
- Perfluoro-3,6-dioxa-4-methyl-7-octene-1-sulfonic acid ("PS Acid"),
- 5-(1,2,2,2-Tetrafluoro)ethoxy-perfluoro-3-oxa-4-methylpentanesulfonic acid ("Hydro-PS Acid"),
- Perfluoroethyl vinyl ether ("PEVE"),[85]
- Tetrafluoroethylene ("TFE"),
- Hexafluoropropylene ("HFP"),
- Perfluoromethyl vinyl ether ("PMVE"),
- Bis(2-methoxytetrafluoroethyl)ketone ("BMTK"),
- Perfluoro-2-(2-Fluorosulfonylethoxy) Propyl Vinyl Ether ("PSEPVE"),
- Perfluoropropyl vinyl ether ("PPVE"),
- Perfluoroethoxypropionyl Fluoride ("PEPF"),
- HFPO Dimer Acid Fluoride ("DAF"),
- Telomeric acid fluorides (n=1),
- Telomeric acid fluorides (n=2),
- Telomeric acid fluorides (n=3),
- Telomeric fluoroformate ("TFF (COF2)6"),
- 2,3,3,3-tetrafluoro-2-[1,1,2,3,3,3-hexafluoro-2-(trifluoromethoxy)propoxy]-propanoyl fluoride ("MD"),
- HFPO Trimer,
- Perfluoromethoxypropionyl Fluoride ("PMPF"),
- SR Resin,
- Trifluoromethyl carbonofluoridate ("TAF"),
- 2H-Perfluoro-5-methyl-3,6-dioxanonane ("E2"),
- Propane, 1,1,2,2,3,3-Heptafluoro-3-(1,2,2,2-Tetrafluoroethoxy)- ("E1"),
- 2H-Perfluoro-5,8-dimethyl-3,6,9-trioxadodecane ("E3"),
- Perflorooctanoic Acid ("PFOA"),
- Methyl perfluoro-6-methyl-4,7-dioxanon-8 eneoate ("IsoPSEPVE"),
- Carbonyl Fluoride ("COF2"),
- Perfluoroacetyl Fluoride ("PAF"),
- 2,3,3,3-Tetrafluoro-2-(pentafluoroethoxy)propanoyl fluoride ("HydroPEVE"),
- Perfluoro-2-butene ("C4"),
- Perfluoropentene ("C5"),
- Perfluoromethylcyclopropane ("PMCP"),
- Methyl Trifluorovinyl ether ("MTVE"),
- n1 Adduct - Propanoyl fluoride, 2-[2-(difluoro9trifluormethoxy)methoxy]-1,1,2,2-tetrafluoroethoxy]-2,3,3,3-tetrafluoro,

---

[85] *See* N.C. Dep't of Env't. Quality, *Emissions Inventory Table, Chemours Company – Fayetteville Works Fluorinated Compounds in Emissions Inventory 2017-2022* at 2, [hereinafter "Emissions Inventory Table 2017-2022"], https://perma.cc/4HUE-P8Z6 (Attachment 46); 2025 Air Permit Application, *supra* note 39, at App. C.

- 1VE - 1-[2-[difluoro(trifluoromthoxy)methoxy]-1,1,2,2,-tetrafluroethoxy]trifluoroethane,
- Monoadduct (“MA”),
- Diadduct (“DA”),
- Perfluoropropionyl fluoride (“PPF”),
- 1-methoxy-1,1,2,2-tetrafluoroethane (“MTFE”),
- Hexafluoropropylene oxide (“HFPO”),
- 2,3,3,3-Tetrafluoro-2-[1,1,2,3,3,3-hexafluoro-2-[1,1,2,3,3,3-hexafluoro- 2-[1,1,2,2-tetrafluoro-2-(fluorosulfonyl)ethoxy]propoxy]propoxy] (“TA”)
- FRD-901,
- Peroxide, bis[2,3,3,3-tetrafluoro-2-(heptafluoropropoxyl)-1-oxopropyl] (“Initiator”),
- FRD-902 (ammonium salt),
- Propanoic acid, 3-[1-[difluoro [ (trifluoroethenyl oxy] methyl]-1,2,2,2-tetrafluoroethoxy] -2,2,3,3-tetrafluoro-, methyl ester (“EVE”),
- 2,2-Difluoro-2-(fluorosulfonyl) acetyl fluoride (“RSU”),
- Hexafluoroacetone,
- Methyl perfluoro (11-(fluoroformyl)-5,8-dimethyl-4,7,10-trioxadodecanoate) (“TAE”),
- Methyl 2,2,3-trifluoro-3-oxopropanoate (“MMF”),
- Methyl perfluoro (5-(fluoroformyl)-4-oxahexanoate) (“MAE”),
- Methyl perfloro (8-(fluoroformyl)-5-methyl-4,7-dioxanonanoate) (“DAE”),
- 3,3,4,4-tetrafluoro-1,2-oxathietane 2,2-dioxide (“SU”),
- Methyl perfluoro-6-methyl-4,7-dioxanon-8 eneoate (“IsoEVE”),
- Trifluoromethane (“fluoroform” or “HFC-23”),
- Tetrafluoro-2-[trifluoro-2-(1,2,2,2-tetra-fluoroethoxy)-1-(trifluoromethyl) ethoxy]-ethane sulfonyl fluoride (“HydroPSEPVE”),
- Methyl-3-methoxy-tetrafluoropropionate (“MTP”),
- Carbon Tetrafluoride (“CF4”),
- Trichloro-1,2,2-trifluoro- 1,1,2-ethane (“F113”),
- 3-[1-[difluoro(1,2,2,2-tetrafluoroethoxy)methyl]-1,2,2,2- tetrafluoroethoxy]-2,2,3,3-tetrafluoro-, methyl ester propanoic acid (“HydroEVE”), and
- 3-methoxy-tetrafluoropropionic acid (“MTP Acid”).[86]

[86] Caliber Insights NC Inc., *Cape Fear River Mass Loading Assessment – Fourth Quarter 2025*, Table 1 (2026), *supra* note 63 (summarizing the surface water and groundwater sampling conducted to estimate the PFAS loadings from Fayetteville Works to the Cape Fear River); Emissions Inventory Table 2017-2022, *supra* note 85; 2025 Air Permit Application, *supra* note 39, at Appendix C.

