# EXHIBIT 3

**OFFICE OF THE GOVERNOR** **OFFICE OF THE ATTORNEY GENERAL** NORTH CAROLINA *Environmental Quality*

July 29, 2026

Assistant Attorney General
U.S. DOJ–ENRD
P.O. Box 7611
Washington, DC 20044-7611
VIA EMAIL – pubcomment-ees.enrd@usdoj.gov

Re: Consent Decree for *The Chemours Company*, D.J. Ref. No. 90–5–1–1–12112
*United States and West Virginia Department of Environmental Protection v. The Chemours Co., et al.*, Civ. No. 2:26–cv–00418 (S.D. W. Va.)

Dear Assistant Attorney General:

This case concerns the continuing devastating effects of the decades-long callous disregard for human health and the environment wrought by the defendants and their predecessors across several states. The defendants currently own and operate facilities in North Carolina, New Jersey and West Virginia with an unparalleled legacy of environmental contamination. These plants have discharged and emitted untold quantities of highly toxic and highly persistent chemicals into the air and water. These chemicals—per- and polyfluoroalkyl substances ("PFAS")—now permeate huge swaths of surface water, groundwater and soils across these states. The toxicity and resistance to degradation of these now notorious chemicals is well documented.

The Environmental Protection Agency ("EPA") and the United States Department of Justice ("USDOJ") now seek to settle by a consent decree ("CD") certain claims with the defendants. Some of these claims concern the defendants' facility in North Carolina—the Fayetteville Works on the Cape Fear River in southeastern North Carolina. On behalf of the State of North Carolina, the Office of the Attorney General, the Office of the Governor, and the Department of Environmental Quality ("NC DEQ"), we write to voice our grave concerns regarding the deficiencies in this proposed CD and to urge EPA, USDOJ, and the United States District Court not to proceed with this proposed decree until all matters discussed herein are fully addressed.[1]

[1] It is our understanding that USDOJ will file this complete comment (including all attachments) with the District Court for the Southern District of West Virginia for the Court's consideration as it evaluates any motion to enter the proposed CD. If USDOJ does not intend to file these comments in full (including all attachments), we ask that USDOJ so inform the North Carolina Attorney General as soon as possible and sufficiently in advance of any

## Background

***PFAS Contamination Caused by Fayetteville Works***[2]

Chemours[3] and its predecessor, E.I. du Pont de Nemours and Company, now known as EIDP, Inc. (collectively, the "Companies"), have been operating the Fayetteville Works facility in North Carolina since the early 1970s. Since around 1980, Fayetteville Works has used southeastern North Carolina as a dumping ground for PFAS. The area is also ground zero for the release of a group of replacement PFAS that are commonly referred to as GenX Compounds.[4] As EPA is aware, "Fayetteville Works is the only facility where Chemours manufactures GenX as a product." Compl. ¶ 156 (ECF #1).

For decades, the Companies emitted uncontrolled PFAS, including GenX Compounds, into the atmosphere through smokestacks and leaky pipes. The airborne PFAS traveled through the atmosphere and were deposited back onto the ground through aerial deposition and in the process were sometimes transformed into other types of PFAS. As a result of these emissions, aquifers throughout ten counties in southeastern North Carolina are now contaminated by PFAS from Fayetteville Works. These aquifers supply thousands of private drinking water wells and public water systems in southeastern North Carolina. The full geographic extent of this contamination is still not known.

The Companies also discharged PFAS directly into the Cape Fear River with no measures taken to limit the amount of PFAS in the facility's discharge. The Cape Fear River is a source of drinking water for hundreds of thousands of North Carolinians. When the contaminated river water was withdrawn by drinking water utilities in these counties, the PFAS were transported—unbeknownst to the utilities—through extensive drinking water conveyance and wastewater collection systems. Because public water systems normally lose some water to leaking,[5] these systems then leaked PFAS-tainted water into the region's aquifers, contaminating thousands of additional drinking water wells.

Furthermore, low lying areas in this region are prone to extensive flooding from hurricanes and large storm events. Based on an assessment required by NC DEQ, Chemours concluded that contamination has spread through the 100-year floodplain of coastal North Carolina in this area.

---

hearing on any motion to enter the proposed CD such that the State would have adequate time to ensure that these comments are before the Court as it considers the proposed CD. *See* 28 C.F.R. § 50.7(b) (requiring that "the Department of Justice will . . . file with the court[ ] any written comments" that it receives during USDOJ's comment period regarding a proposed consent decree such as the one in this case).

[2] Unless otherwise cited, the facts contained in this section are those alleged by NC DEQ and the North Carolina Attorney General in their respective actions against Chemours, which are discussed below. Those allegations, in turn, are supported by voluminous document discovery and expert witness reports and testimony, much of which is available in the public docket for the Attorney General's action, which can be accessed here: https://ncbc.nccourts.org/public/ by entering "20CVS5612" in "Search Selected View."

[3] Except where context indicates otherwise, references to "Chemours" include both The Chemours Company and The Chemours Company FC, LLC.

[4] Unless context indicates otherwise, terms in upper case are those that have been given a specific definition by the proposed CD, including in the appendices.

[5] EPA has estimated that public water systems average losing 16% of their water to leaks. Off. of Water, EPA, Water Audits & Water Loss Control for Public Water Systems (EPA 816-F-13-002) (July 2013).

EPA has concluded that "GenX chemicals have been linked to health effects on the liver, the kidney, the immune system, and developmental effects, as well as cancer." Lifetime Drinking Water Health Advisories for Four Perfluoroalkyl Substances, 87 Fed. Reg. 36,848, 36,849/2 (June 21, 2022). Accordingly, EPA has issued a health advisory and promulgated a maximum contaminant level ("MCL") for GenX in drinking water. *Id.*; PFAS National Primary Drinking Water Regulation, 89 Fed. Reg. 32,532 (Apr. 26, 2024).

PFAS are also known to be highly persistent and bioaccumulative, earning them the nickname "forever chemicals." *See* 87 Fed. Reg. at 36,849/1. Given their pervasiveness and persistence, Chemours cannot say how long this contamination will last and have maintained that it is infeasible to clean it up. In short, this is a massive public health issue, and it is attributable to a single source—Chemours' Fayetteville Works facility.

The Companies knew that Fayetteville Works was releasing PFAS into the environment and that PFAS posed risks to public health. What is more, they knew that control technologies could be implemented to reduce these impacts. But instead of disclosing this information to the State and taking responsibility for this contamination, the Companies hid information about their releases from NC DEQ, EPA and the public. Indeed, the Companies did not disclose site-associated PFAS in any wastewater discharge application for the facility prior to 2017. As for their air emissions, the Companies certified their air emissions inventories for "truth, accuracy, and completeness" when they were untrue, inaccurate and incomplete. *See* 15A N.C. Admin. Code 2Q. 0520. When emissions were eventually reported, the emission inventories underrepresented the amount of pollution by orders of magnitude not only for GenX Compounds but also for many other PFAS chemicals specifically manufactured or transformed at the Fayetteville Works facility.