Despite the extraordinary breadth of contamination associated with Chemours' facilities, the Proposed Consent Decree largely confines its remedial measures to only two PFAS compounds: GenX and perfluorooctanoic acid ("PFOA").[87]

For North Carolina, the Proposed Consent Decree's narrow focus is particularly troubling because Chemours continues to release substantial quantities of numerous previously undisclosed PFAS and related compounds into the Cape Fear River through wastewater discharges, groundwater migration, seeps, and stormwater pathways from Fayetteville Works.[88] For example, the Complaint documents 245 unlawful discharges of different PFAS from the Fayetteville Works facility, including PFPeA, PFHxA, PFHxS, PFBA, and PFOS.[89] Despite EPA's recognition that Chemours will continue to discharge these PFAS from its Fayetteville Works outfalls,[90] EPA does not require the cessation of these violations or otherwise address them in the Proposed Consent Decree.

This narrow approach is inconsistent with the scientific consensus that PFAS are a class of chemicals whose risks cannot be adequately addressed one compound at a time.[91] The health and environmental harms associated with PFAS exposure—including impacts on the liver, thyroid, immune system, developmental health, reproductive health, and cancer risk—are not limited to GenX and PFOA.[92] By restricting the Proposed Decree's already limited remedial

---

[87] At Fayetteville Works, EPA includes procedural rather than substantive requirements related to HFPO, a precursor PFAS chemical used to synthesize GenX and other PFAS. Proposed Consent Decree, *supra* note 26, at Appx. C. These procedural requirements lack any assurance that Chemours will reduce the nearly 2,000 pounds of HFPO that Chemours has already admitted to releasing each year. Emissions Inventory Table 2017-2022, *supra* note 85 (HFPO is listed under CAS No. 428-59-1). The same insufficient approach is taken for several carbooxohalides, also PFAS precursors. Proposed Consent Order, *supra* note 26, at Appx. D. At Chemours' New Jersey facility, the proposed Decree also addresses PFNA in the drinking water requirements for the facility. Proposed Consent Order, *supra* note 26, at Appx. E, ¶ 14(c).
[88] *See* Letter from Jean Zhuang & Hannah M. Nelson, *supra* note 43.
[89] Compl. ¶¶ 356–361 & Appx B, Tbl 1.
[90] Compl. ¶ 362.
[91] *See* Carol F. Kwiatkowski et al., *Scientific Basis for Managing PFAS as a Chemical Class*, 7 Env't Sci. & Tech. Letters 532, 532 (2020), https://perma.cc/4T87-Y2XA (Attachment 47).
[92] For example, PFPeA has been linked to gestational diabetes, disruption of thyroid hormone levels in newborn girls, and a decline in semen motility. Xin Liu et al., *Structure-Based Investigation on the Association Between Perfluoroalkyl Acids Exposure and Both Gestational Diabetes Mellitus and Glucose Homeostasis in Pregnant Women*, 127 Env't Int'l 85, 85–93 (2019), https://perma.cc/V86G-BP4R (Attachment 48); Surabhi Shah-Kulkarni et al., *Prenatal Exposure to Perfluorinated Compounds Affects Thyroid Hormone Levels in Newborn Girls*, 94 Env't Int'l 607, 607–13 (2016), https://perma.cc/3JGM-5MPA (Attachment 49); Xiaofei Song et al., *Biomonitoring PFAAs in Blood and Semen Samples: Investigation of a Potential Link Between PFAAs Exposure and Semen Mobility in China*, 113 Env't Int'l 50, 50–54 (2018), https://perma.cc/QP45-5JDW (Attachment 50). And EPA has determined that exposure to PFHxA "likely causes" liver, fetal development, and thyroid effects, as well as decreased red blood cell counts. U.S. Env't Prot. Agency, *IRIS Toxicological Review of Perfluorohexanoic Acid [PFHxA, CASRN 307-24-4] and Related Salts* xiv (2023), https://perma.cc/A3N2-78CN (Attachment 51). For PFHxS, EPA concluded that exposure likely causes thyroid and developmental immune effects. U.S. Env't Prot. Agency, *IRIS Toxicological Review of Perfluorohexanesulfonic Acid (PFHxS, CASRM 335-46-4) and Related Salts* xvi (2025), https://perma.cc/5Q87-CYEK (Attachment 52). EPA also assessed that developmental, thyroid, and liver effects are likely caused by exposure to PFBA in utero or during adulthood. U.S. Env't Prot. Agency, *IRIS Toxicological Review of Perfluorobutanoic Acid (PFBA, CASRN 375-22-4) and Related Salts* xii (2022),

measures to those two compounds, EPA and Chemours ignore the hundreds of other PFAS known or suspected to be present in Chemours' waste streams and environmental releases. The result is a settlement that fails to address the full scope of contamination and leaves affected communities vulnerable to ongoing exposures from a broad range of toxic PFAS compounds.

Accordingly, the Proposed Consent Decree is neither reasonable nor sufficiently protective of human health and the environment. A settlement that addresses only GenX and PFOA (ineffectively) while allowing releases of numerous other PFAS compounds to continue unabated cannot be expected to provide meaningful remediation, protect downstream drinking water supplies, or adequately remedy the harms caused by Chemours' continuing pattern of PFAS contamination. The Proposed Decree must not be entered in its current form.

**b. The Proposed Consent Decree Largely Ignores Chemours' Current Use of Ultra-Short-Chain PFAS.**

Ultra-short-chain PFAS such as trifluoroacetic acid (TFA) are increasingly recognized for their persistence, mobility, and potential environmental impacts. Chemours has increasingly relied on such replacement PFAS that may evade existing monitoring and control technologies.[93] Still the Proposed Decree imposes no comprehensive requirements to monitor, control, or mitigate these compounds. As a result, it leaves a significant regulatory gap that could allow contamination to continue even if emissions of certain legacy PFAS decline.