***NC DEQ's Injunction Action***

In late 2016, researchers in North Carolina published a study describing exceptionally high levels of PFAS in the Cape Fear River watershed.[6] In 2017, soon after it was revealed that Chemours was discharging alarming amounts of PFAS into the Cape Fear River, NC DEQ filed an emergency injunction action against Chemours to stop ongoing releases of PFAS from Fayetteville Works. *See* Compl., *State ex rel. Regan v. The Chemours Company FC, LLC*, No. 17 CVS 380 (N.C. Super. Ct., Bladen Cnty., Sept. 7, 2017) (Attachment 1). In February 2019, the parties resolved the injunction action through a Consent Order ("Fayetteville Works CO"). Consent Order, *The Chemours Company*, No. 17 CVS 380 (Feb. 25, 2019) (Attachment 2); *see also* Addendum to Consent Order Para. 12, *The Chemours Company*, No. 17 CVS 380 (Oct. 12, 2020) ("Fayetteville Works CO Addendum") (Attachment 3). As part of the Fayetteville Works CO, Chemours was required to stop all discharges of process wastewater from its facility and to significantly reduce its air emissions of PFAS by installing certain emission control devices. Fayetteville Works CO ¶¶ 7–12. In addition to reducing releases of PFAS from the facility, the Fayetteville Works CO also required Chemours to provide replacement drinking water supplies to private well owners impacted by PFAS releases from the facility. *Id.* ¶¶ 19–25. The Fayetteville Works CO also required Chemours to isolate the extensive groundwater contamination under the

---

[6] Mei Sun *et al.*, *Legacy & Emerging Perfluoroalkyl Substances Are Important Water Contaminants in the Cape Fear River Watershed of N.C.*, Envtl. Sci. & Tech. Ltrs. 3(12) (Nov. 2016), available at https://chhe.research.ncsu.edu/wordpress/wp-content/uploads/2017/08/PFECAs_Sun_ESTL2016-2.pdf (visited July 29, 2026).

facility and mitigate the flow of groundwater by installing an underground barrier wall and a pump-and-treat system. Fayetteville Works CO Addendum ¶ 3.b. The Fayetteville Works CO did not address public water systems.

One of the primary purposes of the Fayetteville Works CO was to eliminate the information disparity between NC DEQ and Chemours. The Fayetteville Works CO therefore required comprehensive testing of emissions sources, wastewater and stormwater, as well as development of methods to test for novel PFAS compounds and reporting of that information to the State. Fayetteville Works CO ¶¶ 8, 9, 11–11.2, 14, 25.1–27. Over the course of the past eight years, NC DEQ has acquired massive amounts of information regarding the facility's operations and the numerous PFAS compounds that are involved in the facility's operations as well as the ultimate fate of those compounds in the environment. As a result, NC DEQ staff are among the foremost experts in the testing and control of PFAS in the country.

***The North Carolina Attorney General's Lawsuit***

On October 13, 2020, after NC DEQ's regulatory action had significantly reduced the releases of PFAS from Fayetteville Works, North Carolina's Attorney General filed a lawsuit on behalf of the State against Chemours, DuPont and their affiliates, seeking damages for the harms inflicted upon the State's natural resources. Compl., *State ex. rel. Stein v. E.I. Dupont de Nemours & Co. et al.*, No. 20 CVS 5612 (N.C. Super. Ct., Cumberland Cnty., Oct. 13, 2020) (Attachment 4). That matter remains pending in the North Carolina Supreme Court, where the Companies have asserted that the Attorney General lacks standing to seek damages on behalf of the State. *State ex rel. Jackson v. E.I. Dupont de Nemours & Co.*, No. 436A21-1 (N.C. S. Ct.) (calendared for argument on Sept. 15, 2026). The Attorney General's Office remains committed to ensuring that the State is justly compensated for the harm inflicted by the Companies on the State's natural resources.

***EPA's Complaint***

Now, nearly a decade after NC DEQ brought its injunction action against Chemours and nearly six years after the Attorney General filed his lawsuit, EPA has filed the instant action to address Chemours' violations of the federal Clean Water Act ("CWA"), Toxic Substances Control Act ("TSCA"), and Resource Conservation and Recovery Act ("RCRA"). Compl. (ECF #1).

**CWA Claims:** EPA's Complaint echoes NC DEQ's prior finding that Chemours illegally discharged PFAS into the Cape Fear River for years in violation of the CWA and the facility's discharge permit. *Id.* ¶¶ 350–363. EPA lists well over two hundred individual CWA violations by Chemours at Fayetteville Works for twenty-three PFAS compounds. *Id.* ¶¶ 198–205 & Appx. B, tbl.1.

**TSCA Claims:** The Complaint alleges that Chemours violated TSCA in connection with its manufacturing of HFPO, GenX, and the undisclosed chemical assigned the name "Carbooxohalide." With respect to GenX, the Complaint alleges that Chemours failed to include necessary information in its 2008 premanufacture notice, including information about environmental releases and worker exposure. *Id.* ¶¶ 430–438. The Complaint further alleges that Chemours failed to comply with a preexisting TSCA order requiring Chemours to maintain records

demonstrating compliance with a 99% restriction on releases of GenX from Fayetteville Works. *Id*. ¶¶ 439–445.

With respect to HFPO, the Complaint alleges that Chemours failed to comply with a significant new use rule requiring that HFPO manufacturing and processing occur only within an enclosed process. Chemours also failed to submit a significant new use notice prior to manufacturing and processing HFPO outside an enclosed process. *Id*. ¶¶ 446–456.

Finally, with respect to Carbooxohalide, the Complaint alleges that Chemours failed to submit a significant new use notice prior to commencing its manufacturing and processing of 10,000 pounds or more per year of Carbooxohalide. *Id*. ¶¶ 457–464.

**RCRA Claims:** The Complaint also alleges that Chemours violated RCRA at Fayetteville Works by accepting shipments of hazardous waste from offsite and storing hazardous waste in violation of its RCRA permit. *Id*. ¶¶ 465–476.

***The Proposed CD***

At the same time that EPA filed its Complaint, it lodged a proposed consent decree reflecting a settlement reached between Chemours, EPA and West Virginia. Proposed CD (ECF #2 – 2-7). North Carolina would not be a party to the proposed CD. Furthermore, EPA did not consult with North Carolina regarding any of the requirements that are set forth in the proposed CD.

**Drinking Water Relief:** The proposed CD would require Chemours to provide relief to both public and private drinking water systems impacted by Chemours' release of PFAS in New Jersey and West Virginia. *Id*. at Appx. E. The proposed CD does not contain any injunctive relief pertaining to Chemours' contamination of sources of drinking water throughout ten counties in southeastern North Carolina.

**The Mitigation Fund:** The proposed CD would require Chemours to fund "additional projects to further reduce their emissions and discharges of PFAS, or provide alternative drinking water relief beyond that" which would otherwise be required by the proposed CD. *Id*. ¶ 24. The proposed CD would not require any of these funds to be spent in North Carolina. In addition, the proposed CD would not provide NC DEQ any opportunity to review or comment on any projects, if any, that might be proposed for implementation in North Carolina. Further, if NC DEQ requires Chemours to undertake additional work pertaining to Fayetteville Works, those funds could be credited against the $90 million cap under the proposed CD.