**c. The Proposed Consent Decree Does Not Require Meaningful Reductions in Ongoing PFAS Emissions.**

The Proposed Decree's headline 99.5% GenX emissions reduction requirement[94] is largely illusory. EPA's 2009 Order issued to Chemours under the Toxic Substances Control Act already required a 99% reduction—including a 99% reduction in all fugitive emissions, which is abandoned in the Proposed Decree.[95] And the 2019 North Carolina Consent Order had already

---

https://perma.cc/EZB7-8XF6 (Attachment 53). The International Agency for Research on Cancer determined that PFOS is possibly carcinogenic to humans. IARC Monographs, *Carcinogenicity of Perfluorooctanoic Acid (PFOA) and Perfluorooctanesulfonic Acid (PFOS)*, Int'l Agency for Rsch. on Cancer (Dec. 1, 2023), https://perma.cc/5YL4-BS2D (Attachment 54). More details on the health effects of these and other PFAS compounds are summarized in the prior Administration's PFAS drinking water standards rulemaking. PFAS National Primary Drinking Water Regulation, 89 Fed. Reg. 32532, 32536- 32537 (April 26, 2024).

[93] Chemours Netherlands B.V., *Request for Discharge Requirements for TFA, DFA, PFPrA, TFPrA, HFPO-DA, 6:2 FTS, and Other PFAS* 6, 22–27 (2025), [https://perma.cc/3LYH-YXL7] (Attachment 55); Uthradevi Kannan et al., *Short-Chain PFAS: A Global Challenge - Environmental Fate, Health Risks, and Promising Removal Technologies*, Results in Chemistry, 2026, at 1, 2, 13 tbl.5, (Attachment 56) ("[M]ost available PFAS treatment methods, including activated carbon, ion exchange resins, membrane filtration, advanced oxidation, and thermal destruction, were primarily developed for long-chain PFAS. Their effectiveness against short-chain PFAS is restricted due to smaller molecular size and reduced sorption affinity of these substances.").

[94] Proposed Consent Decree, *supra* note 26, at App. B, ¶ 13 (requiring Chemours to reduce its GenX emissions by 99.5% from inlet to discharges).

[95] Env't Prot. Agency Off. of Chemical Safety and Pollution Prevention, DuPont, TSCA Premanufacture Notice Consent Order at 36 (2009) [hereinafter "2009 Toxic Substances Control Act Order"], https://perma.cc/G8DV-XUJF (Attachment 57); Proposed Consent Decree, *supra* note 26, at App. B, ¶ 15.

pushed GenX emissions below the Proposed Decree's threshold. The Proposed Decree does nothing to close the gap on the remaining GenX emissions Chemours continues to release.[96] It also ignores the approximately 20,000 pounds of other PFAS emitted annually from the Fayetteville Works facility,[97] overstating the Proposed Decree's environmental benefits while leaving overall PFAS emissions essentially unchanged.

**d. The Proposed Consent Decree Fails to Resolve Concerns About Chemours' Emissions-Control Systems.**

In its Complaint, EPA alleges that Chemours has a history of underreported GenX releases from the Fayetteville Works facility and the agency has repeatedly raised questions about the effectiveness of the company's control measures.[98] However, the Proposed Decree does not require comprehensive routing of all emission sources, establish performance standards sufficient to ensure PFAS destruction, or address concerns regarding thermal oxidation as a long-term control strategy. Consequently, significant uncertainty remains regarding both the magnitude of remaining emissions and the effectiveness of the proposed controls.

With these and other shortcomings, the Proposed Decree addresses only a fraction of the harm caused by Chemours at Fayetteville Works while allowing substantial risks to persist. That disconnect between the scope of the pollution and the scope of the remedy renders the settlement unreasonable and contrary to the public interest.[99]

---

[96] Continuous Compliance Report from Heather Carter, Fayetteville Regional Supervisor, Div. Air Quality, to Chemours Company – Fayetteville Works, https://perma.cc/5YBV-JPSR (Attachment 58).

[97] *See* Emissions Inventory Table 2017-2022, *supra* note 85 (total PFAS emissions reported in 2022 add to 20,504 pounds, for example).

[98] Compl. ¶¶ 124-126, 131-138; *see also* Env't Prot. Agency, Interim Guidance on the Destruction and Disposal of Perfluoroalkyl and Polyfluoroalkyl Substances and Materials Containing Perfluoroalkyl and Polyfluoroalkyl Substances 52 (2024), https://perma.cc/65BZ-DT24 (Attachment 59). After investigating Chemours' thermal oxidizer, EPA determined that it is unclear to what extent the company is removing or destroying its PFAS air emissions, and that it is possible for there to be "products of incomplete combustion." As EPA recognized in its guidance on the destruction of PFAS, studies show that strict conditions are required for optimal PFAS destruction. Using a residence time of greater than two seconds, thermal destruction of PFAS is less effective at temperatures below 1,000 to 1,100 degrees Celsius. At lower temperatures (and possibly shorter residence times), products of incomplete combustion are more likely to be present because complete mineralization of the PFAS molecule has not occurred. But EPA determined that Chemours' thermal oxidizer does not meet these conditions. *Id.*

[99] *See United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 89–90 (1st Cir. 1990) (requiring a consent decree be effective at remedying harm to be reasonable); *United States. v. District of Columbia*, 933 F. Supp. 42, 50 (D.D.C. 1996) (reasonableness of a consent decree requires a court to determine "whether the decree is technically adequate to accomplish the goal of cleaning the environment); *United States v. Telluride Co.*, 849 F. Supp. 1400, 1402 (D. Colo. 1994) (requiring the decree be technically adequate and be in the public interest).