**TSCA Relief for HFPO and Carbooxohalide:** The proposed CD would require Chemours to undertake "engineering evaluations" of Fayetteville Works that focus on two pollutants—HFPO (in Appendix C) and Carbooxohalide (in Appendix D). Chemours would hire an independent engineering evaluator to review the HFPO and Carbooxohalide Processes at Fayetteville Works and suggest methods for reducing HFPO and Carbooxohalide releases. *Id*. at Appx. C ¶¶ 1–9 & Appx. D ¶¶ 9–17. Chemours would then submit a response plan to EPA identifying projects selected for implementation by Chemours. There would be no requirement that the projects achieve actual reductions of releases of these compounds, and there would be no standard by which EPA would evaluate whether the projects are sufficient or appropriate. Rather, Chemours simply would be required to identify projects in its plan and explain why it selected

them based on, among other things "cost considerations." *Id.* at Appx. C ¶ 10 & Appx. D ¶ 18. The proposed CD would not afford NC DEQ an opportunity to review or provide input on the proposed projects.

**TSCA Relief for GenX:** Appendix B of the proposed CD would require Chemours to achieve a control level of 99.5% for GenX Compounds at Fayetteville Works. *Id.* at Appx. B. The proposed CD does not identify the source of the 99.5% figure, and there is no indication that it is related to any desired environmental outcome or technology feasibility analysis. Generally speaking, compliance with this requirement would be determined by comparing (1) the amount of GenX Compounds actually released into the environment through air emissions (not including equipment leaks), water discharges, and waste (both liquid and solid) transported to other states for disposal and (2) the amount of GenX Compounds that would otherwise be released from these sources without any controls. *Id.* at Appx. B ¶ 13. The proposed CD would not necessarily require that Chemours achieve any additional reductions of releases of GenX Compounds beyond what is already being achieved at the Facility. Further, even if additional reductions would be necessary to comply with the 99.5% requirement, there is no requirement that these reductions be achieved in North Carolina as opposed to occurring at disposal sites in other states.

**RCRA Relief:** The proposed CD does not contain any injunctive relief pertaining to Chemours' violations of RCRA at Fayetteville Works. Rather, the proposed CD contains a representation from Chemours that it is in compliance with RCRA at Fayetteville Works. *Id.* ¶ 22.

**The Civil Penalty:** Chemours has agreed to pay a civil penalty of $22.5 million. *Id.* ¶ 8. Half that amount is owed to West Virginia, presumably to resolve West Virginia state law violations. *Id.* ¶ 12. Therefore, $11.25 million covers all violations in North Carolina, New Jersey and West Virginia under all federal statutes, but all that money is paid to the U.S. Treasury and not directed to remedy any damage caused by Chemours. *See id.* ¶ 10; *United States v. A.T. Massey Coal Co.*, No. 2:07-0299, 2008 U.S. Dist. LEXIS 108658, at *19 (S.D. W. Va. Apr. 9, 2008). The proposed CD provides that the amount of the civil penalty was calculated based on Chemours' ability to pay. Proposed CD ¶ 9. None of the financial documents listed in Appendix A in support of EPA's ability to pay determination have been made available to the public and it remains to be seen whether the parties will provide the information to the Court for *in camera* review. *Id.* at Appx. A (stating that "[a]ll documents listed in this appendix are subject to Fed. R. Evid. 408 and are claimed by Chemours as confidential business information").

**The Release:** The proposed CD would resolve and release Chemours from any liability for: (i) all violations alleged in the Complaint, including violations of the CWA, TSCA and RCRA at the Fayetteville Works; (ii) potential claims against the defendants under Section 1431 of the Safe Drinking Water Act, 42 U.S.C. § 300i, with respect to known contamination of drinking water by PFOA and HFPO-DA from Fayetteville Works; (iii) potential claims against the defendants under Section 504 of the CWA, 33 U.S.C. § 1364, with respect to known PFOA and HFPO-DA discharges from Fayetteville Works; and (iv) various potential claims against the defendants under TSCA with respect GenX and HFPO. Proposed CD ¶¶ 68–70. In addition to providing these releases, the proposed CD stipulates that Chemours' compliance with the proposed CD would constitute "diligent prosecution," purportedly insulating Chemours from third party citizen suits for "all matters alleged in the Complaint and addressed by the Consent Decree." *See id.* at 2 and statutes cited therein.

## Legal Standard for Entry of a Consent Decree

"[B]efore entering a consent decree the court must satisfy itself that the agreement 'is fair, adequate, and reasonable' and 'is not illegal, a product of collusion, or against the public interest.'" *United States v. North Carolina*, 180 F.3d 574, 581 (4th Cir. 1999) (quoting *United States v. Colorado*, 937 F.2d 505, 509 (10th Cir. 1991)). While district courts are guided by the principle that settlements are encouraged, "a district court should not blindly accept the terms of a proposed settlement." *United States v. Arch Coal, Inc.*, 829 F. Supp. 2d 408, 415 (S.D. W. Va. 2011) *(*quoting *North Carolina*, 180 F.3d at 581).

This fairness analysis contains both procedural and substantive components. *United States v. Duke Energy Carolinas, LLC*, 499 F. Supp. 3d 213, 218 (M.D.N.C. 2020). On the procedural side, the court must gauge the "'candor, openness, and bargaining balance'" of the negotiation process. *Id.* (quoting *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 86 (1st Cir. 1990)). On the substantive side, "fairness requires that a party 'bear the cost of the harm for which it is legally responsible.'" *Id.* (quoting *Cannons Eng'g Corp.*, 899 F.2d at 87). "In considering the fairness and adequacy of a proposed settlement, the court must assess the strength of the plaintiff's case." *North Carolina*, 180 F.3d at 581. "Substantive fairness is closely linked to reasonability and adequacy." *Duke Energy Carolinas*, 499 F. Supp. 3d at 218.

Ultimately, the court's responsibility is to ensure that the decree "furthers the public interest" as expressed in the relevant federal statutes. *Id.* (quoting *United States v. Rohm & Haas Co.*, 721 F. Supp. 666, 680 (D.N.J. 1989)).[7]

## Reasons Why the United States Should Withdraw the Proposed Consent Decree

### I. The proposed CD is procedurally unfair because it violates cooperative federalism principles and the United States' own enforcement guidance regarding cooperation with affected States.

It is well established that Congress intended most federal environmental laws to function within a cooperative federalism framework that encourages federal-state partnership in the implementation of environmental laws. *See, e.g.*, *Arkansas v. Oklahoma*, 503 U.S. 91, 101 (1992). EPA's own enforcement guidelines have long recognized the importance of this partnership, emphasizing the need for open communication and coordination when pursuing enforcement actions that impact a State's interests. As recently as December of last year, this Administration adopted guidance reinforcing the federal government's commitment to work in tandem with States to enforce federal environmental laws. EPA's Office of Enforcement and Compliance Assurance ("OECA") is the arm of EPA that "[d]evelops and prosecutes civil judicial and administrative enforcement actions."[8] OECA touts that it "vigorously enforce[es] the nation's environmental laws" by "target[ing] the most serious water, air, and chemical hazards using improved transparency, advanced technologies, and community participation." *Id.* In December 2025, OECA issued guidance reaffirming the agency's commitment to "reviving cooperative federalism." Mem.