### 2. For North Carolina, the Settlement Rests on Unenforceable Plans Rather Than Binding Outcomes and Offers No Assurance of Meaningful Relief.

A consent decree must impose definite, enforceable obligations that will actually remedy the violations at issue.[100] It must also be "reasonable" in light of the extent of the harm and the technical adequacy of the remedy.[101]

The Proposed Consent Decree fails these standards. It offers little assurance that PFAS contamination or exposure will meaningfully decline in the North Carolina communities harmed by Chemours' conduct. Much of the Proposed Decree either repackages existing obligations or lets Chemours satisfy new ones through future proposals and discretionary agency approvals, rather than binding commitments. Although Chemours may spend up to $90 million on mitigation projects, the Proposed Decree requires no defined, enforceable measures tied to specific contamination areas, environmental outcomes, or exposure reductions.

Four defects are especially significant.

- **The Proposed Decree fails to identify which projects will be implemented or what they will achieve.** Unlike the relief required for West Virginia and New Jersey, the North Carolina provisions do not mandate treatment systems, alternative drinking water supplies, installation and maintenance of treatment at private or public drinking water utilities, or any other specific remedial measures. Instead, any contemplated mitigation remains wholly undefined and depends on later plans and discretionary approvals rather than enforceable outcomes.

- **The Proposed Decree substitutes future discretion for present obligations.** The Proposed Decree sets no mandatory, outcome-based criteria for evaluating or approving mitigation projects. Nor does it require that any mitigation project results in measurable reductions in PFAS concentrations, exposure pathways, or public-health risks. Compliance with the Proposed Decree therefore turns on future agency discretion rather

[100] *United States v. Lexington-Fayette Urb. Cnty. Gov't*, 591 F.3d 484, 489 (6th Cir. 2010) (reasonableness requires assurance that the decree will be "an effective vehicle for cleansing the environment"); *United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409, 1437 (6th Cir. 1991) ("The most important of these 'reasonableness' factors [is] the decree's likely effectiveness as a vehicle for cleansing the . . . [s]ite"); *see also Chavez-DeRemer v. Azteca Restaurante Mexicano, Inc.*, No. 25-CV-1463, 2025 WL 2521146, at *4 (N.D. Ohio Sep. 2, 2025) (noting that in assessing the reasonableness of a proposed consent decree "courts generally consider the harm caused by the defendants' conduct" and whether the decree adequately remedies that harm).

[101] *See United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 89–90 (1st Cir. 1990) ("[T]he reasonableness of [a] consent decree . . . [is] basically a question of technical adequacy, primarily concerned with the probable effectiveness of proposed remedial responses."); *United States v. District of Columbia*, 933 F. Supp. 42, 50 (D.D.C. 1996) (determining the reasonableness of a consent decree requires a court to decide "whether the decree is technically adequate to accomplish the goal of cleaning the environment"); *United States v. Telluride Co.*, 849 F. Supp. 1400, 1402 (D. Colo. 1994) (requiring the same determination of "whether the decree is technically adequate"); *United States v. BP Expl. & Oil Co.*, 167 F. Supp. 2d 1045, 1053 (N.D. Ind. 2001) ("In evaluating the reasonableness of the consent decree, this Court considers . . . whether the decree is technically adequate to accomplish the goal of cleaning the environment.").

than judicially enforceable duties, providing little assurance that meaningful remediation will occur.[102]

- **The Proposed Decree repackages past failures as present relief.** Many requirements—including its requirement that Chemours reduce its GenX emissions by 99.5%—largely restate duties imposed by the 2009 Toxic Substances Control Act Order,[103] which EPA failed to enforce. Repeating previously ignored obligations does not create a concrete, reliable remedy.

- **The Proposed Decree gives Chemours credit for spending that may add no environmental value.** Chemours may count, dollar for dollar towards its $90 million cap on spending for mitigation projects, the cost for work required by New Jersey, North Carolina, or West Virginia to reduce existing PFAS emissions or discharges.[104] That credit risks rewarding actions Chemours must take anyway, weakening both the settlement's remedial value and its deterrent force.

Courts require consent decrees to deliver enforceable results, not aspirational commitments or promises to consider action at a later date.[105] Yet the Proposed Decree offers little more than that.

By leaving critical remedial measures to future discretion and failing to establish clear, enforceable benchmarks for success, the Proposed Decree provides no reliable basis for concluding that environmental harm will be meaningfully reduced.[106] A settlement cannot be deemed reasonable when its most important remedial provisions remain unresolved. Neither the Court nor the public can evaluate the adequacy of a remedy that has yet to be defined. This Proposed Decree substitutes future process for present commitments and offers hope of compliance where enforceable obligations are needed.

The Proposed Decree's Engineering Evaluation requirements illustrate the problem. Although the Proposed Decree requires Chemours to document plans for controls at Fayetteville Works to reduce potential HFPO and carbooxohalide releases, it imposes no specific projects or reduction targets. Instead, Chemours selects the engineer who evaluates the facility, Chemours proposes solutions, and Chemours reports its own compliance to EPA.[107] That structure lets

---

[102] *See Telluride Co.*, 849 F.Supp. at 1406 (declining to approve a Clean Water Act consent decree where EPA negotiated with just one defendant, simply reacted to proposals by defendant's experts, and relied on that single defendant to develop a remedial cleanup plan).
[103] 2009 Toxic Substances Control Act Order, *supra* note 95, at 36.
[104] Proposed Consent Decree, *supra* note 26, at ¶ 24(l).
[105] *See United States v. New York City Hous. Auth.*, 347 F. Supp. 3d 182, 188 (S.D.N.Y. 2018) (finding a proposed decree inadequate where it did "not offer any specificity as to [a party's] required or enjoined conduct" and instead "contemplate[d] the future elaboration of the terms of the injunction through the development of performance requirements and plans").
[106] *See* United States v. *Cannons Engineering Corp.*, 899 F.2d 79, 89–90 (reasonableness turns on the efficacy of the proposed remedy); *New York City Hous. Auth,* 347 F. Supp. 3d at 188 (noting one of the "fatal procedural flaws" of the proposed consent decree was its "formless injunctive relief and enforcement mechanisms").
[107] Proposed Consent Decree, *supra* note 26, at App. C, ¶ 13; Appx. D, ¶ 21.