---

[7] The State takes no position regarding any provisions of the proposed CD that solely affect West Virginia's resolution of its claims.

[8] https://www.epa.gov/aboutepa/about-office-enforcement-and-compliance-assurance-oeca (visited July 29, 2026).

from Craig J. Pritzlaff, Acting Asst. Adm'r, USEPA, to OECA Off. Dirs. & Deputies *et al.* at 2 (Dec. 5, 2025).[9] OECA confirmed that it "shall work cooperatively with co-regulators to ensure consistency in compliance determinations and in enforcement of federal environmental law" and "foster information exchange" with States. *Id.* at 3. OECA further stated that it is "vital" that the agency pursue "[o]pen communication and genuine collaboration" with States. *Id.*

There is no single industrial facility that has had a greater impact on North Carolina's environment than the Fayetteville Works facility. Staff of NC DEQ and other state agencies have devoted countless hours over the last eight years to developing a comprehensive understanding of Chemours' operations and the devastating impact they have had on North Carolina's environment. EPA is keenly aware of North Carolina's tremendous investment of resources into addressing these harms. One would therefore expect that EPA would seek to embody a spirit of "open communication and genuine collaboration" in its enforcement action against Chemours. But instead, EPA elected to coordinate with West Virginia, giving North Carolina no opportunity for input in the deal before it was finalized. Indeed, while EPA and USDOJ had been in close coordination with NC DEQ and the North Carolina Attorney General's Office regarding compliance issues at the Fayetteville Works facility in the past, that coordination ceased in January of 2025.

We are aware that EPA and the USDOJ have publicly indicated that North Carolina affirmatively declined to be involved in settlement negotiations. We are unaware of any factual basis for this statement. To be sure, NC DEQ has pursued its own action against Chemours to enforce certain state law claims for injunctive relief, but the proposed CD here includes matters that are outside the scope of NC DEQ's action. Regardless of whether North Carolina were to formally participate as a party in this action to the degree that West Virginia has, North Carolina unquestionably has a substantial interest in the terms of any injunctive relief required at the Fayetteville Works facility. EPA's decision to forego advance consultation with North Carolina regarding the contents of this deal is procedurally unfair, a clear violation of the cooperative federalism principles that EPA purports to prioritize, and a violation of the agency's own internal enforcement guidelines. In reaching this deal without input from the state officials who are the foremost experts on the impact Fayetteville Works has had on North Carolina's environment, EPA has needlessly entered into its negotiation with Chemours with one arm tied behind its back. It is therefore no surprise that, as discussed below, the agreement EPA has struck suffers from numerous fundamental flaws that render the deal substantively unfair, inadequate and unreasonable. *See Arch Coal*, 829 F. Supp. 2d at 417 (finding it "important" when assessing a proposed consent decree regarding environmental contamination that the United States "involved in the negotiation process" interested organizations that were not parties to the suit).

The exclusion of North Carolina from the process in which EPA engaged to arrive at these terms is not a mere formality. As discussed below, the exclusion of North Carolina has resulted in substantive disparities between the relief granted to the states under the proposed CD.

---

[9] https://www.epa.gov/system/files/documents/2025-12/reinforcing-a-compliance-first-orientation-for-compliance-assurance-and-civil-enforcement-activities.pdf (visited July 29, 2026).

## II. The proposed CD is substantively unfair, inadequate, unreasonable and against public policy

### A. The requirements to control GenX Compounds at Fayetteville Works by 99.5% does not ensure any reductions of pollution in North Carolina.

To address Chemours' persistent failure to comply with a 2009 TSCA order, which required Chemours to restrict releases of GenX Compounds at Fayetteville Works by 99%, the proposed CD would require Chemours to achieve a control level of 99.5% for GenX Compounds at Fayetteville Works. There are several problems with this provision, which render it potentially illusory at best and harmful for North Carolinians at worst.

First, the 99.5% number appears untethered to any environmental outcome or analysis of available control technology for any media. EPA has provided no justification for selecting this 99.5% figure. GenX is toxic at very low levels. EPA itself has set the MCL for GenX for drinking water under the Safe Drinking Water Act at only 10 parts per trillion. 89 Fed. Reg. at 32,532/1.[10] Every pound of GenX that escapes into the environment matters. In order to ensure that GenX is controlled to safe levels, high control efficiencies are vitally important. Therefore, it is necessary to scrutinize this requirement to determine whether it has any real efficacy. Here, the 99.5% figure does not appear to reflect EPA's judgment about the reductions necessary for environmental protection or the reductions that are reasonable with available control technologies.

Second, the proposed CD would not ensure that GenX releases will actually be reduced from the status quo. Because NC DEQ has already mandated that Chemours install control technology to reduce emissions and discharges of GenX, EPA must consider whether the requirements in the proposed CD would provide additional environmental benefits. Here, the Fayetteville Works CO requires the company to operate its thermal oxidizer to "control[ ] all PFAS at an efficiency of 99.99%." Fayetteville Works CO ¶ 7.c. Chemours is also already required to reduce "[f]acility-wide annual air emissions of GenX Compounds by at least 99%" from 2017 levels through installation of control technologies such as carbon adsorbers on various sources at the plant. *Id.* ¶ 8.c. Certain water discharges are also required to be controlled through treatment systems employing granular activated carbon that capture PFAS at efficiencies of greater than 99%. *Id.* ¶ 12; Fayetteville Works CO Addendum ¶¶ 3–4. Considering these and other requirements, it may very well be that Chemours is already at or near the 99.5% control requirement in the proposed CD. As a result, the 99.5% control requirement could be meaningless, requiring Chemours to do little, if anything, to actually comply. Indeed, controls that Chemours already has proposed in a recent air permit application may very well allow Chemours to achieve a higher removal rate than 99.5% if it has not already crossed that threshold. Neither Chemours

---

[10] EPA recently proposed to rescind the MCL for GenX, but this move is based solely on a procedural issue and does not call into question the propriety of the 10 ppt standard. Rescission of Regulatory Determinations and Removal of Related Provisions for Four PFAS Substances (PFHxS, PFNA, HFPO–DA (GenX), and the Mixture of These Three PFAS Plus PFBS), 91 Fed. Reg. 29,413, 29,417 (May 20, 2026) ("The EPA's proposal is not based on any reassessment of the substantive findings . . . ."). Furthermore, as the North Carolina Attorney General and NC DEQ recently stated in comments to EPA, the proposed rescission of the MCL is unlawful. *See* Ltr. from Jeff Jackson, Att'y Gen. of N.C. et al., to Lee Zeldin, Adm'r, EPA (May 20, 2026), https://mcusercontent.com/ded688542b6d79068258f5f44/files/c99bcd96-eca5-2007-5b70-30ead13073c3/2026.07.20_Rescission_Rule_Comments_Final.01.pdf (visited July 29, 2026); Ltr. from Sushma Masemore, Deputy Sec'y for Env't, NC DEQ, to EPA (July 20, 2026) (Attachment 5).

nor EPA have demonstrated that this Appendix B would provide any additional protection of public health or the environment.