Chemours to identify its own deficiencies, choose its own remedies, and certify its own performance—an especially weak safeguard given the company's long history of compliance failures and inaccurate or incomplete reporting. Notably, Chemours failed for years to disclose the presence and manufacture of carbooxohalide at Fayetteville Works, a fact that came to light only after EPA conducted a site visit. In effect, the Proposed Decree substitutes Chemours' own process for enforceable obligations, leaving the public with promises of future evaluation rather than binding requirements to stop ongoing PFAS releases.

The Proposed Decree also lacks an independent verification mechanism for the Engineering Evaluation requirement. While Chemours must submit plans and reports to EPA, there is no clear requirement for EPA to independently inspect, verify, or validate implementation before deeming compliance achieved. Even if it did, there is little reason for confidence in the agency: its 2009 Toxic Substances Control Act Consent Order required 99% treatment efficiency for GenX-related discharges at Fayetteville Works, yet EPA did not inspect compliance *until 2017*,[108] only after significant press coverage and public outrage. Without enforceable verification, neither the Court nor affected communities can know whether the Engineering Evaluation will produce relief or merely another languishing planning process.

Finally, the Proposed Decree allows Chemours and EPA to select projects without any requirement for meaningful participation by the communities most directly affected by Chemours' contamination.[109] Residents whose drinking water supplies, private wells, surface waters, fisheries, and property have been tainted are afforded no role in identifying priorities or evaluating proposed projects. Nor does the Proposed Decree require that mitigation project funds be directed to any particular community. A settlement like this that lacks both community input and geographic nexus risks directing resources away from those who have borne the greatest burden of Chemours' contamination.

Far from ensuring meaningful relief for North Carolina communities, the Proposed Consent Decree risks that Chemours will secure liability relief for the violations documented in the Complaint while providing uncertain and potentially nonexistent benefits to the affected public.

---

[108] Env't Prot. Agency Off. of Inspector Gen., *EPA Toxic Substances Control Act Consent Orders Need Better Coordination, Rep. No. 20-E-0177* 3 (2020) [hereinafter "Inspector General Report"], https://perma.cc/69L4-JJH9 (Attachment 60).

[109] Proposed Consent Decree, *supra* note 26, at ¶¶ 15-18, 24(b)-(c) (describing the project and deliverable review process). Aside from projects proposed for Washington Works, which does require approval by West Virginia Department of Environmental Protection, no project proposed or completed under the proposed Consent Decree requires any input or approval by the affected states (North Carolina and New Jersey) or their affected residents.

### 3. The Excessive 15-Year Compliance Timeline for Chemours to Implement Any Mitigation Projects Leaves Communities Exposed to PFAS for Years and Is Not Reasonable.

A settlement that defers meaningful pollution reductions for over a decade—while contamination and human exposure continues—cannot be considered reasonable.[110] Effective remedies must promptly and directly reduce exposure to ongoing hazards.[111]

To the extent the Proposed Consent Decree includes firm deadlines for cleanup work,[112] it would allow Chemours up to 15 years to implement its preferred Mitigation Projects once approved by EPA.[113] And Chemours has six months after the date of entry of the Proposed Consent Decree to propose an initial set of projects to EPA, including "the length of time to complete each of the proposed projects."[114] Thereafter, EPA will determine whether to proceed with a proposed project and Chemours shall submit for EPA's approval a "workplan for the project with appropriate deadlines and milestones."[115] No additional detail about Mitigation Projects to be completed is provided in the Proposed Consent Decree or supporting documents.

Because the Proposed Consent Decree defers the planning and timeline for completion of any Mitigation Project for up to fifteen years, there is no guarantee that any effective remedy for Chemours' PFAS pollution or meaningful reductions in human exposure will occur promptly, within fifteen years, or at all. Therefore, the Proposed Decree is not reasonable.

### 4. It Is Unreasonable to Allow Chemours to Self-Report Its Compliance or to Select Its Own Remedial Actions Given Its History of Noncompliance and Nondisclosure.

Under the Proposed Consent Decree, the parties contemplate that Chemours will self-report its compliance[116] and select its own remedial actions.[117] This is unreasonable given the

[110] *Cf. United States v. District of Columbia*, 933 F. Supp. 42, 49 (1996) (finding a consent decree reasonable where it required "quick, concrete steps" to correct deficiencies).

[111] *See United States v. Cannons Eng'g Corp.*, 899 F.2d at 89 (requiring that consent decrees reasonably address the environmental harm at issue); *District of Columbia v. Potomac Elec. Power Co.*, 826 F. Supp. 2d 227, 232, 238–39 (D.D.C. 2011) (identifying a "main concern" with the "adequacy, reasonableness and appropriateness of [the] consent decree" is to ensure "Pepco will complete the [remedial investigation and feasibility study] in a reasonable time frame") (internal quotations omitted); *see* also *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, No. 16-CV-00295, 2017 WL 2214655, at *5–6 (N.D. Cal. May 17, 2017) (finding a consent decree "substantively fair" because it would reduce unlawful emissions and permit defendants to bring certain vehicles into compliance in a "timely fashion" which is "preferable to taking no action or waiting" for the defendant to develop a different remedial measure).

[112] Proposed Consent Decree, *supra* note 26, at App. C, ¶ III.12 (providing that Chemours "shall implement the [work described in Chemours'] Response Plan [in response the Engineering Analysis for Fayetteville Works] in accordance with the schedules set forth therein.")

[113] Proposed Consent Decree, *supra* note 26, at ¶ 24(a).

[114] Proposed Consent Decree, *supra* note 26, at ¶ 24(b).

[115] Proposed Consent Decree, *supra* note 26, at ¶ 24(e)

[116] Proposed Consent Decree, *supra* note 26, at ¶ 27(b).