Third, even if the proposed CD would require Chemours to further reduce its emissions and discharges of GenX, it is impossible to say whether those reductions would have any real benefit to North Carolinians. Under the proposed CD, compliance with the control level at Fayetteville Works is determined by combining emissions and discharges across media. That is, Chemours' compliance calculations would use the mass of GenX Compounds in the air, combined with the mass in the water, and then added to the mass shipped offsite for disposal. *E.g.*, Proposed CD, Appx. B, ¶ 13. This construct is unusual at best. The State is not aware of any compliance determinations that are done this way. And there is good reason for that.

The same compounds in different media have different impacts. For example, in North Carolina the bulk of the impacts to drinking water, like private wells, are the result of air emissions. We know this because aggregations of compounds from different release points from the Fayetteville Works facility have different chemical signatures. The chemical profiles for air emissions compounds are different from the profiles for discharges to water. Where GenX has been detected in drinking water wells, it primarily bears the signature of air emissions. Water discharges, on the other hand, are more likely to affect water bodies like the Cape Fear River itself. Simply imposing an umbrella limit for all media fails to take into account the real impacts to human health and the environment in any meaningful way.

Fourth, even if the Appendix B program would result in any reductions in GenX tied to Fayetteville Works, there is no guarantee that those reductions would occur in North Carolina. According to the proposed CD, the calculations to achieve the 99.5% control level account for waste that is shipped offsite. Chemours presently ships waste contaminated with GenX Compounds for offsite disposal in other states. These wastes are disposed of offsite—outside North Carolina. Any increase in the effectiveness of offsite treatment processes would inure to Chemours' benefit, enabling it to avoid achieving those reductions in North Carolina. This offsite treatment has absolutely no impact on the North Carolina environment. Indeed, it is theoretically possible that improvements in offsite treatment could allow Chemours to increase its mass loading in North Carolina while still achieving the 99.5% control requirement. Nothing in the proposed CD would prohibit this from occurring or demonstrates as a factual matter that it is unlikely to occur.

All of this is why the State, in its consent order with Chemours for Fayetteville Works, addressed reductions in emissions and discharges primarily by media and not in the aggregate. The Fayetteville Works CO includes detailed, quantifiable provisions directing Chemours to reduce air emissions, Fayetteville Works CO ¶¶ 7–8, and separately reduce discharges to surface water, *id.* ¶ 12. *See also* Fayetteville Works CO Addendum ¶ 2 (addressing contaminated seeps along the bank of the Cape Fear River), ¶ 3 (mandating reductions in contaminants in extracted groundwater), ¶ 4 (requiring stormwater controls).

Fifth, although the 99.5% reduction requirement purports to take into account all three environmental media—air, water and waste—it specifically excludes fugitive air emissions. Fugitive air emissions are emissions that are not routed through an emissions stack, such as equipment leaks. Unlike emissions that are exhausted through discrete and identified points like a stack on which control equipment can be implemented, fugitive emissions are diverse and can be

more difficult to control. This does not make them any less toxic. Despite the nature of these emissions, facilities can—and do—calculate their volume. Although the Appendix B program on the surface seems comprehensive in its coverage, it specifically excludes any fugitive emissions. Proposed CD, Appx. B ¶ 5. Instead, these emissions are only subject to a leak detection and repair program. NC DEQ is familiar with the monthly emissions profile at Fayetteville Works and has learned that outdoor fugitive emissions can occasionally drive the monthly overall GenX emissions totals.

Finally, Appendix B does not provide a sufficient basis to support the calculations that Chemours would be required to make. The calculations appear to be based on a minimum of monitoring events, and in some cases no monitoring at all. For example, if Chemours fails to obtain any valid monitoring for an entire Compliance Period—a full year—it may use old monitoring results that are adjusted through some unspecified "calculations." Proposed CD, Appx. B ¶ 7. Chemours may also discontinue monitoring entirely based on the results of three monitoring events. And it may also discontinue monitoring following a Major Change based on only one monitoring event. *Id.* ¶ 8.

NC DEQ has been working with Chemours for many years and is familiar with Chemours' production processes and how those processes relate to emissions profiles. Throughout the course of a year, Chemours may engage in several "campaigns" at its process lines. Each of these campaigns will have its own emissions profile. That profile, as well as the amount of emissions, can vary significantly throughout the campaign. Given the highly variable nature of emissions profiles at Fayetteville Works throughout any given Compliance Period, the monitoring requirements to support the demonstration of compliance with the 99.5% mandate are insufficient.[11]

It is also unclear how the timing of waste generated will be factored into the calculations. For example, when and how much waste material is shipped offsite is a function of operational and logistical considerations. The amount of waste generated per a given production campaign may not align in perfect monthly or annual time periods that are used for compliance determinations. The number, type and representativeness of samples collected could lead to high variability in estimating the amount of GenX in the waste. In fact, the uncertainty associated with these issues may result in the calculated results being unreliable.

Appendix B may very well be just a neatly packaged illusion that amounts to little or no benefit for public health or the environment in North Carolina. As such, this provision is substantively inadequate, unfair and against the public interest.

[11] The engineering evaluations under Appendices C and D are similarly problematic. Those programs evaluate HFPO and Carbooxohalide releases based as few as "one monitoring event . . . . during the period of the Engineering Evaluation." Proposed CD, Appx. C ¶ 8.b.i & Appx. D ¶ 16.b.i. The "period of the Engineering Evaluation" is no more than "90 Days" for HFPO and "120 Days" for Carbooxohalide. Proposed CD, Appx. C ¶ 7.a & Appx. D ¶ 15.a. This limited monitoring will fail to capture changes over several campaigns and therefore not likely be representative of Chemours' full operations.

**B. The engineering evaluations for HFPO and Carbooxohalide in Appendices C and D lack enforceable standards sufficient to ensure any environmental benefits.**

To further address Chemours' violations of TSCA, Appendices C and D require "engineering evaluations" of Fayetteville Works that focus on two pollutants—HFPO (in Appendix C) and Carbooxohalide (in Appendix D). North Carolina regulators are very familiar with HFPO, given its relationship with GenX. Carbooxohalide is a different story. According to the proposed CD, Chemours manufactures, processes and uses Carbooxohalide in the United States only at Fayetteville Works. Proposed CD, Appx. D ¶ 7.a. Yet, nothing by the name Carbooxohalide has been disclosed by Chemours to North Carolina regulators. That does not, by itself, mean that the compound is not known to the State. Federal law allows a level of anonymization to protect trade secrets. Therefore, State regulators may be familiar with this compound, just by a different name. Unfortunately, without more information, the State cannot confirm that it knows anything about this compound.

The gist of these engineering evaluations for HFPO and Carbooxohalide appears to be that Chemours would hire an independent engineering evaluator to review the HFPO and Carbooxohalide Processes at Fayetteville Works. The engineering evaluator would then propose new and modified controls to reduce HFPO and Carbooxohalide releases. For each proposed control, the engineering evaluator would estimate the emissions reductions and costs and, as necessary, report on the commercial availability and technical feasibility of the controls. Proposed CD, Appx. C ¶¶ 1–9 & Appx. D ¶¶ 9–17.