[117] Proposed Consent Decree, *supra* note 26, at ¶ 24(b)-(d) (requiring Chemours to identify and provide EPA an initial set of projects with EPA reserving the right for EPA to propose additional ones and to consider whether the

company's demonstrated history of nondisclosure, ongoing violations, and failure to comply with existing legal obligations. In addition, experts from the United Nations have expressed alarm over Chemours Fayetteville Works facility's potential human rights violations and abuses against communities in the lower Cape Fear River watershed.[118] The experts noted serious concern regarding the company's disregard of the wellbeing of nearby residents, suppression of information about the toxic nature of PFAS, and failure to take responsibility for denying the community clean drinking water for decades.[119] This is not a company that should be trusted to voluntarily comply with PFAS reduction measures or report its own compliance.

Chemours' candor in conducting settlement negotiations is already questionable. As demonstrated above in the long list of Chemours' PFAS chemicals at Fayetteville Works, the company uses, manufactures, and/or releases hundreds of PFAS chemicals from its facility in southeastern North Carolina.[120] Yet, during its negotiations of the Proposed Consent Decree, Chemours disclosed only 23 of these PFAS as present at its Fayetteville Works facility.[121] Chemours' failure to disclose the full extent of PFAS present at Fayetteville Works is yet another reason that the Proposed Decree is inadequate and unreasonable. EPA must reopen its investigation to address this misrepresentation by Chemours.

Similarly, during its negotiations of the 2019 NC Consent Order with North Carolina and Cape Fear River Watch, Chemours failed to inform regulators and stakeholders of the full scope of PFAS it was discharging from the Fayetteville Works facility. More than five years after negotiations ended—and only after all remedial pilot testing was complete—Chemours disclosed in February 2025 that wastewater outfalls already subject to PFAS treatment requirements under the 2019 NC Consent Order and Addendum contained the ultra-short chain trifluoroacetic acid (TFA) at concentrations of 44,000 and 156,000 parts per trillion.[122] Thereafter, independent sampling by Cape Fear River Watch detected TFA in finished drinking water supplies at nearly 2,000 parts per trillion, along with other PFAS compounds that Chemours has not effectively controlled as required.[123]

This failure to disclose had material consequences. Had regulators and community stakeholders known about TFA and related compounds such as PFPrA earlier, they could have required Chemours to install more comprehensive technology at the outset. Indeed, it has since been demonstrated that granulated activated carbon does not adequately remove TFA or PFPrA.[124] This is not merely a technical oversight; it reflects Chemours' systematic

---

same or similar benefits could be obtained at lessor costs through other potential projects); Proposed Consent Decree, *supra* note 26, at Appx. C ¶ 13 and App. D ¶ 21 (describing process for engineering analyses for HFPO and carbooxohalide).

[118] Letter from Marcos A. Orellana et al., United Nations Hum. Rts. Council, to Mark Newman, The Chemours Co. LLC (Sep. 25, 2023), at 9–10, https://perma.cc/A5KD-DBHN (Attachment 61).

[119] *Id*.

[120] PFAS Analysis and Methods Interim Report #10, *supra* note 6.

[121] In its Complaint, EPA says that "Chemours has identified 24 PFAS analytes that are or were associated with the Fayetteville Works operations. Compl. ¶ 153.

[122] Chemours TFA Letter, *supra* note 44.

[123] Letter from Jean Zhuang & Hannah M. Nelson, *supra* note 43.

[124] Chemours Netherlands B.V., *supra* note 93, at 6, 22–27.

unwillingness to provide complete and accurate information necessary for effective remedial decision-making.

Chemours' remaining record in North Carolina further illustrates why reliance upon Chemours' disclosures and self-monitoring is misplaced. In 2017, the North Carolina Department of Environmental Quality partially suspended one of Chemours' Clean Water Act permits, citing Chemours' "misrepresentations and inadequate disclosures about GenX and other chemicals" discharged from Fayetteville Works.[125] In addition, despite the company's binding obligations in the 2019 NC Consent Order, Chemours has failed to reduce PFAS air emissions by 99 percent from baseline.[126] The same pattern is evident under the 2009 Toxic Substances Control Act Order: the Proposed Decree largely relies on actions already required by that Order—actions the company has not undertaken[127]—making a self-policing framework untenable. These are not isolated lapses; they are repeat violations of negotiated requirements designed specifically to prevent this type of harm.

The persistence of these issues is tied to a broader pattern of withholding critical information. Chemours possesses extensive data regarding the chemicals it releases, appropriate analytical methods, available treatment technologies, and associated health risks. Yet, as with its decades-long undisclosed pollution of North Carolina prior to 2017, the company has continued to limit public and regulatory access to relevant information. In ongoing litigation with downstream drinking water utilities, Chemours sought to shield thousands of pages of documents, including sampling data, treatment analyses, toxicological studies, and evidence of community exposure.[128] It was only after SELC filed in federal court on behalf of conservation and community groups objecting to the company's effort to conceal 21,000 pages of documents related to their PFAS pollution[129] that the company was forced by the court to produce the documents.[130] This pattern of nondisclosure directly undermines any enforcement scheme that depends on the company's own reporting.

Recent revelations further demonstrate why Chemours' self-regulation is inappropriate.

First, when Chemours announced its plan to expand its PFAS manufacturing operations at the Fayetteville Works Facility, Chemours advertised to the public in its press release that the expansion would not result in "increased emissions" and that the company had already "reduced

---

[125] Compl. ¶ 192.

[126] *See* 2019 NC Consent Order, *supra* note 17, at 3. Chemours' 2017 (baseline year) PFAS emissions were 239,060 lbs/yr. *See* Emissions Inventory Table 2017-2022, *supra* note 85. To reduce these emissions by 99 percent, Chemours would need to limit its PFAS emissions to 2,390.6 lbs/yr. Yet Chemours' PFAS emissions have far exceeded this amount in recent years. *Id.* (showing 2022 PFAS emissions that, when summed, equal 20,504 lbs/yr).