After receiving the engineering evaluator's report, Chemours would be required to submit a response plan to EPA by which it would lay out which controls it would propose to implement. To the extent that Chemours and EPA disagree on how to proceed, Chemours may invoke the proposed CD's dispute resolution procedures. Otherwise, Chemours would be required to accede to EPA's determination as to how to proceed. Proposed CD, Appx. C ¶¶ 10–12 & Appx. D ¶¶ 18–20.

There are a host of problems with this process, which may render it little more than window dressing. The most significant of these issues is the lack of any guiding standards as to which of the engineering evaluator's proposals Chemours should implement. According to the proposed CD, "EPA's review of the proposed Response Plan will evaluate whether the proposed Response Plan will achieve further reductions in Releases applying" a set of "exclusive factors." Proposed CD, Appx. C ¶ 10 & Appx. D ¶ 18. Those "exclusive factors" are set forth in the context of what Chemours' response plan must include:

> Identification and rationale of Chemours' choice of Controls selected, including effectiveness in reducing or preventing Releases, technical feasibility, and cost considerations. If Chemours chooses a Control that will achieve a lesser reduction in Releases than another Control proposed in the Report, Chemours shall specify why it chose its selected Control over the proposed one(s) that might achieve greater reductions in Releases[.]

*Id.*

Thus, EPA's review of the pollution reduction aspect of the plan must consider "effectiveness," "technical feasibility," and "cost considerations." However, there is no standard as to how these factors are to be applied.

Perhaps the problem can be best illustrated by contrast. The Fayetteville Works CO required Chemours to submit a plan "to reduce PFAS contamination in the Cape Fear River and in the raw water intakes of downstream public water utilities." Fayetteville Works CO ¶ 12. But this requirement included two benchmarks. First, the plan was required to demonstrate "the maximum reductions in PFAS loading from the Facility to surface waters . . . that are economically and technologically feasible." *Id.* ¶ 12.a. Second, the Fayetteville Works CO placed the "burden . . . on Chemours to demonstrate that the concentrations of GenX" and another compound "cannot be reduced by at least 80% from baseline levels." *Id.* ¶ 12.d.

The proposed CD includes nothing of the kind. In marked contrast to the Fayetteville Works CO, the proposed CD would require EPA to merely "evaluate whether the proposed Response Plan will achieve further reductions." To determine "whether" the plan achieves this, EPA must consider three factors. However, there is nothing that flows from this determination. If the proposed Response Plan does not achieve further reductions, what then? And what if the Response Plan achieves only marginal reductions that provide no real environmental benefit? The proposed CD provides no answer to these questions.

Most concerning, however, is the reference to "cost considerations." Virtually any proposed control device or method will have a cost attached to it. From its very birth Chemours has maintained that it was unlawfully undercapitalized. *See, e.g.*, *Chemours Co. v. DowDuPont Inc.*, No. 2019-0351-SG, 2020 Del. Ch. LEXIS 112, at *18 (Ch. Mar. 30, 2020). It hardly taxes the imagination that Chemours may contend that, considering the costs associated with the proposed CD, virtually no further controls could be implemented based on "cost considerations." Again, what weight EPA should attach to cost considerations is not specified.

This rudderless planning process should gravely concern the Court. Any disagreement regarding the parameters of the response plan not resolved through dispute resolution would come to the Court for judicial review with the same absence of any standard to apply.

At bottom, this lack of any real standard would place little restriction on how Chemours and EPA may implement the program and would provide no assurance that these engineering evaluations and response plans would provide any benefit at all to the North Carolinians who have been affected by Chemours' toxic emissions and discharges.

What is more, every step of this process would occur without any input from the regulators with the most knowledge about the facility's operations. Appendices C and D pertain only to Fayetteville Works. It is remarkable that EPA would focus so much attention on a facility in North Carolina without involving North Carolina in a process that purports to benefit North Carolinians. Cooperative federalism does not exist without cooperation.

There is no provision in the proposed CD that would allow North Carolina regulators to provide input regarding which projects would be most effective at reducing emissions at Fayetteville Works. Indeed, even at the point of dispute resolution there would not even be a

requirement that North Carolina be notified of any disagreements or that any comments be solicited. The upshot is that a federal district court in West Virginia may be asked to rule on matters that solely concern Chemours' operations in North Carolina without anyone in North Carolina even being notified.

For these reasons, the proposed CD fails to further the public interest and lacks substantive fairness.

### C. There is no justification for expanding drinking water sampling and remediation in New Jersey, Ohio and West Virginia but not in North Carolina.

The proposed CD would provide for sampling of public and private water systems around the Chambers Works in New Jersey and the Washington Works in Ohio and West Virginia. Where that sampling indicates levels of certain PFAS above trigger levels, Chemours would be required to provide alternative drinking water to those systems. Inexplicably, the area surrounding Fayetteville Works in North Carolina has been left out of this program.

Appendix E of the proposed CD would define an area around each of Chambers Works and Washington Works. Proposed CD, Appx. E at attach. A & B. Within those areas, Chemours would be required to offer testing of the Source Water for Private Water Systems (which serve under 25 people and include private wells) and Public Water Systems (which are systems that provide piped drinking water). The sampling program would include all Public and Private Water Systems within these initially defined surrounding areas at each facility site (except public systems that were eligible for inclusion in the settlement of certain multi-district ligation having to do with PFAS-containing aqueous film-forming foam products). *Id.* at Appx. E ¶¶ 1–3. These predefined sampling areas would reach as far as thirty-five miles from the facility and could be extended—"step out"—further if sampling near the perimeter meets certain requirements. *Id.* at Appx. E ¶¶ 8–9.

Where test results show levels of certain PFAS in excess of trigger levels Chemours would be required to provide bottled water as an interim health protective measure. As a longer-term fix Chemours would be required to provide a connection to a Public Water System (if available) or site-specific treatment—either a granular activated carbon or reverse osmosis system. *Id.* at Appx. E, ¶ 17.

These programs are familiar to North Carolina because they are reminiscent of the replacement drinking water provisions in the Fayetteville Works CO. The Fayetteville Works CO requires Chemours to sample private wells impacted by the facility. Similar to the maps in the proposed CD that show the initial sampling areas around Chambers Works and Washington Works, *id*. at Appx E attach. A & B, the area surrounding Fayetteville Works has been divided into sectors that extend outward from the facility. A similar "step out" process applies in these sectors that allows the sampling area to grow as exceedances are found near the perimeter. And, as in the proposed CD, where any exceedances are found in the sampling area around Fayetteville Works, the locations are offered temporary and longer-term alternative drinking water options, which include public water hook-ups, and granular activated carbon and reverse osmosis systems.

Fayetteville Works CO ¶¶ 19–24; *see also* Parsons Corp., Drinking Water Compliance Plan (Apr. 2019) (Attachment 6).

Although the Fayetteville Works program shares some similarities with the programs proposed for Chambers Works and Washington Works, there are some key differences. The Fayetteville Works plan is limited to "any party (i.e., household, business, school, or public building) with a private drinking water well." Fayetteville Works CO ¶ 19. The proposed CD would cover private wells too, but it would also sweep in Public Water Systems and provide relief to users of such systems where sampling evidenced exceedances of the trigger amounts. Proposed CD, Appx. E ¶ 3.