[127] Compl. ¶¶ 115, 122

[128] Press Release, SELC, *SELC Objects to Chemours and DuPont hiding information about their toxic PFAS pollution* (April 14, 2025), https://perma.cc/BHA5-U7KN (Attachment 62).

[129] *Cape Fear Public Utility Authority, et al. v. The Chemours Company FC, LLC, et al*, Memorandum of Law in Support of Motion to Intervene and Object to Defendant's Motion to Maintain Materials Under Seal, No 7:17-cv-00195-D, Dkt. Nos. 503-504 (E.D.N.C. Apr. 14, 2025), https://perma.cc/XTV9-BCCG (Attachment 63).

[130] *Cape Fear Public Utility Authority, et al. v. The Chemours Company FC, LLC, et al*, Order, No 7:17-cv-00195-D, Dkt. No. 538 (E.D.N.C. Dec. 3, 2025), https://perma.cc/5QED-GEL5 (Attachment 64).

air emissions of fluorinated organic compounds by more than 99%."[131] These statements were simply not true; Chemours has missed the 99% reduction mark by nearly ten-fold.[132] And according to Chemours' current application submission, the expanded sources would have the potential to release an additional 3,000 pounds of PFAS into the air each year[133]—pollution that could further threaten the groundwater and drinking water wells throughout the region.

Second, on top of the toxic pollution already produced at its Fayetteville facility, Chemours has previously attempted to import up to four million pounds of GenX from the Netherlands into the Fayetteville facility. The company did so without informing the public and was stopped only after EPA discovered an error in Chemours' import documents.[134]

Finally, the Proposed Consent Decree relies on Chemours to alert EPA when its violations create a substantial endangerment to human health or the environment. But this safeguard is only as reliable as Chemours' willingness to acknowledge the risk of harm. Chemours continues to dispute that PFAS "may be linked to harmful health effects in humans."[135] If the company will not fully acknowledge the risks posed by PFAS, there is little reason to trust it to promptly recognize and report those risks, especially when doing so could expose it to additional liability.

In light of this history, relying on Chemours to self-report and self-direct remedial actions is not reasonable.

## III. The Proposed Consent Decree Does Not Comply with the Governing Statutes.

A court's final consideration is whether the proposed settlement is consistent with the statute the consent decree is intended to enforce. The present Proposed Consent Decree fails to satisfy that requirement because it is inconsistent with the purposes of both the Clean Water Act and the Toxics Substances Control Act.

### A. The Proposed Consent Decree Does Not Comply with the Clean Water Act.

The Clean Water Act's central objective is not partial reduction, delay, or discretionary pollution control; it is to "restore and maintain the chemical, physical and biological integrity of

[131] Press Release, *The Chemours Co., Chemours Schedules Information Sessions on Planned Product Expansion* (Sept. 6, 2022), https://perma.cc/6B9L-XZ4Q (Attachment 65).
[132] *See* 2019 NC Consent Order, *supra* note 17, at 3. Chemours' 2017 (baseline year) PFAS emissions were 239,060 lbs/yr. *See* Emissions Inventory Table 2017-2022, *supra* note 85.
[133] *See* 2025 Letter from The Chemours Company, *supra* note 40 (showing potential emissions increases from the vinyl ethers expansion of over 3,000 pounds per year. The potential emission estimates in Chemours' 2024 application were even higher, and Chemours failed to explain why these emissions estimates inexplicably decreased from one application to the next).
[134] Lisa Sorg, *EPA Okays Chemours Request to Export GenX from the Netherlands to Fayetteville Works Plant,* NC Newsline (Oct. 18, 2023), https://perma.cc/B2XP-MNL (Attachment 66); Lisa Sorg, *EPA Reexamining Importation of Harmful Chemical Wastewater to North Carolina,* NC Newsline (Nov. 7, 2023), https://perma.cc/T92T-GAYL (Attachment 67).
[135] Proposed Consent Decree, *supra* note 26, at 1.

the Nation's waters."[136] To achieve that objective, Congress declared national goals to eliminate the discharge of pollutants into navigable waters, prohibit toxic pollutants in toxic amounts, and protect fish, shellfish, wildlife, and recreation.[137] A consent decree resolving Clean Water Act violations must therefore be capable of bringing the defendant into compliance with the Act.[138] This Proposed Decree is not.

The United States' Complaint alleges 245 unlawful discharges of 23 PFAS from Chemours' Fayetteville Works Facility into the Cape Fear River without authorization under the Clean Water Act.[139] Yet the Proposed Consent Decree contains no enforceable requirement that Chemours stop discharging those 23 PFAS,[140] *or* the hundreds of other PFAS the company is known to use at Fayetteville Works.[141] Nor does the Proposed Consent Decree impose specific controls, deadlines, performance standards, or stipulated consequences tied to eliminating those discharges. Instead, the Proposed Decree leaves Chemours with discretion to select projects that may merely "further reduce" PFAS releases[142] and even permits Chemours to choose a control that achieves lesser reductions so long as it explains why it did so.[143] That is not compliance. Compliance means ending the violations alleged in the Complaint,[144] not simply allowing the same unlawful discharges to continue under the cover of a court-approved settlement.

The omission is especially serious because PFAS are persistent toxic pollutants and the receiving water is the Cape Fear River, a resource used by downstream communities for drinking water and relied on for aquatic life and recreation. A decree that does not require cessation of PFAS discharges in the Cape Fear River cannot "restore or maintain the chemical, physical, and biological integrity" of the river. It instead condones ongoing pollution.

Courts evaluating Clean Water Act settlements look to whether the enforcement action is capable of requiring compliance and is in good faith calculated to do so.[145] This Proposed Decree fails that standard because it does not require compliance for any Clean Water Act violations, including those actually pleaded. Unlike decrees that mandate injunctive measures to eliminate unlawful discharges and achieve permit compliance,[146] this Proposed Decree contains no concrete path to stop Chemours' unlawful PFAS discharges from Fayetteville Works.