The fact that these benefits are proposed to be provided to the public in New Jersey, Ohio and West Virginia but not to North Carolinians is arbitrary and insupportable. North Carolina already has a program by which Chemours is required to provide some of these benefits to some water users[12] but this hardly distinguishes Fayetteville Works from Chambers Works or Washington Works. The proposed CD itself acknowledges that around Washington Works some "Private Water Systems and Public Water Systems currently receiv[e] treatment" from Chemours pursuant to an Order on Consent between Chemours and the United States EPA. Proposed CD, Appx. E ¶ 15. The provision of alternative water under the Order on Consent is based on sampling data and requires Chemours to provide temporary and longer-term alternate water supply. *See* 1st Amend. to Order on Consent, *In re The Chemours Co. et al.*, EPA Docket Nos. SDWA-03-2009-0127-DS and SDWA-05-2009-0001 (EPA Reg. 5, Jan. 5, 2017) (Attachment 7). Chemours also operates a similar program of sampling and providing alternative water supplies around Chambers Works. *See* AECOM, Std. Op. Proc. for the Ongoing 2016 Residential Drinking-Water Well Surveying & PFAS Sampling Prog. (Dec. 1, 2020) (Attachment 8). Despite these pre-existing programs, the parties are seeking approval to initiate additional relief at these sites without ever explaining why the residents of North Carolina would be denied a similar remedy. EPA has essentially determined pursuant to this proposed consent decree that under federal law residents in New Jersey, Ohio and West Virginia are entitled to relief to which North Carolinians are not. To the extent EPA has determined that certain relief is required to ensure compliance with federal law, EPA should demand that relief in all relevant states to ensure that American citizens are guaranteed the same protections from the unlawful activity that EPA purports to address in this matter.

Consequently, the proposed CD would be arbitrary and irrational, substantively unfair, against the public interest, and fail to fairly charge the defendants with costs of the harm for which they are legally responsible.

---

[12] And to be sure, the Fayetteville Works CO contains some provisions that are far more protective than those included in the proposed CD in some respects. However, the existence of these features of the Fayetteville Works CO should not deprive North Carolinians of the benefits of the federal protections that EPA determines are necessary under federal law.

### D. The other mitigation requirements in the proposed CD provide no assurance of environmental benefits in North Carolina.

The proposed CD would require Chemours to fund "additional projects to further reduce their emissions and discharges of PFAS or provide alternative drinking water relief beyond that" required by the proposed CD. Proposed CD ¶ 24. This requirement suffers from several problems.

First, the proposed CD would provide almost no guidance regarding the uses of this mitigation money. Beyond the broad categories of reducing emissions and providing additional drinking water, there is no specificity about what projects might be acceptable. EPA's usual practice regarding mitigation funding in consent decrees appears to be to specify the project or projects that the defendant must undertake. *See, e.g.*, *United States v. Fayat S.A.S.*, No. 1:25-cv-120, 2025 EPA Consent LEXIS 1, ¶ 20 & Appx. A (D.D.C. Jan. 16, 2025) (requiring defendants to reduce air emissions of specific pollutants by removing qualifying diesel engines from service); *United States v. Va. Elec. & Power Co.*, No. 03-517A, 2003 EPA Consent LEXIS 190, Appx. C (E.D. Va. Apr. 21, 2003) (specifying several mitigation projects and indicating in which state each project must occur). In a minority of instances, the consent decree will spell out a menu of projects and allow the defendant some discretion regarding which projects proceed. *See, e.g.*, *United States v. Duke Energy Corp.*, No. 1:00 cv 1262, 2015 EPA Consent LEXIS 10, ¶ 70 & Appx. A (M.D.N.C. Sept. 15, 2015). The proposed CD does neither. Instead, it is entirely unclear what would occur, where it would occur, and what benefits those projects might achieve.

Second, the proposed CD provides no standard to guide EPA's determination of whether a project should proceed. EPA and the defendants must "confer . . . as to the costs, benefits, and overall length of time to complete each" project, "on whether the same or similar benefits could be obtained at lesser costs through other potential projects, and whether Chemours is already undertaking any proposed project other than under" the proposed CD. Proposed CD ¶ 24.2. However, when it comes to EPA making the determination, the proposed CD provides no guidance. This is particularly concerning given the proposed CD's lack of explicit direction to consider the benefits to the public who have been affected by the defendants' conduct.

Third, compounding this problem, the determination of project benefits would require no consideration of any input from the State in which the project is planned to occur. Nor can the affected State propose projects. Instead, this would be a closed process. This squarely contravenes EPA guidance regarding mitigation projects, which directs that in determining "whether there are any mitigation actions that can be suitably tailored to effectively address the harm caused by the violations," EPA "should consult with affected states whenever appropriate." Mem. from Susan Shinkman, Dir., Off. of Civil Enforcement, to Reg'l Counsels *et al.* at 6–7 (Nov. 14, 2012).[13] In order to maximize the odds that the money is spent to the greatest benefit, the parties should invite State participation in that process.

Fourth, although the proposed CD would allocate up to $90 million to be spent to address the impacts of the defendants' conduct in three states, the proposed CD would not require that a single cent of the fund be spent in any particular state. The proposed CD would specifically

[13] https://www.epa.gov/sites/default/files/2013-10/documents/2ndeditionsecuringmitigationmemo.pdf (visited July 29, 2026).

recognize that EPA alleged that the defendants own and operate the Fayetteville Works plant in North Carolina, that this facility released PFAS into the environment "in violation of applicable federal . . . law"; that there is evidence that exposure to some PFAS may be linked to harmful health effects in humans; and that releases from the facilities "have affected surface waters, and the drinking water of tens of thousands of people in the areas near the Facilities." Proposed CD pp 1–2. Yet, the proposed CD would allow the entirety of the $90 million mitigation fund to be spent to address Washington Works and/or Chambers Works, leaving nothing to further address the violations and harm alleged by EPA at Fayetteville Works in North Carolina.

Fifth, the proposed CD would allow the defendants a credit of up to 40% of the $90 million ($36 million) if the State of New Jersey, North Carolina or West Virginia "require[s] that Defendants undertake work that further reduces existing emissions or discharges of PFAS from the Facilities or provide drinking water relief beyond that set forth in [the proposed CD]." Proposed CD ¶ 24.*l*. By definition, anything that a State would "require" the defendants to do would be simply to assure that the defendants are complying with the law, including the Fayetteville Works CO. The defendants should not receive a break for complying with the law. Compliance with the law is the bare minimum that is expected from a regulated party. Allowing the defendants to benefit to the tune of $36 million for simply doing the bare minimum that they and every other entity in the same situation must do makes no sense and deprives the citizens affected by the defendants' unlawful conduct of further relief for no good reason.