---

[136] 33 U.S.C. § 1251(a).
[137] 33 U.S.C. § 1251(a)–(b).
[138] *United States v. District of Columbia*, 933 F. Supp. 42, 52 (D.D.C. 1996).
[139] Compl. ¶¶ 352–363, Appx. B, Tbl. 1.
[140] Compl. ¶ 352.
[141] PFAS Analysis and Methods Interim Report #10, *supra* note 6.
[142] Proposed Consent Decree, *supra* note 26, at ¶ 24.
[143] Proposed Consent Decree, *supra* note 26, at App. C (HFPO Injunctive Terms), ¶ 10.a.
[144] *Friends of Milwaukee's Rivers v. Milwaukee Metro. Sewerage Dist.*, 382 F.3d 743, 764 (7th Cir. 2004).
[145] *Piney Run Pres. Ass'n v. Cnty. Comm'rs of Carroll Cnty.*, 523 F.3d 453, 460 (4th Cir. 2008).
[146] *See United States v. City of Welch*, No. 11–00647, 2012 WL 385489, at *2–3 (S.D.W.Va. 2012) (requiring the city to comply with the Clean Water Act by implementing injunctive measures to address unlawful discharges from its wastewater treatment plant and to eliminate its combined sewer overflows).

The Court should not enter a decree that purports to resolve Clean Water Act violations while failing to require the relief necessary to end them.

### B. The Proposed Consent Decree Does Not Comply with the Toxic Substances Control Act.

The "primary purpose" of the Toxic Substances Control Act is to assure that chemicals in commerce "do not present an unreasonable risk of injury to health or the environment."[147] The Proposed Decree flouts this statutory purpose.

EPA and Chemours have never been able to show that communities are safe from "unreasonable risk" resulting from Chemours' persistent PFAS pollution. This risk is heightened by Chemours' and EPA's long history of ignoring the 2009 Toxic Substances Control Act Order, resulting in contamination of drinking water for over half a million North Carolinians. It is also exacerbated by Chemours' vast underreporting of its GenX emissions;[148] its unpermitted leaks of GenX and other pollutants in recent years;[149] and its continued release of tens of thousands of pounds of PFAS into the environment each year, including GenX.[150]

The Proposed Decree does nothing to shield communities from further unreasonable risk from Chemours' operations. Instead, it parrots terms from the 2009 Toxic Substances Control Act Order that Chemours has already demonstrated it is comfortable violating,[151] and sets GenX efficiency standards that are lenient enough to allow Chemours to continue its GenX and other PFAS pollution unabated.

EPA must revise the Proposed Decree to ensure that communities are protected from exposure to Chemours' PFAS pollution and to comport with the purpose of the Toxic Substances Control Act. If it does not, the reviewing court should reject the Proposed Decree.

---

[147] 15 U.S.C. § 2601(b)(3). EveryCRSReport, *The Toxic Substances Control Act (TSCA): A Summary of the Act and Its Major Requirements* (2015), https://perma.cc/XR26-RUH9.

[148] 60-Day Notice of Intent to Modify Air Quality Permit No. 03735T43 from N.C. Dep't of Env't Quality to The Chemours Company, Fayetteville Works (Apr. 6, 2018), https://perma.cc/FXM4-6X2Q (Attachment 68) (Chemours reported emitting 66.6 pounds of GenX in 2016; GenX emissions were later revealed to be well over 2,000 lbs each year).

[149] Chemours has reported at least three GenX leaks in recent years, from faulty gaskets, valves, and feed lines. *See* Letter from Christel Compton, Environmental Manager, Chemours Co. – Fayetteville Works, to Heather S. Carter, Regional Supervisor, Div. of Air Quality, N.C. Dep't of Env't Quality (July 15, 2024), https://perma.cc/P87A-KMCS (Attachment 69); Letter from Heather S. Carter, Regional Supervisor, Div. of Air Quality, N.C. Dep't of Env't Quality, to Seth Bailey, Plant Manager, Chemours Co. – Fayetteville Works (Aug. 7, 2024), https://perma.cc/P5F3-ENNN (Attachment 70); Letter from Dianne L. Fields, Env't Manager, The Chemours Company – Fayetteville Works, to Heather S. Carter, Regional Supervisor, Div. of Air Quality, N.C. Dep't of Env't Quality (Dec. 17, 2024), https://perma.cc/Z3U2-QQ3Q (Attachment 71).

[150] *See* Emissions Inventory Table 2017-2022, *supra* note 85.

[151] 2009 Toxic Substances Control Act Order at 36, *supra* note 95; Inspector General Report, *supra* note 108.

**IV. Conclusion**

Given the severity, duration, and geographic scope of Chemours' violations, the public is entitled to a settlement that delivers meaningful accountability, comprehensive remediation, public participation, and court-enforceable protections against future harm. The Proposed Consent Decree delivers none of those things. Instead, it provides Chemours with substantial litigation benefits while requiring surprisingly little in the way of concrete, enforceable relief for the communities that have borne the burden of its pollution. Its headline promises obscure significant gaps, leaving major sources of PFAS releases and exposure pathways insufficiently addressed—if addressed at all.

Because it fails to adequately remedy the violations at issue, lacks sufficiently definite and enforceable obligations, and bears little relationship to the full scope of the harm caused by Chemours' PFAS pollution, the Proposed Consent Decree is unfair, unreasonable, inconsistent with the governing statutes, and contrary to the public interest. It must be substantially revised to require comprehensive, enforceable measures that address the full range of contamination, ensure meaningful pollution reductions for the full suite of Chemours' PFAS chemicals used at Fayetteville Works, and provide real protection for affected communities before the United States seeks its entry by the Court. In the alternative, all provisions related to Chemours' actions in North Carolina should be removed. If neither occur, the reviewing court should reject the Proposed Consent Decree.

**Respectfully submitted,**

Kelly Moser

Myra Blake

Jean Zhuang

Tim Barbera