Finally, the proposed CD is unclear whether Chemours is even required to spend $90 million (less the 40% discount). When ordering mitigation and specifying an amount to be spent, EPA's consent decrees normally indicate a minimum spend. For example, a decree may require that the defendant "shall spend no less than $ 13.9 million Project Dollars." *Va. Elec. & Power Co.*, 2003 EPA Consent LEXIS 190, ¶ 142. By contrast, the proposed CD would specify a maximum: "Funding for the projects will be capped at $90,000,000 . . . ." Proposed CD ¶ 24.a. The drafters may have intended to create a requirement that Chemours spend $90 million. Given the choice of words in the proposed CD, however, it certainly is open to the interpretation that Chemours may comply by spending something less—possibly far less—than $90 million.

For these reasons, the proposed CD would be substantively unfair, would be against the public interest, and would fail to make the defendants bear the cost of the harm for which they are legally responsible.

### E. The proposed CD would resolve well over two hundred Clean Water Act violations at Fayetteville Works in exchange for no benefit in North Carolina.

In the complaint, EPA's very first claim for relief is for discharges by Chemours from Fayetteville Works in North Carolina in violation of the CWA. Compl. ¶¶ 350–63. As support for this cause of action, EPA lists well over two hundred individual Clean Water Act violations by Chemours at Fayetteville Works alone. Compl., Appx. B tbl.1. Under the proposed CD, Chemours would "agree that the Complaint states claims upon which relief may be granted pursuant to the CWA[.]" Proposed CD ¶ 2. Unsurprisingly, the parties propose that the "Consent Decree resolves the civil claims of the United States . . . for the violations alleged in the Complaint filed in this action through the date of Lodging." *Id.* ¶ 68. Thus, by the proposed CD, the parties purport to

resolve all 200+ CWA violations in North Carolina. However, the proposed CD would require Chemours to do nothing in exchange for this release.

As discussed above, the proposed CD would require Chemours to achieve the 99.5% reduction of GenX Compounds, and to conduct engineering analyses and implement a response plan regarding HFPO and Carbooxohalide. All of these provisions implement TSCA, not the CWA. Chemours would also be required to spend up to $90 million on mitigation projects, none of which are required to occur in North Carolina. Thus, EPA's plan is to simply wipe the slate clean of over two hundred CWA violations in exchange for possibly no remedial requirements in North Carolina.

It is true that Chemours has agreed to pay a civil penalty of $22.5 million. Half that amount is owed to West Virginia to resolve state law claims. Therefore, $11.25 million would resolve all violations of federal law in North Carolina, New Jersey and West Virginia. Even regarding that amount, money collected by the United States as civil penalties is paid to the U.S. Treasury and is not earmarked to the affected areas. *A.T. Massey Coal*, 2008 U.S. Dist. LEXIS 108658, at *19.

Moreover, EPA fails to demonstrate that the amount of the civil penalty for violations in North Carolina is appropriate. The proposed CD explains that one of "[t]he factors considered in calculating the civil penalty include[d] . . . the Financial Information submitted by Defendants." Proposed CD ¶ 9.a. The "Financial Information [p]rovided by Chemours" is listed in Appendix A. It comprises six two-year "Budget Reviews," seven three-to-four year "Financial Projection Model[s]," and "2024 – 2028 Capital Expenditure Detail." None of this information is available for public scrutiny because the proposed CD announces that "[a]ll" of it is "subject to Fed. R. Evid. 408" and to Chemours' "claim[ ]" that it is "confidential business information" ("CBI"). Proposed CD, Appx. A.

The lack of transparency here prohibits interested parties from effectively evaluating the assertion in the proposed CD that the defendants "have a limited ability to pay the total civil penalty the United States could seek for the violations alleged in this case." *See* Proposed CD ¶ 9.a. At the very least the parties should submit the information to the Court for *in camera* review so the Court can be satisfied that this is an arm's length deal.[14]

Given these infirmities, the proposed CD would fail to adequately account for the strength of the plaintiff's case or require the party that is responsible for the harm to shoulder the burden of their unlawful and harmful conduct.

---

[14] Whether Rule 408 and CBI rules even apply is debatable. Rule 408 renders "not admissible" evidence of "a statement made during compromise negotiations about [a] claim" where the statement is used to "either to prove or disprove the validity or amount of a disputed claim." In this case, even assuming both parties' use of the Financial Information to justify the amount of the civil penalty is within the scope of the rule, the parties should not be permitted to rely on the Financial Information to support a judgment and at the same time refuse to disclose that information, particularly to the Court that they are asking to enter that judgment, but also to affected entities.

Regarding shielding the information as CBI, nowhere does EPA appear to agree that the Financial Information even is CBI. The proposed CD just recounts that the defendants' "claim[ ]" that it is CBI. The proposed CD does not reflect that EPA even considered whether the Chemours' claim to CBI protection is justified. Here again, the parties should not be permitted to request a judgment by the Court that is specifically based on important information that they are withholding from scrutiny by the Court and affected parties.

* * *

Should the United States seek to enter the proposed CD and the Court oblige, there is a very real risk that the federal government will have released claims for hundreds of violations arising out of the harm the defendants caused in North Carolina without having secured any meaningful relief for North Carolinians at all. If the federal government is serious about resolving 200+ CWA violations, and other violations under TSCA and RCRA regarding Fayetteville Works, it needs to do more than offer the residents of North Carolina some hope that maybe its proposed court-approved agreement may have some benefits in North Carolina. It needs to offer concrete, enforceable measures that will—not may—improve the lives of the North Carolinians who have been affected by years of reckless conduct at Fayetteville Works. Therefore, the State of North Carolina respectfully requests that the United States withdraw the proposed CD and work with Chemours and North Carolina to develop a proposal that equitably and substantially addresses the defendants' violations. The State and its agencies stand ready to provide further technical information to support those discussions or should the Court wish to review further information.

Sincerely,

Josh Stein
Governor

Jeff Jackson
Attorney General

D. Reid Wilson
Secretary
Dept. of Envtl. Quality

**Attachments**

1. Complaint, *State ex rel. Regan v. The Chemours Company FC, LLC*, No. 17 CVS 380 (N.C. Super. Ct., Bladen Cnty., Sept. 7, 2017).

2. Consent Order, *State ex rel. Regan v. The Chemours Company FC, LLC*, No. 17 CVS 380 (N.C. Super. Ct., Bladen Cnty., Feb. 25, 2026).

3. Addendum to Consent Order Paragraph 12, *State ex rel. Regan v. The Chemours Company FC, LLC*, No. 17 CVS 380 (N.C. Super. Ct., Bladen Cnty., Oct. 12, 2020).

4. Complaint, *State ex. rel. Jackson v. E.I. Dupont De Nemours & Co. et al.*, No. 20 CVS 5612 (N.C. Super. Ct., Cumberland Cnty., Oct. 13, 2020).

5. Letter from Sushma Masemore, Deputy Sec'y for Env't, NC DEQ, to EPA (July 20, 2026).

6. Parsons Corp., Drinking Water Compliance Plan (Apr. 2019).

7. First Amendment to Order on Consent, *In re The Chemours Co. et al.*, EPA Docket Nos. SDWA-03-2009-0127-DS and SDWA-05-2009-0001 (EPA Reg. 5, Jan. 5, 2017).

8. AECOM, Standard Operating Procedure for the Ongoing 2016 Residential Drinking-Water Well Surveying and PFAS Sampling Program (Dec. 1, 2020).